# 24-3262-cv(L), 24-3263-cv(XAP)

## United States Court of Appeals

### for the

### Second Circuit

NINO MARTINENKO, on behalf of herself and others similarly situated,

*Plaintiff-Counter-Defendant-Appellee,*

DAGMARA MAJA HUK,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

212 STEAKHOUSE, INC. and NIKOLAY VOLPER,

*Defendants-Counter-Claimants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX**
**Volume 1 of 2 (Pages A-1 to A-287)**

JEFFREY M. BENJAMIN
LINDEN LAW GROUP, P.C.
*Attorneys for Defendants-Counter-*
*Claimants-Appellants-Cross-*
*Appellees*
250 Park Avenue, 7th Floor
New York, New York 10017
(212) 537-6612

i

# TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Motion by Defendants to Decertify Rule 23 Class and Motion for Judgment as to Plaintiff's Count 5 of the Complaint ("Motion to Decertify"), filed November 16, 2023, with Proposed Order Attached thereto....................................................... | A-27 |
| Declaration of Jonathan W. Greenbaum, for Defendants, in Support of Motion to Decertify, filed November 16, 2023 ..................................... | A-31 |
| Exhibit 1 to Greenbaum Declaration - 212 Steakhouse Class List (Annotated)................. | A-34 |
| Exhibit 2 to Greenbaum Declaration - List of Recorded Hours........................................... | A-37 |
| Exhibit 3 to Greenbaum Declaration - Deposition Transcript of Nino Martinenko, Plaintiff, dated December 20, 2022 ...................... | A-39 |
| Exhibit 4 to Greenbaum Declaration - Notice of Proposed Class Action Settlement in *Mustafa Fteja v. Nusret New York LLC, et al.,* S.D.N.Y., 19-cv-429................................................ | A-128 |
| Exhibit 5 to Greenbaum Declaration - Deposition Transcript of Dagmara Huk, Non-Party Witness, dated December 20, 2022 .............. | A-140 |
| Declaration of Nikolay Volper, Defendant, in Support of Motion to Decertify, dated November 14, 2023 ............................................... | A-185 |

ii

**Page**

Exhibit 1 to Volper Declaration -
Class List ................................................................ A-190

Exhibit 2 to Volper Declaration -
212 Steakhouse Class List (Annotated)
(Reproduced herein at pp. A-35 – A-36)

Exhibit 3 to Volper Declaration -
Copies of Pay Stubs for Nino Martinenko for
Period of April 18, 2021 to December 19, 2021 .... A-196

Exhibit 4 to Volper Declaration -
List of Security Level Access ................................ A-223

Exhibit 5 to Volper Declaration -
List of Nino Martinenko's Access of the System
After Termination of Employment ........................ A-225

Exhibit 6 to Volper Declaration -
Copy of Labor Law Poster .................................... A-227

Declaration of Nikolay Volper, Defendant, in
Opposition to Motion for Summary Judgment,
dated December 20, 2023 ...................................... A-228.1

Declaration of Michael DiGiulio, for Plaintiff, in
Opposition to Motion to Decertify, dated
December 21, 2023 ................................................ A-229

Exhibit 1 to DiGiulio Declaration -
Deposition Transcript of Nikolay Volper,
Defendant, dated October 6, 2022 ........................ A-233

Exhibit 2 to DiGiulio Declaration -
Defendants' Responses and Objections to the
Plaintiff's First Request for the Production of
Documents to All Defendants, dated
July 12, 2022 ........................................................ A-288

iii

**Page**

Exhibit 3 to DiGiulio Declaration -
Eight Opt-Out Letters ............................................. A-301

Exhibit 4 to DiGiulio Declaration -
Copies of Envelopes ............................................... A-310

Exhibit 5 to DiGiulio Declaration -
Copies of Pay Stubs for Dagmara Huk and Nino
Martinenko Silva .................................................... A-318

Exhibit 6 to DiGiulio Declaration -
W-2 Form for Nino Martinenko Silva for Year
2021 ........................................................................ A-322

Declaration of Nino Matinenko, Plaintiff, in
Opposition to Motion to Decertify, dated
December 21, 2023 ................................................. A-324

Declaration of Dagmara Huk, Opt-In Plaintiff, in
Support of Plaintiff's Motion for Class
Certification, dated December 9, 2022 ................. A-326

Notice of Motion by Plaintiff and the Class for
Attorneys' Fees and Costs ("Motion for
Attorneys' Fees"), dated November 8, 2024.......... A-328

Declaration of Michael DiGiulio, for Plaintiffs, in
Support of Motion for Attorneys' Fees, dated
November 8, 2024 .................................................. A-329

Exhibit 1 to DiGiulio Declaration -
Class Counsel's Time Records.............................. A-336

Exhibit 2 to DiGiulio Declaration -
Copies of Invoices and Receipts........................... A-363

iv

**Page**

Exhibit 3 to DiGiulio Declaration -
Transcript of Fairness Hearing Teleconference in
*Orlando v. Liberty Ashes, Inc.*, No. 15 Civ. 9434
(S.D.N.Y. Sept. 4, 2020) ........................................ A-376

Exhibit 4 to DiGiulio Declaration -
Transcript of *Lola v. Skadden, Arps, Meagher,
Slate & Flom LLP*, No. 13-cv-5008 (S.D.N.Y.
Dec. 21, 2015)........................................................ A-392

Exhibit 5 to DiGiulio Declaration -
Transcript of *Zivkovic v. Laura Christy LLC*,
No. 17 Civ. 553 (S.D.N.Y. June 15, 2022).............. A-414

Exhibit 6 to DiGiulio Declaration -
Excerpts from the Wolters Kluwer 2021 Real
Estate Report............................................................ A-452

Opposition by Defendants to Motion for Attorneys'
Fees, filed November 22, 2024................................ A-479

Declaration of Denise A. Schulman, for Plaintiffs,
in Support of Motion for Attorneys' Fees, dated
December 5, 2024 .................................................... A-490

Exhibit 1 to Schulman Declaration -
Time Entries............................................................ A-494

Exhibit 2 to Schulman Declaration -
Supplemental Joseph Kirschenbaum LLP's
Time Entries............................................................ A-495

Opinion and Order of the Honorable Jennifer L
Rochon, dated September 24, 2024, Appealed
From........................................................................ A-496

Judgment of the United States District Court for the
Southern District of New York, dated September
25, 2024, Appealed From........................................ A-523

v

**Page**

Opinion and Order of the Honorable Jennifer L.
    Rochon, dated November 13, 2024, Appealed
    From....................................................... A-525

Judgment of the United States District Court for the
    Southern District of New York, dated November
    14, 2024, Appealed From...................................... A-534

Opinion and Order of the Honorable Jennifer L.
    Rochon, dated December 23, 2024, Appealed
    From....................................................... A-537

Notice of Appeal by Defendants, dated
    December 11, 2024.............................................. A-553

Notice of Cross-Appeal by Opt-In Plaintiff, dated
    December 12, 2024.............................................. A-555

Amended Notice of Appeal by Defendants, dated
    December 30, 2024.............................................. A-556

A-1

CLOSED,APPEAL,CASREF,ECF,MEDTFR9,MOTREF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00518-JLR-RWL

| | |
|---|---|
| Martinenko v. 212 Steakhouse Inc. et al | Date Filed: 01/20/2022 |
| Assigned to: Judge Jennifer L. Rochon | Date Terminated: 11/14/2024 |
| Referred to: Magistrate Judge Robert W. Lehrburger | Jury Demand: Defendant |
| Cause: 29:201 Fair Labor Standards Act | Nature of Suit: 710 Labor: Fair Standards |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Nino Martinenko**
*on behalf of herself and others similarly
situated*

represented by **Denise Andrea Schulman**
Joseph & Kirschenbaum LLP
32 Broadway, Suite 601
New York, NY 10004
212-688-5640
Email: denise@jhllp.com
*ATTORNEY TO BE NOTICED*

**Michael Digiulio**
Joseph & Kirschenbaum LLP
32 Broadway
Suite 601
New York, NY 10004
212-688-5640
Fax: 212-981-9587
Email: mike@jk-llp.com
*ATTORNEY TO BE NOTICED*

**Daniel Maimon Kirschenbaum**
Joseph, Herzfeld, Hester, & Kirschenbaum
233 Broadway, 5th Floor
New York, NY 10017
(212)688-5640x2548
Fax: (212)688-5639
Email: maimon@jhllp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dagmara Maja Huk**

represented by **Denise Andrea Schulman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Digiulio**
(See above for address)
*ATTORNEY TO BE NOTICED*

A-2

V.

**Defendant**

**Nikolay Volper**                              represented by **Jonathan Wolfe Greenbaum**
                                                Coburn & Coffman, PLLC
                                                1244 19th Street, N.W.
                                                Washington, DC 20036
                                                (202) 657-5006
                                                Fax: (866) 561-9712
                                                Email: jg@coburngreenbaum.com
                                                *ATTORNEY TO BE NOTICED*

                                                **Mitchell S. Segal**
                                                Law Office of Mitchell S. Segal P.C.
                                                1129 Northern Boulevard
                                                Suite 404
                                                Manhasset, NY 11030
                                                516-415-0100
                                                Email: msegal@segallegal.com
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**212 Steakhouse Inc.**                         represented by **Jonathan Wolfe Greenbaum**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Mitchell S. Segal**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Natalie Nehls**
                                                Coburn & Greenbaum, PLLC
                                                1710 Rhode Island Ave, NW
                                                2nd Floor
                                                Washington, DC 20036
                                                325-262-3744
                                                Email: natalie@coburngreenbaum.com
                                                *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Nikolay Volper**                              represented by **Mitchell S. Segal**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**212 Steakhouse Inc.**                         represented by **Mitchell S. Segal**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

V.

A-3

**Counter Defendant**

**Nino Martinenko**
*on behalf of herself and others similarly*
*situated*

represented by **Denise Andrea Schulman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Maimon Kirschenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/20/2022 | 1 | COMPLAINT against 212 Steakhouse Inc., Nikolay Volper. (Filing Fee $ 402.00, Receipt Number ANYSDC-25610557)Document filed by Nino Martinenko..(Kirschenbaum, Daniel) (Entered: 01/20/2022) |
| 01/20/2022 | 2 | CIVIL COVER SHEET filed..(Kirschenbaum, Daniel) (Entered: 01/20/2022) |
| 01/20/2022 | 3 | **FILING ERROR - DEFICIENT - SUMMONS REQUEST -** REQUEST FOR ISSUANCE OF SUMMONS as to 212 Steakhouse Inc and Nikolay Volper, re: 1 Complaint. Document filed by Nino Martinenko..(Kirschenbaum, Daniel) Modified on 1/21/2022 (vf). (Entered: 01/20/2022) |
| 01/20/2022 | 4 | NOTICE OF APPEARANCE by Daniel Maimon Kirschenbaum on behalf of Nino Martinenko..(Kirschenbaum, Daniel) (Entered: 01/20/2022) |
| 01/20/2022 | 5 | CONSENT TO SUE UNDER THE F.L.S.A.. Document filed by Nino Martinenko.. (Kirschenbaum, Daniel) (Entered: 01/20/2022) |
| 01/21/2022 | 6 | NOTICE OF APPEARANCE by Denise Andrea Schulman on behalf of Nino Martinenko..(Schulman, Denise) (Entered: 01/21/2022) |
| 01/21/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Daniel Maimon Kirschenbaum. The party information for the following party/parties has been modified: Nino Martinenko. The information for the party/parties has been modified for the following reason/reasons: party text was omitted. (vf)** (Entered: 01/21/2022) |
| 01/21/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lewis J. Liman. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 01/21/2022) |
| 01/21/2022 | | Magistrate Judge Robert W. Lehrburger is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 01/21/2022) |
| 01/21/2022 | | Case Designated ECF. (vf) (Entered: 01/21/2022) |
| 01/21/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Daniel Maimon Kirschenbaum to RE-FILE Document No. 3 Request for Issuance of Summons. The filing is deficient for the following reason(s): Plaintiff party name error on summons caption. Party** |

A-4

| | | |
|---|---|---|
| | | **name spelling does not correspond to pleading caption. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (vf)** (Entered: 01/21/2022) |
| 01/21/2022 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to 212 Steakhouse Inc and Nikolay Volper, re: 1 Complaint. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 01/21/2022) |
| 01/21/2022 | 8 | ELECTRONIC SUMMONS ISSUED as to 212 Steakhouse Inc., Nikolay Volper. (vf) (Entered: 01/21/2022) |
| 02/02/2022 | 9 | AFFIDAVIT OF SERVICE. 212 Steakhouse Inc. served on 1/28/2022, answer due 2/18/2022. Service was accepted by Andrez Pizarro. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 02/02/2022) |
| 02/02/2022 | 10 | AFFIDAVIT OF SERVICE. Nikolay Volper served on 1/28/2022, answer due 2/18/2022. Service was accepted by Andrez Pizarro - coworker. Service was made by Mail. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 02/02/2022) |
| 02/27/2022 | 11 | NOTICE OF APPEARANCE by Mitchell S. Segal on behalf of 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 02/27/2022) |
| 02/27/2022 | 12 | FIRST LETTER MOTION for Extension of Time to File addressed to Judge Lewis J. Liman from Mitchell Segal, Esq. dated February 27, 2022. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 02/27/2022) |
| 02/28/2022 | 13 | ORDER granting 12 Letter Motion for Extension of Time to File (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 02/28/2022) |
| 03/17/2022 | 14 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Parties are directed to dial into the Court's teleconference number at 888-251-2909, Access Code 2123101, and follow the necessary prompts. Initial Conference set for 4/6/2022 at 12:00 PM before Judge Lewis J. Liman. (Signed by Judge Lewis J. Liman on 3/17/2022) (tg) (Entered: 03/17/2022) |
| 03/28/2022 | 15 | FIRST RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 03/28/2022) |
| 03/28/2022 | 16 | NOTICE OF APPEARANCE by Mitchell S. Segal on behalf of 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 03/28/2022) |
| 03/28/2022 | 17 | ANSWER to 1 Complaint with JURY DEMAND., COUNTERCLAIM against Nino Martinenko. Document filed by Nikolay Volper, 212 Steakhouse Inc...(Segal, Mitchell) (Entered: 03/28/2022) |
| 03/30/2022 | 18 | PROPOSED CASE MANAGEMENT PLAN. Document filed by Nino Martinenko.. (Schulman, Denise) (Entered: 03/30/2022) |
| 04/04/2022 | 19 | MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b)*. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 04/04/2022) |
| 04/04/2022 | 20 | MEMORANDUM OF LAW in Support re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b)*. . Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 04/04/2022) |
| 04/04/2022 | 21 | DECLARATION of Denise A. Schulman in Support re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b)*.. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - proposed notice, # 2 Exhibit Ex 2 - proposed text notice).(Schulman, Denise) (Entered: 04/04/2022) |

| 04/04/2022 | 22 | DECLARATION of Nino Martinenko in Support re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b)..* Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - paystubs, # 2 Exhibit Ex 2 - paystubs).(Schulman, Denise) (Entered: 04/04/2022) |
|---|---|---|
| 04/06/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Initial Pretrial Conference held on 4/6/2022 by Telephone Conference. Denise Schulman present by telephone for Plaintiff. Mitchell Segal present by telephone for Defendants. Case management plan approved. Defendants' to amend counterclaims by May 4, 2022. Defendants' opposition to conditional certification due by April 18, 2022. Post-Discovery Status Conference set for January 3, 2023 at 2:00PM before Judge Lewis J. Liman. (mf) (Entered: 04/15/2022) |
| 04/11/2022 | 23 | LETTER addressed to Judge Lewis J. Liman from Denise A. Schulman dated April 11, 2022 re: briefing schedule. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 04/11/2022) |
| 04/11/2022 | 24 | MEMO ENDORSEMENT on re: 23 Letter filed by Nino Martinenko. ENDORSEMENT: Plaintiff should make her motion to dismiss on April 18, 2022 unless she is able to reach an agreement with Defendants otherwise. SO ORDERED. ( Motions due by 4/18/2022.) (Signed by Judge Lewis J. Liman on 4/11/2022) (va) (Entered: 04/12/2022) |
| 04/12/2022 | 25 | LETTER addressed to Judge Lewis J. Liman from Denise A. Schulman dated April 12, 2022 re: briefing schedule. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 04/12/2022) |
| 04/15/2022 | 26 | CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedingsbefore a United States Magistrate Judge, including motions and trial. Any motion to amend or to join additional parties shall be filed no later than 5/6/2022. Fact Discovery due by 10/6/2022. Depositions shall be completed by 10/6/2022. Expert Discovery due by 11/21/2022. Deposition due by 11/21/2022. Discovery due by 12/21/2022. Status Conference set for 1/3/2023 at 02:00 PM before Judge Lewis J. Liman. Motions due by 1/9/2023. This case is to be tried to a jury. The parties have conferred and present best estimate of the length of trial is 4 days. (Signed by Judge Lewis J. Liman on 4/15/2022) (va) (Entered: 04/15/2022) |
| 04/18/2022 | 27 | FIRST MEMORANDUM OF LAW in Opposition re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b).* . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 04/18/2022) |
| 04/21/2022 | 28 | REPLY MEMORANDUM OF LAW in Support re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b).* . Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 04/21/2022) |
| 04/21/2022 | 29 | DECLARATION of Denise A. Schulman in Support re: 19 MOTION to Certify Class *FLSA collective pursuant to 29 USC 216(b)..* Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2).(Schulman, Denise) (Entered: 04/21/2022) |
| 04/26/2022 | 30 | MEMORANDUM AND ORDER granting 19 Motion to Certify Class. For the reasons stated, the motion for conditional certification of this action under Section 216(b) is GRANTED, and Plaintiff is authorized to disseminate notice consistent with this Memorandum and Order. Defendants shall provide the requested discovery within seven (7) days of the date of this Memorandum and Order, and Plaintiff shall disseminate notice within fourteen (14) days of the date of this Memorandum and Order. Plaintiff's counsel is ORDERED to file on ECF copies (in redacted form if necessary) of any consents to join |

A-6

| | | |
|---|---|---|
| | | the FLSA action. The Clerk of Court is respectfully directed to close Dkt. No. 19. SO ORDERED. (Signed by Judge Lewis J. Liman on 4/26/2022) (va) (Entered: 04/26/2022) |
| 04/30/2022 | 31 | AMENDED ANSWER to with JURY DEMAND. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 04/30/2022) |
| 05/19/2022 | 32 | CONSENT TO SUE UNDER THE F.L.S.A.. Document filed by Dagmara Maja Huk.. (Schulman, Denise) (Entered: 05/19/2022) |
| 05/26/2022 | 33 | LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Lewis J. Liman from Denise A. Schulman dated May 26, 2022. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - proposed case management plan). (Schulman, Denise) (Entered: 05/26/2022) |
| 05/27/2022 | 34 | ORDER granting 33 Letter Motion for Extension of Time to Complete Discovery.The requested extension is granted, and the proposed revised Case Management Plan will be entered. By June 1, 2022, Defendants are ordered to file a letter in response to Plaintiff's request that the Court set a deadline for Defendants to respond to Plaintiff's discovery requests. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (kc) (Entered: 05/27/2022) |
| 05/27/2022 | 35 | AMENDED CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a United States Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). Motions due by 4/4/2023. Depositions shall be completed by 1 6/2023. Expert Deposition due by 2/20/2023. Fact Discovery due by 1/6/2023. Expert Discovery due by 2/20/2023. Discovery due by 3/21/2023. Post-Discovery Status Conference set for 3/23/2023 at 11:00 AM before Judge Lewis J. Liman. This case is to be tried to a jury. The parties have conferred and their present best estimate of the length of trial is 4 days. (Signed by Judge Lewis J. Liman on 5/27/2022) (mml) Modified on 6/1/2022 (mml). (Entered: 05/27/2022) |
| 06/13/2022 | 36 | LETTER MOTION for Discovery addressed to Judge Lewis J. Liman from Denise A. Schulman dated June 13, 2022. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 06/13/2022) |
| 06/13/2022 | 37 | ORDER granting 36 Letter Motion for Discovery. Defendants shall respond to Plaintiff's document requests and produce all responsive documents by June 27, 2022. The proposed amended case management plan is approved. The parties shall submit the post-discovery letter referred to in that order by March 21, 2023; that letter shall also request a post-discovery conference. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 06/13/2022) |
| 06/30/2022 | 38 | LETTER MOTION for Discovery *for discovery sanctions and to compel discovery* addressed to Judge Lewis J. Liman from Denise A. Schulman dated June 30, 2022. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Exhibit 1 - discovery requests, # 2 Exhibit Exhibit 2 - email correspondence).(Schulman, Denise) (Entered: 06/30/2022) |
| 06/30/2022 | 39 | ORDER taking under advisement 38 Motion for Discovery. Defendant to respond by 5:00 p.m. on July 5, 2005, and to show cause why sanctions should not be imposed. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 06/30/2022) |
| 07/05/2022 | 40 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis J. Liman from Mitchell Segal, Esq. dated 7/05/2022 re: 38 LETTER MOTION for Discovery *for discovery sanctions and to compel discovery* addressed to Judge Lewis J. Liman from Denise A. Schulman dated June 30, 2022. . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 07/05/2022) |

A-7

| 07/05/2022 | 41 | ORDER granting in part and denying in part <u>38</u> Letter Motion for Discovery. Defendants are ordered to produce all responsive documents on or before July 15, 2022. All objections to the document request are deemed waived by virtue of Defendants' failure to respond to the request in the time period permitted by the Rules and by this Court's Order. Parties are to jointly report on July 18, 2022, whether the document request has been complied with. The motion for sanctions is denied, save that after July 15, 2022, Plaintiff may move for its reasonable expenses in making this motion. See Fed. R. Civ. P. 37(a)(5). (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 07/05/2022) |
|---|---|---|
| 07/18/2022 | 42 | NOTICE OF APPEARANCE by Michael Digiulio on behalf of Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 07/18/2022) |
| 07/18/2022 | 43 | STATUS REPORT. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # <u>1</u> Exhibit 1 - Interrogatories, # <u>2</u> Exhibit 2 - Requests for Production). (Digiulio, Michael) (Entered: 07/18/2022) |
| 07/18/2022 | 44 | STATUS REPORT. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 07/18/2022) |
| 07/19/2022 | 45 | LETTER addressed to Judge Lewis J. Liman from Denise A. Schulman dated July 19, 2022 re: Defendants' July 18, 2022 letter. Document filed by Nino Martinenko.. (Schulman, Denise) (Entered: 07/19/2022) |
| 07/19/2022 | | ORDER: The Court will hold a Telephone Conference to address the discovery dispute in this matter on July 22, 2022 at 10:00AM. Parties are directed to dial into the Court's teleconference line at 888-251-2909 and use access code 2123101. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (mf) (Entered: 07/19/2022) |
| 07/19/2022 | | Set/Reset Hearings: Telephone Conference set for 7/22/2022 at 10:00 AM before Judge Lewis J. Liman. (mf) (Entered: 07/19/2022) |
| 07/22/2022 | 46 | ORDER re: <u>43</u> Status Report filed by Nino Martinenko, Dagmara Maja Huk. The discovery dispute raised by Plaintiff at Dkt. No. 43 was resolved at the conference held today in this matter. Plaintiff may move after August 5, 2022 for sanctions as discussed at the conference and attorneys fees as the Court indicated in its July 5, 2022 Order at Dkt. No. 41. (HEREBY ORDERED by Judge Lewis J. Liman) (Text Only Order) (kc) (Entered: 07/22/2022) |
| 07/22/2022 | | Minute Entry for proceedings held before Judge Lewis J. Liman: Telephone Conference held on 7/22/2022 in re: discovery dispute. Denise Schulman and Michael Digiulio present by telephone for Plaintiffs. Mitchell Segal present by telephone for Defendants. Court reporter present. (mf) (Entered: 07/25/2022) |
| 08/12/2022 | 47 | TRANSCRIPT of Proceedings re: CONFERNECE held on 7/22/2022 before Judge Lewis J. Liman. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/2/2022. Redacted Transcript Deadline set for 9/12/2022. Release of Transcript Restriction set for 11/10/2022..(McGuirk, Kelly) (Entered: 08/12/2022) |
| 08/12/2022 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 7/22/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically |

A-8

| | | |
|---|---|---|
| | | available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 08/12/2022) |
| 08/31/2022 | 49 | LETTER addressed to Judge Lewis J. Liman from Denise A. Schulman dated August 31, 2022 Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 08/31/2022) |
| 08/31/2022 | 50 | MEMO ENDORSEMENT: on re: 49 Letter filed by Nino Martinenko. ENDORSEMENT: The proposed briefing schedule is approved. SO ORDERED. (Signed by Judge Lewis J. Liman on 8/31/2022) (ama) (Entered: 08/31/2022) |
| 09/22/2022 | 51 | LETTER MOTION to Compel Defendant 212 Steakhouse, Inc. to Appear for Deposition addressed to Judge Lewis J. Liman from Michael DiGiulio dated September 22, 2022. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit A - Deposition Notice).(Digiulio, Michael) (Entered: 09/22/2022) |
| 09/22/2022 | 52 | ORDER taking under advisement 51 Motion to Compel. Defendant to respond by 5:00 p.m. on September 23, 2022, selecting one of the two dates offered by Plaintiff. Plaintiff may move for sanctions at the same time as it moves for the other discovery-related sanctions. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 09/22/2022) |
| 09/23/2022 | 53 | LETTER RESPONSE to Motion addressed to Judge Lewis J. Liman from Mitchell Segal dated 9/23/2022 re: 51 LETTER MOTION to Compel Defendant 212 Steakhouse, Inc. to Appear for Deposition addressed to Judge Lewis J. Liman from Michael DiGiulio dated September 22, 2022. . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 09/23/2022) |
| 09/23/2022 | 54 | ORDER granting 51 Letter Motion to Compel. As agreed, Nikolay Volper shall be made available for deposition on October 6, 2022 at 10:00 a.m. (HEREBY ORDERED by Judge Lewis J. Liman)(Text Only Order) (Liman, Lewis) (Entered: 09/23/2022) |
| 09/26/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Jennifer L. Rochon. Judge Lewis J. Liman is no longer assigned to the case. (nb) (Entered: 09/26/2022) |
| 09/27/2022 | 55 | NOTICE OF REASSIGNMENT This case has been reassigned to the undersigned. All counsel must familiarize themselves with the Court's Individual Rules, which are available at https://nysd.uscourts.gov/hon-jennifer-1-rochon. Unless and until the Court orders otherwise, all prior orders, dates, and deadlines shall remain in effect notwithstanding the case's reassignment. Any conference or oral argument before or directed by the Magistrate Judge will proceed as ordered. However, all previously-scheduled appearances or conferences before the District Judge are hereby adjourned pending further notice from the Court. Additionally, within two weeks of the filing of this Order, the parties are hereby ORDERED to file on ECF a joint letter updating the Court on the status of the case. The joint letter shall not exceed four (4) pages. If this case has been settled or otherwise terminated, counsel need not submit such letter or appear, provided that a stipulation of discontinuance, voluntary dismissal, or other proof of termination is filed on the docket prior to the joint letter submission deadline, using the appropriate ECF Filing Event. See SDNY ECF Rules & Instructions§§ 13.17-13.19, available at http://nysd.uscourts.gov/ecf filing.php. Requests for extensions or adjournment of dates not affected by this Order may be made only in accordance with the Court's Individual Rules and Practices, which are available at https://nysd.uscourts.gov/hon-jennifer-1-rochon. (And as further set forth herein.) SO ORDERED. (Signed by Judge Jennifer L. Rochon on 9/27/2022) (jca) (Entered: 09/27/2022) |
| 10/11/2022 | 56 | STATUS REPORT. Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 10/11/2022) |

A-9

| 10/24/2022 | 57 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement). Referred to Magistrate Judge Robert W. Lehrburger. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 10/24/2022) (jca) (Entered: 10/24/2022) |
|---|---|---|
| 10/24/2022 | 58 | ORDER: The Court has reviewed the parties' joint letter. ECF No. 56. The parties report an interest in conducting mediation at the close of fact discovery. Id. Accordingly, it is hereby ORDERED that this case, involving claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., is referred for mediation to the Court-annexed Mediation Program for mediation at or around the close of fact discovery. The parties are notified that Local Rule 83.9 shall govern the mediation and are directed to participate in the mediation in good faith. The mediation will have no effect upon any scheduling Order issued by this Court without leave of this Court. By separate order today, the Court will refer this case to the designated Magistrate Judge for General Pretrial Purposes, including settlement. SO ORDERED. Please reference the following when corresponding with the Mediation Office. E-mail MediationOffice@nysd.uscourts.gov, telephone (212) 805-0643, and facsimile (212) 805-0647. Mediator to be Assigned by 11/7/2022. (Signed by Judge Jennifer L. Rochon on 10/24/2022) (jca) (Entered: 10/24/2022) |
| 10/24/2022 | 59 | LETTER MOTION for Leave to File Sanctions Motion addressed to Magistrate Judge Robert W. Lehrburger from Michael DiGiulio dated October 24, 2022. Document filed by Nino Martinenko..(Digiulio, Michael) (Entered: 10/24/2022) |
| 10/25/2022 | 60 | ORDER granting 59 Letter Motion for Leave to File Document. A pre-motion letter for the sanctions motion authorized by Judge Liman is not necessary. However, the Court encourages Plaintiffs to keep the motion short. The motion shall be filed by November 1, 2022. Defendants shall file their opposition by November 15, 2022. Plaintiffs shall file a reply, if any, by November 22, 2022. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 10/25/2022) (mml) (Entered: 10/25/2022) |
| 10/25/2022 | | Set/Reset Deadlines: Motions due by 11/1/2022. Responses due by 11/15/2022 Replies due by 11/22/2022. (mml) (Entered: 10/25/2022) |
| 11/01/2022 | 61 | MOTION for Sanctions . Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 11/01/2022) |
| 11/01/2022 | 62 | MEMORANDUM OF LAW in Support re: 61 MOTION for Sanctions . . Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 11/01/2022) |
| 11/01/2022 | 63 | DECLARATION of Denise A. Schulman in Support re: 61 MOTION for Sanctions .. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - collective list, # 2 Exhibit Ex. 2 - Plaintiff's document requests, # 3 Exhibit Ex. 3 - Plaintiff's interrogatories, # 4 Exhibit Ex. 4 - 7/22/22 conference transcript, # 5 Exhibit Ex. 5 - deposition notice, # 6 Exhibit Ex. 6 - Veritext invoice, # 7 Exhibit Ex. 7 - deposition excerpts, # 8 Exhibit Ex. 8 - weekly tip sheets, # 9 Exhibit Ex. 9 - daily tip sheets, # 10 Exhibit Ex. 10 - check images, # 11 Exhibit Ex. 11 - paystubs, # 12 Exhibit Ex. 12 - time records, # 13 Exhibit Ex. 13 - class list, # 14 Exhibit Ex. 14 - Defendants' document responses, # 15 Exhibit Ex. 15 - Plaintiff's counsel's time records, # 16 Exhibit Ex. 16 - hearing transcript, # 17 Exhibit Ex. 17 - hearing transcript, # 18 Exhibit Ex. 18 - hearing transcript, # 19 Exhibit Ex. 19 - Wolters Kluwer report excerpts).(Schulman, Denise) (Entered: 11/01/2022) |
| 11/01/2022 | 64 | DECLARATION of Nino Martinenko in Support re: 61 MOTION for Sanctions .. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex. 1 - tip sheets, # 2 Exhibit Ex. 2 - tip sheets, # 3 Exhibit Ex. 3 - paystubs, # 4 Exhibit Ex. 4 - pay records, # 5 Exhibit Ex. 5 - pay records).(Schulman, Denise) (Entered: 11/01/2022) |

| 11/15/2022 | 65 | MEMORANDUM OF LAW in Opposition re: 61 MOTION for Sanctions . . Document filed by 212 Steakhouse Inc., Nikolay Volper. (Attachments: # 1 Affidavit Opposition). (Segal, Mitchell) (Entered: 11/15/2022) |
|---|---|---|
| 11/16/2022 | 66 | SECOND MEMORANDUM OF LAW in Opposition re: 61 MOTION for Sanctions . . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 11/16/2022) |
| 11/16/2022 | 67 | THIRD MEMORANDUM OF LAW in Opposition re: 61 MOTION for Sanctions . . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 11/16/2022) |
| 11/22/2022 | 68 | REPLY MEMORANDUM OF LAW in Support re: 61 MOTION for Sanctions . . Document filed by Nino Martinenko..(Digiulio, Michael) (Entered: 11/22/2022) |
| 11/22/2022 | 69 | DECLARATION of Denise A. Schulman in Support re: 61 MOTION for Sanctions .. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit 1).(Digiulio, Michael) (Entered: 11/22/2022) |
| 12/09/2022 | 70 | MOTION to Certify Class . Document filed by Dagmara Maja Huk, Nino Martinenko.. (Digiulio, Michael) (Entered: 12/09/2022) |
| 12/09/2022 | 71 | MEMORANDUM OF LAW in Support re: 70 MOTION to Certify Class . . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 12/09/2022) |
| 12/09/2022 | 72 | DECLARATION of Michael DiGiulio in Support re: 70 MOTION to Certify Class .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10).(Digiulio, Michael) (Entered: 12/09/2022) |
| 12/09/2022 | 73 | DECLARATION of Nino Martinenko in Support re: 70 MOTION to Certify Class .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Digiulio, Michael) (Entered: 12/09/2022) |
| 12/09/2022 | 74 | DECLARATION of Dagmara Huk in Support re: 70 MOTION to Certify Class .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1). (Digiulio, Michael) (Entered: 12/09/2022) |
| 12/23/2022 | 75 | FIRST MEMORANDUM OF LAW in Opposition re: 70 MOTION to Certify Class . . Document filed by 212 Steakhouse Inc., Nikolay Volper. (Attachments: # 1 Exhibit Declaration).(Segal, Mitchell) (Entered: 12/23/2022) |
| 12/27/2022 | 76 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated December 27, 2022. Document filed by Dagmara Maja Huk, Nino Martinenko..(Schulman, Denise) (Entered: 12/27/2022) |
| 12/28/2022 | 77 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement) and Dispositive Motion (i.e., motion requiring a Report and Recommendation). Referred to Magistrate Judge Robert W. Lehrburger. Motions 70, 76 referred to Robert W. Lehrburger. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 12/28/2022) (vfr) (Entered: 12/28/2022) |
| 12/28/2022 | | MOTIONS REFERRED: 70 MOTION to Certify Class ., 76 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated December 27, 2022. Motions referred to Robert W. Lehrburger. (vfr) (Entered: 12/28/2022) |

| 12/28/2022 | 78 | ORDER granting 76 Letter Motion for Extension of Time to File Response/Reply re 76 LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated December 27, 2022. Granted. SO ORDERED. Replies due by 1/9/2023.. (Signed by Magistrate Judge Robert W. Lehrburger on 12/28/2022) (kv) (Entered: 12/28/2022) |
|---|---|---|
| 01/04/2023 | 79 | REPLY MEMORANDUM OF LAW in Support re: 70 MOTION to Certify Class . . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 01/04/2023) |
| 03/16/2023 | 80 | ORDER: The Court will hold a hearing on Plaintiff's motion for sanctions on April 4, 2023, at 2:30 p.m. in Courtroom 18D, 500 Pearl Street, New York, N.Y. 10007 before Magistrate Judge Robert W. Lehrburger. Parties are instructed to review and adhere to Judge Lehrburger's individual rules and practices. (HEREBY ORDERED by Magistrate Judge Robert W. Lehrburger) (Text Only Order). (rsh) (Entered: 03/16/2023) |
| 03/16/2023 |  | Set/Reset Hearings: Motion for Sanctions Conference set for 4/4/2023 at 02:30 PM in Courtroom 18D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Robert W. Lehrburger. (rsh) (Entered: 03/16/2023) |
| 03/27/2023 | 81 | FIRST LETTER MOTION for Conference addressed to Magistrate Judge Robert W. Lehrburger from Mitchell Segal, Esq. dated 03/27/2023. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Segal, Mitchell) (Entered: 03/27/2023) |
| 03/28/2023 | 82 | ORDER terminating 81 Letter Motion for Conference re: 81 FIRST LETTER MOTION for Conference addressed to Magistrate Judge Robert W. Lehrburger from Mitchell Segal, Esq. dated 03/27/2023. The Court will not provide legal advice. Counsel should adhere to this Court's individual rules of practice, which includes provisions regarding filing under seal. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 3/28/2023) (tg) (Entered: 03/28/2023) |
| 04/03/2023 | 83 | NOTICE: The April 4, 2023 conference on Motion for Sanctions will begin at 3:30 p.m. in Courtroom 18 D. Please note this is a time change. (Entered: 04/03/2023) |
| 04/03/2023 | 84 | FIRST LETTER MOTION for Conference *Pre Motion Conference to Disqualify and Sanctions* addressed to Magistrate Judge Robert W. Lehrburger from Mitchell Segal, Esq. dated April 3, 2023. Document filed by 212 Steakhouse Inc., Nikolay Volper. (Attachments: # 1 Exhibit Text Message, # 2 Exhibit Affidavits, # 3 Exhibit Deposition - Hug).(Segal, Mitchell) (Entered: 04/03/2023) |
| 04/03/2023 | 85 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated April 3, 2023 re: 84 FIRST LETTER MOTION for Conference *Pre Motion Conference to Disqualify and Sanctions* addressed to Magistrate Judge Robert W. Lehrburger from Mitchell Segal, Esq. dated April 3, 2023. . Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - conditional collective certification order).(Schulman, Denise) (Entered: 04/03/2023) |
| 04/04/2023 | 86 | ORDER denying 84 Letter Motion for Conference re: 84 FIRST LETTER MOTION for Conference *Pre Motion Conference to Disqualify and Sanctions* addressed to Magistrate Judge Robert W. Lehrburger from Mitchell Segal, Esq. dated April 3, 2023. As discussed during the hearing held on April 4, 2023, Defendants' letter motion at Dkt. 84 regarding disqualification of Plaintiff's counsel and imposing sanctions is DENIED. The text communication, and the communication with Huk, both were authorized pursuant to the Court's earlier order granting conditional certification of the collective and approving notice by text and other means. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 4/4/2023) (tg) (Entered: 04/04/2023) |

| | | |
|---|---|---|
| 04/04/2023 | | Minute Entry for proceedings held before Magistrate Judge Robert W. Lehrburger: Motion for Sanctions Conference held on 4/4/2023 t 4:00 p.m. (rsh) (Entered: 04/06/2023) |
| 04/12/2023 | 87 | REPORT AND RECOMMENDATION TO HON. JENNIFER L. ROCHON: CLASS CERTIFICATION re: 70 MOTION to Certify Class . filed by Nino Martinenko, Dagmara Maja Huk. For the foregoing reasons, I recommend that Plaintiff's motion for class certification be GRANTED and that: (1) a class be certified and defined as follows: "all tipped employees - servers, runners, bussers, and bartenders - who worked for Defendants at any time on or after January 20, 2016 at 212 Steakhouse"; (2) Plaintiffs Nino Martinenko and Dagmara Huk be appointed class representatives; (3) Joseph & Kirschenbaum LLP be appointed Class Counsel; (4) Defendants be required to produce a complete class list to the extent they are in possession, custody, or control of information to compile that list; and (5) The class notice presented as Exhibit 1 to the DiGiulio Declaration be approved and authorized to issue. To the extent not addressed above, the Court has considered Defendants' arguments and finds them to be without merit. Objections to R&R due by 4/26/2023 (Signed by Magistrate Judge Robert W. Lehrburger on 4/12/2023) (tg) (Entered: 04/12/2023) |
| 04/12/2023 | 88 | REPORT AND RECOMMENDATION TO HON. JENNIFER L. ROCHON: MOTION FOR SANCTIONS re: 61 MOTION for Sanctions . filed by Nino Martinenko. For the foregoing reasons, I recommend that to redress Defendants' various violations of discovery obligations and orders: (1) The Court deem established the following facts: (i) 212's gross annual revenue in 2021 and 2022 exceeded $500,000; (ii) Defendant Volper was the sole owner of 212 in 2021 and 2022; (iii) all front-of-house employees who clocked in and out on the restaurant's POS system were paid the applicable New York tip credit minimum wage for the hours for which they were clocked in; (iv) Defendants paid putative class members their regular rate for overtime hours (rather than time-and-a-half); and (v) Defendants did not pay putative class members a spread-of-hours premium. (2) The Court find Defendants in contempt for failing to comply with the Court's order requiring production of all tip sheets and time records for the putative class, and impose coercive sanctions as follows: (i) Defendants be given 14 days from the date of the Court's decision on the instant motion to produce all tip sheets and time records for the putative class that are within Defendants' possession, custody or control, along with a sworn affidavit from Defendants attesting that Defendants have produced all such documents found after a reasonable search and explaining what they have done to search for and collect them; (2) that, starting 15 days from the date of the Court's decision on the instant motion, to the extent that the contempt still has not been purged, coercive sanctions be imposed, payable to the Clerk of Court, at the rate of $100 per day of continued non-compliance until the contempt is purged; and (3) if Defendants still have not purged the contempt after a total of 30 days from the date of the decision on the instant motion, the coercive sanctions increase to a daily amount of $250. (3) The Court order Defendants' attorney Mitchell Segal to pay Plaintiff for the $313 court reporter fee incurred when Defendant 212 failed to appear for its deposition on the first day for which it was noticed; and (4) The Court order Defendants to pay reasonable attorney's fees and costs in the amount of $28,805, which were incurred in connection with the instant motion and the subject discovery violations. I further recommend that Plaintiff's request to find numerosity established be denied as moot, and that Plaintiff's motion be denied in all other respects. To the extent not discussed above, the Court has considered all of Defendants' arguments and finds them to be without merit. Objections to R&R due by 4/26/2023 (Signed by Magistrate Judge Robert W. Lehrburger on 4/12/2023) (tg) (Entered: 04/12/2023) |
| 04/26/2023 | 89 | NOTICE of Substitution of Attorney. Old Attorney: Mitchell S. Segal, New Attorney: Jonathan W. Greenbaum, Address: Coburn & Greenbaum, PLLC, 1710 Rhode Island |

A-13

| | | |
|---|---|---|
| | | Avenue, NW, Suite 200, Washington, DC, America 20036, 202.744.5003. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 04/26/2023) |
| 04/27/2023 | 90 | NOTICE OF APPEARANCE by Jonathan Wolfe Greenbaum on behalf of 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 04/27/2023) |
| 04/27/2023 | 91 | NOTICE OF APPEARANCE by Jonathan Wolfe Greenbaum on behalf of 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 04/27/2023) |
| 04/27/2023 | 92 | MEMORANDUM OPINION AND ORDER for 87 Report and Recommendations, 70 Motion to Certify Class filed by Nino Martinenko, Dagmara Maja Huk, 88 Report and Recommendation. Accordingly, the Court adopts the Class Certification Report in its entirety. The Court GRANTS Plaintiffs' motion for class certification and HEREBY ORDERS that: 1) A class is certified and defined as follows: "all tipped employees servers, runners, bussers, and bartenders who worked for Defendants at any time on or after January 26, 2016 at 212 Steakhouse"; 2) Plaintiffs Nino Martinenko and Dagmara Huk are appointed class representatives; 3) Joseph & Kirschenbaum LLP is appointed Class Counsel; 4) Defendants are required to produce a complete class list to the extent they are in possession, custody, or control of information to compile that list; and 5) The class notice presented as Exhibit 1 to the Declaration of Michael DiGiulio, filed December 9, 2022 at ECF No. 72 is approved and authorized to issue. The lack of any timely objections, in light of the clear notice provided in the Class Certification Report, precludes appellate review of this decision. See Frank, 968 F.2d at 300; Lee, 473 F. Supp. 2d at 436. The Clerk of Court is respectfully directed to terminate ECF No. 70. (Signed by Judge Jennifer L. Rochon on 4/27/2023) (tro) (Entered: 04/28/2023) |
| 04/28/2023 | 93 | MEMORANDUM OPINION AND ORDER for 88 Report and Recommendations. Accordingly, the Court adopts the Sanctions Report in its entirety, and the Court GRANTS in part and DENIES in part Plaintiff's motion for sanctions as follows: First, the Court deems established the following facts: (i) 212's gross annual revenue in 2021 and 2022 exceeded $500,000; (ii) Defendant Volper was the sole owner of 212 in 2021 and 2022; (iii) all front-of-house employees who clocked in and out on the restaurant's point-of-sale system were paid the applicable New York tip credit minimum wage for the hours for which they were clocked in; (iv) Defendants paid putative class members their regular rate for overtime hours (rather than time-and-a-half); and (v) Defendants did not pay putative class members a spread-of-hours premium. Second, the Court finds Defendants in contempt for failing to comply with the Court's order requiring production of all tip sheets and time records for the putative class, and imposes coercive sanctions as follows: (i) Defendants are given 14 days from the date of this Order to produce all tip sheets and time records for the putative class that are within Defendants' possession, custody or control, along with a sworn affidavit from Defendants attesting that Defendants have produced all such documents found after a reasonable search and explaining what they have done to search for and collect them; (2) that, starting 15 days from the date of this Order, to the extent that the contempt still has not been purged, coercive sanctions be imposed, payable to the Clerk of Court, at the rate of $100 per day of continued non-compliance until the contempt is purged; and (3) if Defendants still have not purged the contempt after a total of 30 days from the date of this Order, the coercive sanctions increase to a daily amount of $250. Third, the Court orders Defendants' attorney Mitchell Segal to pay Plaintiff for the $313 court reporter fee incurred when Defendant 212 failed to appear for its deposition on the first day for which it was noticed; and Fourth, the Court orders Defendants to pay reasonable attorney's fees and costs in the amount of $28,805, which were incurred in connection with the instant motion and the subject discovery violations. Additionally, Plaintiff's request to find numerosity established is denied as moot, and Plaintiff's motion is denied in all other respects. The lack of any timely objections, in light of the clear notice provided in the Sanctions Report, precludes appellate review of this decision. See Frank, 968 F.2d at 300; |

| | | Lee, 473 F. Supp. 2d at 436. The Clerk of Court is respectfully directed to terminate ECF No. 61. (Signed by Judge Jennifer L. Rochon on 4/27/2023) (tro) (tro). (Entered: 04/28/2023) |
|---|---|---|
| 06/06/2023 | 94 | TRANSCRIPT of Proceedings re: Conference held on 4/4/2023 before Magistrate Judge Robert W. Lehrburger. Court Reporter/Transcriber: Carole Ludwig, (212) 420-0771. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (nmo) (Entered: 06/06/2023) |
| 06/06/2023 | 95 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Conference proceeding held on 04/04/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(nmo) (Entered: 06/06/2023) |
| 07/13/2023 | 96 | AFFIDAVIT of Nikolay Volper re: 88 Report and Recommendations,,,,,,,,,,, . Document filed by 212 Steakhouse Inc., Nikolay Volper..(Greenbaum, Jonathan) (Entered: 07/13/2023) |
| 08/22/2023 | 97 | FIRST MOTION for Conference *Requesting A Pre Motion Conference*. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 08/22/2023) |
| 08/23/2023 | 98 | ORDER By separate order today, the Court is amending the existing order of reference to Magistrate Judge Lehrburger to include all dispositive motions, including the motions contemplated by Defendants at ECF No. 97. In light of the referral of dispositive motions, to conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this matter, the parties must discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conducting all further proceedings before Magistrate Judge Lehrburger If the parties consent to proceed before Magistrate Judge Lehrburger, they must, by September 6, 2023, submit to the Court a fully executed Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form, a copy of which is attached to the Order of Reference (and also available at https://nysd.uscourts.gov/forms/consent-proceed-us-magistrate-judge). If the Court approves that form, all further proceedings will then be conducted before Magistrate Judge Lehrburger rather than before this Court. Any appeal would be taken directly to the United States Court of Appeals for the Second Circuit, as it would be from this Court if the consent form were not signed and so ordered. An information sheet on proceedings before magistrate judges is also attached to the Order of Reference. If any party does not consent to conducting all further proceedings before the Magistrate Judge, the parties must file a joint letter, by September 6, 2023, advising the Court that the parties do not consent, but without disclosing the identity of the party or parties who do not consent. No adverse consequences will result from the withholding of that consent. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 8/23/2023) (jca) (Entered: 08/23/2023) |
| 08/23/2023 | 99 | AMENDED ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement) and Dispositive Motion (i.e., motion requiring a Report and Recommendation). Referred to Magistrate Judge Robert W. Lehrburger. SO ORDERED. Motions referred to Robert W. Lehrburger. (Signed by Judge Jennifer L. Rochon on 8/23/2023) (jca) (Entered: 08/23/2023) |

A-15

| 08/25/2023 | 100 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated August 25, 2023 re: 97 FIRST MOTION for Conference *Requesting A Pre Motion Conference*. . Document filed by Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - exclusion requests, # 2 Exhibit Ex 2 - mailing envelopes, # 3 Exhibit Ex 3 - paystubs, # 4 Exhibit Ex 4 - Volper deposition excerpts, # 5 Exhibit Ex 5 - Martinenko deposition excerpts).(Schulman, Denise) (Entered: 08/25/2023) |
|---|---|---|
| 08/30/2023 | 101 | FIRST LETTER MOTION for Conference re: 100 Response in Opposition to Motion,, *Request A Pre-Motion Conference* addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated August 30, 2023. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 08/30/2023) |
| 08/30/2023 | 102 | NOTICE of Hearing: Pre-Motion Conference set for 9/14/2023 at 10:30 AM before Magistrate Judge Robert W. Lehrburger. This conference will be conducted via Microsoft Teams. A link will be emailed to the parties, one week prior to the conference. The public may dial in to the listen only line at (646)-453-4442, access code 289588271#. Parties are instructed to review and adhere to Judge Lehrburger's individual rules and practices. (rsh) (Entered: 08/30/2023) |
| 08/30/2023 | 103 | JOINT LETTER addressed to Judge Jennifer L. Rochon from Jonathan W. Greenbaum dated August 30, 2023 re: Nin Martinenko, et al v. 212 Steakhouse, Inc., et al. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 08/30/2023) |
| 09/01/2023 | 105 | LETTER MOTION for Conference re: *Plaintiff's anticipated summary judgment motion* addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 09/01/2023) |
| 09/07/2023 | 106 | FIRST LETTER MOTION for Conference re: 105 LETTER MOTION for Conference re: *Plaintiff's anticipated summary judgment motion* addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. *Response to Plaintiff's September 1, 2023 Letter* addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated September 6, 2023. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 09/07/2023) |
| 09/14/2023 | | Minute Entry for proceedings held before Magistrate Judge Robert W. Lehrburger: Pre-Motion Conference held on 9/14/2023 at 10:30 a.m. (rsh) (Entered: 09/14/2023) |
| 09/14/2023 | 107 | ORDER terminating 97 Letter Motion for Conference re: 97 FIRST MOTION for Conference Requesting A Pre Motion Conference, 101 FIRST LETTER MOTION for Conference re: 100 Response in Opposition to Motion,, Request A Pre-Motion Conference addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated August 30, 2023., 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023., 106 FIRST LETTER MOTION for Conference re: 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. Re ; terminating 101 Letter Motion for Conference re: 97 FIRST MOTION for Conference Requesting A Pre Motion Conference, 101 FIRST LETTER MOTION for Conference re: 100 Response in Opposition to Motion,, Request A Pre-Motion Conference addressed to Magistrate Judge Robert W. Greenbaum dated August 30, 2023., 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023., 106 FIRST LETTER MOTION for Conference re: 105 LETTER |

| | | |
|---|---|---|
| | | MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. Re ; terminating 105 Letter Motion for Conference re: 97 FIRST MOTION for Conference Requesting A Pre Motion Conference, 101 FIRST LETTER MOTION for Conference re: 100 Response in Opposition to Motion, Request A Pre-Motion Conference addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated August 30, 2023., 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023., 106 FIRST LETTER MOTION for Conference re: 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. Re ; terminating 106 Letter Motion for Conference re: 97 FIRST MOTION for Conference Requesting A Pre Motion Conference, 101 FIRST LETTER MOTION for Conference re: 100 Response in Opposition to Motion,, Request A Pre-Motion Conference addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated August 30, 2023., 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023., 106 FIRST LETTER MOTION for Conference re: 105 LETTER MOTION for Conference re: Plaintiff's anticipated summary judgment motion addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated September 1, 2023. As set forth during the pre-motion conference held on September 14, 2023: 1. Plaintiffs may proceed with filing their motion for summary judgment. Defendants may proceed with their motion to decertify (and, if warranted, summary judgment). The parties will file their motions on the same schedule: Opening motion papers shall be filed by November 16, 2023; Opposing motion papers shall be filed by December 21, 2023; Reply briefs shall be filed by January 12, 2024. 2. Defendants' motion to amend to add a faithless-employee counterclaim is denied for lack of good cause, undue delay, and lack of merit. 3. By September 21, 2023, the parties shall jointly file a letter regarding the end date for sanctions keyed to document production rather than provision of the requisite affidavit. The Clerk of Court is respectfully directed to terminate the motions at Dkts. 97, 100, 105, and 106. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 9/14/2023) (mml) (Entered: 09/14/2023) |
| 09/14/2023 | | Set/Reset Deadlines: Motions due by 11/16/2023. Responses due by 12/21/2023. Replies due by 1/12/2024. (mml) (Entered: 09/14/2023) |
| 09/19/2023 | 108 | NOTICE of Hearing: Settlement Conference set for 10/5/2023 at 9:30 AM before Magistrate Judge Robert W. Lehrburger. This conference will be conducted via Microsoft Teams. A link will be emailed to the parties, one week prior to the conference. The parties are instructed to review and adhere to Judge Lehrburger's individual Settlement Conference Procedures. The parties are further instructed to submit their pre-conference submissions, along with their Attendance Acknowledgment Form (available in pdf fillable format as attachment to the Settlement Conference Procedures) no later than September 28, 2023, by 5:00 p.m. (rsh) (Entered: 09/19/2023) |
| 09/21/2023 | 109 | JOINT LETTER addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated 09.21.2023 re: Sanctions. Document filed by 212 Steakhouse Inc... (Greenbaum, Jonathan) (Entered: 09/21/2023) |
| 09/21/2023 | 110 | MEMO ENDORSEMENT on re: 109 Letter Sanctions filed by 212 Steakhouse Inc. ENDORSEMENT: SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 9/21/23) (yv) Transmission to Finance Unit (Cashiers) for processing. (Entered: 09/21/2023) |

| 10/05/2023 | | Minute Entry for proceedings held before Magistrate Judge Robert W. Lehrburger: Settlement Conference held on 10/5/2023 at 9:30 a.m. (rsh) (Entered: 10/05/2023) |
|---|---|---|
| 11/16/2023 | 111 | FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint*. Document filed by 212 Steakhouse Inc., Nikolay Volper. (Attachments: # 1 Proposed Order Proposed Order). (Greenbaum, Jonathan) (Entered: 11/16/2023) |
| 11/16/2023 | 112 | FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint*. Document filed by 212 Steakhouse Inc., Nikolay Volper. (Attachments: # 1 Affidavit Declaration of Jonathan Greenbaum, # 2 Exhibit Exhibit 1 To Declaration of Jonathan Greenbaum, # 3 Exhibit Exhibit 2 To Declaration of Jonathan Greenbaum, # 4 Exhibit Exhibit 3 To Declaration of Jonathan Greenbaum, # 5 Exhibit Exhibit 4 To Declaration of Jonathan Greenbaum, # 6 Exhibit Exhibit 5 To Declaration of Jonathan Greenbaum, # 7 Affidavit Declaration of Nikoly Volper, # 8 Exhibit Exhibit 1 To Declaration of Nikolay Volper, # 9 Exhibit Exhibit 2 To Declaration of Nikolay Volper, # 10 Exhibit Exhibit 3 To Declaration of Nickolay Volper, # 11 Exhibit Exhibit 4 To Declaration of Nikolay Volper, # 12 Exhibit Exhibit 5 To Declaration of Nikolay Volper, # 13 Exhibit Exhibit 6 To Declaration of Nikolay Volper).(Greenbaum, Jonathan) (Entered: 11/16/2023) |
| 11/16/2023 | 113 | MOTION for Summary Judgment . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/16/2023 | 114 | MEMORANDUM OF LAW in Support re: 113 MOTION for Summary Judgment . . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/16/2023 | 115 | DECLARATION of Michael DiGiulio in Support re: 113 MOTION for Summary Judgment .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13).(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/16/2023 | 116 | DECLARATION of Denise A. Schulman in Support re: 113 MOTION for Summary Judgment .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10).(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/16/2023 | 117 | DECLARATION of Nino Martinenko in Support re: 113 MOTION for Summary Judgment .. Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/16/2023 | 118 | RULE 56.1 STATEMENT. Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 11/16/2023) |
| 11/27/2023 | | CASHIERS OFFICE REMARK on 93 Order Adopting Report and Recommendations, in the amount of $3150.00, paid on 11/27/23, Receipt Number 23609.(amf) (Entered: 11/27/2023) |
| 12/21/2023 | 119 | RESPONSE in Opposition to Motion re: 113 MOTION for Summary Judgment . *Opposition To Plaintiffs' Motion For Summary Judgment*. Document filed by 212 Steakhouse Inc.. (Attachments: # 1 Supplement Defendants Counter-Statement Of Disputed Facts Pursuant To Local Civil Rule 56.1, # 2 Supplement Declaration of Nikolay Volper In Opposition To Plaintiffs Motion For Summary Judgment, # 3 Exhibit Exhibit 1 To Declaration of Nikolay Volper, # 4 Exhibit Exhibit 2 To Declaration of Nikolay Volper, # 5 Exhibit Exhibit 3 To Declaration of Nikolay Volper, # 6 Supplement |

| | | |
|---|---|---|
| | | Tab 1 To Exhibit 3 To Declaration of Nikolay Volper, # 7 Supplement Tab 2 To Exhibit 3 To Declaration of Nikolay Volper, # 8 Exhibit Exhibit 4 To Declaration Of Nikolay Volper, # 9 Supplement Declaration of Jonathan Greenbaum, # 10 Exhibit Exhibit 1 To Declaration of Jonathan Greenbaum, # 11 Exhibit Exhibit 2 To Declaration of Jonathan Greenbaum, # 12 Exhibit Exhibit 3 To Declaration of Jonathan Greenbaum).(Greenbaum, Jonathan) (Entered: 12/21/2023) |
| 12/21/2023 | 120 | MEMORANDUM OF LAW in Opposition re: 111 FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint.*, 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint.* . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 12/21/2023) |
| 12/21/2023 | 121 | DECLARATION of Michael DiGiulio in Opposition re: 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint.*, 111 FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint.*. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6). (Digiulio, Michael) (Entered: 12/21/2023) |
| 12/21/2023 | 122 | DECLARATION of Nino Martinenko in Opposition re: 111 FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint.*, 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint.*. Document filed by Nino Martinenko..(Digiulio, Michael) (Entered: 12/21/2023) |
| 12/21/2023 | 123 | DECLARATION of Dagmara Huk in Opposition re: 111 FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint.*, 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint.*. Document filed by Dagmara Maja Huk..(Digiulio, Michael) (Entered: 12/21/2023) |
| 01/10/2024 | 124 | FIRST LETTER addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated 01.10.2024 re: Request Leave To File Replies To The Respective Motions Of No More Than 12 Pages, 2 Over Your Honor's Individual Rules. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 01/10/2024) |
| 01/11/2024 | 125 | MEMO ENDORSEMENT on re: 124 Letter, filed by 212 Steakhouse Inc. ENDORSEMENT: Granted. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 1/11/2024) (mml) (Entered: 01/11/2024) |
| 01/12/2024 | 126 | REPLY MEMORANDUM OF LAW in Support re: 113 MOTION for Summary Judgment . . Document filed by Dagmara Maja Huk, Nino Martinenko..(Digiulio, Michael) (Entered: 01/12/2024) |
| 01/12/2024 | 127 | REPLY AFFIRMATION of Michael DiGiulio in Support re: 113 MOTION for Summary Judgment .. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit A).(Digiulio, Michael) (Entered: 01/12/2024) |
| 01/12/2024 | 128 | FIRST REPLY MEMORANDUM OF LAW in Opposition re: 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint. Defendants' Reply To Plaintiffs Opposition To Decertify Rule 23 Class And In Further Support Of Defendants' Motion For Judgment As* |

| | | |
|---|---|---|
| | | *To Count 5 Of The Complaint*. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 01/12/2024) |
| 01/16/2024 | 129 | LETTER MOTION for Leave to File sur-reply addressed to Magistrate Judge Robert W. Lehrburger from Denise A. Schulman dated January 16, 2024. Document filed by Nino Martinenko..(Schulman, Denise) (Entered: 01/16/2024) |
| 01/18/2024 | 130 | FIRST LETTER addressed to Magistrate Judge Robert W. Lehrburger from Jonathan W. Greenbaum dated 01.18.2024 re: Plaintiffs' Request For Leave To File A Surreply Be Denied. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 01/18/2024) |
| 01/19/2024 | 131 | ORDER denying 129 Letter Motion for Leave to File Document. The request to submit a sur-reply brief is denied, but the Court will accept and consider both the instant letter as a sur-reply as well as the Plaintiff's letter in response at Dkt. 130. SO ORDERED. (Signed by Magistrate Judge Robert W. Lehrburger on 1/19/2024) (mml) (Entered: 01/19/2024) |
| 08/13/2024 | 132 | REPORT AND RECOMMENDATION TO HON. JENNIFER L. ROCHON: CLASS DECERTIFICATION AND SUMMARY JUDGMENT re: 111 FIRST MOTION to Dismiss *Defendants Motion To Decertify Rule 23 Class And Motion for Judgment As To Plaintiff's Count 5 Of The Complaint* filed by 212 Steakhouse Inc., Nikolay Volper, 112 FIRST MOTION to Dismiss *Memorandum In Support Of Motion To Decertify Rule 23 Class And Motion For Judgment As To Count 5 Of The Complaint* filed by 212 Steakhouse Inc., Nikolay Volper, 113 MOTION for Summary Judgment filed by Nino Martinenko, Dagmara Maja Huk. To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be moot or without merit. For the foregoing reasons, I recommend that Defendants motion to decertify the Rule 23 class be DENIED and Plaintiffs' motion for summary judgment be GRANTED in part and DENIED in part. Specifically, I recommend that: 1. The class be awarded unpaid minimum wages under the NYLL without a tip credit allowance in the total amount of $96,608.35; 2. The class be awarded unpaid overtime wages under the NYLL without a tip credit allowance in the total amount of $2,530.75; 3. The class be awarded unpaid spread-of-hours premiums under the NYLL where applicable in the total amount of $2,388; 4. The class be awarded liquidated damages under the NYLL in the total amount of $101,527.10; 5. Defendant Volper be held individually liable for damages under the FLSA and NYLL; 6. Plaintiff Huk's NYLL § 195 wage notice and statement claims be dismissed for lack of standing; 7. Summary judgment be denied on the rest of the class members' NYLL § 195 wage notice and wage statement claims; and 8. The parties be ordered to meet and confer regarding next steps for addressing individualized injury with respect to the unnamed class member § 195 claims. 9. Prejudgment interest be awarded from June 18, 2019 at a rate of 9% on the total unpaid wages of $101,527.10. Objections to R&R due by 8/27/2024. (Signed by Magistrate Judge Robert W. Lehrburger on 8/13/2024) (mml) (Entered: 08/13/2024) |
| 08/14/2024 | 133 | LETTER MOTION for Extension of Time addressed to Judge Jennifer L. Rochon from Jonathan Greenbaum dated 8/14/24. Document filed by 212 Steakhouse Inc., Nikolay Volper..(Greenbaum, Jonathan) (Entered: 08/14/2024) |
| 08/14/2024 | 134 | ORDER granting in part and denying in part 133 Letter Motion for Extension of Time. The request is GRANTED in part and DENIED in part. Objections to the R&R shall be filed no later than August 30, 2024. Responses to objections shall be filed no later than September 10, 2024. SO ORDERED. Objections to R&R due by 8/30/2024. (Signed by Judge Jennifer L. Rochon on 8/14/2024) (tg) (Entered: 08/15/2024) |
| 08/14/2024 | | Terminate Transcript Deadlines (tg) (Entered: 08/15/2024) |

A-20

| 08/30/2024 | 135 | OBJECTION to 132 Report and Recommendations *Defendants' Objection To Report And Recommendation* Document filed by 212 Steakhouse Inc.. (Attachments: # 1 Proposed Order Proposed Order).(Greenbaum, Jonathan) (Entered: 08/30/2024) |
|---|---|---|
| 08/30/2024 | 136 | OBJECTION to 132 Report and Recommendations Document filed by Dagmara Maja Huk, Nino Martinenko..(Schulman, Denise) (Entered: 08/30/2024) |
| 09/03/2024 | 137 | NOTICE of supplemental authority re: 136 Objection to Report and Recommendations. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - Guthrie v. Rainbow Fencing Inc.).(Schulman, Denise) (Entered: 09/03/2024) |
| 09/09/2024 | 138 | NOTICE of supplemental authority re: 136 Objection to Report and Recommendations. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1- Castillo v Hollis Delicatessen Corp, # 2 Exhibit Ex 2 - Reyes v Crystal Window & Door Sys.).(Schulman, Denise) (Entered: 09/09/2024) |
| 09/10/2024 | 139 | MEMORANDUM OF LAW in Opposition re: 135 Objection to Report and Recommendations . Document filed by Dagmara Maja Huk, Nino Martinenko.. (Schulman, Denise) (Entered: 09/10/2024) |
| 09/10/2024 | 140 | FIRST MEMORANDUM OF LAW in Opposition *Opposition And Response To Plaintiffs Objections To Report And Recommendation*. Document filed by 212 Steakhouse Inc... (Greenbaum, Jonathan) (Entered: 09/10/2024) |
| 09/24/2024 | 141 | OPINION AND ORDER for 132 Report and Recommendations. For the foregoing reasons, the Court adopts the R&R in its entirety. Defendants' motion to decertify the Rule 23 class is DENIED. Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. Defendants cross-motion for summary judgment is GRANTED in part and DENIED in part. Specifically, the Court orders that: 1. The class be awarded unpaid minimum wages under the NYLL without a tip credit allowance in the total amount of $96,608.35; 2. The class be awarded unpaid overtime wages under the NYLL without a tip credit allowance in the total amount of $2,530.75; 3. The class be awarded unpaid spread-of-hours premiums under the NYLL where applicable in the total amount of $2,388; 4. The class be awarded liquidated damages under the NYLL in the total amount of $101,527.10; 5. Defendant Volper be held individually liable for damages under the FLSA and NYLL; 6. Plaintiff Huk's NYLL Section 195 wage notice and statement claims be dismissed for lack of standing; 7. Summary judgment be denied on the rest of the class members' NYLL Section 195 wage notice and wage statement claims; 8. The parties be ordered to meet and confer regarding next steps for addressing individualized injury with respect to the unnamed class member Section 195 claims; and 9. Prejudgment interest be awarded from June 18, 2019, at a rate of 9% on the total unpaid wages of $101,527.10. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 9/24/2024) (jca) Transmission to Orders and Judgments Clerk for processing. (Entered: 09/24/2024) |
| 09/25/2024 | 142 | CLERK'S JUDGMENT re: 141 Opinion Order. in favor of Dagmara Maja Huk, Nino Martinenko against 212 Steakhouse Inc., Nikolay Volper in the amount of $ 251,269.84. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated September 24, 2024, the Court adopts the R&R in its entirety. Defendants' motion to decertify the Rule 23 class is DENIED. Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. Defendants cross-motion for summary judgment is GRANTED in part and DENIED in part. Specifically, the Court orders that: 1. The class is awarded unpaid minimum wages under the NYLL without a tip credit allowance in the total amount of $96,608.35; 2. The class is awarded unpaid overtime wages under the NYLL without a tip credit allowance in the total amount of $2,530.75; 3. The class is awarded unpaid spread-of-hours premiums under the NYLL |

| | | |
|---|---|---|
| | | where applicable in the total amount of $2,388; 4. The class is awarded liquidated damages under the NYLL in the total amount of $101,527.10; 5. Defendant Volper is held individually liable for damages under the FLSA and NYLL; 6. Plaintiff Huk's NYLL Section 195 wage notice and statement claims be dismissed for lack of standing; 7. Summary judgment is denied on the rest of the class members' NYLL Section 195 wage notice and wage statement claims; 8. The parties is ordered to meet and confer regarding next steps for addressing individualized injury with respect to the unnamed class member Section 195 claims; and 9. Prejudgment interest awarded from June 18, 2019, at a rate of 9% on the total unpaid wages of $101,527.10 to the entry of the judgment in the amount of $48,215.64. (Signed by Acting Clerk of Court Daniel Ortiz on 9/25/2024) (Attachments: # 1 Notice of Right to Appeal) (nd) (Entered: 09/25/2024) |
| 10/01/2024 | 143 | LETTER MOTION for Extension of Time to File *motion for attorneys' fees and costs* addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated October 1, 2024. Document filed by Dagmara Maja Huk, Nino Martinenko..(Schulman, Denise) (Entered: 10/01/2024) |
| 10/02/2024 | 144 | ORDER granting in part 143 Letter Motion for Extension of Time to File. The request is GRANTED in part. Plaintiffs' deadline for their motion for attorneys' fees and costs is extended to November 8, 2024. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 10/2/2024) (jca) (Entered: 10/02/2024) |
| 10/02/2024 | | Set/Reset Deadlines: Motions due by 11/8/2024. (jca) (Entered: 10/02/2024) |
| 10/15/2024 | 145 | LETTER addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated October 15, 2024 re: request to dismiss without prejudice all remaining NYLL 195 claims. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - proposed notice, # 2 Exhibit Ex 2 - proposed judgment).(Schulman, Denise) (Entered: 10/15/2024) |
| 10/16/2024 | 146 | MEMO ENDORSEMENT on re: 145 Letter, filed by Nino Martinenko, Dagmara Maja Huk ENDORSEMENT Defendant shall respond to this letter by October 21, 2024. (Signed by Judge Jennifer L. Rochon on 10/16/2024) (jca) (Entered: 10/16/2024) |
| 10/21/2024 | 147 | LETTER addressed to Judge Jennifer L. Rochon from Jonathan W. Greenbaum dated 10.16.2024 re: Response To Docket No. 145 10.15. 24 Letter. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 10/21/2024) |
| 10/23/2024 | 148 | MEMO ENDORSEMENT on re: 147 Letter filed by 212 Steakhouse Inc. ENDORSEMENT Given that new items were raised in this letter, Plaintiff shall respond by October 28, 2024. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 10/23/2024) (jca) (Entered: 10/23/2024) |
| 10/28/2024 | 149 | LETTER addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated October 28, 2024 re: NYLL 195 claims. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - state court complaints, # 2 Exhibit Ex 2 - state court dockets, # 3 Exhibit Ex 3 - state court appearances, # 4 Exhibit Ex 4 - revised proposed judgment).(Schulman, Denise) (Entered: 10/28/2024) |
| 11/08/2024 | 150 | MOTION for Attorney Fees *and Costs*. Document filed by Nino Martinenko..(Digiulio, Michael) (Entered: 11/08/2024) |
| 11/08/2024 | 151 | MEMORANDUM OF LAW in Support re: 150 MOTION for Attorney Fees *and Costs*. . Document filed by Nino Martinenko..(Digiulio, Michael) (Entered: 11/08/2024) |
| 11/08/2024 | 152 | DECLARATION of Michael DiGiulio in Support re: 150 MOTION for Attorney Fees *and Costs*.. Document filed by Nino Martinenko. (Attachments: # 1 Exhibit 1, # 2 Exhibit |

A-22

| | | |
|---|---|---|
| | | 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6).(Digiulio, Michael) (Entered: 11/08/2024) |
| 11/13/2024 | <u>153</u> | OPINION AND ORDERFor the foregoing reasons, Plaintiffs' motion to voluntarily dismiss the remaining NYLL Section 195 claims without prejudice is GRANTED, and Defendants' motion to decertify the class is DENIED. The Court will enter the proposed judgment at Dkt. 145-2 that includes the allocation among Class Members, and Plaintiffs are ordered to issue the notice to Class Members set forth in Dkt. 145-1. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 11/13/2024) (jca) (Entered: 11/13/2024) |
| 11/14/2024 | <u>154</u> | JUDGMENT It is hereby ORDERED, ADJUDGED, AND DECREED, that the Clerk of Court shall enter judgment as follows: 1.Pursuant to the Courts Opinion and Order dated September 24, 2024, judgment shall be entered against Defendants 212 Steakhouse, Inc. and Nikolay Volper, jointly and severally, and in favor of the class in the total amount of $251,269.84 as follows: i. The class is awarded unpaid minimum wages under the NYLL without a tip credit allowance in the total amount of $96,608.35; ii. The class is awarded unpaid overtime wages under the NYLL without a tip credit allowance in the total amount of $2,530.75; iii. The class is awarded unpaid spread-of-hours premiums under the NYLL where applicable in the total amount of $2,388; iv. The class is awarded liquidated damages under the NYLL in the total amount of $101,527.10; v. Prejudgment interest is awarded from June 18, 2019 to September 25, 2024, at a rate of 9% on the total unpaid wages of $101,527.10 in the amount of $48,215.64. The judgment of $251,269.84 shall be allocated among the Class Members as set forth in Exhibit A to this Judgment. 2.If the judgment is not entirely paid within 90 days of judgment, or 90 days after the expiration of time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by 15 percent. The Court also awards post-judgment interest pursuant to 28 U.S.C. § 1961. 3. For the reasons stated in the Courts Opinion and Order dated September 24, 2024, Plaintiff Huk's NYLL Section 195 wage notice and statement claims are dismissed without prejudice for lack of standing. 4. The Court grants Plaintiffs' request to dismiss Plaintiff Martinenko's and all remaining class members' NYLL Section 195 wage notice and statement claims without prejudice.The Clerk of Court is respectfully requested to close the case. (Signed by Judge Jennifer L. Rochon on 11/14/2024) (jca) Transmission to Finance Unit (Cashiers) for processing. (Entered: 11/14/2024) |
| 11/22/2024 | <u>155</u> | RESPONSE in Opposition to Motion re: <u>150</u> MOTION for Attorney Fees *and Costs. Defendants Opposition To Plaintiffs Motion For Attorneys' Fees*. Document filed by 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 11/22/2024) |
| 11/22/2024 | <u>156</u> | LETTER MOTION for Extension of Time to File Response/Reply *in further support of motion for attorneys' fees and costs* addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated November 22, 2024. Document filed by Dagmara Maja Huk, Nino Martinenko..(Schulman, Denise) (Entered: 11/22/2024) |
| 11/22/2024 | <u>157</u> | ORDER granting <u>156</u> Letter Motion for Extension of Time to File Response/Reply Plaintiffs' request for an extension is GRANTED. Plaintiffs shall file their reply by December 6, 2024. SO ORDERED. Replies due by 12/6/2024. (Signed by Judge Jennifer L. Rochon on 11/22/2024) (jca) (Entered: 11/22/2024) |
| 11/25/2024 | <u>158</u> | LETTER addressed to Judge Jennifer L. Rochon from Michael DiGiulio dated November 25, 2024 re: Request for Amended Judgment. Document filed by Nino Martinenko. (Attachments: # <u>1</u> Exhibit A - Amended Proposed Judgement).(Digiulio, Michael) (Entered: 11/25/2024) |
| 11/26/2024 | <u>159</u> | ORDER On September 24, 2024, this Court denied Defendants' motion to decertify the class and granted summary judgment in Plaintiffs' and the Class's favor on their Fair Labor Standards Act (FLSA) and New York Labor Law ("NYLL") claims, with the |

**A-23**

| | | |
|---|---|---|
| | | exception of the NYLL § 195 claims. Dkt. 141. The Court dismissed without prejudice the NYLL § 195 claims for opt-in Plaintiff Huk for lack of standing and denied the motions as to the remaining NYLL § 195 claims. Dkt. 141. Plaintiffs thereafter moved to voluntarily dismiss the remaining NYLL § 195 claims without prejudice. Dkts. 145, 149. Defendants in turn moved to dismiss these claims with prejudice and to decertify the Class. Dkt. 147. On November 13, 2024, the Court granted Plaintiffs' request to dismiss the claims without prejudice and denied Defendants' motion in its entirety, Dkt. 153, and on November 14, 2024, the Court entered final judgment, Dkt. 154. Plaintiffs now request that the Court amend the final judgment to clarify that the NYLL § 195 claims that were dismissed without prejudice are dismissed without leave to replead in this action. Dkt. 158. Plaintiffs' request for an amendment of the final judgment in this action is therefore denied. (And as further set forth herein.) SO ORDERED. (Signed by Judge Jennifer L. Rochon on 11/26/2024) (jca) (Entered: 11/26/2024) |
| 12/05/2024 | 160 | REPLY MEMORANDUM OF LAW in Support re: 150 MOTION for Attorney Fees *and Costs.* . Document filed by Dagmara Maja Huk, Nino Martinenko..(Schulman, Denise) (Entered: 12/05/2024) |
| 12/05/2024 | 161 | DECLARATION of Denise A. Schulman in Support re: 150 MOTION for Attorney Fees *and Costs.*. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - time records, # 2 Exhibit Ex 2 - time records).(Schulman, Denise) (Entered: 12/05/2024) |
| 12/11/2024 | 162 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** FIRST NOTICE OF APPEAL. Document filed by 212 Steakhouse Inc.. Filing fee $ 605.00, receipt number ANYSDC-30312997. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Greenbaum, Jonathan) Modified on 12/11/2024 (km). (Entered: 12/11/2024) |
| 12/11/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Jonathan Greenbaum to RE-FILE Document No. 162 Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. When refiling, bypass the payment screen since it was already paid. (km) (Entered: 12/11/2024)** |
| 12/11/2024 | 163 | NOTICE OF APPEARANCE by Jonathan Wolfe Greenbaum on behalf of 212 Steakhouse Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Greenbaum, Jonathan) (Entered: 12/11/2024) |
| 12/11/2024 | 164 | FIRST NOTICE OF APPEAL from 142 Clerk's Judgment,,,,,,, 154 Judgment,,,,,,,,. Document filed by 212 Steakhouse Inc.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A, # 2 Exhibit B). (Greenbaum, Jonathan) (Entered: 12/11/2024) |
| 12/11/2024 | | USCA Appeal Fees received $605.00 receipt number ANYSDC-30312997 on 12/11/2024 re: 164 Notice of Appeal, filed by 212 Steakhouse Inc.(km) (Entered: 12/11/2024) |
| 12/11/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 164 Notice of Appeal.(km) (Entered: 12/11/2024) |
| 12/11/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 164 Notice of Appeal, filed by 212 Steakhouse Inc. were transmitted to the U.S. Court of Appeals.(km) (Entered: 12/11/2024) |

| 12/12/2024 | 165 | NOTICE OF CROSS APPEAL from 154 Judgment,,,,,,,, 141 Order Adopting Report and Recommendations,,,,,, 142 Clerk's Judgment,,,,,,,. Document filed by Dagmara Maja Huk. Filing fee $ 605.00, receipt number ANYSDC-30325544. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Schulman, Denise) Modified on 12/16/2024 (nd). (Entered: 12/12/2024) |
| --- | --- | --- |
| 12/16/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 165 Notice of Cross Appeal,..(nd) (Entered: 12/16/2024) |
| 12/16/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 165 Notice of Cross Appeal, filed by Dagmara Maja Huk were transmitted to the U.S. Court of Appeals..(nd) (Entered: 12/16/2024) |
| 12/23/2024 | 166 | OPINION AND ORDER For the foregoing reasons, the Court GRANTS in part Plaintiffs' motion for attorneys' fees, and expenses. Plaintiffs are hereby awarded $223,458.28 in fees and expenses. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 12/23/2024) (jca) Transmission to Finance Unit (Cashiers) for processing. (Entered: 12/23/2024) |
| 12/30/2024 | 167 | AMENDED AMENDED NOTICE OF APPEAL re: 164 Notice of Appeal, 166 Memorandum & Opinion,. Document filed by 212 Steakhouse Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C).(Greenbaum, Jonathan) (Entered: 12/30/2024) |
| 12/30/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 167 Amended Notice of Appeal.(km) (Entered: 12/30/2024) |
| 12/30/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 167 Amended Notice of Appeal filed by 212 Steakhouse Inc. were transmitted to the U.S. Court of Appeals. (km) (Entered: 12/30/2024) |
| 01/13/2025 | 168 | LETTER addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated January 13, 2025 re: proposed amended judgment. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - proposed amended judgment, # 2 Exhibit Ex 2 - Defendants' issues identified for appeal).(Schulman, Denise) (Entered: 01/13/2025) |
| 01/14/2025 | 169 | ORDER On September 24, 2024, the Court adopted the Report and Recommendation of Magistrate Judge Lehrburger in its entirety, and granted summary judgment in Plaintiffs' favor on Martinenko's and Huk's FLSA overtime claims. Dkt. 141 at 2 ("Opinion and Order"). On November 14, 2024, the Court entered final judgment in this matter, " [p]ursuant to the Court's Opinion and Order dated September 24, 2024," awarding damages under the NYLL and granting Plaintiffs' request to dismiss the outstanding NYLL § 195 claims without prejudice for a lack of standing. Dkt. 154. On January 13, 2025, Plaintiffs filed an application requesting the entry of an amended judgment clarifying that the judgment entered in favor of Plaintiffs Martinenko and Huk ("Plaintiffs") and against Defendants 212 Steakhouse, Inc. and Nikolay Volper on November 14, 2024 included judgment as to Plaintiffs' FLSA overtime claims. Dkt. 168. The Court declines to enter an amended judgment. Plaintiffs have not formally moved for an amendment under Federal Rule of Civil Procedure ("Rule") 59, and, in any event, Rule 59 expressly states that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(e). SO ORDERED. (Signed by Judge Jennifer L. Rochon on 1/14/2025) (jca) (Entered: 01/14/2025) |
| 01/21/2025 | 170 | LETTER MOTION for Discovery addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated January 21, 2025. Document filed by Dagmara Maja Huk, Nino Martinenko. (Attachments: # 1 Exhibit Ex 1 - Volper restraining notice and information subpoena, # 2 Exhibit Ex 2 - 212 Steakhouse restraining notice and information service, # 3 Exhibit Ex 3 - USPS delivery confirmation (Volper), # 4 Exhibit Ex 4 - USPS delivery confirmation (212 Steakhouse)).(Schulman, Denise) (Entered: 01/21/2025) |

| 01/22/2025 | 171 | ORDER with respect to 170 Letter Motion for Discovery Letter Motion for Discovery Defendants shall provide a response, if any, to Class Counsel's letter by January 24, 2025. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 1/22/2025) (jca) (Entered: 01/22/2025) |
|---|---|---|
| 01/22/2025 | | Set/Reset Deadlines: Responses due by 1/24/2025 (jca) (Entered: 01/22/2025) |
| 01/24/2025 | 172 | FIRST RESPONSE re: 170 LETTER MOTION for Discovery addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated January 21, 2025. *Response To Plaintiffs Request For Post Judgment Discovery*. Document filed by 212 Steakhouse Inc.. (Attachments: # 1 Exhibit Exhibits).(Greenbaum, Jonathan) (Entered: 01/24/2025) |
| 01/27/2025 | 173 | ORDER. The parties shall appear for a remote conference before the Court on Wednesday, January 29, 2025 at 11:00 a.m. Counsel will receive Microsoft Teams log-in credentials at the email listed on the docket. The public listen-only line may be accessed by dialing +1 646-453-4442; Phone Conference ID: 930 737 195. (HEREBY ORDERED by Judge Jennifer L. Rochon)(Text Only Order)(sh) (Entered: 01/27/2025) |
| 01/29/2025 | 174 | NOTICE OF APPEARANCE by Natalie Nehls on behalf of 212 Steakhouse Inc...(Nehls, Natalie) (Entered: 01/29/2025) |
| 01/29/2025 | 175 | ORDER For the reasons set forth in the Court's ruling on the record at the discovery conference on January 29, 2025, Defendants Nikolay Volper and 212 Steakhouse, Inc. are ordered to respond to the Class Counsel's information subpoenas by February 11, 2025. The Clerk is respectfully requested to terminate the motion at Dkt. 170. SO ORDERED. Motions terminated: 170 LETTER MOTION for Discovery addressed to Judge Jennifer L. Rochon from Denise A. Schulman dated January 21, 2025. filed by Nino Martinenko, Dagmara Maja Huk. (Signed by Judge Jennifer L. Rochon on 1/29/2025) (jca) (Entered: 01/29/2025) |
| 01/29/2025 | | Minute Entry for proceedings held before Judge Jennifer L. Rochon: Discovery Hearing held via Microsoft Teams on 1/29/2025. (aba) (Entered: 01/29/2025) |
| 01/31/2025 | 176 | LETTER MOTION to Seal addressed to Judge Jennifer L. Rochon from Jonathan Greenbaum dated January 31, 2025. Document filed by Nikolay Volper, 212 Steakhouse Inc...(Greenbaum, Jonathan) (Entered: 01/31/2025) |
| 01/31/2025 | 177 | MOTION for Jonathan W. Greenbaum to Withdraw as Attorney . Document filed by Nikolay Volper, 212 Steakhouse Inc.. (Attachments: # 1 Supplement Memorandum of Law in Support of Motion to Withdraw, # 2 Proposed Order Proposed Order). (Greenbaum, Jonathan) (Entered: 01/31/2025) |
| 01/31/2025 | 178 | ***EX-PARTE***DECLARATION of Jonathan W. Greenbaum in Support re: 177 MOTION for Jonathan W. Greenbaum to Withdraw as Attorney .. Document filed by Nikolay Volper, 212 Steakhouse Inc.. Motion or Order to File Under Seal: 176 . (Greenbaum, Jonathan) (Entered: 01/31/2025) |
| 02/03/2025 | 179 | ORDER On January 31, 2025, counsel for Defendants 212 Steakhouse, Inc. and Nikolay Volper, Coburn, Greenbaum, & Eisenstein, PLLC ("CGE") filed a motion to withdraw as Defendants' counsel. See Dkt. 177. By February 5, 2025, Defense counsel shall serve (1) the motion and any supporting documents and (2) a copy of this Order on their clients, and by February 7, 2025, file proof of such service on the docket. See S.D.N.Y. Local Rule 1.4. Any opposition to the motion to withdraw shall be filed by February 10, 2025; any reply shall be filed by February 12, 2025. Unless and until the Court grants the motion, CGE remains counsel of record for purposes of post-judgment enforcement proceedings. If Defendants have secured new counsel, new counsel shall promptly enter a notice of appearance to ensure a smooth transition of counsel in the event that the motion to withdraw is granted. SO ORDERED. (Motions due by 2/7/2025., Replies due by |

A-26

| | | 2/12/2025., Responses due by 2/10/2025) (Signed by Judge Jennifer L. Rochon on 2/3/2025) (jca) (Entered: 02/03/2025) |
|---|---|---|
| 02/04/2025 | 180 | ORDER granting 176 Letter Motion to Seal. In order to preserve confidentiality of the attorney-client relationship, the request to file the declaration of Jonathan W. Greenbaum under seal and ex parte is granted. The Clerk of Court is respectfully directed to maintain Dkt. 178 under seal with the current viewing restrictions. SO ORDERED. (Signed by Judge Jennifer L. Rochon on 2/3/2025) (jca) (Entered: 02/04/2025) |
| 02/07/2025 | 181 | TRANSCRIPT of Proceedings re: CONFERNECE held on 1/29/2025 before Judge Jennifer L. Rochon. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/28/2025. Redacted Transcript Deadline set for 3/10/2025. Release of Transcript Restriction set for 5/8/2025.. (McGuirk, Kelly) (Entered: 02/07/2025) |
| 02/07/2025 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERNECE proceeding held on 1/29/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 02/07/2025) |
| 02/10/2025 | 183 | MEMORANDUM OF LAW in Opposition re: 177 MOTION for Jonathan W. Greenbaum to Withdraw as Attorney . . Document filed by Dagmara Maja Huk, Nino Martinenko.. (Schulman, Denise) (Entered: 02/10/2025) |
| 02/11/2025 | 184 | ORDER. On February 3, 2025, the Court ordered defense counsel to serve the motion to withdraw and any supporting documents on their client and to file proof of such service on the docket by February 7, 2025. To date, defense counsel has not filed proof of service on the docket. As a courtesy, the Court shall grant an extension for defense counsel to file proof of service until February 13, 2025. (HEREBY ORDERED by Judge Jennifer L. Rochon) (Text Only Order) (aba) (Entered: 02/11/2025) |
| 02/12/2025 | 185 | DECLARATION of Jonathan W. Greenbaum in Support re: 177 MOTION for Jonathan W. Greenbaum to Withdraw as Attorney .. Document filed by Nikolay Volper, 212 Steakhouse Inc.. (Attachments: # 1 Exhibit Exhibit A).(Greenbaum, Jonathan) (Entered: 02/12/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/12/2025 15:51:40 | | |
| **PACER Login:** | cpwashington16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00518-JLR-RWL |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

A-27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NINO MARTINENKO, on behalf of herself and others similarly situated,<br><br>                          Plaintiff,<br><br>      -against-<br><br>212 STEAKHOUSE, INC., and NIKOLAY VOLPER,<br><br>                      Defendants. | Case No.: 22-CV-518 (JLR) (RWL) |

**DEFENDANTS MOTION TO DECERTIFY RULE 23 CLASS**
**AND MOTION FOR JUDGMENT AS TO PLAINTIFF'S**
**COUNT 5 OF THE COMPLAINT**

    Defendants, 212 Steakhouse, Inc. ("212 Steakhouse") and Nikolay Volper ("Volper") hereby move this Court pursuant to Fed. R. Civ. P. 23 and 12(c) to decertify the previously certified class action and to dismiss Count 5 of the Complaint as Plaintiff lacks Article III standing to bring Count 5 in this Court.

    The grounds for this Motion are set forth in the accompanying Memorandum and Exhibits attached hereto. A Proposed Order is attached.

                                        Respectfully submitted,

                                        Jonathan W. Greenbaum
                                        Natalie Nebis
                                        COBURN & GREENBAUM, PLLC
                                        Second Floor
                                        1710 Rhode Island Avenue, NW
                                        Washington, DC. 20036

Telephone No:  202.1744.5003
Facsimile No.:  866.561.9712
Email:  jg@coburngreenbaum.com
        natalie@coburngreenbaum.c.om

A-29

## CERTIFICATE OF SERVICE

I hereby certify that on this _16th_ day of November 2023 a true and correct copy of *Defendants Motion To Decertify Rule 23 Class And Motion For Judgment As To Plaintiff's Count 5 Of The Complaint* was filed via ECF to all Parties of Record.

Jonathan W. Greenbaum

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| NINO MARTINENKO, on behalf of herself and others similarly situated, | : : : | Case No.:  22-CV-518 (JLR) (RWL) |
| Plaintiff, | : : | |
| -against- | : : | |
| 212 STEAKHOUSE, INC., and NIKOLAY VOLPER, | : : : | |
| Defendants. | : : | |

**[PROPOSED] ORDER**

Upon consideration of Defendants Motion to Decertify the previously certified class of "all tipped employees – servers, bussers and bartenders – who worked for Defendants at any time on or after January 20, 2016 at 212 Steakhouse" it is hereby Ordered this _____ day of _____, 2024 that said Rule 23 class is Decertified.

It is further Ordered that Count 5 of the Complaint is dismissed as Plaintiff does not have standing to bring such a claim to this Court as she has not alleged an injury in fact and cannot demonstrate such injury in fact beyond a technical violation.

**SO ORDERED**

_____
U.S. DISTRICT COURT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NINO MARTINENKO, on behalf of herself and others similarly situated,<br><br>               Plaintiff,<br><br>-against-<br><br>212 STEAKHOUSE, INC., and NIKOLAY VOLPER,<br><br>               Defendants. | Case No.: 22-CV-518 (JLR) (RWL)<br><br>**DECLARATION OF**<br>**JONATHAN GREENBAUM** |

I, Jonathan W. Greenbaum, hereby declare as follows under penalty of perjury.

1.     I represent Defendants in this action. I am a member of Coburn & Greenbaum, PLLC and am licensed to practice in this Court.

2.     As counsel for Defendants, counsel for Plaintiffs sent us twelve (12) opt-out notices they received from prospective class members indicating their desire to be excluded from this case. Attached hereto as Exhibit 1 is a class list as annotated by the opt-outs undelivered notices and those on the original list who did not meet the class definition.

3.     On August 22, 2023 I received an e-mail from Denise Shulman, counsel for Plaintiffs, that the following class notices were returned as undeliverable: Gabriel Charles, Haley Melendez, Keya Rocaverte, Lychezar Lazarov, Noel Lora and Tristian Collazo. Lychezar Lazarov was not on our class list as he passed away subsequent to his employment at 212 Steakhouse. Plaintiff sent him a notice at the last known address we provided, but it was returned to Plaintiffs as undelivered.

4.     In the same e-mail, counsel for Plaintiffs informed us that the notices were send via the US Postal Service first class mail. They also stated there are no receipt confirmations. As such, we have no information whether the notices were actually received by the intended recipients. Nor do we know if Plaintiffs use of alternate addresses are accurate. The notices could have been delivered to an address where the intended recipient no longer lives. Despite our requests for some type of confirmation, there are none.

5.     Plaintiffs also believed that certain additional employees should be included in the class, but on further investigation the individuals either did not work during the class period or they were not tipped employees. This is further set forth in the Volper Declaration.

6.     Based on the number of opt-outs, undeliverable notices and individuals initially on Defendants class list who should not have been identified on the list (See Volper Declaration), there are at most 24 individuals who would comprise of the class.

7.     Defendants have also reviewed the clock in and clock out times for the class members (excluding the opt-outs, those who did not receive notices, and those who do not meet the class definition) and the remaining individuals have either no overtime hours during their employment, or extremely limited overtime, which would be attributed to their not signing out for breaks. Fourteen current class members had no overtime hours. Exh. 2 attached hereto.

8.     Named Plaintiff Martinenko and the lone FLSA opt-in Huk have limited overtime hours, but that could be attributed to their failure to clock out during the meal break and/or any other 30 minute or more break. See Volper Declaration.

9.     Plaintiff testified in her deposition that she left Defendants restaurant in 2018 and returned in March of 2021. Exh. 3 (Martinenko Deposition). Martinenko testified that during the time between leaving Defendants restaurant in 2018 and returning in 2021 she worked as a server

at Nusr-et Steakhuse.  Nusr-et Steakhouse was named as a defendant in a wage-hour class action which encompassed the time period Martinenko claims to have worked at that restaurant.  The class comprised of front of the house tipped employees (i.e. servers) and raised the same claims as those in this case, including tip credit minimum wage and wage notice and wage statement claims. Case No. 19-cv-429 (S.D.N.Y.).  A notice of class settlement was disseminated to that class and Martinenko was not in the list of opt-out employees to that class (Dk. No. 73, 19-cv-429).  A copy of the notice of class settlement is attached hereto as Exhibit 4.  The notice explains the claims (i.e. "failing to pay the proper minimum wages due to their taking of an invalid tip credit").

10.     Attached hereto as Exhibit 5 is a true and correct copy of Huk's deposition in this proceeding.

I Declare and affirm that they foregoing is true and correct under penalty of perjury.

Jonathan W. Greenbaum, Dated
November 14, 2023

A-34

# EXHIBIT 1

A-35

## 212 Steakhouse Class List (Annotated)

| Name | Status |
|------|--------|
| Nadia Paputnikava | Opt out |
| Alexander Rynkovsky | Opt out |
| Everardo Perez | Opt out |
| Samuel Garcia | Opt out |
| Javier Clemente | Opt out |
| Bonafacio Ramos | Opt out |
| Jose Paul Roque | Opt out |
| Oscar Bravo Morales | Opt out |
| Alexander Araque Porras | Opt out |
| Juan Aguilar | |
| Angel Hernandez | |
| Mariken Tan | Opt out |
| Mark Smith | |
| Deirde Cora Bethea | |
| Radzivon Babniyazav | |
| Raul Romero | |
| Gisely Rosa | |
| Hector Conoz | |
| Alessandro Ardueni | Opt out |
| Dimitry Zarodin | |
| Stefana Manzano | |
| Miguel Torres | |
| Iroel Vazguez | |
| Laluz Barbara | No information |
| Vivian Peng | |
| Tela Witting | |
| Juan Deluna | |
| Adrian Pizarro | Not eligible- back of house |
| Haley Melendez | Undeliverable |
| Tristian Collazo | Undeliverable |
| Kelsey Foley | |
| Noel Lora | Undeliverable |
| Gabriel Charles | Undeliverable |
| Jake Willis | |
| Benny Torres | |
| Kaye Rocaverte | Undeliverable |
| Assel Ivanskaya | Not eligible- host |
| Jose Pena | |
| Shonda Williams | |
| Jose Garcia | |
| Jaime Tovar | |
| Luis Fernandez | Opt out |

A-36

| Nino Martinako | |
| Dagmora Huk | |

A-37

# EXHIBIT 2

A-38

### 212 Steakhouse Recorded Hours

| Name | Total overtime |
|---|---|
| Juan Aguilar | 8.81 total overtime hours (5 out of 27 weeks had overtime hours) |
| Angel Hernandez | .89 total overtime hours (1 out of 45 weeks had overtime hours) |
| Hector Conoz | 2.9 total overtime hours (1 out of 19 weeks had overtime hours) |
| Miguel Torres | 6.3 total overtime hours (1 out of 29 weeks had overtime hours) |
| Juan Deluna | 26.5 total overtime hours (3 out of 21 weeks had overtime hours) |
| Jake Willis | 6.8 total overtime hours (1 out of 22 weeks had overtime hours) |
| Jaime Tovar | 12.2. total overtime hours (4 out of 28 weeks had overtime hours) |
| Mark Smith | No overtime |
| Stefana Manzano | No overtime |
| Deirde Cora Bethea | No overtime |
| Iroel Vazquez | No overtime |
| Vivian Peng | No overtime |
| Tela Witting | No overtime |
| Radzivon Babniyazav | No overtime |
| Kelsey Foley | No overtime |
| Raul Romero | No overtime |
| Benny Torres | No overtime |
| Jose Pena | No overtime |
| Shonda Williams | No overtime |
| Jose Garcia | No overtime |
| Gisely Rosa | No overtime |

A-39

# EXHIBIT 3

CERTIFIED COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x
NINO MARTINENKO, on behalf of herself and
others similarly situated,

                          Plaintiff,

        -against-      Case No:  22-CV-518


212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                          Defendants.
-------------------------------------------------x




            EXAMINATION BEFORE TRIAL of the Plaintiff

                NINO MARTINENKO

                December 20, 2022




TENEJA THWEATT, Notary Public
489177





(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco     (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-9000 Century City    (408) 885-0550 San Jose          (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez          (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -----------------------------------------------x
     NINO MARTINENKO, on behalf of herself and
3    others similarly situated,

4                                    Plaintiff,

5          -against-        Case No:  22-CV-518

6

7

8    212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

9                                    Defendants.
     -----------------------------------------------x

10         EXAMINATION BEFORE TRIAL of the Plaintiff,

11   NINO MARTINENKO, taken by the Defendants, pursuant

12   to Court Order, held at the Law Offices of Mitchell

13   S. Segal, P.C., 137 5th Avenue, 9th Floor, New

14   York, New York 10010, on December 20, 2022, at

15   10:10 a.m., before a Notary Public of the State of

16   New York.

17

18   ***********************************************
                   BARKLEY COURT REPORTERS

19

20

21

22

23

24

25
```

                                    1

NINO MARTINENKO

**BARKLEY**
Court Reporters

```
 1    A P P E A R A N C E S:

 2    JOSEPH & KIRSCHENBAUM, LLP
              Attorney for Plaintiff
 3            32 Broadway, Suite 601
              New York, New York 10004
 4            (212)688-5640

 5     BY:    MICHAEL DiGIULIO, ESQ.
              Mike@jk-llp.com
 6

 7

 8    LAW OFFICES OF MITCHELL S. SEGAL P.C.
              Attorney for Defendants
 9            1129 Northern Boulevard, Suite 404
              Manhasset, New York 11303
10            (516)415-0100

11     BY:    MITCHELL S. SEGAL, ESQ.
              Msegal@segallaw.com
12

13

14    ALSO PRESENT:

15    NIKOLAY VOLPER, Defendant

16

17

18

19

20

21

22

23

24

25
```

<div align="center">2</div>

NINO MARTINENKO

BARKLEY
Court Reporters

1          S T I P U L A T I O N S :

2    IT IS STIPULATED AND AGREED by and between the
     attorneys for the respective parties herein, and in
3    compliance with Rule 221 of the Uniform Rules for
     the Trial Courts:

4
     THAT the parties recognize the provision of Rule
5    3115 subdivisions (b), (c) and/or (d).  All
     objections made at a deposition shall be noted by
6    the officer before whom the deposition is taken,
     and the answer shall be given and the deposition
7    shall proceed subject to the objections and to the
     right of a person to apply for appropriate relief
8    pursuant to Article 31 of the C.P.L.R.;

9    THAT every objection raised during a deposition
     shall be stated succinctly and framed so as not to
10   suggest an answer to the deponent and, at the
     request of the questioning attorney, shall include
11   a clear statement as to any defect in form or other
     basis of error or irregularity.  Except to the
12   extent permitted by CPLR Rule 3115 or by this rule,
     during the course of the examination persons in
13   attendance shall not make statements or comments
     that interfere with the questioning.

14
     THAT a deponent shall answer all questions at a
15   deposition, except (i) to preserve a privilege or
     right of confidentiality, (ii) to enforce a
16   limitation set forth in an order of a court, or
     (iii) when the question is plainly improper and
17   would, if answered, cause significant prejudice to
     any person.  An attorney shall not direct a
18   deponent not to answer except as provided in CPLR
     Rule 3115 or this subdivision.  Any refusal to
19   answer or direction not to answer shall be
     accompanied by a succinct and clear statement on
20   the basis therefore.  If the deponent does not
     answer a question, the examining party shall have
21   the right to complete the remainder of the
     deposition.

22
     THAT an attorney shall not interrupt the deposition
23   for the purpose of communicating with the deponent
     unless all parties consent or the communication is
24   made for the purpose of determining whether the
     question should not be answered on the grounds set
25   forth in Section 221.2 of these rules, and, in such

                            3

                     NINO MARTINENKO                    BARKLEY
                                                      Court Reporters

1    event, the reason for the communication shall be
     stated for the record succinctly and clearly.
2
     THAT the failure to object to any question or to
3    move to strike any testimony at this examination
     shall not be a bar or waiver to make such objection
4    or motion at the time of the trial of this action,
     and is hereby reserved; and
5
     THAT this examination may be signed and sworn to by
6    the witness examined herein before any Notary
     Public, but the failure to do so or to return the
7    original of the examination to the attorney on
     whose behalf the examination is taken, shall not be
8    deemed a waiver of the rights provided by Rule 3116
     and 3117 of the C.P.L.R, and shall be controlled
9    thereby; and

10   THAT the certification and filing of the original
     of this examination are hereby waived.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

NINO MARTINENKO

BARKLEY
Court Reporters

A-45

1   N I N O   M A R T I N E N K O, the witness herein,

2   having been first duly sworn by a Notary Public of

3   the State of New York, was examined and testified

4   as follows:

5   EXAMINATION BY

6   MR. SEGAL:

7   Q.      State your name for the record, please.

8   A.      Nino Martinenko.

9   Q.      State your address for the record, please.

10  A.      8309 3rd Avenue, 2nd Floor, Brooklyn, New

11  York 11209.

12  Q.      My name is Mitch Segal.  I represent the

13  defendants in this matter.  Good morning.

14  A.      Morning.

15  Q.      So I'm going to ask you several questions.

16  Have you ever been in a deposition before?

17  A.      No.

18  Q.      Okay.  So I'll ask you questions.  Please

19  wait until I'm done stating the question.  You have

20  to give an audible answer, yes or no, so the

21  transcriber can report that.

22          Let me ask you a question:  Did you meet

23  with your attorney prior to this deposition?

24  A.      We met a couple of times in general.  And

25  you mean to prepare for the deposition?

5

NINO MARTINENKO

BARKLEY
Court Reporters

Case 1:22-cv-00518-JLR-RWL    Document 112-4    Filed 11/16/23    Page 8 of 89

```
 1                    N. Martinenko
 2   Q.      When was that?
 3   A.      No.  I'm making sure I'm getting the
 4   question correctly.
 5   Q.      Okay.
 6   A.      Are you asking me if I met him to prepare
 7   for this?
 8   Q.      Yes.
 9   A.      I met him about a month ago.  And he -- I
10   just -- because I wasn't familiar what it was
11   about.  He just took me through the, you know, how
12   it usually goes.  That's all.
13   Q.      Did you speak with him subsequent or after
14   the month ago about the deposition and potential
15   questions and responses?
16   A.      Not that I remember, but maybe.  I just had
17   few questions --
18   Q.      Well, it was only a month ago, so your
19   memory has -- we're going to be talking about
20   several years ago, right?
21   A.      Okay.
22   Q.      So if you can't remember 30 days ago, how
23   are you going to remember several years ago?
24   A.      No.  Well, we didn't go through questions.
25   I just had questions myself, what was it going to
```

6

BARKLEY
Court Reporters

```
                        N. Martinenko
 1
 2    be about.  And he kind of took me through the
 3    process.
 4    Q.      Okay.  When was the last time you did that?
 5    A.      That was one and only time we did, about a
 6    month ago.
 7    Q.      Okay.  That's fine.  Are you able to
 8    testify truthfully today?
 9    A.      Yes.
10    Q.      Did you have any alcoholic beverages in the
11    last 24 hours?
12    A.      No.
13    Q.      Any drugs?
14    A.      No.
15    Q.      Are you on any prescription medications?
16    A.      Nope.
17    Q.      You said you lived -- what was the address?
18            THE REPORTER:  8309 3rd Avenue, 2nd
19            Floor, Brooklyn, New York 11209.
20    Q.      You said second floor.  Is there an
21    apartment?
22    A.      Yes.
23    Q.      Can we have the apartment?
24            MR. DiGIULIO:  Objection to
25            relevancy.
```

7

BARKLEY
Court Reporters

A-48

N. Martinenko

1
2          MR. SEGAL:  Addresses, we need a
3      correct address.
4   Q.    So second floor.  What apartment number is
5   that?
6   A.    It's just one apartment on that floor.
7   Q.    Okay.  That's fine.
8          Okay.
9          So Nino, where were you -- are you a U.S.
10  citizen?
11  A.    Yes.
12          MR. DiGIULIO:  Objection.  You can
13      answer.
14  A.    Yes, I am.
15  Q.    And when did you come to the U.S.?
16  A.    2012.
17  Q.    And what's your educational background?
18  A.    I have a bachelor's degree on economics and
19  finances.
20  Q.    On what?  I'm sorry?
21  A.    Economics and finances.
22  Q.    Where was that?  Where did you get that?
23  A.    Back in my country, in Georgia, the
24  republic of Georgia.
25  Q.    So you're from where originally?

8

NINO MARTINENKO

BARKLEY
Court Reporters

A-49

N. Martinenko

1

2    A.    I am from the country Georgia.

3    Q.    Georgia in Russia, is that --

4    A.    It's not in Russia.  It's next to Russia.

5              (Reporter clarification.)

6    Q.    When you came to the U.S., what has been

7    your occupation from 2012 on?

8    A.    Well, I worked different places for about a

9    couple of months.  And then I started a server job

10   at the restaurant.

11   Q.    Okay.  So -- okay.  So a couple of places

12   just for a couple of months?

13   A.    Yeah.  Before I found where I wanted to

14   stay for longer than couple of months.

15   Q.    Okay.  And when was that?

16   A.    I don't understand the question.

17   Q.    In other words, so you did a couple -- what

18   were the prior jobs?

19              MR. DiGIULIO:  Objection to form.

20         Prior to what?

21              MR. SEGAL:  The prior jobs.  She

22         said she worked at three different jobs --

23              (Simultaneous speakers.)

24   A.    I didn't mention any job.

25   Q.    Okay.  So let's go through that.

9

BARKLEY
Court Reporters

A-50

```
 1                    N. Martinenko
 2         Where did you work first?
 3   A.      I worked for a store that would sell fur
 4   coats.  I was just bag consultant -- like
 5   consulting people.
 6   Q.      And what store was that?
 7   A.      It was called Premier Fur, I think.
 8   Q.      And where was that located?
 9   A.      It was in Brooklyn on 86th Street and
10   Bensonhurst.  I don't exactly remember the address.
11   Q.      Okay.  And when did you start there?
12   A.      I would say I started probably at, like --
13               MR. SEGAL:  Off the record.
14               (Whereupon, a discussion was held
15         off the record.)
16   A.      Okay.  Yeah, I don't exactly remember.  It
17   was probably September when I started there.
18   Q.      Okay.  Of 2012?
19   A.      No.  I'm sorry.  2013.
20   Q.      Okay.  And how long did you work there for?
21   A.      Couple of months.  I would say until
22   November.
23   Q.      Okay.
24   A.      And then --
25   Q.      Yeah.  Okay.  Why did you leave, or what
```

10

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2    was the --
 3    A.      It wasn't enough income.  So I was looking
 4    for something else.
 5    Q.      And what was your next position?
 6    A.      My next position was a server.
 7    Q.      And where was that?
 8    A.      It was a Georgian restaurant in Manhattan.
 9    It's called Oda House.  O-D-A House.
10                    (Reporter clarification.)
11    A.      That's where I started working as a server.
12    Q.      And how long did you stay there for?
13    A.      Until 2015 May, I'm assuming.  Yeah, May.
14    Q.      So roughly two years or so?
15    A.      Yeah.
16    Q.      And why did you leave Oda House?
17    A.      I just did not feel good there, meaning,
18    like, certain people would not make me feel good
19    there.  So I just had to leave.
20    Q.      What does that mean exactly?
21    A.      Well, there were a couple of employees that
22    would just go gossiping.  And one of them -- I
23    don't know if it's appropriate to say.  One of them
24    had crush on me, which would really make me feel
25    uncomfortable there, so I just had to leave.
```

                              11



N. Martinenko

1  

2  Q.      Did you report that --

3  A.      No.

4  Q.      -- to Oda House?

5  A.      Nobody was harassing me.  Why would I

6  report it?  I just decided to leave myself.

7  Q.      Did you sue Oda House?

8  A.      No.

9  Q.      What was your next position?

10  A.      My next position was a server at 212

11  Steakhouse.

12  Q.      Okay.  So let's talk about that.  When did

13  you start?

14  A.      It was -- I'm assuming the end of June or

15  beginning of July of 2015.

16  Q.      When did you complete your --

17         Well, withdraw.

18         When did you last work at 212 Steakhouse?

19  A.      I have two terms working there.  The first

20  time when I left 212 Steakhouse was 2018 December,

21  and then I got back there in 2020 -- I mean '21,

22  beginning.  I lasted until December '21.  It was

23  about New Year's when I got fired.

24  Q.      What was your position at 212 Steakhouse?

25  A.      My position was called a server.

12

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

1

2  Q.    Why do you say it was called --

3  A.    Because I would do more than servers would

4  do.

5  Q.    What would you do that was more than

6  servers do?  Well, let me -- what do servers do

7  normally?

8  A.    Well, they serve people.  They take orders,

9  they put that in the POS system.  They send orders.

10  They make sure they serve drinks.  They order

11  drinks for the customers.  They, you know, make

12  sure the food comes out on time.  They present food

13  to the customers when it comes out, and they check

14  on them if they have been enjoying the food.  And

15  at the end, they present the check, and they charge

16  their cards or they take cash (unintelligible).

17              (Reporter clarification.)

18  Q.    What was the ending of that, they charge

19  their cards and what?

20  A.    They charge their cards or take the cash

21  payment depending on how they're paying.

22  Q.    So you did that as a server?

23  A.    Yes.

24  Q.    What else did you do?  You said you did

25  more than a server, so what else did you do?

13

NINO MARTINENKO

BARKLEY
Court Reporters

```
                         N. Martinenko
 1
 2   A.      Okay.  Well, I also did take phone calls,
 3   take reservations.  Okay.  I actually was spending
 4   a lot of hours just doing that, which was not my
 5   position.  I would also be in charge to, let's say,
 6   order desserts to certain places where they
 7   would -- you know, if I had -- if I would forget,
 8   let's say, ordering desserts, and we were out of
 9   desserts, I would be in trouble because that was my
10   responsibility to do --
11   Q.      Who gave you that responsibility?
12   A.      I -- I mean, there was nobody else to do
13   it, and then -- there was a girl there that would
14   do it before me, but then just because she wasn't
15   there anymore, it just automatically became my job.
16   Q.      Okay.  Let's go back.  Someone must have --
17               (Reporter clarification.)
18   Q.      Let me ask the questions.
19               (Reporter clarification.)
20   Q.      I'll ask the question again.
21           Who told you to order desserts?
22   A.      Imran Sajid.
23   Q.      Who?
24   A.      Imran.
25   Q.      And who is Imran?
```

14

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    A.      He's the person that works there as well.
3    I don't exactly know what his position is, but he
4    acts as if he's an owner too of the restaurant.
5    Q.      You said that a prior girl was doing the
6    desserts and then you took that over.  Did someone
7    tell you to take that over?
8    A.      I just told you it was Imran.
9    Q.      And what did he tell you exactly?
10   A.      If I could start ordering desserts now that
11   the girl wasn't there anymore.
12   Q.      And how did you know how to order desserts?
13   A.      Well, he gave me a phone number, and I
14   started calling that number and ordering desserts.
15   Q.      How long did that take you?
16   A.      Depending on how busy that dessert place
17   was, it would have been ten minutes, fifteen or
18   twenty.
19   Q.      Okay.  Other than ordering dessert, what
20   else did you do that wasn't a server
21   responsibility?
22                MR. DiGIULIO:  Objection.
23           Misrepresents testimony.  You can answer.
24                THE WITNESS:  Should I answer?
25                MR. DiGIULIO:  Yes, please answer.
```

15

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    A.      Well, I also mentioned the phone calls.
3    That's not a server position.  Besides ordering
4    desserts, I would also be in charge to write
5    paychecks, like, for the -- for the other
6    employees.
7    Q.      Okay.  That's fine.
8            Let's go back to the phone calls.
9    A.      Mm-hmm.
10   Q.      How many phone calls did you take per day?
11   A.      I didn't count, but it was at least 50.
12   Q.      How long was each phone call?
13   A.      Depending on what they wanted, it would
14   have been two minutes, three minutes or more.
15   Q.      So what were your hours that you worked?
16   A.      If I was doing double, like double shift,
17   it would've been starting from 1:00 and then
18   finishing up until closing, which was never a
19   certain time because it depended what -- like what
20   was the latest reservation and what time last
21   customer would walk in, and then what time they
22   would decide to leave.  So basically, I can say it
23   was maybe until 12:00 a.m., sometimes longer.
24   Q.      What time did you come in to the
25   restaurant?
```

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

A.    If I was opening, meaning if it was a double shift, I would have been there 11:30, somewhere that time.  Yeah.

Q.    11:30.  So let's focus on the double shift for a second.  So you came in at 11:30, and when did you work until?

A.    Double shift means that I was staying there until closing.  So it would have been 12:00 a.m., 1:00 a.m.  I don't know.  If it was -- if we were super lucky maybe until 11:00 p.m.  But usually that's how long it would have been.

Q.    On average, what was it?  11:00 p.m.?

A.    Average, I would say 12:00 a.m.

Q.    And how many days -- how many days a week did you do a double shift?

A.    Two mostly.  Two or three.

Q.    Okay.  What was it, two or three?

A.    Well, schedule would change.  So it could have been two or three.  It wasn't same exact thing every week.

Q.    Would you say that fifty percent of the time, you did two or three, or was it --

A.    Fifty percent of the --

Q.    Eighty, or what do you think?

17

BARKLEY
Court Reporters

N. Martinenko

1

2    A.    I would do fifty percent of the time, it

3    would have been two days, double.

4    Q.    Was the restaurant closed during that

5    double shift at all?

6    A.    If there was no customers doing lunch

7    there -- which is basically -- that's how it would

8    go, like there were no customers -- officially we

9    would announce it was closed at 4:00 because that's

10    when the other staff would come in for the dinner

11    shift.  And that's when we would start preparation

12    for dinner.  So it was basically closed from 4:00

13    to 5:00.

14    Q.    Okay.  I'm familiar with the restaurant, as

15    you know.

16    A.    I've served you couple of times.

17    Q.    Yes, you did.  And it's not a busy lunch;

18    is it?

19    A.    There's basically no business for lunch, at

20    least for those days when I worked there.

21    Q.    Am I incorrect to state that lunch

22    wasn't -- that was always an issue, to open for

23    lunch or not, because it wasn't that busy?

24    A.    Issue --

25    Q.    In other words, didn't the restaurant close

18

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   sometimes for lunch, and in the beginning it wasn't
 3   really open for lunch, and then it opened up for
 4   lunch later, and it wasn't successful, and it
 5   closed again?  Is that not the truth?
 6   A.      Yeah, it was couple of times that they
 7   didn't do lunch.  But then they would reopen it
 8   again.  Yes.
 9   Q.      Okay.  So let's focus on that for a second.
10           So during your tenure, right, how many
11   times --
12           Withdrawn.
13           During the time you worked there --
14   A.      Mm-hmm.
15   Q.      -- which was according to your complaint --
16   well, actually let's take a step back.
17           So really the years that we're talking
18   about here are two thousand -- even though you said
19   you worked from 2016 to 2018, the years we're
20   talking about are 2016 to '18, and then from '21 --
21   January '21 to December '21.  So forget about 2015
22   because that's not really applicable.  It doesn't
23   go back six years, which is the complaint's
24   statute.
25           So during 2016 to 2018, right -- which is,
```

19

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    I guess, three years; let's assume that for the
3    time being -- and then another year from '21 to --
4    from '21, so four years, how many months was the
5    restaurant closed for lunch?
6    A.     I can't really answer that question.  I
7    don't know exactly.
8    Q.     Can you speculate --
9                 MR. DiGIULIO:  Objection.  Calls --
10   A.     I can't.
11                MR. DiGIULIO:  -- speculation.  You
12         can answer, if you can.
13   Q.     Can you guess?
14   A.     I can't.
15   Q.     To the best of your recollection, was it
16   five months, ten months, a year?
17   A.     I can't remember.  I can't answer that
18   question.  Like, I might make a mistake.  So I
19   can't answer that question.
20   Q.     That's all right.  I don't want you to make
21   a mistake.  So you don't have any recollection
22   whether the restaurant was opened or closed from
23   2016 to 2018 for lunch?
24   A.     Maybe it wasn't open all the time, but
25   most -- most of those time, it was open for lunch.
```

NINO MARTINENKO

BARKLEY
Court Reporters

A-61

N. Martinenko

1

2  Q.     But you can't determine the amount of

3  months?

4  A.     I can't tell you exact amount of months how

5  many days it was closed or how many months.

6  Q.     Okay.

7  A.     But a lot of time, it was open, and I

8  worked.

9  Q.     But you can't tell me that either.  If you

10  don't know when it was closed, you can't tell me

11  when it was open; is that correct?

12  A.     Well, I remember working there for lunch.

13  Q.     No one's saying you didn't --

14  A.     But --

15  Q.     All I'm saying is if you can't tell me the

16  amount of months it was closed from 2016 to 2018 --

17  A.     Okay.

18  Q.     Then the reciprocal, you can't tell me when

19  it was open --

20          MR. DiGIULIO:  Objection to form.

21      No one's saying you didn't work.

22  A.     The only thing I'm saying right now is that

23  I would never think this would happen, and I didn't

24  just decide to memorize when it was open and when

25  it was closed.  So it was just --

21

NINO MARTINENKO

BARKLEY
Court Reporters

1                          N. Martinenko

2    Q.      What do you --

3    A.      -- as a human being, I'm telling you I

4    don't remember exactly how many months it was

5    closed.  But most of it, it was open for lunch.

6    Q.      What do you mean you didn't expect this to

7    happen?  What does that --

8    A.      I mean I wasn't planning on suing anybody.

9    Why would I start remembering when was it open?

10   Q.      So what determined that you were suing?

11   A.      I'm sorry?

12   Q.      What was the decision that made you sue?

13   A.      Because it was very unfair how I got fired.

14   Q.      So it's about the firing; is that correct?

15   A.      It's about the firing, about me not getting

16   paid, whatever the labor law is about.

17                    (Simultaneous speakers.)

18   Q.      Well, just to be honest with you -- so

19   you've made statements in this complaint.

20   A.      Mm-hmm.

21   Q.      And you said it was opened, you worked this

22   time.  But if you don't remember, these statements

23   can't carry weight, so to speak.

24                    (Simultaneous speakers.)

25                    MR. SEGAL:  Objection.  There's no

                              22

BARKLEY
Court Reporters

A-63

```
1                        N. Martinenko
2          question.
3   A.     I do remember it.
4   Q.     Are these your statements as to when you
5   worked in this complaint?
6   A.     I don't understand the question.
7   Q.     Okay.  Have you read this complaint?
8   A.     Yes.
9                  MR. DiGIULIO:  Objection.  It's not
10                in evidence.  You're not showing it to her,
11                this complaint.
12  Q.     Okay.  Let's -- you want to do this?  We'll
13  do this.  Okay.  This will be Exhibit 1 for
14  defendants.
15                (Defendant's Exhibit 1, complaint,
16                was marked for identification.)
17                (Whereupon, a discussion was held
18                off the record.)
19  Q.     I show you Defendant's Exhibit 1.
20         Are you familiar with this complaint?
21  A.     I've seen it, yes.
22  Q.     Did you read it?
23  A.     I did.  It's -- yeah, I just.
24  Q.     What was the last --
25  A.     Long time ago I --
```

23

BARKLEY
Court Reporters

                           N. Martinenko

1
2    Q.     When was the last time you read it?
3    A.     I only read it once, and it was probably
4    like a month and a half ago or maybe a month ago.
5    Q.     I'd like you to take some time and review
6    that complaint.
7    A.     The whole thing?
8    Q.     Well, let --
9    A.     You want me to pay attention to the
10   particular --
11   Q.     We're talking over each other.  I don't
12   want to do that.
13   A.     Sorry.
14   Q.     That's okay.  Let's focus on -- let's focus
15   on the facts, which is paragraph 20 --
16   A.     Mm-hmm.
17   Q.     -- until paragraph 32.  Why don't you just
18   read those over.
19   A.     (Perusing.)
20          Okay.
21   Q.     Okay.  So in anywhere on these facts, do
22   you state that the restaurant was closed during the
23   time that you worked for lunch?
24   A.     It doesn't say it here.
25   Q.     Just -- that's it.  Just answer the

                                24

BARKLEY
Court Reporters

```
                        N. Martinenko
 1
 2   question, please.  Okay.  And anywhere in these
 3   facts, do you state that during the time period
 4   that you worked, approximately 50 percent of the
 5   time you did double shifts?  It's a yes-or-no
 6   question.
 7   A.     Can you --
 8               MR. DiGIULIO:  Objection.  The
 9          exhibit speaks for itself.  You can answer.
10   A.     And can you repeat your question because --
11   Q.     Sure.  Is there anywhere in this complaint
12   or these facts, the paragraphs that you just read,
13   does it state that during the time you were
14   employed, you worked double shifts, meaning the
15   restaurant was open for lunch 50 percent of the
16   time?
17               MR. DiGIULIO:  Same objection.  You
18          can answer.
19   Q.     Yes or no?
20   A.     I still -- I mean, I'm trying to understand
21   what the question is about.
22   Q.     I mean, I can't be clearer.
23   A.     Fifty percent of the time meaning -- who
24   said it was 50 percent of the time I was doing
25   double shifts?
```

NINO MARTINENKO

BARKLEY
Court Reporters

N. Martinenko

2   Q.    Does it say that --

3   A.    It doesn't --

4                (Simultaneous speakers.)

5   Q.    Because that's what you just told me.

6   A.    I told you I was doing 50 percent of --

7   Q.    You said two to three times --

8                (Simultaneous speakers.)

9   Q.    -- per week.  Does it state that in here?

10  A.    It says here two to three lunch shift

11  lasting about two hours.  It's paragraph 24.

12  Q.    Okay.  Does it say that the restaurant was

13  closed at any time during that time period that you

14  worked?

15  A.    It doesn't say --

16  Q.    Okay.

17  A.    But it was couple of months maybe that it

18  was just closed.  Most of the time it was open for

19  lunch.

20  Q.    Well, you just said you didn't remember

21  when it was closed?

22  A.    Because it was so -- it was such a minor --

23  it was a little bit when it wasn't open.

24  Q.    So do you remember, or you don't remember?

25  A.    I remember at some point it was closed for

26

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2  a bit for lunch.  But most of the time, it was
 3  open.
 4  Q.      What does for a bit mean?
 5  A.      Like couple of months.
 6  Q.      Do you know what year that was?
 7  A.      No.  I don't remember exactly what year was
 8  that.
 9  Q.      Okay.  Does it state in here anywhere that
10  you ordered desserts?
11  A.      I don't think so.
12  Q.      But you read this right prior to filing?
13  A.      I didn't -- I'm repeating.  I read it once,
14  and it was probably a month ago.  And I don't
15  remember reading desserts.
16  Q.      You read this only a month ago?
17  A.      Yeah.
18  Q.      Did you read it prior to 1/20/22?
19  A.      1/20 -- what's --
20  Q.      When the complaint was filed?
21  A.      Oh, prior to that, we just spoke, me and my
22  lawyer.  And I was familiar with what was going on
23  here, but I didn't read it.
24  Q.      I'm not sure what that means, what was
25  going on here?
```

BARKLEY
Court Reporters

1                          N. Martinenko

2    A.      I mean, I know what we spoke about, but I

3    didn't read the thing.

4    Q.      You didn't read the complaint prior to its

5    filing; is that correct?

6    A.      It was sent to me, and I -- I read it, but

7    I didn't really go into the details.  Like I --

8    Q.      Did you read it, or you didn't read it?  In

9    other words --

10   A.      So I didn't have a printed copy.  It was on

11   my phone.  So it was kind of impossible for me to

12   read the whole thing.  So I kind of went over it.

13   But one month ago, I read the whole thing.

14   Q.      But you didn't really read it prior to its

15   filing --

16   A.      No.

17   Q.      Is that correct?

18   A.      No.  I mean, I did read it but not

19   thoroughly.

20   Q.      Okay.  Thank you.  When you started working

21   here, was that when the restaurant first opened?

22   A.      It was open before -- before I started.

23   Q.      How many years before; do you know?

24   A.      As I know, they opened in 2014.  But I

25   wasn't there.

                              28



N. Martinenko

1

2    Q.    Okay.  So relatively in the beginning you

3    started; is that correct?

4    A.    Yeah, correct.  A year later, yeah.

5    Q.    And I'm familiar with the restaurant

6    because I live nearby.  It wasn't that busy; is

7    that correct?

8    A.    It was okay, I think.

9    Q.    Isn't it true that it took a decent amount

10   of time to pick up at some point?

11   A.    It was -- when I started, it was pretty

12   busy, and it got busier afterwards.  But I don't

13   think it was slower or bad business.

14   Q.    When were -- because you say you worked

15   until 12:00 a.m., that restaurant was never open

16   that late during the initial years that you worked.

17   So I'm curious why you say 12:00 a.m.?

18   A.    Restaurant being open doesn't mean that

19   there are no customers inside.  You might not

20   receive new customers at 12:00, but somebody that

21   worked inside the restaurant at 9:30 or 10:00 could

22   stay longer than 12:00 a.m.  You can't really kick

23   the customers out.

24   Q.    What time did the kitchen closed?

25             MR. DiGIULIO:  Objection to form.

29

BARKLEY
Court Reporters

```
1                    N. Martinenko
2        You can answer.
3              (Whereupon, a discussion was held
4        off the record.)
5  A.    It was I think 10:30.
6  Q.    Okay.  So let me ask a practical question,
7  and please let me finish.  If the kitchen closed at
8  10:30 --
9  A.    Mm-hmm.
10 Q.    -- why were you there until 12:00 a.m.?
11 A.    Working at the restaurant -- I guess you
12 have never done that -- 10:30 is -- when your
13 kitchen is open until 10:30, that means if you
14 receive -- if you start serving a customer that
15 orders their food at 10:00 or 10:30, they need time
16 to finish up their meal, have their drinks.  From
17 10:30 to 12:00, how long is that?  One hour and a
18 half.  So yeah.
19 Q.    So are you telling me that when the -- if
20 the -- and by the way, when you say the kitchen
21 closes, they're done?  Does the chef leave?
22 A.    I don't know.  Chef mean, like, if the
23 kitchen is closed, we don't order more --
24              (Simultaneous speakers.)
25              (Reporter clarification.)
```

30

NINO MARTINENKO

BARKLEY
Court Reporters

1                        N. Martinenko

2    A.      Okay.  So when the kitchen is closed, we

3    sent no more food orders.  But I don't know what

4    chef doing, if he's leaving or if he's somewhere in

5    there again.  Why would I start looking for him?  I

6    know the kitchen is done, finished.

7    Q.      Since you're a server, and since I don't

8    know because I've never worked in a restaurant,

9    according to you, but I've owned probably ten, but

10   that's okay --

11                  (Simultaneous speakers.)

12   Q.      Since the kitchen closed and you've served

13   the patrons, are you saying that they take an hour

14   and a half before you give them a check and leave?

15   A.      Sometimes more than that.

16   Q.      And that was from during 2015 to 2018 when

17   the restaurant first started out and it was very

18   slow?

19   A.      It wasn't very slow.

20   Q.      Oh, it wasn't?

21   A.      It wasn't.

22   Q.      Okay.  Okay.  Were you ever hanging out at

23   the bar after you served your customers?

24   A.      After the restaurant was closed, I could

25   have stayed at the bar, yeah.

                            31



```
 1                    N. Martinenko
 2   Q.      How about from the time of 10:30 to 12:00?
 3   A.      If I was working, I was not hanging out
 4   anywhere.
 5   Q.      How about the time from 9:00 to 10:00 if
 6   you didn't have any tables?
 7   A.      Can you specify what does hanging out mean
 8   at this point?
 9   Q.      Yeah, standing at the bar?
10   A.      If I have nothing to do, I might stand
11   there and talk with my coworker.
12   Q.      How many days a week did you work on
13   average?
14              MR. DiGIULIO:  Objection.  Asked
15         and answered.  You can go ahead.
16   Q.      Go ahead, yeah.
17   A.      Well, five days -- five dinner shifts, plus
18   two lunch shifts.  So I had two days off.  So
19   basically --
20   Q.      What days were that?
21   A.      It wasn't permanent.  It was changing.
22   Q.      On average, any regularity?
23   A.      It was changing.  Mostly I would be off the
24   beginning of week, never at the weekend.
25   Q.      Monday, Tuesday?
```

32

BARKLEY
Court Reporters

```
 1                      N. Martinenko
 2    A.      Yeah, Monday, Tuesday; Tuesday, Wednesday;
 3    Wednesday, Thursday, something like that.  It would
 4    change.  Maybe not back to back.  Maybe Monday and
 5    Wednesday.  It was never the same.
 6    Q.      Do you think Wednesday and Thursday are the
 7    beginning of the week?
 8    A.      Did I start with Monday?
 9    Q.      Please answer my question --
10                 (Simultaneous speakers.)
11    A.      I started with Monday.
12    Q.      It's a yes-or-no question.
13    A.      Wednesday and Thursday is not the beginning
14    of the --
15    Q.      That's it.  That's all.  I just want
16    yes-or-no questions, please.  Okay.
17            What were you paid by the hour?
18    A.      Ten dollars.
19                 MR. DiGIULIO:  Objection to the
20            form of the question.  There's no time
21            frame.  But you can answer, if you know.
22    A.      The last year -- I'm speaking about the
23    last year.  It was $10 an hour.
24    Q.      Withdrawn question.  Your attorney is
25    right.
```

33

NINO MARTINENKO

BARKLEY
Court Reporters

```
1                      N. Martinenko
2          In 2015, what were you paid by the hour?
3    A.      Five dollars an hour.
4    Q.      Five dollars an hour?
5    A.      Yes.
6    Q.      Do you have any proof that you were paid
7    five dollars an hour in 2015?
8    A.      No, because I wasn't getting any pay stubs.
9    Q.      But you only met a month ago to discuss
10   this right?
11              MR. DiGIULIO:  Objection.
12        Harassing the witness.
13   Q.      Okay.  2016, what were you paid by the
14   hour?
15   A.      I don't exactly remember when it changed.
16   But it was -- after we started at $5 an hour and
17   probably a year later, a little more after, it was
18   7.25, I think, or 7.50.  Not sure.
19   Q.      Okay.  In 2017, what were you paid by the
20   hour?
21   A.      It remained the same for, like, until I
22   left 212 Steakhouse in 2018.
23   Q.      So from two thousand -- because you state
24   here even though you didn't read the complaint --
25   you state that you worked from 2015 to 2018, and
```

34

BARKLEY
Court Reporters

```
 1                     N. Martinenko
 2   then you took time off, and then it was '21.  So
 3   you're telling me from 2016, which is really the
 4   only applicable period here, you earned 7.25 an
 5   hour, and that never changed; is that correct?
 6   A.     As far as I remember, yes, it didn't
 7   change.
 8   Q.     What do you mean as far as you remember?
 9   A.     Again, I wasn't paid -- I wasn't shown pay
10   stubs.  So I don't know exactly how much I was
11   getting.  But it has never been --
12   Q.     Well, we'll get to that because you kind of
13   did payroll yourself, didn't you?
14   A.     I did payroll --
15                 (Simultaneous speakers.)
16                 (Reporter clarification.)
17   Q.     From 2016 to whenever you were terminated,
18   you were paid 7.25 an hour?
19                 MR. DiGIULIO:  Objection.  That
20          misstates her testimony.
21   Q.     Plus tips; is that correct?
22                 MR. DiGIULIO:  Objection.  Still
23          misstates --
24   Q.     Did you earn tips on top of 7.25 an hour?
25   A.     Yes.
```

<center>35</center>

BARKLEY
Court Reporters

N. Martinenko

1

2   Q.    Did you ever complain about the 7.25 to any

3   owner or manager?

4   A.    No.

5   Q.    Did you feel that that was the correct

6   amount of minimum wage or tip minimum wage that you

7   should get --

8   A.    I never thought --

9   Q.    Let me finish, please.  Let's satisfy

10  Teneja.  She's going to punch us both.  Okay.  I'm

11  getting there.

12        Did you complain to anybody about that?

13  A.    I didn't because I didn't know it was -- it

14  wasn't correct or something.

15  Q.    Did you ever speak to any other employee

16  about getting paid 7.25 per hour?

17  A.    I didn't.  At the time, I didn't.

18  Q.    Okay.  Well -- what do you mean at the

19  time?  You mean you didn't?

20  A.    I didn't.  By that time, I didn't.

21  Q.    By that time, you mean during your whole

22  employment; is that correct?

23  A.    No.  Can I say?

24  Q.    Yes, when did you --

25  A.    I had a conversation about not getting paid

36

BARKLEY
Court Reporters

```
 1                     N. Martinenko
 2   overtime in 2021 with other coworkers.  But it
 3   wasn't about an hour -- like $10 or 7.25 or
 4   anything.  I just had a question, why were we not
 5   getting paid overtime.
 6   Q.     In what month of 2021 did you have that
 7   conversation?
 8   A.     I exactly don't remember.  It was probably
 9   May -- May or maybe April.  It was not really a
10   conversation.  I just asked the question.
11   Q.     Who did you have that conversation with?
12   A.     Everyone was there, but mostly I kind of
13   had a conversation -- I kind of asked that question
14   to Sasha, which is Alexander Rinkovski (phonetic).
15   Q.     Who?
16   A.     Alexander Rinkovski.
17   Q.     And who is he?
18   A.     He's also a server.
19   Q.     Alexander Mikovski [sic]?
20   A.     Rinkovski.
21   Q.     Rinkovski.  And you just asked about
22   overtime?
23   A.     Yeah.
24   Q.     What did he say?
25   A.     He said he didn't know if we were supposed
```

<center>37</center>

BARKLEY
Court Reporters

A-78

```
 1                    N. Martinenko
 2   to get any overtime at all.
 3   Q.      Were there ever any times since the kitchen
 4   closed at 10:30 where you left before 12:00 a.m.?
 5   A.      Well, could have been a couple of cases,
 6   maybe if it was a slow night, very slow, and we had
 7   to close a bit earlier.
 8   Q.      Would you call that restaurant a busy
 9   restaurant during the whole time you worked or slow
10   restaurant or --
11   A.      It's a busy restaurant.
12   Q.      It's a busy restaurant.  Okay?
13   A.      Dinner is busy.  I would say that.
14   Q.      Okay.  Let's focus on your tips now.
15           So you worked five days per week generally,
16   right?
17   A.      Mm-hmm.
18   Q.      Well, most the time, actually, five days
19   per week.
20           How much tips did you earn per week?
21   A.      It's -- it's never the same number.  It
22   just changes.
23   Q.      I understand.
24   A.      So I can't really give you exact number.
25   But it would have been somewhere from 900 to 1,200
```

38

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   per week.  Maybe little less than (unintelligible).
 3   Q.     I'm sorry?
 4   A.     Maybe slightly less, but you know it was
 5   generally...
 6   Q.     So on average for the five days -- like 200
 7   and change per day; is that right?  Is that fair?
 8   A.     Yup.
 9   Q.     Now, were those credit card tips or cash
10   tips?
11   A.     Credit card tips.
12   Q.     What about cash tips?
13   A.     We had some which was --
14                  (Simultaneous speakers.)
15   Q.     But you're not including that in there; is
16   that correct?
17   A.     No.  That's the amount that would go on my
18   paycheck.
19   Q.     Okay.  How much do you think you earned in
20   cash tips?
21   A.     I don't remember that exactly.  But it
22   wasn't much.
23   Q.     Okay.  Did you ever keep any --
24          Withdrawn.
25          We'll get back to that.  Okay.
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2          How did you determine -- how did the tip
 3    process work at that restaurant?
 4    A.      Tip process meaning how did we split?
 5    Q.      Let me -- I'll withdraw the question.  I'll
 6    state it differently.  That wasn't a good question.
 7          Yeah.  So was there a process by which --
 8    well, let's start from the beginning.  Were tips
 9    shared at the restaurant?
10    A.      Yeah.
11    Q.      Who did you share the tips with, the other
12    servers?
13    A.      Other servers, runners and bussers and
14    bartender.
15    Q.      And how was that determined?
16    A.      Servers and the bartender would get one
17    point.  Bussers would get half a point, and I'm
18    assuming runners was point 6, I think, point 6 or
19    point 7.
20    Q.      I'm sorry.  Server and bartenders would get
21    one point?
22    A.      Yeah.
23    Q.      Runners would get what?
24    A.      Bussers would get half a point, and
25    runners, I think it was point 6.
```

40

BARKLEY
Court Reporters

```
                          N. Martinenko
 1
 2   Q.      Point six?
 3   A.      Point six, I think.  Or point 7, but mostly
 4   it's six.
 5   Q.      And the bartender?
 6   A.      One point.
 7   Q.      So everybody's tips were compiled at the
 8   end of the night?
 9   A.      Mm-hmm.
10   Q.      In 2016 -- what time was that done every
11   night?
12   A.      After the restaurant was closed.
13   Everyone -- every customer would leave after that.
14   Q.      And who controlled that process?
15   A.      Okay.  So we would keep all our receipts at
16   us during the night.  And then at the end, every
17   single server would process their own -- count
18   their own tips in total.  There was like this
19   little paper that we would write down the numbers
20   of tables and how much tip it came -- like how much
21   they tipped and then total of the tip.
22           So every single server had the total of how
23   much tips they made.  And then we would put this
24   together, we would calculate, and according to how
25   many points was on the floor, we would split it.
```

41

BARKLEY
Court Reporters

N. Martinenko

1

2    Q.    Was there one person in particular that

3    controlled that process, or was it a communal

4    thing?

5    A.    Well, everyone was doing their own tips.

6    But at the end we would do, like, total.  It could

7    be me or Sasha or someone else.  It depends on who

8    worked or who was willing to do it.

9    Q.    Were cash tips included in that process?

10   A.    Cash tips would go, you know, together on

11   the table.  And we would split it the same way, you

12   know, with the points system.

13   Q.    Let me ask you a question.  So if you're

14   telling me that you got 900 to 1,200 per week but

15   it was just credit card tips, why are you not

16   including the cash tips in that analysis?  Because

17   you said it was only credit cards?

18        MR. DiGIULIO:  Objection to form.

19        You can answer, if you know.

20   A.    I thought you were asking me about the

21   paychecks.  That's why I answered you --

22   Q.    No.  Well, let's go back to the question.

23   A.    Mm-hmm.

24   Q.    How much -- my question was how much in

25   tips do you earn per week?  Let me finish.  You

42

BARKLEY
Court Reporters

A-83

```
 1                    N. Martinenko
 2   told me 900 to 1,200.  I said, Is that cash or
 3   credit card?  You said, Credit card.  Why don't you
 4   give me the real number including cash?
 5   A.     Okay.  Well, cash wasn't really much, so I
 6   would say 150 a week total.
 7   Q.     Okay.  So now it's 1,050 to 1,300 is what
 8   you're saying?
 9   A.     Yeah.  Including cash, yes.
10                    (Whereupon, a discussion was held
11            off the record.)
12                    (Whereupon, a recess was taken at
13            this time.)
14   Q.     In your opinion, how many customers, during
15   the five days you served, paid in cash?
16            Well, withdraw that question.
17            How about this:  In your opinion --
18                    (Whereupon, a discussion was held
19            off the record.)
20   Q.     So in your opinion, how many tables did you
21   serve during five days?
22   A.     Oh, that's -- I can't say really number.
23   How many tables during the week I served?
24   Q.     Yeah?
25   A.     I think -- oh, god.  I have to, you know,
```

43

A-84

```
1                          N. Martinenko
2    kind of re-imagine.
3    Q.      I'll withdraw the question.  How about the
4    -- let's do it this way.  Were you assigned a
5    certain -- not because I know nothing about the
6    restaurant business, as you said, but how many
7    tables were you assigned?  Were you assigned
8    certain tables so --
9    A.      There were sections.  Okay.  So one
10   section, let's say, would have, like, seven
11   tables -- six, seven, maybe more if it was super
12   busy.  And well, let's say I had to help out, like,
13   another server.  I might have taken one table from
14   their section too.  So it's just -- you know, it
15   would have been six, seven tables in my section,
16   maybe eight.
17   Q.      How many sections were there?
18   A.      One, two -- like depending on how many
19   servers were there.  Let's say if it was three, it
20   was one section, the second one, and the one in the
21   back.  So it would be three sections.  Yeah.
22   Q.      How many tables were there?  Do you know?
23   A.      In each section?
24   Q.      No, in the restaurant.
25   A.      Total.  I don't remember the number of
```

44

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2    tables (unintelligible).
 3                 (Reporter clarification.)
 4    A.      I don't remember exact number of tables.
 5    Q.      When you served --
 6            Withdrawn.
 7            Did a runner ever come to you and ask you
 8    what table gets this?  Were they ever confused as
 9    far as the food that was ordered?
10    A.      No.  Runner had a ticket that would say --
11    Q.      And that had a table number on it, right?
12    A.      Yes.
13    Q.      And you don't know the number of tables in
14    the whole restaurant?
15    A.      I know -- I don't know how many tables are
16    there because also tables work in a way where you
17    can split them apart and put them together.  Okay.
18    So I knew the table numbers, but I don't know how
19    many are there, you know.
20    Q.      That's fair.  Let's focus on the evenings
21    that you worked, all right?
22    A.      Okay.
23    Q.      So you worked five days, and you had
24    roughly six to seven tables per day?
25    A.      That's not true.
```

45

BARKLEY
Court Reporters

A-86

```
                          N. Martinenko
 1
 2    Q.      In the section --
 3                (Simultaneous speakers.)
 4    Q.      How many rounds, so to speak, occurred each
 5    night?  In other words, how many tables turned
 6    over?  Was it once, twice, three times?
 7    A.      Twice, I would say.
 8    Q.      Twice.  Okay.  That's fine.
 9            And did -- were the reservations consistent
10    with that?  We're going to turn over each table two
11    times.  Let's make it a 7:00, make it at 9:00.
12    Whatever it was?
13    A.      Yeah.  We didn't really have a person who
14    would kind of, like, assign the reservations at
15    that point, like, to be smoothly transitioned to a
16    second turn.  But we tried our best to do it that
17    way.
18    Q.      That's fine.  So if there were two times,
19    and let's take -- let's just choose the number six.
20    But I know you said six or seven.  I'm not trying
21    to confuse you.  Let's use six.
22            That's twelve tables a night, right?
23    A.      Mm-hmm.
24    Q.      That's sixty tables for the nights you
25    worked?
```

46

BARKLEY
Court Reporters

N. Martinenko

1

2   A.      Mm-hmm.

3   Q.      Just dinners.  Of those (unintelligible),

4   60 tables, how many paid in cash, in your opinion?

5   A.      Approximately -- because lately most people

6   paid with cards, and we were not happy about that

7   either, but that's how it goes so.  I would say

8   maybe six or seven throughout the week.

9   Q.      So ten percent roughly?

10  A.      Yeah.

11  Q.      What was the average check?

12  A.      I -- okay.  Again, this restaurant has very

13  expensive items on the menu.  So depending on --

14  it's just really hard to say.  Like what's the

15  average.  I would say -- let's say 200.

16  Q.      Per person or total?

17  A.      No, like per tab.

18  Q.      Okay.

19  A.      But it's only because I'm thinking about

20  those two-tab tables that would try to order, like,

21  less expensive things.  And let's say their bill

22  was 120, but then there is another table that would

23  order something that would cost them 600.  So I'm

24  just, kind of, like, balancing it out and saying

25  200.

47

BARKLEY
Court Reporters

N. Martinenko

1

2    Q.    Two hundred to me seems on the low end for

3    that menu.

4    A.    No, I'm saying average.  Like...

5    Q.    Well, what was the -- just refresh my

6    recollection.  Not that it's that pertinent.  But

7    the combination with the wagyu beef and this and

8    that, how much did that cost?  Do you remember?

9    A.    Um --

10   Q.    That steak platter, I don't remember

11   (unintelligible) --

12                (Reporter clarification.)

13   Q.    Okay.  I'm sorry.

14         How much -- to the best of your

15   recollection, how much did the steak platter with

16   the wagyu beef and the different kind of

17   combination items cost?

18   A.    That wagyu beef platter is $225 with three

19   different slices of wagyu on it.  But it doesn't

20   mean that everybody gets it.

21   Q.    I understand.  And that was for one person,

22   correct?

23   A.    Mostly it would be shared between two

24   people.

25   Q.    Okay.  The tables that were in your

48

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2   section, were they two-tops or four-tops?
 3   A.      Mixed.  Both.  Again, sections would
 4   change.  So it's not the same thing.
 5   Q.      I could do the math, but let's move on.
 6           While you were working at 212 -- that's the
 7   defendant.  I'll just call it 212 for purposes of
 8   our conversation or discussion today at the
 9   deposition -- did you work anywhere else?
10   A.      No.
11   Q.      You never had another job during the day,
12   night, or evening while you were -- during the
13   times you stated you worked here, had any other
14   employer?
15   A.      There was this one situation when I was
16   coming back to 212.  In 2021, I had another job
17   that I was, like, slowly, kind of, like, moving
18   from there to 212.  So --
19   Q.      You're talking in and about --
20   A.      2021, yes.  That's when I kind of had,
21   like, the other job.  But I've never had both
22   restaurants on the same day, like, I had to run
23   there and come here.  No, it was always, like,
24   scheduled in a way where I would be on time in both
25   places, and it was just for a little bit.  Then I,
```

49

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2    you know, quit there, and I moved here, and I
 3    didn't have any other job.
 4    Q.     So at some point, you did have another job
 5    during the transition period; is that correct?
 6    A.     Yup.
 7    Q.     And how long do you think that was?
 8    A.     Maybe like two months.
 9    Q.     And that was in 2021?
10    A.     Yeah.
11    Q.     The cash tips you received, did you ever
12    report those as income?
13                 MR. DiGIULIO:  Objection.  Invasion
14            of privacy.  Irrelevant.
15                 MR. SEGAL:  It's not irrelevant.
16                 MR. DiGIULIO:  How is it relevant?
17                 MR. SEGAL:  Cash tips go into the
18            tip (unintelligible).
19                 MR. DiGIULIO:  We're not having any
20            allegations that there's misappropriated
21            tips here.
22                 MR. SEGAL:  (Unintelligible) it's
23            misappropriated because you're talking
24            about nonpayment of minimum wage and
25            overtime.  The cash tips accord go into the
```

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2         minimum wage to see if they paid minimum
 3         wage or overtime.
 4                   MR. DiGIULIO:  The allegations
 5         (unintelligible) --
 6                   (Reporter clarification.)
 7                   MR. SEGAL:  This is not a
 8         judgement.  This is a complaint.  It's an
 9         allegation.  So I can ask that question.
10                   MR. DiGIULIO:  All right.  Go
11         ahead.
12    A.   What was the question again?
13    Q.   The question was:  Did you ever report as
14    income the cash tips that you received?
15    A.   No.
16    Q.   Did you ever --
17         Withdrawn.
18         Do you know that you're required to report
19    that?
20    A.   I did not.
21    Q.   Did you ever tell management or ownership
22    of the cash tips that you received?
23    A.   Tell, like -- tell meaning, like, to let
24    them know that I had cash tips today, every day?
25    Q.   Yes.
```

51

BARKLEY
Court Reporters

1                    N. Martinenko

2    A.     No.

3    Q.     How were you paid your -- how were you paid

4    your wages, by check or cash?

5    A.     By check.

6    Q.     From the beginning of the time that you

7    worked until the end?

8    A.     Yes.

9    Q.     And those checks were handwritten checks or

10   payroll checks?

11   A.     Handwritten checks that would come with a

12   paper --

13   Q.     A pay stub?

14   A.     Pay stub, yeah.

15   Q.     So you received a pay stub during all the

16   time you worked?

17   A.     Not all the time.  Only on 2021.

18   Q.     Oh, okay.  So from 2016, which is the time

19   period we're dealing with, to 2018, you did not

20   receive a -- let's call it a pay stub?

21   A.     No.

22   Q.     What did you receive from 2016 to 2018?

23   A.     Only handwritten paycheck.

24   Q.     Okay.  And then in 2021, you received a

25   payroll check, not a handwritten check?

                        52

BARKLEY
Court Reporters

N. Martinenko

1

2    A.    Handwritten check and a pay stub printed.

3    Q.    Okay.  In 2016 to 2018, were your --

4          Withdrawn.

5          Did you know the hours that you worked from

6    2016 to 2018 on a weekly basis?

7                (Simultaneous speakers.)

8    Q.    I'm sorry.

9    A.    I didn't track them.  Like, I didn't

10   memorize the hours.  But I did work a lot,

11   meaning --

12   Q.    When you got the --

13   A.    I would clock in and clock out.

14   Q.    We'll get to that.

15   A.    Yeah.

16   Q.    When you got your check, did you look at

17   it?

18   A.    Well, I would look at the amount.  But what

19   else --

20   Q.    Did you quantify that it made sense with

21   the hours that you worked?

22   A.    I did not.  Because there was nothing to

23   look at.

24   Q.    But you just mentioned that you kind of

25   knew the hours you worked, right?

53

BARKLEY
Court Reporters

N. Martinenko

1
2    A.    Well, I knew approximately how much time I

3    spent in the restaurant for the whole week.  But I

4    couldn't count it because they have us clock in and

5    clock out, and they know it better than me.  So I'm

6    trusting them.  They writing the checks.

7    Q.    Let's go to, now, your -- your other

8    services, because according to you, you did a lot.

9    So did you do a payroll?

10   A.    Only on 2021, and I didn't do a payroll.  I

11   was just writing checks.

12   Q.    When?

13   A.    On 2021.

14   Q.    Well, how were you writing checks?  The

15   payroll company wrote the checks in 2021.

16              MR. DiGIULIO:  Objection.

17        Mischaracterizes the testimony.  You can

18        answer.

19   A.    Okay.  Paychecks were handwritten.  They

20   would do -- whoever the person that was doing the

21   payroll, calculating tips, deducting taxes and all

22   that, it was someone else, not me.  But then this

23   finished up paperwork would be sent to me so that I

24   have it.  When it's time to pay, I would just have

25   the checkbook, which I would write myself, with the

54

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   amount and the name of the employees.  I didn't do
 3   a payroll.  I was just writing checks.
 4   Q.    Okay.  And when was that, during --
 5   A.    2021.
 6                (Simultaneous speakers.)
 7   Q.    I'm sorry?
 8   A.    2021.
 9   Q.    That's it?
10   A.    Maybe couple of times before, but it wasn't
11   consistent.  Yeah.
12   Q.    You had access to the office, right?
13   A.    Everyone did.
14   Q.    You had access to the checkbook, was that
15   correct?
16   A.    Everyone did.
17   Q.    You had access to the tip sheets; is that
18   correct?
19   A.    Everyone did.
20   Q.    I'm just asking about you.
21   A.    Yes.
22   Q.    Did you take payroll information and make
23   copies from that office?
24   A.    No.
25   Q.    You didn't?
```

NINO MARTINENKO

BARKLEY
Court Reporters

1                          N. Martinenko

2    A.      I didn't.

3    Q.      Did you take tip sheets and make copies?

4    A.      No.

5    Q.      You didn't?

6    A.      I didn't.

7    Q.      You're under oath, by the way.

8    A.      So?

9    Q.      And your attorneys showed us that at the

10   last deposition.

11   A.      But I didn't --

12                   MR. DiGIULIO:  Objection.  That's a

13           misrepresentation (unintelligible).

14                   MR. SEGAL:  You can object.

15   Q.      Were any tip sheets done for lunches?

16   A.      If there were any customers, yeah.  But if

17   there wasn't, then no.

18                   MR. SEGAL:  We can take a break for

19           three minutes or so.

20                   (Whereupon, a recess was taken at

21           this time.)

22                   (Defendant's Exhibit 2, tip

23           declaration, was marked for

24           identification.)

25                   (Defendant's Exhibit 3, daily tips,

                              56

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2         was marked for identification.)
 3                (Defendant's Exhibit 4, time
 4         brackets, was marked for identification.)
 5    Q.     Showing you Defendant's Exhibit 2.  Do you
 6    know what that is?
 7    A.     Yeah, it's a weekly tips sheet.
 8    Q.     And were you involved in creating that
 9    sheet?
10    A.     Not the template.  But, you know, I
11    could -- I was involved putting numbers down, yes.
12    Q.     So this was for the week of 7/8 to 7/11/21,
13    correct?
14    A.     Yeah.
15    Q.     Okay.  Were you in control of that sheet?
16    A.     Again, I did not create the template, but
17    everybody who was finishing up the dinner shift,
18    whoever was calculating the tips for the day at the
19    end, they would write down the amount under -- on
20    each name so...
21    Q.     Did you provide that sheet to your
22    attorneys at some point?
23    A.     I did provide payroll, like, a pay stubs
24    that I had received.  I don't remember.  I might
25    have.  But I don't think so.  I don't think I sent
```

BARKLEY
Court Reporters

```
1                    N. Martinenko
2    it to them.
3    Q.      Well, that's an exhibit that was provided
4    by your attorney.
5    A.      Okay.  So I guess I sent it to them, yeah.
6    Q.      So how did they get that?
7    A.      Well, for me to -- okay.  For them to
8    calculate the tips for the week, I had to take a
9    picture of the -- of this on a Sunday night.  It
10   would have been me or Sasha or somebody.  So, like,
11   we were supposed to take a picture of it and send
12   it to Imran, who, by himself, would send it to
13   somebody else who was in charge to create the
14   payroll.  So it was in my phone.
15   Q.      That's not my question.  My question was
16   how did your attorneys receive that sheet?  Was
17   that from you?
18   A.      I sent it to them.  How else?
19   Q.      Was that -- did you take that from the
20   office, the restaurant's office?
21   A.      I had it in my phone already long time ago.
22   Q.      Do you have pictures of all the weekly
23   sheets in your phone?
24   A.      The ones that I sent to Imran, yes.
25   Q.      Did everybody take pictures of that?
```

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2    A.     Yes.
 3    Q.     All the waiters -- all servers?  Excuse me.
 4    A.     Yeah.  I mean, sometimes maybe busboys or
 5    runners -- because it was right there in the
 6    drawer.  It was for people to see, like, how much
 7    are they making so...
 8    Q.     Let's look at the next exhibit, Exhibit 3
 9    which is...
10    A.     This one.
11    Q.     Now, this one doesn't look like a picture.
12    A.     Okay.
13    Q.     This you one looks like a form -- a copy of
14    a form.
15    A.     Okay.
16    Q.     Did you supply that form to your attorneys?
17    A.     I don't think so.
18    Q.     No?
19    A.     It's not -- I didn't have it.
20            MR. DiGIULIO:  You guys produced
21         that.
22            MR. SEGAL:  Oh, we produced that?
23            MR. DiGIULIO:  We put the Bates
24         stamp numbers and the defendant's names
25         (unintelligible) --
```

<center>59</center>

NINO MARTINENKO

BARKLEY
*Court Reporters*

```
1                      N. Martinenko

2                (Simultaneous speakers.)

3                      MR. SEGAL:  All right.  Withdraw

4          the question.  Okay.  That's okay.  We have

5          others.

6    Q.    Can I see Exhibit 4 for a second.

7          So I'll show you Defendant's Exhibit 4, and

8    I refer you to Page 3.  Can you tell me what that

9    is?

10   A.    It's not something that came from me for

11   sure.  But I'm assuming it's clock-in and

12   clock-out, right?

13                (Simultaneous speakers.)

14   Q.    So what's the top date that you see there?

15   A.    Which -- hold on.  What do you mean top

16   date?

17   Q.    On Page 3, so --

18   A.    The top date mean- --

19   Q.    Time in, what does it say?

20   A.    4:22.

21   Q.    Right?

22   A.    Right.  Okay.

23   Q.    And the time out?

24   A.    11:47.

25   Q.    Okay.  And the restaurant, as you stated,
```

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   is closed from 4:00 to 5:00.  Did you clock in and
 3   clock out during that time period?
 4   A.     Wait.  If I go there for dinner time and
 5   I'm preparing restaurant to be open at 5:00, when I
 6   go at 4:00, I clock in, and then I start working,
 7   right?
 8   Q.     Is there a meal break at any time?
 9   A.     Not really.  I mean, they would provide
10   food, but there was no break specifically --
11   Q.     What time did that occur?  Sorry.
12                    (Simultaneous speakers.)
13   A.     It would be somewhere -- it would be
14   somewhere, like, before we opened up.  Like, 15
15   minutes early.  Like, let's say 4:40, 4:45, that
16   was when we would get the meal to eat and then get
17   ready to work.  But there was no particular break
18   for it.
19   Q.     Well, you weren't working during that time
20   period were you?
21   A.     Well, we were eating.  Yeah.
22   Q.     Well, I understand that.  But you were
23   eating?
24   A.     And?
25   Q.     You didn't clock in and clock out during
```

61

BARKLEY
Court Reporters

A-102

```
1                        N. Martinenko
2   that meal break?
3   A.      Okay.  So let me put the -- most of the
4   time when the meal was ready, we were also, like,
5   about to open up.  So I -- a lot of times I had to
6   eat my meal inside the kitchen because there were
7   already clients -- customers inside the restaurant.
8   So, like, why would I clock out and clock in if I'm
9   biting a meal and then I'm going and serving a
10  customer, so...
11  Q.      Did you sit and eat the meal?
12  A.      Sometimes if they prepared it on time,
13  meaning, like, if there was time for me to sit,
14  yes.
15  Q.      What time did the restaurant open up for
16  dinner?
17  A.      5:00.
18  Q.      5:00?
19  A.      Yes.
20  Q.      So there wasn't any customers from 4:00 to
21  5:00, was there?
22  A.      Yes.
23  Q.      So -- and that's when the meal was served;
24  is that correct?
25  A.      Meal wasn't served on time always.
```

BARKLEY
Court Reporters

A-103

```
 1                    N. Martinenko
 2   Q.     Well, it wasn't served at 6:00, was it?
 3   A.     No, but it was served sometimes, like, five
 4   minutes to 5:00, maybe at 5:00, so we already had
 5   doors open for the customers.
 6   Q.     Sometimes or always?
 7   A.     Sometimes.
 8   Q.     But what does "sometimes" mean?
 9   A.     I mean like two, three times a week at
10   least.
11   Q.     So you're stating that the meal would --
12   was served at five to 5:00 two or three times a
13   week?
14   A.     Yeah.  No, I mean -- I'm not saying at 5:00
15   exactly.  It was like close to 5:00.  So there was
16   no time for me to sit down.  Not only for me but
17   anybody.
18   Q.     Let's look at this page for a second.
19   A.     Mm-hmm.
20   Q.     How many days are on this page?
21   A.     On the whole page?  Do you want me to count
22   it?
23   Q.     I'll count for you.  How is that?  One,
24   two, three, four, five, six, seven, eight, nine;
25   ten.  One, two, three, four, five, six, seven,
```

63

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2  eight, nine; twenty.  One, two, three, four, five,
 3  six, seven, eight, nine; thirty.  One, two, three,
 4  four, five, six, seven, eight, nine; forty.  So I
 5  got 46 days.
 6  A.      Okay.
 7  Q.      A month and a half roughly.  Okay.
 8          Of the 46 days, how many days does the last
 9  column show over eight hours?
10                  MR. DiGIULIO:  Objection.
11          Misstates the document.  Every entry isn't
12          a distinct day.  But you can answer the
13          question.
14  A.      Okay.  So --
15                  MR. SEGAL:  Wait, what?  Excuse me?
16                  MR. DiGIULIO:  So there are times
17          for instance --
18                  MR. SEGAL:  It's only when it's
19          over 12:00 that's (unintelligible).
20          They're all the same days.  And I believe
21          that only happened...
22                  MR. DiGIULIO:  You're right.
23                  MR. SEGAL:  -- on one day.
24  A.      Okay.  What's the question?
25                  MR. SEGAL:  Can you repeat the
```

64

BARKLEY
Court Reporters

```
 1                          N. Martinenko
 2          question?
 3                      (Whereupon, the record was read by
 4          the reporter.)
 5     A.     It shows three -- four.
 6     Q.     Let's look.  So the first one is on 4/10;
 7     is that correct?
 8     A.     Yes.
 9     Q.     Actually I take that back.  4/9, I'm sorry.
10          How many hours -- we'll go back to that.
11     So 4/9, 5/7, 5/15.  So of 46 days, four of them,
12     less than ten percent, shows that you're entitled
13     to any of time --
14                      MR. DiGIULIO:  Objection.
15     Q.     Is that correct?
16                      MR. DiGIULIO:  Misstates the
17          document.  You can answer the question.
18                      (Simultaneous speakers.)
19     A.     We are only underlining one particular day.
20     But then if we count five shifts together where
21     there are so many days where it's over seven
22     hours --
23     Q.     We're talking about the document.  Let's
24     focus on this.  I'm not asking you your whole --
25                      (Simultaneous speakers.)
```

65

```
 1                         N. Martinenko
 2    Q.     Let's focus on that, and please just answer
 3    my question.
 4    A.     Okay.  I'm trying.
 5    Q.     Well, answer it.  It's not that difficult.
 6           So four days out of 46 days, there's the
 7    minimum overtime.  And the latest you've clocked
 8    out -- the only other time is two hours over, if
 9    that's correct.  And by the way, did you clock in
10    any time for lunch during these 46 days?
11                  MR. DiGIULIO:  I'm going to object
12           to the statements made.  And they
13           misrepresent what overtime is.  But you can
14           answer the question.
15    A.     What I'm seeing here is that this is a
16    time -- the season of the year when the restaurant
17    is the slowest.  So I obviously was not really
18    staying that long.
19    Q.     March, April, and May?
20    A.     Yes, sir.  And also like -- that's pretty
21    much it.  And the reason I'm not clocked in for
22    lunchtimes here is that this is kind of -- like,
23    the time when I was transmitting from the previous
24    job to here, and then I started taking lunch
25    shifts.
```

NINO MARTINENKO

BARKLEY
Court Reporters

1                          N. Martinenko

2    Q.      And so in your opinion, the end of March to

3    the beginning of June is the slowest time?

4    A.      Yes, sir.

5    Q.      Okay.  Do you know what spread of hours is

6    by the way?

7    A.      "Spread"?  You can explain if you'd like.

8    Q.      No.  Just do you know what it is?

9    A.      I don't know.

10   Q.      Okay.  Because you mentioned it in your

11   complaint.  So I would assume that you knew what it

12   was.  But you don't?

13   A.      Spread of hours?

14   Q.      Yes.

15   A.      Well, I'm not sure.  Yeah, I'm kind of --

16   Q.      That's okay.

17   A.      -- guessing.

18   Q.      Please just answer the question.

19           And would you say that -- well, in your

20   opinion what are the busiest months?

21   A.      Busy starts in September, October.

22   November, December.  These are, like, very busy

23   times, somewhat busy.  January gets a little

24   slower...

25   Q.      Okay.  So let's turn your attention to

                            67

BARKLEY
Court Reporters

```
1                      N. Martinenko
2    Page 4.
3    A.       Mm-hmm.
4    Q.       And why don't we go to -- well, that's
5    interesting.
6             So let's look at -- let's go with 9:24 on
7    Page 4 where it says 7:58, right?  And let's count
8    some days here.  So one, two, three, four, five,
9    six, seven, eight, nine, ten, eleven, twelve,
10   thirteen, fourteen, fifteen, sixteen, seventeen,
11   eighteen.  So there's eighteen days on this page.
12            And one, two, three, four, five, six,
13   seven, eight, nine, ten.  One, two, three, four,
14   five, six, seven, eight, nine, ten,
15   (unintelligible.)
16                      (Reporter clarification.)
17                      (Whereupon, a discussion was held
18            off the record.)
19   Q.       So there's 48 days on Page 5 of 5, and
20   we're looking at 18, Page 4 of 5, which, according
21   to you, is the busiest time period?
22   A.       I think you're missing 9/23.  That also --
23   Q.       You want to include that?  We can include
24   that.
25   A.       Isn't it September though?
```

68

BARKLEY
Court Reporters

N. Martinenko

1

2  Q.    Yeah.  So let's make it 19.  That's fine.

3        So of these 19 days -- well, you want me to

4  include eight hours and one minute, I

5  (unintelligible).  Of these 19 days -- one, two,

6  three, four, five, six, seven -- only eight days

7  are over eight hours; is that correct?

8  A.    Are we just looking at this page, right?

9              MR. DiGIULIO:  I don't know.

10             THE WITNESS:  Because I don't know.

11         This is half of October.  This is half of

12         September.  So I don't know.

13             MR. VOLPER:  (Unintelligible.)

14  Q.    We can play this game all day long, but the

15  busiest time period, according to you, maybe some

16  days you've worked over eight hours.  But if we add

17  up the weeks, I don't think there's any overtime on

18  it.

19             MR. DiGIULIO:  Objection to the

20         form of the question.  Again, it misstates

21         the overtime requirements (unintelligible).

22         You can answer.

23             MR. SEGAL:  No, I agree with that.

24         I'd rather do the weekly to be honest with

25         you, but I'm just going through.

69

BARKLEY
Court Reporters

N. Martinenko

Q.    So you say you worked every week over 40

hours, but does this indicate that?

          MR. DiGIULIO:  Objection.  This

          misstates what's written in the complaint.

          You can answer if you know.

A.    I would not like to answer that.  The

numbers --

          (Reporter clarification.)

A.    I'm not understanding because the numbers

speak --

Q.    Well, you have to answer.

A.    Answer what?

Q.    Doesn't it indicate different than what you

stated in the complaint?

A.    I don't think so.

Q.    How is that?

A.    That's my opinion.

Q.    Do you want to go through the numbers?

A.    No.

Q.    Okay.  Is it your opinion, or is it based

on the time in and time out?

A.    Well, my opinion comes out of the numbers

that I see here.

Q.    Well, then let's do that, because I don't

70

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   see that.  So show me -- show me that you worked in
 3   excess of 40 hours, and this is just one random
 4   time sheet.  We can do it all day long.  Show me
 5   where you worked in excess of 40 hours, which you
 6   stated in your complaint from Page 3 to Page 6
 7   or 5?
 8   A.     Where -- are we on Page 4 now?
 9                 (Simultaneous speakers.)
10                 MR. DiGIULIO:  Objection to the
11         form.
12   A.     I think we were counting September, and you
13   were putting me back to Page 3, which is, I think,
14   June or July.  So if we are counting September,
15   right here; 11 hours and 40 minutes, 7 hours and 58
16   minutes, 8 hours and 1 minute, 13 hours, and 11
17   hours plus minutes.  It already indicates it's
18   over -- way over 40 hours.  So I don't want to talk
19   about this because numbers are here.
20   Q.     No, it's really not.  What about the next
21   page?  You said every week.
22                 MR. DiGIULIO:  Objection.  That
23         mischaracterizes the complaint.
24                 MR. SEGAL:  How does it
25         mischaracterize the complaint?
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                        N. Martinenko
 2               MR. DiGIULIO:  Look at the
 3          complaint.  It says, "regularly worked."
 4          You said "every week."
 5               MR. SEGAL:  This is not regularly
 6          at all.
 7               MR. DiGIULIO:  Sure.  Forgery.  Go
 8          for it.
 9               MR. SEGAL:  What?
10               MR. DiGIULIO:  Continue.
11     Q.    Do you have a good relationship with
12     Nikolay?
13     A.    I did.
14     Q.    What happened with that relationship?
15     A.    I don't know.  He knows better.
16     Q.    Well, I'm asking you, not him?
17     A.    Well, I was very respectful.  But then, you
18     know, just because I got sick, he was really mad at
19     me, and then it went south, our relationship.
20     Q.    When you say you got sick, what do you mean
21     by that?
22     A.    I was infected with COVID.
23     Q.    When did that happen?
24     A.    In December, closer to Christmas.  I don't
25     exactly remember the date.
```

72

```
 1                      N. Martinenko
 2   Q.     Did you go for a COVID test?
 3   A.     Yes, I did.
 4   Q.     Were you still working --
 5          Withdrawn.
 6          Were you still working at the restaurant
 7   when you got COVID?
 8   A.     When I learned I had COVID, I didn't go to
 9   the restaurant.  Before I worked there, yes.
10   Q.     Did you have any signs or symptoms when you
11   were at the restaurant prior to you learning that
12   you had COVID?
13   A.     No.
14              MR. DiGIULIO:  Objection to the
15          relevancy of the question.
16              MR. SEGAL:  It's relevant.
17              MR. DiGIULIO:  How is it relevant?
18              MR. SEGAL:  Because it affects her
19          employment at the restaurant, and it
20          affected the restaurant.  The restaurant
21          had to close due to her --
22              MR. DiGIULIO:  You withdrew the
23          allegations.  Are you going to bring them
24          up now again?
25              MR. SEGAL:  Yeah, I'll bring them
```

73

BARKLEY
Court Reporters

1                     N. Martinenko

2       up --

3                 MR. DiGIULIO:  He, under oath --

4                 (Simultaneous speakers.)

5                 MR. VOLPER:  I don't withdraw

6       anything.

7                 MR. DiGIULIO:  You testified under

8       oath that you did withdraw those claims.

9                 MR. VOLPER:  No, we never -- we

10      said we're going to sue in a different

11      court.

12                MR. DiGIULIO:  All right.  Well,

13      then we're not going to answer any

14      questions about this.  It's a discovery to

15      another pending action.

16                MR. VOLPER:  Yeah, but the law

17      required she to be fully vaccinated in

18      order to work.  So it's relevant to any

19      labor-related cases.  It's a law --

20                MR. DiGIULIO:  Please instruct your

21      client not to speak to me.

22                MR. SEGAL:  Well, you asked him a

23      question.

24                (Simultaneous speakers.)

25                MR. VOLPER:  It's a law.  She have

74

BARKLEY
Court Reporters

A-115

```
 1                    N. Martinenko
 2        to (unintelligible).
 3              MR. SEGAL:  Well, let's everybody
 4        chill out.
 5              MR. DiGIULIO:  No.  I'm not going
 6        let you ask her about this.  It's an
 7        invasion of privacy, and it's irrelevant.
 8              MR. SEGAL:  It's not.  It's related
 9        to the restaurant.  It was a Cuomo law.
10        She had to get vaccinated.
11              MR. DiGIULIO:  Your employer had to
12        enforce Cuomo law.  We're not going to
13        answer this.
14              MR. VOLPER:  I'm not enforcement
15        agency, my friend.  I'm not enforcement
16        agency.
17              MR. DiGIULIO:  Oh, you didn't
18        enforce it?
19              MR. VOLPER:  I'm not a enforcement
20        agency.  It's my responsibility --
21              (Simultaneous speakers.)
22              MR. SEGAL:  If we have to call the
23        judge, we'll call the judge.  Let me ask
24        the questions.
25              MR. VOLPER:  It's my
```

75

NINO MARTINENKO

BARKLEY
Court Reporters

A-116

```
 1                    N. Martinenko
 2        responsibility --
 3                    (Simultaneous speakers.)
 4                    MR. SEGAL:  Nikolay, let me ask the
 5        questions.
 6                    MR. VOLPER:  Call the judge.
 7                    MR. SEGAL:  If I have to, I will.
 8        You want to call him right now?
 9                    MR. DiGIULIO:  I don't.  I'm
10        instructing her not to answer questions
11        about -- related to COVID.
12                    MR. VOLPER:  Let's do it.
13                    MR. SEGAL:  Okay.  You want to do
14        this?
15                    MR. DiGIULIO:  I don't.
16                    MR. SEGAL:  Let me ask a couple of
17        other questions.  Let's see.  Okay?  Let's
18        take it --
19   Q.    Talk to me about your -- what happened, how
20   were you terminated from the restaurant?
21   A.    I was terminated over phone that I was not
22   supposed to come back after -- actually it was,
23   like, I literately had to take these words out of
24   his mind -- mouth, because he wasn't telling me
25   that I was fired.  He was just lying to me that,
```

76

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                         N. Martinenko
 2    oh, it's not busy now.  You can stay home.  Then I
 3    had to tell him that it wasn't true because I could
 4    see the reservation -- there are a lot of
 5    reservations.  It's not slow.  And then at the end,
 6    I finally got him to say, you know what, I don't
 7    need you anymore.  You're fired.  So that's how I
 8    got fired.
 9    Q.     If you weren't at the restaurant, how did
10    you see the restaurant?
11    A.     Well, I worked.  After I recovered from the
12    COVID, I worked two shifts.  And then I could see
13    the reservation.
14    Q.     When did you get COVID?  Do you remember
15    the exact day?
16    A.     I don't remember the day, but it was like a
17    mid-December, like closer to Christmas so...
18    Q.     Okay.  And when you had COVID, you didn't
19    come into the restaurant?
20    A.     I didn't.
21    Q.     And then when you came back that one day,
22    you were done with COVID?
23    A.     Yes.
24    Q.     Okay.  And after -- and what was that, that
25    day?
```

77

NINO MARTINENKO

BARKLEY
Court Reporters

A-118

```
 1                    N. Martinenko
 2    A.      I'm not sure.  I might be -- it would be a
 3    mistake.  But I think the last time I worked was
 4    December 28, or 27.  28, I think.
 5    Q.      And then is there a schedule that you
 6    looked at and saw you weren't on on the 29th, or
 7    how did that --
 8    A.      I'm assuming I was just informed over the
 9    text message to, you know, like that I was supposed
10    to go in work.
11    Q.      By the way, I never asked you this
12    question.  In 2018, how did you leave the
13    restaurant?
14    A.      I just had another job offer and I just
15    ended.
16    Q.      What job offer was that?
17    A.      It was another restaurant job.
18    Q.      Is that the same restaurant you mentioned?
19    A.      Which did I mention?
20    Q.      That you were working at both places at one
21    time?
22    A.      Oh, no.  It was the different one.
23    Q.      Okay.  And why did you leave that
24    restaurant?
25    A.      I couldn't get used to environment.  It
```

78

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2   was, like, very, kind of, like, ethnic racist kind
 3   of environment.
 4   Q.      What kind of restaurant is that?
 5   A.      It's called Nusr-Et Steakhouse.
 6   Q.      Nusr-Et --
 7   A.      Nusr-Et.  Nusr-Et is the name of the
 8   Turkish Salt Bae chef.
 9   Q.      Where is it located?
10   A.      It's on 53rd and 5th Avenue, I think.  It's
11   like an old China Grill.
12   Q.      Oh, the old China Grill location?
13   A.      Yes.
14   Q.      Did they terminate you, or you left on your
15   own?
16   A.      I was going to leave, but then they
17   terminated too.  Like I was -- it was a
18   termination.  But actually, I was going to put in
19   my two weeks that day, but they were --
20   Q.      What was the basis of that termination?
21   A.      They didn't really have any reasons.  They
22   just -- they said that they were overstaffed and
23   they didn't need me.
24   Q.      Did you file a lawsuit against them?
25   A.      No.
```

BARKLEY
Court Reporters

A-120

1                           N. Martinenko

2                        (Whereupon, a discussion was held

3            off the record.)

4    Q.    When you first started working with the

5    restaurant, after your year-end wage statement, did

6    you receive a 1099 or a W-2?

7    A.    Are we talking about 212 Steakhouse?

8    Q.    Yeah.  I forgot about -- we're past the

9    other restaurant.

10   A.    At the end of the year?

11   Q.    Yes.

12   A.    The tax season, yeah, I got the 1099 form.

13   Q.    Do you know what a 1099 form is?

14   A.    I know that it -- what I know about 1099 is

15   that your taxes are not deducted during the weekly

16   salary, and then you --

17   Q.    Did you file a 1099 form?

18   A.    Yes, of course.

19   Q.    Personally or through an entity?

20   A.    No, I had an accountant I went to.

21   Q.    Who filed that tax return?  Was it you

22   individually or an entity?  In other words, who

23   filed the tax return?

24   A.    I didn't do it myself.  I went to an

25   accountant.

                              80

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2              MR. DiGIULIO:  She doesn't
 3         understand the question.
 4  Q.     Who's the filer?  Was it Nino Martinenko or
 5  a was it a corporation or a --
 6  A.     No.  It was me.  It was me, of course.
 7              MR. DiGIULIO:  Who did you guys
 8         issue the 1099 to?
 9              MR. VOLPER:  You want me to answer?
10              MR. SEGAL:  No, I don't.
11              MR. VOLPER:  You want me to answer?
12              MR. SEGAL:  I don't.  I don't.
13              Let's take a two-minute break.  But
14         I think we're almost done.
15              (Whereupon, a recess was taken at
16         this time.)
17  Q.     When was the first time you told Nikolay
18  Volper that you weren't feeling good around that
19  Christmas holiday?
20  A.     I actually texted him.  I can look up in my
21  phone if you want, but I don't remember a date.
22  Q.     What was the rest of that --
23  A.     I texted him saying I got COVID.  And then
24  his reaction was like, Oh, that's bad, or something
25  like that.  I think nothing else.
```

<div align="center">81</div>

BARKLEY
Court Reporters

N. Martinenko

1

2    Q.    Were you ever in the restaurant prior to

3    that date with symptoms?

4    A.    No.

5    Q.    And once you felt you had the symptoms, you

6    never went into that restaurant?

7    A.    No.

8    Q.    Did you ever wear a mask in the restaurant?

9    A.    When we had to wear it, I was wearing it.

10   But there was, like, some time that it wasn't a

11   mandatory thing, so I wasn't wearing it.

12   Q.    Was anyone else in the restaurant sick, to

13   your knowledge?

14   A.    To my knowledge, it was a hostess girl and

15   me.  Nobody else really had COVID.  Hostess is

16   someone that I had basically no contact with.

17   Q.    Who is that?

18   A.    I don't remember her name.  It was a girl

19   that would just come on the busy day.  She would be

20   standing by the door, and I would be busy on the

21   floor.  So I did not have any contact with her to

22   my -- would you like to hear my opinion?  I think

23   it was a customer --

24              MR. DiGIULIO:  No.

25              THE WITNESS:  Okay.

82

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2              MR. DiGIULIO:  He didn't ask you.
 3              THE WITNESS:  Okay.
 4              MR. SEGAL:  Give me one second.
 5         Okay.
 6              (Whereupon, a recess was taken at
 7         this time.)
 8    Q.    Were you familiar with the vaccination law
 9    at the time you were sick in relation to the
10    hospitality industry?
11              MR. DiGIULIO:  Objection.  Don't
12         answer that.  It's irrelevant, and it's
13         invasive.
14              Do you want to call the judge to
15         ask this question?
16              MR. VOLPER:  Let's call the judge.
17         Yes.
18              MR. DiGIULIO:  Sure.
19              MR. VOLPER:  Okay.  Let's do it.
20              MR. DiGIULIO:  I'm not going to
21         call.
22              MR. VOLPER:  Call the judge.  It's
23         a law.  A law to work.  It's related to
24         labor.
25              MR. SEGAL:  Let's just call to get
```

NINO MARTINENKO

BARKLEY
Court Reporters

```
 1                    N. Martinenko
 2      this resolved.  Okay?
 3              MR. DiGIULIO:  What's your position
 4      about it's relevancy?  You should call.
 5      I'm just curious.
 6              MR. VOLPER:  (Unintelligible) law.
 7              MR. SEGAL:  It's related to the
 8      hospitality industry.  Employees had to be
 9      vaccinated.  It's related to, somewhat, her
10      termination.  She's saying she was
11      wrongfully terminated.
12              MR. DiGIULIO:  No, she's not.
13      There's no claim for wrongful termination,
14      so please call.
15              MR. VOLPER:  Is she -- if she can
16      work illegally in your opinion.
17              MR. DiGIULIO:  Whether she can work
18      or not is actually relevant, her work
19      status.
20              MR. VOLPER:  (Unintelligible.)
21              (Reporter clarification.)
22              MR. DiGIULIO:  This is off the
23      record.
24              (Whereupon, a discussion was held
25      off the record.)
```

84

BARKLEY
Court Reporters

```
 1                          N. Martinenko
 2               MR. SEGAL:  Defense is done asking
 3          Nino Martinenko any questions at this
 4          deposition.  And if Plaintiff's counsel
 5          wants to --
 6               MR. DiGIULIO:  I have one question.
 7     EXAMINATION BY
 8     MR. DiGIULIO:
 9     Q.    So Nino, did anyone instruct you to clock
10     out for the time that you were eating a meal shift
11     during your time at 212 Steakhouse?
12     A.    No.
13               MR. DiGIULIO:  Okay.  That's it.
14          You can follow up on --
15               MR. SEGAL:  You want to follow up?
16               MR. VOLPER:  I want to say
17          something.
18               (Whereupon, a discussion was held
19          off the record.)
20     FURTHER EXAMINATION BY
21     MR. SEGAL:
22     Q.    Back on the record.  So Nino, the time
23     records reveal that sometimes you did clock in and
24     clock out during break.  Not often, but you did?
25     A.    I would clock out if I had a lunch shift.
```

85

BARKLEY
Court Reporters

N. Martinenko

1                        N. Martinenko

2    I would clock out, take a little break.  Maybe

3    breathe some air outside, and then I would go and

4    come back.  Why would I stay clocked in if I was --

5                   (Simultaneous speakers.)

6    Q.    Who told you to do that?

7    A.    It was common sense.  I didn't need anyone

8    to tell me that.

9    Q.    No one at all told you to do that?

10   A.    No.  I just clocked out because I thought

11   it was fair to do.

12   Q.    Did other employees do that?

13   A.    I don't know.  I didn't look at what they

14   were doing?

15   Q.    Were you involved in the records?

16                   MR. DiGIULIO:  Objection.  Vague.

17         You can answer.

18   A.    I don't get the question.

19   Q.    Okay.  Didn't you see -- did you ever

20   review the time records when you were involved in

21   the payroll?

22   A.    How could I see it?

23   Q.    Printed off the machine?

24   A.    I did not have access to it.

25   Q.    So you, on your own, decided to clock in

86

NINO MARTINENKO

BARKLEY
Court Reporters

1    and clock out during your days that you had the
2    double shift?
3    A.    Yes.  Maybe I took it as an example from
4    someone else prior to that.  I'm talking about
5    years ago when I first started.  But in general,
6    it's common sense if I'm not inside the restaurant
7    and I'm outside taking a break, it's a common sense
8    to clock out.  I think so, right?
9    Q.    Did you do that all the time?
10   A.    Yes, if I was going outside the restaurant
11   and I was on a break, I was doing that all the
12   time.
13   Q.    And the 4:00 or 5:00 meal break, you never
14   did?
15   A.    No.
16                 MR. SEGAL:  No further questions.
17                 (Time Noted:  12:36 p.m.)
18
19         _____
20                 NINO MARINENKO
21
22   Subscribed and sworn to before me
23   this _____ day of _____ 20__.
24   _____
25                 Notary Public


87

NINO MARTINENKO

BARKLEY
Court Reporters

# EXHIBIT 4

A-129

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MUSTAFA FTEJA,
*on behalf of himself,*
*FLSA Collective Plaintiffs and the Class,*

                                    Plaintiff,

                         v.

NUSRET NEW YORK LLC d/b/a Nusr-et
Steakhouse and NUSRET GÖKÇE a/k/a
"The Salt Bae," *jointly and severally,*

                           Defendants.

Case No.: 19-cv-429

**NOTICE OF PROPOSED**
**CLASS ACTION SETTLEMENT**

---

**PURSUANT TO THE CONTEMPLATED CLASS AND COLLECTIVE SETTLEMENT**
**DESCRIBED IN THIS NOTICE, YOUR ESTIMATED AWARD WILL BE**
**APPROXIMATELY $[_____] FOR EACH WEEK THAT YOU WERE EMPLOYED.**
**PLEASE READ THIS NOTICE CAREFULLY TO LEARN ABOUT YOUR RIGHTS**

---

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

# If you were employed at the Nusr-et Steakhouse in New York City as an hourly, front-of-house, tipped employee at any time between October 1, 2017 and October 31, 2019, please read this Notice:

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

### PLEASE READ THIS NOTICE CAREFULLY

This Notice relates to a proposed settlement of a class and collective action litigation. It has been authorized by a federal court. It contains important information as to your right to participate in the settlement, make a claim for payment or elect not to be included in the class.

<u>Introduction</u>

This notice pertains to any individual who was employed by Defendants as an hourly, front-of-house, tipped employee at their Nusr-et Steakhouse restaurant located at 60 West 53rd Street, New York, New York 10019 from October 1, 2017 to October 31, 2019.

A former employee of Defendants, Mustafa Fteja, filed a lawsuit for allegedly unpaid minimum wages due to an allegedly invalid tip credit and overtime premiums and other claimed damages against Defendants. The Court in charge of this case is the United States District Court for the Southern District of New York. The lawsuit is known as *Fteja v. Nusret New York LLC, et al.* The person who filed the lawsuit is called the "Plaintiff." Plaintiff alleges in the lawsuit that, among other things, Defendants failed to pay him and other employees the proper minimum and overtime wages, and unlawfully retained certain tips from them, in violation of the Fair Labor Standards Act ("FLSA") and New York State Labor Law ("NYLL"). Defendants deny the Plaintiff's allegations. It is Defendants' position that they properly compensated Plaintiff and other employees.

Although Defendants deny that they are liable or owe damages to anyone, Defendants have concluded that it is in their best interests to resolve Plaintiff's claims on behalf of Plaintiff and other employees in order to avoid the uncertainties and expense of litigation. Accordingly, Plaintiff and Defendants have agreed to settle the action. Defendants have agreed to pay $300,000 to cover the claims of all of the employees in this case as well as expenses such as attorneys' fees and administration fees.

Under the allocation formula, if the Court approves the settlement, and you do not exclude yourself, you will receive a payment based on the number of weeks you worked for Defendants during the relevant period of time, 50% of which shall be reported as W-2 wages and 50% of which shall be reported as 1099 earnings. Based on initial estimates, which are subject to change, Class Members will receive $[_____] for each week they were employed.

Neither Class Counsel nor Defendants makes any representations concerning tax consequences of this settlement or participation in it, and you are advised to seek your own personal tax advice prior to acting in response to this Notice.

Your legal rights may be affected, and you have a choice to make now. These rights and options are summarized below and fully explained in this Notice.

**YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT:**

| | |
|---|---|
| **DO NOTHING** | If you choose to participate in the settlement, you do not have to do anything. Once the settlement is approved by the Court, you will automatically receive your allocated settlement amount. |
| **EXCLUDE YOURSELF** | If you wish to exclude yourself ("opt-out") from the lawsuit you must follow the directions outlined in response to question 12 below. |

2

Case: 24-3262, 07/28/2025, DktEntry: 42.1, Page 137 of 300

A-131

Case 1:19-cv-00429-KHP   Document 112-5   Filed 03/02/20   Page 2 of 14
Case 1:22-cv-00518-JLR-RWL   Document 112-5   Filed 02/26/23   Page 4 of 12

**OBJECT**    If you wish to object to the settlement, you may write to the Court about why you believe the settlement is unfair or unreasonable. If the Court rejects your objection, you will still be bound by the terms of the settlement for claims under New York Law unless you submit a valid and timely opt-out. You will not be bound by the settlement if you opt-out of this action as described herein. If you object you may appear at the Fairness Hearing to speak to the Court about the fairness of the settlement.

- These rights and options – and the deadlines to exercise them – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after any appeals are resolved. Please be patient.

## BASIC INFORMATION

### 1. Why did I receive this notice?

You have received this notice because Defendants' records show that you worked for their Nusret Steakhouse restaurant in New York City at sometime between from October 1, 2017 and October 31, 2019. The Court ordered that you be sent this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about all of your options, before the Court decides whether to approve the settlement. If the Court approves the settlement and after objections and appeals are heard, payments will be mailed to class members who do not exclude themselves.

This notice explains the lawsuit, the settlement, your legal rights, and what benefits are available.

The Court overseeing this case is the United States District Court for the Southern District of New York. This lawsuit is known as *Fteja v. Nusret New York LLC et al.*, No. 19-cv-00429.

The individual who filed this lawsuit is called the "Plaintiff." Nusret New York LLC and Nusret Gökçe are called the "Defendants."

### 2. What is this lawsuit about?

This lawsuit involves claims brought by the Plaintiff alleging that Defendants violated the FLSA and NYLL by failing to pay the proper minimum wages due to their taking of an invalid tip credit, which also resulted in unpaid overtime premiums, withholding tips, and other alleged violations. Defendants deny that they did anything wrong and deny they underpaid employees. In fact, Defendants contend that they properly paid all employees correctly at all times, and believe their documentation shows proper payments, notices, and wage statements.

A-132

### 3. What is a class action?

A class action is a lawsuit where one or more persons sue not only for themselves, but also for other people who have similar claims. These other people are known as Class Members. In a class action, one court resolves the issues for all Class Members, except for those who exclude themselves from the Class. The Honorable Katharine H. Parker, United States Magistrate Judge of the United States District Court for the Southern District of New York is presiding over this class action. Magistrate Judge Parker has not made any determination about who is right or wrong in this lawsuit.

### 4. Why is there a settlement?

The Court did not decide in favor of either the Plaintiff or Defendants. Instead, after extensive negotiations and with the help of a neutral mediator, the parties agreed to settle. While both Plaintiff and Defendants believe they would have prevailed, by settling they avoid the costs or a trial, the risk of losing, and the delay of litigating the case and of potential appeals. Plaintiff and his attorneys believe that the settlement is fair and reasonable, and in the best interests of all Class Members. The settlement does not mean Defendants did anything wrong or violated the law.

## THE SETTLEMENT BENEFITS – WHAT YOU GET

### 5. What does the settlement provide?

Defendants have agreed to deposit $300,000 into a fund to be divided among current and former employees who are covered by the settlement. The settlement fund shall cover payments to the Administrator for administering the settlement, estimated to be approximately $15,000, the Class Representative, Plaintiff Fteja, estimated to be approximately $15,000, and Plaintiff's counsel for attorneys' fees and costs, estimated at $100,000, plus costs not to exceed $5,000. The remaining amount, after such fees and costs have been deducted, shall be divided among Class Members based on the number of weeks they worked for Defendants during the relevant liability period.

### 6. How much will my payment be?

Based on the formula that has been preliminarily approved by the Court, you will be entitled to receive an estimated award of $[_____] for each week that you were employed, which shall be reported as 50% W-2 wages and 50% 1099 earnings. Based on your calculated weeks worked during the class period of [INSERT] weeks, your estimated class settlement payment is $[INSERT]. The allocation formula takes into account the number of weeks you worked during the relevant liability period. The Settlement Agreement contains the exact allocation formula.

You may obtain a copy of the Settlement Agreement by following the instructions in Paragraph 22, below.

Case: 24-3262, 07/28/2025, DktEntry: 42.1, Page 139 of 300

A-133

Case 1:19-cv-09429-KHP   Document 71-2   Filed 03/02/20   Page 5 of 11
Case 1:22-cv-00518-SLR-RWL   Document 112-5   Filed 02/26/23   Page 6 of 12

# HOW YOU GET A PAYMENT

**7.    How can I get my payment?**

If you do nothing, you will automatically be deemed to be part of the class settlement and will be paid a share of the Settlement Fund.   You will be sent a settlement check if and when the Court approves the settlement and after all appeals have been exhausted. If you choose to exclude yourself, then you will not receive a payment.

**8. When will I get my payment?**

The Court will hold a fairness hearing to determine whether to approve the settlement, as described in more detail in Paragraph 19. If the Court approves the settlement, there may be appeals after that. It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps more than a year. Please be patient.

**9.   What am I giving up to get a payment or stay in the Class?**

Unless you exclude yourself (as explained in Paragraph 12 below), you will remain in the Class. This means that you cannot sue, continue to sue, or be part of any other lawsuit against Defendants about the legal issues in this case and arising under New York wage and hour laws.  It also means that all of the Court's orders will apply to you and legally bind you.  In addition, if you cash your settlement check, you will also specifically opt-into the litigation and cannot sue, continue to sue, or be part of on any claims against Defendants arising under the federal wage and hour laws (i.e. the Fair Labor Standards Act).

Class Members will be paid based on a formula taking into account weeks worked for Defendants during the period October 1, 2017 to October 31, 2019.

Based on Defendants' employment records, you are a Class Member and will be paid based on the number of weeks you worked during the class period.  Based on your calculated weeks worked during the class period of [INSERT] weeks, your estimated class settlement payment is $[INSERT].

If you would like additional information about your claims and the method of allocation of your payment, you may contact the Settlement Administrator.

Any unclaimed funds shall be applied to a *cy pres* charitable donation to a charitable organization or school devoted to the care of mentally disabled individuals determined by the parties.

**10.     Payment to Class Representatives**

The Settlement proposes that named Plaintiff Mustafa Fteja, who took a lead role in this litigation and assisted in its resolution will receive an individual service payment in the amount of $15,000. These service payments will serve as compensation for the his efforts as the Class Representative

Case: 24-3262, 07/28/2025, DktEntry: 42.1, Page 140 of 300

A-134

Case 1:19-cv-09429-KHP   Document 112-5   Filed 03/02/20   Page 6 of 11
Case 1:22-cv-00518-JLR-RWL   Document 112-5   Filed 02/26/23   Page 14 of 12

to take a leading role in this litigation, and for his significant involvement and time spent in discovery for the benefit of the Class Members.

## 11.   Procedures

If you do nothing, you will automatically participate in the class settlement. If you want to exclude yourself, please refer to Paragraph 12 hereto.

If the Court grants final approval of the Settlement, this action will end, and Class Members who do not opt out will release Defendants from October 1, 2017 through October 31, 2019 from all claims asserted in the Complaint as described below. This means that you cannot sue, continue to sue, or be party to any other lawsuit against Defendants regarding wage claims pursuant to the New York Labor Law, although you may still retain certain federal Fair Labor Standards Act claims if you do not execute and deposit any settlement check you receive in this matter. It also means that all of the Court's orders will apply to you and legally bind you.

The Release in the Settlement Agreement provides that:

    **(i)**    **With respect to claims under New York State law, you are releasing all of your wage and hour claims that could have been asserted, for the period October 1, 2017 to October 31, 2019 and**

    **(ii)**    **With respect to claims under the federal Fair Labor Standards Act, you are releasing all of your wage and hour claims that could have been asserted, for the period October 1, 2017 to October 31, 2019 if and when you execute and deposit any settlement check you receive in this matter.**

    **By failing to opt-out of this lawsuit, you will automatically be part of the class settlement for the New York State law claims. By endorsing and depositing a settlement check, you will automatically be part of the collective class settlement for the federal Fair Labor Standard Act claims.**

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want to release any potential claims against Defendants, and also agree to not receive a payment from this settlement, then you must take steps to get out. This is called excluding yourself – or is sometimes referred to as opting out of the settlement Class.

## 12.   How do I exclude myself from the settlement?

If you do not want to participate in the class settlement, you must take steps to exclude yourself from this case.

If you want to exclude yourself, you must mail a written, signed statement to the Settlement Administrator stating "I opt out of the Nusret Steakhouse wage and hour settlement" and include your name, address, and telephone number ("Opt-out Statement"). To be effective, the Opt-out

Case: 24-3262, 07/28/2025, DktEntry: 42.1, Page 141 of 300

A-135

Case 1:19-cv-00428-KHP   Document 112-5   Filed 03/02/20   Page 7 of 11
Case 1:22-cv-00518-JLR-RWL   Document 112-5   Filed 11/16/23   Page 13 of 12

Statement must be mailed to the Settlement Administrator via First Class United States Mail, postage prepaid, and postmarked by [the Bar Date].

> *Nusret Steakhouse* Settlement Administrator
> c/o Rust Consulting, Inc.
> PO Box 54
> Minneapolis, MN 55440-0054

If you exclude yourself from the Lawsuit and Settlement, you will NOT be allowed to object to the settlement as described in paragraph 17 below.

**13. If I don't exclude myself from the settlement, can I sue Defendants for the same thing later?**

No. By participating in the settlement, you give up any rights to sue Defendants under federal and state law with regard to the claims brought in this case or which could have been brought in this case.   If you have a pending lawsuit, speak to your lawyer in that case immediately to see if this settlement will affect your other case.

**14. If I exclude myself, can I get money from this settlement?**

No. If you exclude yourself, you will not receive any money from this lawsuit. But, you may sue, continue to sue, or be part of a different lawsuit against Defendants regarding these same claims.

## THE LAWYERS REPRESENTING YOU

**15. Do I have a lawyer in this case?**

The law firm of Lee Litigation Group, PLLC, 148 West 24th Street, Eighth floor, New York, New York 10011, has been designated as legal counsel to represent you and the other Class Members. These lawyers are called Class Counsel.   You will not be charged separately for these lawyers. Their fees are being paid from the total settlement fund.   If you want to be represented by your own lawyer, you may hire one at your own expense.

**16. How will the Plaintiff's attorney  and service providers be paid?**

Class Counsel will ask the Court to approve payment of up to $100,000 (1/3 of the settlement fund established by Defendants) to them for attorneys' fees, plus additional costs and expenses up to $5,000.   The fees would pay Class Counsel for all work that they have performed in this action including filing briefs, engaging in discovery, investigating the facts, attending court conferences and negotiating and overseeing the settlement.

The Court has approved payment of $15,000 as fees to Rust Consulting, Inc. to administer the settlement.

## OBJECTING TO THE SETTLEMENT

### 17. How do I tell the Court that I don't like the settlement?

You can object to the settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. If the Court rejects your objection, you will still be bound by the terms of the settlement of your claims under New York Law unless you have submitted a valid and timely request for exclusion. To object, you must send a letter saying that you object to the settlement in *Fteja v. Nusret New York LLC, et al.* Your statement must include all reasons for the objection and any supporting documentation in your possession. Your statement must also include your name, address, and telephone number.

If you wish to present your objection at the fairness hearing described below, you must state your intention to do so in your written objection. Your statement should be as detailed as possible otherwise the court may not allow you to present reasons for your objection at the fairness hearing that you did not describe in your written objection. Mail the objection to the Settlement Administrator via First-Class United States Mail to the address below. Your objection will not be heard unless it is mailed to the Settlement Administrator via First Class United States Mail and post-marked by [Bar Date].

> *Nusret Steakhouse* Settlement Administrator
> c/o Rust Consulting, Inc.
> PO Box 54
> Minneapolis, MN 55440-0054

The Settlement Administrator will share your objection with Class Counsel and Defendants' counsel and your objection statement will be filed with the Court.

You may not object to the settlement if you submit a letter requesting to exclude yourself or "opt-out" of the settlement of the lawsuit.

### 18. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the settlement. You can object only if you stay in the Class. Excluding yourself from the settlement ("opting-out") is telling the Court that you don't want to be part of the Class. If you exclude yourself, you are not allowed to object because the case no longer affects you.

The Court will hold a hearing to decide whether to approve the settlement. Class Counsel will answer questions the Judge may have. You do not have to come to the hearing, but you are welcome to do so at your own expense.

If you send an objection, it is not necessary for you to come to Court to talk about it, but you may do so at your own expense or pay your own lawyer to attend. As long as you mailed your written objection on time, the Court will consider it. If you do attend the hearing, it is possible that you will not be permitted to speak unless you timely object in writing as described above and notify the Court of your intention to appear at the fairness hearing.

8

Case: 24-3262, 07/28/2025, DktEntry: 42.1, Page 143 of 300

A-137

Case 1:19-cv-00429-KHP   Document 71-2-5  Filed 03/02/20   Page 9 of 11
Case 1:22-cv-00518-SLR-RWL   Document 71-5  Filed 11/18/23  Page 10 of 12

# THE COURT'S FAIRNESS HEARING

### 19. When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing at _____ a.m./p.m. on _____, 2020, in Courtroom 17-D South, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York.

At this hearing the Court will consider whether the terms of the settlement are fair, reasonable, and adequate. If there are objections, the Court will consider them. The Judge will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

### 20. Do I have to come to the hearing?

No. Class Counsel will answer questions the Court may have. But, you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary.

### 21. May I speak at the hearing?

If you file a timely Objection to the Settlement, you may ask the Court for permission to speak at the Fairness Hearing. To do so, you must include the words "I intend to appear at the Fairness Hearing" in your written objection, which must be filed according to the procedure described in Paragraph 17, above. Your testimony at the Fairness Hearing will be limited to those reasons that are included in your written objection. You cannot speak at the hearing if you exclude yourself from the settlement.

# GETTING MORE INFORMATION

### 22. Are there more details about the settlement?

This notice summarizes the proposed settlement. More details are in the Settlement Agreement. You can review the settlement agreement by asking for a copy of the Settlement Agreement by writing or calling the Settlement Administrator.

### 23. How do I get more information?

If you have other questions about the settlement, you can contact the Settlement Claims Administrator, or Class Counsel at the addresses and/or telephone numbers below.

A-138

C.K. Lee, Esq.
Lee Litigation Group PLLC
148 West 24th Street, Eighth Floor
New York, NY 10011
Telephone: (212) 465-1180


DATED:      [_____], 20___

A-139

*Fteja v. Nusret New York LLC, et al.*, No. 19-cv-00429

## CHANGE OF ADDRESS FORM

## To [Name]

We need to be sure we can contact you. If your address is different than the address to which the Notice of Proposed Settlement of Class and Collective Action Lawsuit and Fairness Hearing ("Notice") was mailed or is expected to change prior to the mailing of the settlement payment as described in the Notice, please complete this form and send it to the Claims Administrator at the address at the bottom of this form.

NAME: _____

ADDRESS: _____

CITY: _____

STATE: _____  ZIP: _____

ALTERNATE CONTACT INFORMATION OF A FAMILY MEMBER OR FRIEND (IN CASE WE CANNOT REACH YOU):

NAME: _____  RELATIONSHIP: _____

ADDRESS: _____

CITY: _____

STATE: _____  ZIP: _____

Please return this sheet to the Claims Administrator at the following address:

> *Nusret Steakhouse* Settlement Administrator
> c/o Rust Consulting, Inc.
> PO Box 54
> Minneapolis, MN 55440-0054

11

# EXHIBIT 5

CERTIFIED COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
NINO MARTINENKO, on behalf of herself and
Others similarly situated,

                          Plaintiff,

        -against-        Case No:  22-CV-518


212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

                          Defendants.
------------------------------------------------x




          EXAMINATION of a Non-Party Witness

              DAGMARA HUK

           December 20, 2022




TENEJA THWEATT, Notary Public
489178

 

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine      (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 685-0550 San Jose          (760) 322-2240 Palm Springs (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez           (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills     (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn           (518) 490-1910 Albany       (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris           00+1+800 222 1231 Dubai     001+1+800 222 1231 Hong Kong

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------------x
     NINO MARTINENKO, on behalf of herself and
3    Others similarly situated,

4                              Plaintiff,

5         -against-      Case No:  22-CV-518

6

7

8    212 STEAKHOUSE, INC., and NIKOLAY VOLPER,

8                      Defendants.
9    ------------------------------------------x

10        EXAMINATION of a Non-Party Witness,

11   DAGMARA HUK, taken by the Defendants, pursuant to

12   Court Order, held at the Law Offices of Mitchell S.

13   Segal, P.C., 137 5th Avenue, 9th Floor, New York,

14   New York 10010, on December 20, 2022, at 1:38 p.m.,

15   before a Notary Public of the State of New York.

16

17   ************************************************

17             BARKLEY COURT REPORTERS

18

19

20

21

22

23

24

25

                              1

DAGMARA HUK

BARKLEY
Court Reporters

```
 1    A P P E A R A N C E S:

 2    JOSEPH & KIRSCHENBAUM, LLP
              Attorney for Plaintiff
 3            32 Broadway, Suite 601
              New York, New York 10004
 4            (212)688-5640

 5    BY:     MICHAEL DiGIULIO, ESQ.
              Mike@jk-llp.com
 6

 7

 8    LAW OFFICES OF MITCHELL S. SEGAL P.C.
              Attorney for Defendants
 9            1129 Northern Boulevard, Suite 404
              Manhasset, New York 11303
10            (516)415-0100

11    BY:     MITCHELL S. SEGAL, ESQ.
              Msegal@segallaw.com
12

13

14    ALSO PRESENT:

15    NIKOLAY VOLPER, Defendant

16

17

18

19

20

21

22

23

24

25
```

2

BARKLEY
Court Reporters

1        S T I P U L A T I O N S :

2    IT IS STIPULATED AND AGREED by and between the
     attorneys for the respective parties herein, and in
3    compliance with Rule 221 of the Uniform Rules for
     the Trial Courts:

4
     THAT the parties recognize the provision of Rule
5    3115 subdivisions (b), (c) and/or (d).  All
     objections made at a deposition shall be noted by
6    the officer before whom the deposition is taken,
     and the answer shall be given and the deposition
7    shall proceed subject to the objections and to the
     right of a person to apply for appropriate relief
8    pursuant to Article 31 of the C.P.L.R.;

9    THAT every objection raised during a deposition
     shall be stated succinctly and framed so as not to
10   suggest an answer to the deponent and, at the
     request of the questioning attorney, shall include
11   a clear statement as to any defect in form or other
     basis of error or irregularity.  Except to the
12   extent permitted by CPLR Rule 3115 or by this rule,
     during the course of the examination persons in
13   attendance shall not make statements or comments
     that interfere with the questioning.

14
     THAT a deponent shall answer all questions at a
15   deposition, except (i) to preserve a privilege or
     right of confidentiality, (ii) to enforce a
16   limitation set forth in an order of a court, or
     (iii) when the question is plainly improper and
17   would, if answered, cause significant prejudice to
     any person.  An attorney shall not direct a
18   deponent not to answer except as provided in CPLR
     Rule 3115 or this subdivision.  Any refusal to
19   answer or direction not to answer shall be
     accompanied by a succinct and clear statement on
20   the basis therefore.  If the deponent does not
     answer a question, the examining party shall have
21   the right to complete the remainder of the
     deposition.

22
     THAT an attorney shall not interrupt the deposition
23   for the purpose of communicating with the deponent
     unless all parties consent or the communication is
24   made for the purpose of determining whether the
     question should not be answered on the grounds set
25   forth in Section 221.2 of these rules, and, in such

3

BARKLEY
Court Reporters

1    event, the reason for the communication shall be
     stated for the record succinctly and clearly.
2
     THAT the failure to object to any question or to
3    move to strike any testimony at this examination
     shall not be a bar or waiver to make such objection
4    or motion at the time of the trial of this action,
     and is hereby reserved; and
5
     THAT this examination may be signed and sworn to by
6    the witness examined herein before any Notary
     Public, but the failure to do so or to return the
7    original of the examination to the attorney on
     whose behalf the examination is taken, shall not be
8    deemed a waiver of the rights provided by Rule 3116
     and 3117 of the C.P.L.R, and shall be controlled
9    thereby; and

10   THAT the certification and filing of the original
     of this examination are hereby waived.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              4

1   D A G M A R A   H U K,  the witness herein, having

2   been first duly sworn by a Notary Public of the

3   State of New York, was examined and testified as

4   follows:

5   EXAMINATION BY

6   MR. SEGAL:

7   Q.      State your name for the record, please.

8   A.      Dagmara Huk.

9   Q.      State your address for the record, please.

10  A.      342 East 62nd Street, Number 19, New York,

11  New York 10065.

12  Q.      Good afternoon.  My name is Mitch Segal.  I

13  represent the defendants in this action.  I'm here

14  to depose you pursuant to this lawsuit.  I'm going

15  to ask you questions.  We'll try not to talk over

16  each other.  And just give an audible answer so the

17  transcriber can record the answer.

18          Have you ever been in a deposition before?

19  A.      Yes.

20  Q.      I'm sorry?

21  A.      Yes.

22  Q.      When was that?

23  A.      My previous case, not related to this.

24  Q.      Another labor case?

25  A.      No.

5

BARKLEY
Court Reporters

```
                              D. Huk

 1

 2    Q.     Okay.  So you have.  You understand.

 3           Okay.  So Dagmara, when did you come to the

 4    U.S.?

 5    A.     In 2008.

 6    Q.     And where were you from originally?

 7    A.     I'm Polish.

 8    Q.     So you're from Poland?

 9    A.     Mm-hmm.

10    Q.     And what's your educational background?

11    A.     Healthcare.

12    Q.     Did you go to high school?

13    A.     In Poland.

14    Q.     Did you to college?

15    A.     Yes.

16    Q.     In Poland?

17    A.     Here.

18    Q.     Where did you go?

19    A.     Private college, then Hunter College, then

20    City Tech in Brooklyn.

21    Q.     And what did you study?  Healthcare?

22    A.     Healthcare.

23    Q.     To do what?

24    A.     To work in healthcare in a hospital.

25    Q.     To be a...
```

6

BARKLEY
Court Reporters

```
                              D. Huk
 1
 2   A.      Healthcare administrator.
 3                    (Reporter clarification.)
 4   Q.      Okay.  And when did you graduate?  When
 5   were you done with your college studies?
 6   A.      Not sure.  I'm not sure.  It was a while
 7   ago.
 8   Q.      Okay.  Did you work in healthcare?
 9   A.      Yes.
10   Q.      And where did you work?
11   A.      Healthcare clinic in Brooklyn and then
12   Sloan Kettering.
13   Q.      Okay.  What was the healthcare clinic in
14   Brooklyn?
15   A.      Multispecialty.
16   Q.      Where are they located?
17   A.      In Greenpoint.
18   Q.      You have the address?
19   A.      Yes, 145 Nassau.
20                    (Reporter clarification.)
21   Q.      Nassau Street?
22   A.      Mm-hmm.
23   Q.      Okay.  And how long did you work there for?
24   A.      A while.  Five, six years.
25   Q.      Okay.  When did you leave there?
```

7

BARKLEY
Court Reporters

A-149

1                          D. Huk

2    A.    Don't remember.  A while ago.

3    Q.    You need to be a little more specific on

4    your answers.

5    A.    I can't give you -- I can't give you a year

6    if I don't remember it.  It was years ago.  I've

7    been here over -- like, while so --

8    Q.    You've been here 14 years?

9    A.    Yeah.

10   Q.    You went to school.  And thereafter you

11   worked.  So --

12   A.    I did both.

13   Q.    Correct.  So --

14   A.    I worked and go to school at the same time.

15   Q.    How many years did you go to school?

16   A.    Sixish.

17   Q.    Okay.  So 2014, then you graduated or you

18   were done with school?

19   A.    Possibly.

20   Q.    Okay.  And so possibly you graduated in

21   2014, maybe, possibly you worked at the Brooklyn

22   healthcare place for five years.  So maybe 2019?

23   A.    I start working there before I started

24   school.

25   Q.    Okay.  So how many years after school did

                           8

BARKLEY
Court Reporters

A-150

D. Huk

1
2      you work there for?

3      A.      How many years?  I don't remember.  It was

4      a while ago.  I don't remember if I -- no.  I

5      didn't finish.  I left the clinic before I

6      graduated school.

7      Q.      By the way, I forgot to ask two questions.

8      Are you under the influence of any thing today?

9      A.      No.

10     Q.      Did you take any drugs?

11     A.      No.

12     Q.      Any alcohol in the last 24 hours?

13     A.      No.

14     Q.      Okay.  So when did you start at Sloan

15     Kettering?

16     A.      Can I pull up my resume so I can give you

17     exact dates?

18              MR. DiGIULIO:  No.

19     Q.      No.  Just from your best recollection.

20     A.      2017 maybe.

21     Q.      And you worked there for how long?

22     A.      Year and a half.

23     Q.      Okay.  And what did you do after that,

24     before you started at 212 Steakhouse?

25     A.      I worked at the restaurant.  I worked at

9

BARKLEY
Court Reporters

A-151

```
                          D. Huk
1
2    the other restaurant.
3    Q.     What's the other restaurant?
4    A.     Bistango.
5    Q.     Bistango?
6    A.     Bistango, yes.
7    Q.     Where is that?
8    A.     Between 29th and 3rd.
9    Q.     And when did you start there, do you
10   remember?
11   A.     I worked there throughout the school.  I
12   worked at the healthcare clinic.  I went to school,
13   and then I was working at Bistango as well.
14   Q.     When was the last time you worked at
15   Bistango?  How do you spell that, by the way?
16   A.     B-I-S-T-A-N-G-O.
17   Q.     Bistango.  Okay.
18   A.     They shut down.
19   Q.     Is that why you left there?
20   A.     Mm-hmm.
21   Q.     Do you know when that was?
22   A.     During COVID.
23   Q.     Oh, okay.  In the beginning, March of 20 --
24   A.     Mm-hmm.
25                  (Reporter clarification.)
```

10

DAGMARA HUK

BARKLEY
Court Reporters

A-152

```
                              D. Huk
 1
 2    A.      Yes.
 3    Q.      What was your next job after Bistango when
 4    they closed?
 5    A.      After Bistango, I worked at Jue Lan.
 6    Q.      Jue Lan?
 7    A.      Mm-hmm.
 8    Q.      Right here?
 9    A.      Yes.
10    Q.      When did you start there?
11    A.      The summer after things were opened
12    outdoors.  But I didn't stay --
13                  (Cell phone interruption.)
14    Q.      What was your position at Jue Lan?
15    A.      Server.
16    Q.      When did you start?  I'm sorry.  What did
17    you say, summer of '20?
18    A.      July.
19    Q.      And that was because they had the outdoor
20    thing going on?
21    A.      Mm-hmm.
22    Q.      July of '20?
23    A.      Yes.
24    Q.      How long did you work there for?
25    A.      Maybe two months.
```

11

DAGMARA HUK

BARKLEY
Court Reporters

```
 1                         D. Huk
 2    Q.      Why did you leave there?
 3    A.      I didn't like the environment.
 4    Q.      What do you mean by that?
 5    A.      Just didn't like the environment.
 6    Q.      The staff, the patrons?
 7    A.      It was long hours.
 8    Q.      You didn't work lunch though, did you?  I
 9    don't even think they had lunch back then.
10    A.      I did work lunch there.
11    Q.      You did.  Okay.
12            So that was from July '20 to August '20?
13    A.      Right before I started working at the
14    steakhouse.  Yes.
15    Q.      So when did you start at 212 Steakhouse?
16    A.      End of summer, August 2020.
17    Q.      And at Bistango you were a server also?
18    A.      Server, bartender, manager.
19    Q.      And Jue Lan you were just a server?
20    A.      Mm-hmm.
21            Yes.  Sorry.  Just a habit.
22    Q.      That's okay.  Not a problem.
23            And what was your position when you started
24    at 212 Steakhouse?
25    A.      Bartender.
```

                                  12

BARKLEY
Court Reporters

A-154

```
 1                           D. Huk
 2    Q.      How did you find out about the position at
 3    212 Steakhouse?
 4    A.      Through craigslist.
 5    Q.      You started in August 2020, and when did
 6    you work until?
 7    A.      October -- September, October 2021.
 8    Q.      How many days a week did you work?
 9    A.      Depending how many days they needed me for.
10    I would say five, six.
11    Q.      What days were those?
12    A.      I'm sorry?
13    Q.      Which days?
14    A.      Depending on the schedule.  The schedule
15    changes every week.
16    Q.      Would you work weekends every week?
17    A.      Sure.  Always Saturdays.
18    Q.      Sundays?
19    A.      Sundays.
20    Q.      And how many hours a week did you work --
21    how many hours per day did you work?
22    A.      Depending on the need, from opening through
23    closing.
24    Q.      Well, did you --
25    A.      Sometimes we stayed longer.
```

13

**BARKLEY**
Court Reporters

A-155

D. Huk

1

2  Q.    Did you work lunch hours?

3  A.    We didn't have lunch back then.  We just

4  started towards the end.

5  Q.    Okay.  So on average, when did you start

6  work?

7  A.    Can you repeat the question?

8  Q.    Yes.  Generally what time did you start?

9  A.    We would start at 3:00.

10  Q.    3:00?

11  A.    3:00 or 4:00, yes.

12  Q.    Well, 3:00 or 4:00 is two different -- what

13  do you think?

14  A.    Sometimes we had to come in early, like, to

15  take care of -- unpack the liquor or help with

16  something.  So most of the time it was 3:00,

17  sometimes it was 4:00.

18  Q.    What time did you leave?

19  A.    I would say 11:00, 11:30 sometimes.  If we

20  had a party, maybe 12:00.

21  Q.    How many times did you have a party there

22  on average?

23  A.    When it happened.

24  Q.    You have to try to be succinct with your

25  answers.

14

BARKLEY
Court Reporters

A-156

```
 1                          D. Huk
 2              MR. DiGIULIO:  Objection.
 3   Q.    You can't just be general.
 4              MR. DiGIULIO:  Objection.  She's
 5         answering the best that she can.
 6   Q.    Sometimes is not going to work.
 7         In your opinion, how many parties did they
 8   have per week, if any?
 9              MR. DiGIULIO:  Objection to the
10         form.  You can answer, if you know.
11   A.    You can't generalize how many parties a
12   week.  It's a restaurant business.
13   Q.    I'm familiar.
14   A.    I'm glad you are.
15   Q.    How many parties a week?
16   A.    I don't know how many parties.  I can't
17   answer that question.
18   Q.    Zero, once every week, two every week?
19   A.    I can't answer that question.
20   Q.    You can't answer that question?
21   A.    It always depends on a season or the --
22   Q.    Well, you didn't work there for that many
23   seasons, right?  So you worked there from --
24              MR. DiGIULIO:  All four, I think.
25   A.    Yeah.
```

15

BARKLEY
Court Reporters

D. Huk

1
2  Q.    At best.  So what seasons were busier for
3  parties?
4  A.    Holidays are busier.  Easter, maybe, was
5  busier, birthdays.  It all depends.  There's no --
6  Q.    Birthdays isn't a season.  Easter is one
7  week.
8  A.    Like, January is usually slower, as you
9  know.  Then it picks up around March, April, May,
10 then September when kids are in school.  It all
11 depends on the season.
12 Q.    Okay.  So you really don't know.  All
13 right?
14 A.    I didn't say I don't know.
15 Q.    Well, you were answering (unintelligible).
16       Okay.  What were you paid?
17            MR. DiGIULIO:  Objection to the
18       form.  You can answer.
19 Q.    Withdrawn.  I'll change the question.
20       How much per hour did you work?
21            MR. DiGIULIO:  Objection to the
22       form.  You can answer.  You can answer.
23 A.    How much per hour, $10.
24 Q.    Was that through the whole time you worked?
25 A.    Yes.

16

D. Huk

1

2  Q.    Okay.  And did you earn tips on top of

3  that?

4  A.    Yes.

5  Q.    And what was your average tips per day?

6  A.    You mean cash tips?

7  Q.    Well, both credit card and cash?

8  A.    Average per day?

9  Q.    Or week, whatever is easier for you --

10  A.    Week, below -- on my paycheck, below a

11  thousand.

12  Q.    A thousand?

13  A.    Below usually.  It was like 800, 900.

14  Q.    Eight hundred to a thousand; is that fair

15  to say?

16  A.    Yes.

17  Q.    And that is both credit card and cash, or

18  just credit card?

19  A.    Credit card.

20  Q.    What about cash?

21  A.    I don't really keep track of -- I don't

22  really keep track of my cash.  Maybe 400.

23  Q.    So you don't count your cash when you get

24  the cash?

25  A.    No, I don't.

17

BARKLEY
Court Reporters

A-159

|     | D. Huk |
| --- | --- |
| 1   | D. Huk |
| 2   | Q.    That's interesting. |
| 3   |       Okay.  And that's per week, 400, or per |
| 4   | day? |
| 5   | A.    Per week. |
| 6   | Q.    And why did you leave? |
| 7   | A.    Because I was hired as bartender, and I got |
| 8   | demoted to a server without my permission. |
| 9   | Q.    Who demoted you? |
| 10  | A.    The owners. |
| 11  | Q.    Who is that? |
| 12  | A.    Nikolay. |
| 13  | Q.    And why do you feel the -- I'm sorry.  Why |
| 14  | do you feel the server is a demotion from the |
| 15  | bartender? |
| 16  | A.    Because that's not position I was hired |
| 17  | for. |
| 18  | Q.    And why were you demoted? |
| 19  | A.    Because -- |
| 20  |         MR. DiGIULIO:  You can answer if |
| 21  |     you know. |
| 22  | A.    I'm not -- honestly, I'm not sure. |
| 23  | Q.    What do you think? |
| 24  | A.    Because they hired another person. |
| 25  | Q.    Okay.  Why would they do that? |

18

DAGMARA HUK

BARKLEY
*Court Reporters*

```
1                           D. Huk
2    A.      I'm not sure.
3    Q.      How did you find out about this lawsuit,
4    craigslist?
5    A.      No.  I don't think it was on craigslist.
6    Q.      How did you find out?
7    A.      Through my lawyer.
8    Q.      Through your lawyer?
9    A.      Yes.  I got contacted by my lawyer.
10   Q.      Your lawyer contacted you about the
11   lawsuit?
12   A.      (No verbal response.)
13   Q.      And what did your lawyer say?
14              MR. DiGIULIO:  Objection.  Don't
15        answer that.
16   Q.      Okay.  That's interesting.
17        Did you clock -- well, let's go back for a
18   second.
19        So when you were paid, you received payroll
20   checks?
21   A.      You mean the printout?
22   Q.      Yeah.
23   A.      Not all the time.  Most of the time we
24   didn't.
25   Q.      The checks that you received, were they
```

19

BARKLEY
Court Reporters

A-161

```
 1                          D. Huk
 2   handwritten, or they were from a payroll company?
 3   A.      Handwritten.
 4   Q.      Did you ever get a check from a payroll
 5   company?
 6   A.      No.
 7   Q.      No?
 8   A.      (No verbal response.)
 9   Q.      When you went to work, did you clock in and
10   clock out?  In other words, when you walked in, did
11   you have to put your ID, and you clocked into the
12   POS system?
13   A.      Yes, you have to use your number.
14   Q.      And you clocked out also when you left?
15   A.      Sure.  Yes.
16   Q.      And were you served a meal during the time
17   you were there?
18   A.      Family staff meal.
19   Q.      Yeah.  Right.
20           When did that happen?
21   A.      Usually at the beginning of the shift.
22   Q.      4:00?
23   A.      Mm-hmm.  But we didn't really have time to
24   do it because there were things we had to take care
25   of.  So it wasn't consistent.
```

20

BARKLEY
Court Reporters

A-162

1                              D. Huk

2    Q.     Well, was the time that they served the

3    meal consistent, or it depended on your schedule

4    and what you had to do?

5    A.     Depending on the schedule.

6    Q.     But they served it normally at 4:00?

7    A.     Depends how busy the kitchen is.  Sometimes

8    it was 5:00; sometimes it was 4:00.

9    Q.     5:00 the restaurant opened up though, yes?

10   A.     Mm-hmm.

11                 MR. DiGIULIO:  Yes?

12                 THE WITNESS:  Yes, I'm sorry.

13   Q.     That's okay.

14          But you clocked in at 4:00.  And when they

15   served you, you never clocked out when they served

16   the meal if you ever sat down and ate, did you?

17   A.     No, because we didn't have a formal break.

18   Q.     Well, the meal --

19   A.     Meaning that if the meal was served, I

20   would start eating.  But if there was something --

21   I had to answer phone, I had to get up and answer

22   the phone call, meaning work, not have a break.

23   Q.     What other things did you do besides

24   bartending there?

25   A.     Order supply, order liquor, go to the

                              21

DAGMARA HUK

```
 1                    D. Huk
 2  liquor store, buy stuff.  Go to do pay -- write the
 3  checks, clean, helping the kitchen, anything they
 4  needed.
 5  Q.     Was there one particular person in charge
 6  of payroll?
 7  A.     Yes, Imran.
 8  Q.     What about writing the checks?
 9  A.     He -- most of the time he would not write
10  the checks.  He would ask the staff to write the
11  check.
12  Q.     Who wrote the checks, primarily, out of the
13  staff?
14  A.     There was no primary person.  It was
15  sometimes me, sometimes Nino, some- --
16             (Cell phone interruption.)
17             (Whereupon, a discussion was held
18         off the record.)
19  Q.     Sometimes Nino, sometimes you?
20  A.     So it depends who was working that day.
21  Q.     Other than Nino and you, was there anybody
22  else?
23  A.     Sometimes Sasha.
24  Q.     Sasha?
25  A.     Sometimes Imran.
```

22

BARKLEY
Court Reporters

A-164

D. Huk

1
2    Q.    What was the tip process at the end of the
3    evening?  How did that work?
4    A.    It was a points system.  You want me to
5    explain it to you?
6    Q.    No, I kind of know it.
7          And how did that work?  Was there someone
8    in charge of that or just at the end of the night?
9    A.    Whoever was available.
10   Q.    And did you get paid your credit card tips
11   at the end of the week or every day?  How did that
12   work?
13   A.    Weekly.
14   Q.    Weekly?
15   A.    Mm-hmm.
16   Q.    And when you did the tips, was cash
17   included in the tip sheets or not?
18   A.    Was the cash included in the tip sheet?
19   Q.    In other words, let me give you a
20   hypothetical.  Let's say you made $200 in credit
21   card tips.  Let's say you made $50 in cash tips.
22   Was that included in everyone's analysis?  Everyone
23   said how much cash they made or just the credit
24   cards?
25   A.    Yes, it was written as well.

23

BARKLEY
Court Reporters

A-165

1                          D. Huk

2   Q.      I'm sorry?

3   A.      It was written.

4   Q.      It was written?

5   A.      Yeah.

6   Q.      Did you report the cash tips?

7   A.      Yes.

8   Q.      How did you do that?

9           I understand on the analysis.  Did you

10  report the cash tips to the owners of the

11  restaurant?

12  A.      Yes, it was written -- they could open the

13  book and see how much we made.

14  Q.      Do you know that you have to report your

15  cash tips to owners of the restaurant so they can

16  file a form with the IRS?  Did you report that to

17  them?

18              MR. DiGIULIO:  Objection.  Asked

19          and answered.  You can go again.

20              MR. SEGAL:  I don't think it was,

21          actually.

22              MR. DiGIULIO:  You can answer his

23          question again.

24  A.      I don't think that's -- I mean, that's --

25  to my knowledge, that's the manager's

                            24

                      DAGMARA HUK

BARKLEY
Court Reporters

D. Huk

1
2  responsibility to report whatever is there, because
3  the evidence was visible to the manager.  So that's
4  not my duty.  I was -- again, I was a bartender.
5  So that's not my duty to report this to anybody.
6  Q.     Did you report the cash tips on your tax
7  return?
8  A.     Yes, I did.
9  Q.     So your tax return has cash tips on it?
10          MR. DiGIULIO:  Objection.  Asked
11       and answered.  You don't have to answer
12       again.
13          MR. SEGAL:  Yes, she does.  Your
14       objection is noted.  She's got to answer
15       again.
16          MR. DiGIULIO:  Sure.  One more
17       time.  Go ahead.
18  A.     Yes, I reported cash tips.
19  Q.     Okay.  When you got your wage statement at
20  the end of the year, what was it: a W-2 or -- was
21  it a W-2?
22  A.     W-2, yes.
23  Q.     That W-2 included the hourly wage plus your
24  credit card tips; is that correct?
25  A.     Yes.

25

BARKLEY
Court Reporters

```
                            D. Huk
 1
 2   Q.     Okay.  But it didn't include the cash tips?
 3   A.     No.
 4   Q.     Okay.  But you reported that, as you said,
 5   on top of that?
 6   A.     Well, my accountant takes care of that.
 7   Q.     Did he report it?
 8   A.     Yes.  I believe so.
 9   Q.     Did you work full-time for 212 Steakhouse
10   throughout your whole tenure?
11   A.     Yes.
12   Q.     Yes?
13          You never worked part-time for them?
14   A.     No.
15   Q.     After you left 212 Steakhouse, did you work
16   part-time for them sometimes?
17   A.     If I left, why would I work for them?
18   Q.     I don't know.
19   A.     Can you please rephrase the question.
20   Q.     Well, you just answered it.  So the
21   answer's no, I guess?
22   A.     I guess.
23   Q.     Yes or no?
24              MR. DiGIULIO:  Objection to the
25          form.  You answer.
```

BARKLEY
Court Reporters

```
 1                        D. Huk
 2    A.      (No verbal response.)
 3    Q.      Okay.
 4                   (Whereupon, a discussion was held
 5            off the record.)
 6    Q.      So I show you what was labeled as
 7    Defendant's Exhibit 4.  And this is -- he'll
 8    explain it to you.  And this is a page of your time
 9    records from August 31st to December 30th.  So I
10    want to show you this.
11            So that is your clock-in and clock-out; is
12    that correct?
13    A.      Yes.
14    Q.      Okay.  And so you never took a break,
15    right?  So there was only a beginning clock-in and
16    an ending clock-out?
17    A.      Correct.
18    Q.      And this line here is the hours that you
19    worked.  Okay.  And this period covers September,
20    October, November and December.
21    A.      Mm-hmm.
22    Q.      And -- so if you look at the hours, are
23    there many days that you worked over eight hours?
24                   MR. DiGIULIO:  Objection.  The
25            document speaks for itself.  You can
```

27

BARKLEY
Court Reporters

```
 1                         D. Huk
 2          answer.
 3   A.     As you can see (indicating).
 4   Q.     Not really?
 5   A.     I didn't say not really.  I'm just saying
 6   the document speaks for itself.
 7   Q.     You're saying the document speaks for
 8   itself.  Excellent.  Very good.
 9          There's only a couple of days where you
10   worked more than eight days.  So are you seeking
11   claims for overtime wages?
12   A.     Yes.
13   Q.     How?
14                MR. DiGIULIO:  Objection to the
15          form.  You can answer.
16   Q.     Tell me how.  Those are the hours that you
17   worked.
18   A.     I --
19   Q.     Show me one week where you worked over 40
20   hours.
21   A.     I can't do the math right now.
22   Q.     There probably is not one, to be honest
23   with you.
24                MR. DiGIULIO:  Objection.
25   Q.     Did you ever work --
```

A-170

D. Huk

1

2          (Whereupon, a discussion was held

3      off the record.)

4   Q.     Was there ever a day where you worked in

5   excess of ten hours?

6   A.     I worked overtime.

7   Q.     Well, we just went through it.  You really

8   didn't, but...

9          MR. DiGIULIO:  Objection.

10  Q.     All right.  So let's go back to it then.

11  Show me one week where you worked in excess of 40

12  hours.

13  A.     I need more reference than that.  I'm not

14  going to do the math.  I did work over 40 hours.

15  Q.     Based on what?  Those are your time

16  records.

17  A.     On the hours.

18  Q.     Are those correct?  Are those the right

19  clock-in and clock-out?

20  A.     Would you like me to do the math right now?

21  Q.     You can.

22  A.     I worked overtime.

23  Q.     Based on what?

24  A.     On the time.

25  Q.     Based on overtime?

29

BARKLEY
Court Reporters

A-171

D. Huk

1

2    A.    Based on the time that I spent at the

3    restaurant.

4    Q.    Okay. All right. And was there any days

5    that you worked in excess of ten hours per day?

6    A.    Ten hours per day?

7              MR. DiGIULIO:  Are you going to

8         show her the exhibit?

9    Q.    (Handing.)

10   A.    11:45 on that page, 11:44.

11   Q.    That's not yours --

12             MR. DiGIULIO:  The top pages.

13   Q.    So two days, basically?

14   A.    Well, based on one page that you're showing

15   me right now. So yes, I did work more than ten

16   hours, to answer your question.

17   Q.    Twice?

18   A.    Still.

19   Q.    Who exactly told you that they were

20   changing your position from a bartender to a

21   server?

22   A.    Nikolay.

23   Q.    And did he give a reason?

24   A.    Did he give me a reason?  He said he hired

25   this guy that won the award in Vegas, and he's

30

DAGMARA HUK

BARKLEY
*Court Reporters*

D. Huk

1  going to be a bartender from now on.  But he's not

2  going to take responsibilities of a server, which I

3  was doing.  Like, he's not going to help.  He's

4  going to get the same points, and he's going to be

5  a bartender from now on.

6  Q.    How long did you work at 212 as a server?

7  A.    From the time that he hired another

8  bartender.

9  Q.    When was that?  You only worked there a

10 year, and it was only a year and a half ago, if

11 that.  So it's not that hard to remember.

12 A.    Yeah.  Well, it was a while ago.

13 Q.    So you only -- you can't remember --

14 A.    I can't give you exact month because I

15 can't remember.  Whenever he was hired, and you

16 should know when he was hired.

17 Q.    Well, you should know because it affected

18 your employment, not mine.

19       How long did you act as a server until you

20 left?

21 A.    Few months.

22 Q.    Two months, three months?

23 A.    Maybe three months.  I'm not going to

24 answer that because I don't want to give you an

25

31

A-173

1                          D. Huk

2    answer that's not right.  Few months.

3    Q.      No.  That's fine.

4            We'll take a two-minute break.  All right?

5                    (Whereupon, a recess was taken at

6            this time.)

7                    (Defendant's Exhibit 1, payroll

8            records, was marked for identification.)

9    Q.      So I show you Defendant's Exhibit 1.

10           Dagmara, please review Defendant's

11   Exhibit 1.

12   A.      Sure.

13   Q.      Do you know what these are?

14   A.      Yes.

15   Q.      What are they?

16   A.      Pay stubs.

17   Q.      So earlier, I believe you said that you

18   didn't receive pay stubs; you only received written

19   checks?

20                   MR. DiGIULIO:  Objection.

21           Mischaracterizes the testimony.  You can

22           answer.

23   Q.      Well, let's go back then.

24           So did you receive these pay stubs every

25   time you were paid?

                            32

DAGMARA HUK

BARKLEY
Court Reporters

A-174

1                          D. Huk

2    A.      Not every time.

3    Q.      When did you not receive these?

4    A.      Depending if I was sent it or not.  It was

5    no rule.

6    Q.      Well, what is the -- well, look at the

7    dates.  Go through the whole file.

8    A.      Sure.

9    Q.      Isn't it true -- and the dates are on the

10   top right.  Isn't it true that this covered your

11   full time that you worked at the restaurant?

12   A.      Repeat the question.

13   Q.      I said if you look at the dates on the top

14   right and go through that whole exhibit --

15   A.      Mm-hmm.

16   Q.      -- isn't it true that this covered the

17   complete dates that you worked at the restaurant?

18   A.      (Perusing.)

19           (Unintelligible.)

20           Possibly.  I'm not sure.

21   Q.      So if it possibly showed the full tenure at

22   the restaurant, then you did receive wage

23   statements every time you were paid; is that

24   correct?

25   A.      What do you mean by "wage statement"?

                            33

BARKLEY
Court Reporters

A-175

```
                              D. Huk
 1
 2    Q.      This is called a wage statement?
 3    A.      No, I didn't.
 4    Q.      You never received this every time you got
 5    paid?
 6    A.      No.  No, I didn't.  Sometimes we would
 7    receive only a --
 8                  (Reporter clarification.)
 9    A.      Sometimes we would receive just an amount
10    to write the checks without the pay stubs.
11    Q.      The times that you supposedly did not
12    receive this, did you request this?
13    A.      No.
14    Q.      And the times that you did receive this,
15    who gave this to you?
16    A.      Imran.
17    Q.      Based on this, the restaurant had wage
18    statements every time you were paid; is that
19    correct?
20                  MR. DiGIULIO:  Objection.
21          Mischaracterizes the exhibit.
22    A.      Wait.  I also want to go back because you
23    said based on the date.  I have Nino's here, so why
24    am I looking at Nino's pay stub?
25    Q.      Nino's you don't have to look at.  So just
```

34

BARKLEY
Court Reporters

A-176

```
 1                        D. Huk
 2   look at yours.
 3   A.      So why would you say it shows my entire
 4   tenure if it's only a few pages of my pay stubs and
 5   the rest is Nino's?
 6   Q.      Well, let's look at yours.
 7   A.      There's only few of them.
 8   Q.      There's not a few of them.  There's a lot
 9   of them.
10   A.      You said it's my entire tenure.
11   Q.      So it started at 9/28/20, and it goes to --
12               MR. DiGIULIO:  Missing a lot of
13           weeks.
14   A.      Yeah, I just realized it.  The rest is
15   Nino.  I thought it was mine.
16   Q.      It goes to June of 2021.  Did you work the
17   weeks that it states that you have under your name?
18   A.      Well, yes.  But I don't think it's the full
19   thing.
20   Q.      Okay.
21   A.      Because we're going from 11/08, and then
22   next one is 12/07.  So we're skipping a month here.
23   Q.      Well, let's look --
24   A.      Then 12/07, and then 2/22.  So we're
25   skipping two months.  Then another month, 3/01.
```

35

BARKLEY
Court Reporters

```
1                         D. Huk
2     Then we have a following week, 5/03.  So we're
3     skipping months here -- a lot of months actually.
4     Q.    Okay.  These weeks that you worked, though,
5     did you receive these statements?
6     A.    Like I said before, not all the time.
7     Q.    And when you closed out a check, was that
8     only checks at the bar?
9                   MR. DiGIULIO:  Objection to the
10           form.  You can answer, if you know.
11    Q.    In other words, when you closed -- you had
12    an employee ID, right?  And you could ring up
13    items, right?  People at the bar, or you did a meal
14    at the bar, you closed out those checks?
15    A.    I don't understand the question.
16    Q.    Okay.  I'll try it again.
17          Let's say you had a couple at the bar, and
18    they decided to eat at the bar.  Is that your
19    check?  Did you open up that check on the POS
20    system?
21    A.    Yes.
22    Q.    And then when they were done, you closed it
23    out, and you gave them the check, right, and took
24    their payment?
25    A.    That's how it works.
```

DAGMARA HUK

BARKLEY
Court Reporters

A-178

```
                              D. Huk
 1
 2    Q.      Okay.  Yeah.  Okay.
 3            And if they paid you in cash, did you
 4    report that as cash?
 5                    MR. DiGIULIO:  Objection to the
 6            form of the question.  You can answer.
 7    Q.      No.  Let's say they paid -- the bill was 80
 8    bucks, and they give you a hundred bucks.  Would
 9    you report that as a cash --
10    A.      Well, how else would you report it?
11    Q.      I don't know.  I'm asking you.
12    A.      I don't know either.  How else can you
13    report it if people are paying cash?
14    Q.      Well, you don't know or --
15    A.      No.  I'm asking you.
16    Q.      I'm not under questioning.  You are.  So I
17    don't really care what I said.
18    A.      Yes, people pay cash.  You close it as
19    cash.  If people pay as a credit card, you close it
20    as credit card.  That's just how it works.
21    Q.      In that instance, so they paid $80, and
22    they gave you $20, did you report that as a cash
23    tip in the system?
24    A.      Report it as a cash tip in the system?
25    Q.      Yes.
```

37

BARKLEY
Court Reporters

D. Huk

1

2  A.    There was no way to report cash tip in the

3  system.

4  Q.    There was no way to report the cash tip --

5  A.    We didn't do that.

6  Q.    So the only way to report the cash tip,

7  that $20, was at the end of the night, that tip

8  sheet?

9  A.    Correct.

10 Q.    So if it wasn't in the system as a cash

11 tip, how would the management know how much cash to

12 report?

13 A.    Like I said, at the end of the night we

14 would write it down at the back of the page.

15 Q.    And did they ever ask you -- forget about

16 at the end of the night, did they ever ask you at

17 the end of the week how much cash tip you earned?

18 A.    No one asked me that question.

19 Q.    So you assumed that management would go

20 through those cash sheets and report those cash

21 tips; is that correct?  The tip sheets, I'm sorry,

22 and report the cash tips?

23 A.    Again, I'm a bartender.

24 Q.    Well, you're also a manager at your prior

25 restaurant and a server?

38

BARKLEY
Court Reporters

D. Huk

1

2  A.      Yeah, but that's not my --

3  Q.      Well, you're a jack-of-all-trades.  You do

4  everything, right?  And according to you, you did

5  everything at this restaurant too, right?

6          (Simultaneous speakers.)

7  A.      I did.

8  Q.      You did payroll --

9  A.      Yeah, but it's not my --

10         MR. DiGIULIO:  Objection.

11         Mischaracterizes testimony.  You can answer

12         it if there's a question.

13 Q.      Did you ever file for unemployment during

14 any period of time while you were working at the

15 restaurant?

16 A.      No.

17 Q.      Did you file for unemployment right after

18 you stopped working at this restaurant?

19 A.      No.

20 Q.      No.  So you never filed for unemployment

21 related to 212 Steakhouse?

22 A.      No.

23 Q.      Okay.  And as far as working during the

24 pandemic, did you ever get COVID while you were

25 working in the restaurant?

39

BARKLEY
Court Reporters

A-181

```
                             D. Huk
 1
 2   A.     Did I get COVID when I was working?
 3   Q.     Right.  During your employment at the
 4   restaurant towards -- at any time?
 5   A.     I don't think so.  I don't remember that,
 6   but I don't think so.
 7   Q.     Did any other employees get COVID, that you
 8   know of?
 9   A.     Well, a lot of people were getting sick,
10   and it wasn't necessarily related to COVID because
11   people get sick during -- like now.
12   Q.     Did you speak to anybody else, any of the
13   other employees about --
14             MR. DiGIULIO:  Objection.
15   Q.     -- getting COVID or them getting COVID?
16             MR. DiGIULIO:  I'm going to object
17        to this whole line of questioning around
18        this.  It's totally irrelevant
19        (unintelligible) invasion of privacy.
20             MR. SEGAL:  I'm not sure it's
21        invasion of privacy, but...
22             MR. DiGIULIO:  I instruct her not
23        to answer.
24             MR. SEGAL:  All right.  Give us one
25        more break.  We'll come back, and we'll
```

40

BARKLEY
Court Reporters

A-182

1                          D. Huk

2          wrap this up.

3                  (Whereupon, a recess was taken at

4          this time.)

5     Q.    So Dagmara, I'm going to show you

6     Defendant's Exhibit 2 one more time.  I guess this

7     is from the earlier deposition.

8          Do you see your name on that tip sheet?

9     A.    Yes.

10    Q.    Okay.  And is this a weekly tip

11    declaration?

12    A.    Yes.

13    Q.    And does it contain both credit card tips

14    and cash, or just credit card tips?

15    A.    This is credit cards.

16    Q.    Okay.  And then I want to show you -- this

17    is -- we don't have one of those marked already?

18                  MR. DiGIULIO:  I think we do.

19          Yeah.  But you can mark it again, if you

20          want.

21                  (Whereupon, a discussion was held

22          off the record.)

23    Q.    So I'm going to show you Exhibit 3.  Are

24    you one of the servers listed on this sheet?

25    A.    I'm sorry.  Repeat the question.

                          41

BARKLEY
Court Reporters

D. Huk

2  Q.    Are you one of the servers listed on this

3  sheet?

4  A.    Correct.

5  Q.    And this is a daily, instead of the weekly

6  that we just looked at?

7  A.    Yes.

8  Q.    And this contains solely credit card tips

9  and noncash tips; is that correct?

10  A.    Yes.

11  Q.    Okay.  Was there ever a time that you were

12  unable to work at 212 Steakhouse due to COVID?

13        MR. DiGIULIO:  You can answer.

14  A.    Unable to work at the restaurant due to

15  COVID?  I don't -- no, I don't think so.

16  Q.    Were you familiar with the law that

17  required restaurant employees to wear masks and be

18  vaccinated?

19  A.    Yes.

20

21        (Continued on next page to

22        accommodate jurat.)

23

24

25

42

DAGMARA HUK

BARKLEY
Court Reporters

```
1    Q.      Did you comply with that law?

2                    MR. DiGIULIO:  Objection.  I'm

3            going to instruct her not to answer again

4            for the same reasons you did before.

5                    MR. SEGAL:  I have no further

6            questions.  Thank you for your time.

7                    MR. DiGIULIO:  I have no further

8            questions either.

9                    (Time Noted:  3:03 p.m.)

10

11                    _____

12                            DAGMARA HUK

13

14   Subscribed and sworn to before me

15   this _____ day of _____ 20__.

16

17   _____

18           Notary Public

19

20

21

22

23

24

25
```

43

BARKLEY
Court Reporters

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NINO MARTINENKO, on behalf of herself     :     Case No.: 22-CV-518 (JLR) (RWL)
and others similarly situated,               :

                                                 :
                           Plaintiff,     :     **DECLARATION OF**
                                              :     **NIKOLAY VOLPER**
        -against-              :
                                              :
212 STEAKHOUSE, INC., and           :
NIKOLAY VOLPER,                   :
                                             :
                       Defendants.     :
                                               :

---

**NIKOLAY VOLPER,** being duly sworn, deposes and declares under penalty of perjury and states as follows:

1.    I am an individual defendant in this action.

2.    I am submitting this declaration on behalf of myself and as the corporate representative of 212 Steakhouse. I have personal and first hand knowledge and information of the facts and statements herein and I can personally attest to the authenticity of the exhibits attached to this Declaration.

3.    As part of this proceeding I compiled a class list of what I initially believed was front of the house tipped employees for the class period. That list was sent to the Plaintiff's attorneys. Exh 1 (attached hereto). After we sent the list to Plaintiff's, I realized that a few of the names did not belong on the list.

4.    One of the names on the list was Laluz Barbara. On further review we could not locate any information or records on this individual. Another individual on the list, Adrian Pizarro was a "back of the house employee," i.e. a non-tipped position, as such he is not eligible to be a

class member. Another individual on the list, Assel Ivanskaya was a host in the restaurant and that is a non-tipped position, also not eligible to be a class member.

5.      It is our understanding that Plaintiffs attorneys sent a notice to the two deceased employees and the notice from one of those deceased employees, Lychezer Lazarov, came back as undeliverable in any event. We do not believe that the deceased employees should be included in the class in any event.

6.      We were also notified by Plaintiffs that six notices were returned as undeliverable. Those were: Gabriel Charles, Haley Melendez, Keya Rocaverte, Lychezer Lazarov, Noel Lora, and Tristian Collazo.

7.      We were notified by Plaintiffs that twelve (12) individuals from the class list submitted opt-out notices expressing their decision to be excluded from the class. The 12 opt-out's who provided opt-out notices to Plaintiffs were: Nadia Paputnikava, Alexander Rynkovsky, Eduardo Perez, Samuel Garcia, Javier Clemente, Bonaficio Ramos, Jose Paul Roque, Oscar Bravo Morales, Luis Fernandez, Alexander Arague Porras, Mariken Tran and Alexander Ardveni.

8.      Plaintiffs sent us copies of these opt-out notices.

9.      There are 24 individuals remaining in the class once the individuals who did not meet the class definition, the opt-outs and individuals who did not receive notice are excluded. Exhibit 2 (Revised class list with annotations regarding opt-out, undelivered and not class eligible).

10.      Martinenko and Huk's claimed overtime are mostly, or all, attributed to their failure to take into account the meal break of 30 minutes, or any breaks they took over 30 minutes. They did not clock out for these non-compensable breaks.

11.      Also based on our records, none of the 24 individuals, including Plaintiff, earned less than the regular minimum wage for all hours worked. For example, a review of named plaintiff

Martinenko's 212 Steakhouse pay shows that she earned an average $51.92 per hour for her 2021 pay. This included her hourly tip credit minimum wage of $10.00 per hour. Exh 3.

12.    I do not spend a lot of time in the Restaurant on a day to day basis. I do not schedule the employees hours. The front of the house employees set their own schedules which is based, of course, on the hours of operation of the restaurant. If a server, busser, or bartender needs time off on one of their work days or is out, the employees arrange for coverage.

13.    Our front of the house employees and in particular the servers (like Martinenko) and bartenders (like Huk) are experienced in the restaurant industry. They have had prior service jobs where tips were customary and comprised most of their pay. My understanding is that they are fully familiar with the tip credit and how it applies to payroll.

14.    The front of the house employees know they are being paid a hourly minimum wage tip credit and tips. The employees administer their own tip pool, with a point system derived by them.

15.    Prior to our current practice of using a payroll service, certain servers prepared the paychecks for the staff. Martinenko, in particular, prepared the payroll checks. She did this by reviewing the payroll information. Opt-in plaintiff Huk also prepared payroll at times.

16.    Martinenko had access to the payroll information. The Point Of Sale ("POS") system tracked employees hours and check in and check out times, i.e. hours of work. Martinenko had access to the Restaurant computers which contained the payroll information and the POS system. Martinenko had the highest level of security on our computer system, Level 3, which is the same level I have. This is a higher level security than other employees. Exh 4. The level of security Martinenko had allowed her to access the system remotely, make edits to the information and downloads. Martinenko's employment ended December 28, 2021. However, as evidenced

3

by Exh. 5 attached hereto, Marktinenko accessed this system multiple times after her employment ended.

17.     Federal and New York labor law posters, and in particular wage-hour posters, are displayed in the workplace so employees can see them. These posters contain the wage-hour rules under both federal law and state law. The posters include provisions regarding tips and the tip credit. The tip credit poster contains a provision that if an employee's tip combined with the employee's cash wage do not equal the applicable state minimum wages the restaurant must make up the difference. However, as I stated employees have always earned more than the regular minimum wage for all hours worked. Exh 6.

18.     The front of the house employees, which includes servers, bartenders and bussers, operate with little supervision and all know their roles and how they are paid. They administer their own tip pool and several of them, Martinenko in particular, are involved with administering payroll.

19.     Plaintiff Martinenko started working at the restaurant in 2015 and then left in December 2018. She again worked at the restaurant starting on March 25, 2021. Her employment ended on December 28, 2021. Based on her testimony at her deposition in this case she worked at the restaurant Nusr-Et Steakhouse in the period after leaving 212 Steakhouse the first time, December 2018 and prior to her return in March, 2021.

20.     As part of this case I understand that Plaintiff Martinenko seeks penalties with respect to her claim that the Restaurant did not provide her with wage statements and pay notices, and/or such notices were deficient. She seeks for herself and a class of other front of the house employees statutory penalties for this claim. The statutes at issue have penalties of up to $5,000 per violation. Since there are 2 notices at issue, Martinenko seeks $10,000, the maximum amount

4

A-189

for her, and similar amounts (if not the same) for a class. The Restaurant is in debt and has not recovered from the pandemic. We are behind in rent and have past due taxes and other obligations which would mean if I had to pay these amounts, I would have to close. I simply could not pay such amounts. Further, since our tipped employees earn well over even the regular minimum wage, I fail to see how they have been harmed by any technical violation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 14, 2023

Nikolay Volper

# EXHIBIT 1

**Class List**

Nadia Paputnikava- Bartender
2750 E 12th street apt 3C
Brooklyn, NY 11235
tel 347-377-1402

Alexander Rynkovsky Server
65 Oriental Blvd Apt 8B
Brooklyn NY 11235
347-707-5410

Everardo Perez -Server
3721 59th street Apt 1F
Woodside, NY 11377
929-435-7300

Samuel Garcia -Runner
703 E 137 street Apt 4B
Bronx NY 10454
646-248-1753

Javier Clemente- Busser
2798 Frederick Douglas Blvd Apt 6C
New York, NY 10039
646-309-6362

Bonafacio Ramos - Runner
419 W 129 street Apt 5Z
New York,NY 10027
347-864-3863

Jose Paul Roque -Busser
101-01 34TH Ave BSMT
Corona NY 11368
347-605-7271

Oscar Bravo Morales -Server

Corona NY 11368
347-361-4025

Luis Fernandez- Server
6208 Palisades Ave Apt 6
West New York ,NJ 07093
347-737-7126

Alexander Arague Porras -server
171 Crescent Pl
Yonkers, NY 10704
347-682-9779

Juan Aguilar- Busser
30-77 14th Street
Astoria, NY 11102

Angel Hernandez -Runner
8528 Grand Ave Apt 1B
Elmhurst ,NY 11373

Mariken Tan-server
464 West 27 street Apt 2F
Chicago ,Illinois 60616
347-547-4202

Mark Smith -Busser
31-23 49th street Apt2A
Woodside NY 11377
929-224-6931

Deirde Cora Bethea - Bartender

960 Willoughby 1 E
Brooklyn NY 11221

Radzivon Babniyazav -Runner

Brooklyn ,NY 11223
929-430-1380

Raul Romero -Runner
980 Simpson street
Bronx ,NY 10459
518-417-0906

Gisely Rosa- Server
2344 27th street
Astoria ,NY 11105

Hector Conoz - Busser
11129 Roosevelt ave
Corona ,NY 11368
917-517-6105

Alessandro Ardueni -Bartender
43-33 48 street Apt 6D
Astoria ,NY 11104
646-384-7320

Dimitry Zarodin -Server
8645 20th Ave
Brooklyn NY   11214
516-850-6236

Stefana Manzano -Server

3041 Gruger Ave
Bronx NY 10467

Miguel Torres -Runner
416 72nd street apt 2
North Bergen,NJ 07047

Iroel Vazguez -Busser

33-45 72nd Street 1 floor
Jackson Heights NY 11372

237 16th street apt 406
Jersey City ,NJ 07310

Vivain Peng-Server
214 Hidden woods ct
Piscataway, NJ 08854

Tela Witting -Server
234 East 52nd street
New York NY 10022

Juan Deluna -Server
69-68 street
Guttenberg NJ 07093

Adrian Pizarro - Busser
11659 121 street #1
S Ozone Park NY 11420

Haley Melendez -Bartender
510 W 190 street
New York NY 10033

Tristian Collazo -Busser
3000 Bronx Park east Apt 3B
Bronx NY 10467

Kelsey Foley -server
204 Macdonough street Apt3B
Brooklyn, NY 11216

Noel Lora -busser
760 Grand Concourse Ave apt 2N
Bronx NY 10451

Gabriel Charles -Runner
224 West 135 street Apt 1
New York NY 10030

Jake Willis -Busser

Newburry Park ,CA 91320

**No address/contact information:**

Benny Torres

Kaye Rocaverte

Assel Ivanskaya

Jose Pena

Shonda Williams

Jose Garcia

Jaime Tovar

# EXHIBIT 3

212 STEAKHOUSE INC
3|6 E 53RD STREET
NY 10022


NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 04/12/2021 - 04/18/2021 | | Pay Date: 04/18/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 28:08 | 10.00 | 281.33 | 281.33 |
| Reported Cash Tips | | | 906.83 | 906.83 |
| | 28:08 | | 1,188.16 | 1,188.16 |
| **Taxes** | | | **Current** | **YTD Amount** |
| NY - City Resident | | | -40.94 | -40.94 |
| NY - Paid Family Leave | | | -6.07 | -6.07 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -94.00 | -94.00 |
| Social Security Employee | | | -73.67 | -73.67 |
| Medicare Employee | | | -17.23 | -17.23 |
| NY - Withholding | | | -56.33 | -56.33 |
| NY - Disability | | | -0.60 | -0.60 |
| | | | -288.84 | -288.84 |
| **Adjustments to Net Pay** | | | **Current** | **YTD Amount** |
| meals contribution | | | -12.00 | -12.00 |
| **Net Pay** | | | **887.32** | **887.32** |

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 04/19/2021 - 04/25/2021 | | Pay Date: 04/25/2021 |
|---|---|---|---|---|---|---|---|

**Employee**

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209

**SSN**

***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 22:47 | 10.00 | 227.83 | 509.16 |
| Reported Cash Tips | | | 1,070.81 | 1,977.64 |
| | 22:47 | | 1,298.64 | 2,486.80 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -45.78 | -88.70 |
| NY - Paid Family Leave | -6.64 | -12.71 |
| Medicare Employee Add'l Tax | 0.00 | 0.00 |
| Federal Withholding | -107.00 | -201.00 |
| Social Security Employee | -80.51 | -154.18 |
| Medicare Employee | -18.83 | -36.06 |
| NY - Withholding | -63.05 | -119.38 |
| NY - Disability | -0.60 | -1.20 |
| | -322.39 | -611.23 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -9.00 | -21.00 |

| Net Pay | 967.25 | 1,854.57 |

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 04/26/2021 - 05/02/2021 | | Pay Date: 05/02/2021 |
|---|---|---|---|---|---|---|---|

**Employee**

SSN

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209

***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 29:37 | 10.00 | 296.17 | 805.33 |
| Reported Cash Tips | | | 1,266.62 | 3,244.26 |
| | 29:37 | | 1,582.79 | 4,049.59 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -57.52 | -144.22 |
| NY - Paid Family Leave | -7.99 | -20.70 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -155.00 | -356.00 |
| Social Security Employee | -96.89 | -251.07 |
| Medicare Employee | -22.66 | -58.72 |
| NY - Withholding | -79.14 | -198.52 |
| NY - Disability | -0.60 | -1.80 |
| | -419.80 | -1,031.03 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -12.00 | -33.00 |

| Net Pay | 1,130.99 | 2,985.56 |
|---|---|---|

A-200

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022


NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 05/03/2021 - 05/09/2021 | | Pay Date: 05/09/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 33:12 | 10.00 | 332.00 | 1,137.33 |
| Reported Cash Tips | | | 1,201.89 | 4,446.15 |
| | 33:12 | | 1,533.89 | 5,583.48 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -55.23 | -200.45 |
| NY - Paid Family Leave | -7.84 | -28.54 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -148.00 | -504.00 |
| Social Security Employee | -95.11 | -346.18 |
| Medicare Employee | -22.24 | -80.98 |
| NY - Withholding | -77.38 | -275.90 |
| NY - Disability | -0.60 | -2.40 |
| | -407.40 | -1,438.43 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -12.00 | -45.00 |

| Net Pay | 1,114.49 | 4,100.05 |

212 STEAKHOUSE INC, 316 E 53RD STREET, NY 10022

A-201

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 05/10/2021 - 05/16/2021 | | Pay Date: 05/16/2021 |
|---|---|---|---|---|---|---|---|

**Employee**

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209

SSN

***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 32.27 | 10.00 | 324.50 | 1,461.83 |
| Reported Cash Tips | | | 1,409.53 | 5,855.68 |
| | 32.27 | | 1,734.03 | 7,317.51 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -65.14 | -265.59 |
| NY - Paid Family Leave | -8.86 | -37.40 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -192.00 | -696.00 |
| Social Security Employee | -107.51 | -453.69 |
| Medicare Employee | -25.14 | -106.10 |
| NY - Withholding | -89.58 | -365.48 |
| NY - Disability | -0.60 | -3.00 |
| | -488.83 | -1,927.26 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -60.00 |

| Net Pay | 1,230.20 | 5,330.25 |
|---|---|---|

A-202

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 05/17/2021 - 05/23/2021 | | Pay Date: 05/23/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | SSN | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 30:36 | 10.00 | 306.00 | 1,767.83 |
| Reported Cash Tips | | | 921.95 | 6,777.63 |
| | 30:36 | | 1,227.95 | 8,545.46 |
| **Taxes** | | | Current | YTD Amount |
| NY - City Resident | | | -42.67 | -308.26 |
| NY - Paid Family Leave | | | -6.27 | -43.67 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -99.00 | -795.00 |
| Social Security Employee | | | -76.13 | -529.82 |
| Medicare Employee | | | -17.81 | -123.91 |
| NY - Withholding | | | -58.75 | -424.23 |
| NY - Disability | | | -0.60 | -3.60 |
| | | | -301.23 | -2,228.49 |
| **Adjustments to Net Pay** | | | Current | YTD Amount |
| meals contribution | | | -12.00 | -72.00 |
| **Net Pay** | | | 914.72 | 6,244.97 |

A-203

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 05/24/2021 - 05/30/2021 | | Pay Date: 05/30/2021 |
|---|---|---|---|---|---|---|---|

**Employee**

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209

**SSN**

***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 27.52 | 10.00 | 278.67 | 2,046.50 |
| Reported Cash Tips | | | 1,073.44 | 7,851.07 |
| | 27.52 | | 1,352.11 | 9,897.57 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -48.14 | -356.40 |
| NY - Paid Family Leave | -6.91 | -50.58 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -113.00 | -908.00 |
| Social Security Employee | -83.83 | -613.65 |
| Medicare Employee | -19.60 | -143.51 |
| NY - Withholding | -66.31 | -490.54 |
| NY - Disability | -0.60 | -4.20 |
| | -338.39 | -2,566.88 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -9.00 | -81.00 |

| Net Pay | 1,004.72 | 7,249.69 |
|---|---|---|

A-204

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 06/21/2021 - 06/27/2021 | | Pay Date: 06/27/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 32:40 | 10.00 | 326.67 | 2,373.17 |
| Reported Cash Tips | | | 1,261.81 | 9,112.88 |
| | 32:40 | | 1,588.48 | 11,486.05 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| NY - City Resident | | | -58.66 | -415.06 |
| NY - Paid Family Leave | | | -8.12 | -58.70 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -160.00 | -1,068.00 |
| Social Security Employee | | | -98.49 | -712.14 |
| Medicare Employee | | | -23.04 | -166.55 |
| NY - Withholding | | | -80.71 | -571.25 |
| NY - Disability | | | -0.60 | -4.80 |
| | | | -429.62 | -2,996.50 |

| Adjustments to Net Pay | | | Current | YTD Amount |
|---|---|---|---|---|
| meals contribution | | | -15.00 | -96.00 |

| **Net Pay** | | | **1,143.86** | **8,393.55** |

212 STEAKHOUSE INC, 316 E 53RD STREET, NY 10022

A-205

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 05/28/2021 - 07/04/2021 | | Pay Date: 07/04/2021 |
|---|---|---|---|---|---|---|---|

**Employee**

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209

**SSN**

***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 12:59 | 10.00 | 129.83 | 2,503.00 |
| Reported Cash Tips | | | 632.94 | 9,745.82 |
| | 12:59 | | 762.77 | 12,248.82 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| NY - City Resident | | | -22.43 | -437.49 |
| NY - Paid Family Leave | | | -3.90 | -62.60 |
| Medicare Employee Add'l Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -43.00 | -1,111.00 |
| Social Security Employee | | | -47.29 | -759.43 |
| Medicare Employee | | | -11.06 | -177.61 |
| NY - Withholding | | | -30.42 | -601.67 |
| NY - Disability | | | -0.60 | -5.40 |
| | | | -158.70 | -3,155.20 |

| Adjustments to Net Pay | | | Current | YTD Amount |
|---|---|---|---|---|
| meals contribution | | | -6.00 | -102.00 |

| Net Pay | | | 598.07 | 8,991.62 |
|---|---|---|---|---|

A-206

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 07/05/2021 - 07/11/2021 | | Pay Date: 07/11/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 34:29 | 10.00 | 344.83 | 2,847.83 |
| Reported Cash Tips | | | 1,159.05 | 10,904.87 |
| | 34:29 | | 1,503.88 | 13,752.70 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -54.89 | -492.38 |
| NY - Paid Family Leave | -7.68 | -70.28 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -142.00 | -1,253.00 |
| Social Security Employee | -93.24 | -852.67 |
| Medicare Employee | -21.80 | -199.41 |
| NY - Withholding | -75.55 | -677.22 |
| NY - Disability | -0.60 | -6.00 |
| | -395.76 | -3,550.96 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -117.00 |

| Net Pay | 1,093.12 | 10,084.74 |
|---|---|---|

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 07/12/2021 – 07/18/2021 | | Pay Date: 07/18/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 34:33 | 10.00 | 345.50 | 3,193.33 |
| Reported Cash Tips | | | 1,510.30 | 12,415.17 |
| | 34:33 | | 1,855.80 | 15,608.50 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -70.55 | -562.93 |
| NY - Paid Family Leave | -9.48 | -79.76 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -219.00 | -1,472.00 |
| Social Security Employee | -115.06 | -967.73 |
| Medicare Employee | -26.91 | -226.32 |
| NY - Withholding | -97.38 | -774.60 |
| NY - Disability | -0.60 | -6.60 |
| | -538.98 | -4,089.94 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -132.00 |

| Net Pay | 1,301.82 | 11,386.56 |

A-208

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 07/19/2021 - 07/25/2021 | | Pay Date: 07/25/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 34:42 | 10.00 | 347.00 | 3,540.33 |
| Reported Cash Tips | | | 1,412.01 | 13,827.18 |
| | 34:42 | | 1,759.01 | 17,367.51 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -68.25 | -629.18 |
| NY - Paid Family Leave | -6.99 | -88.75 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -198.00 | -1,670.00 |
| Social Security Employee | -109.06 | -1,076.79 |
| Medicare Employee | -25.51 | -251.83 |
| NY - Withholding | -91.18 | -865.78 |
| NY - Disability | -0.60 | -7.20 |
| | -499.59 | -4,589.53 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -147.00 |

| Net Pay | 1,244.42 | 12,630.98 |
|---|---|---|

A-209

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 09/13/2021 - 09/19/2021 | | Pay Date: 09/19/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 37:13 | 10.00 | 372.17 | 3,912.50 |
| Reported Cash Tips | | | 1,483.97 | 15,311.15 |
| | 37:13 | | 1,856.14 | 19,223.65 |
| **Taxes** | | | **Current** | **YTD Amount** |
| NY - City Resident | | | -70.57 | -699.75 |
| NY - Paid Family Leave | | | -9.46 | -98.23 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -219.00 | -1,889.00 |
| Social Security Employee | | | -115.08 | -1,191.87 |
| Medicare Employee | | | -26.91 | -278.74 |
| NY - Withholding | | | -96.94 | -961.72 |
| NY - Disability | | | -0.60 | -7.80 |
| | | | -537.58 | -5,127.11 |
| **Adjustments to Net Pay** | | | **Current** | **YTD Amount** |
| meals contribution | | | -18.00 | -165.00 |
| **Net Pay** | | | **1,300.56** | **13,931.54** |

A-210

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 09/20/2021 - 09/26/2021 | | Pay Date: 09/26/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 27:39 | 10.00 | 276.50 | 4,189.00 |
| Reported Cash Tips | | | 790.34 | 16,101.49 |
| | 27:39 | | 1,066.84 | 20,290.49 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -35.66 | -735.41 |
| NY - Paid Family Leave | -5.45 | -103.68 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -79.00 | -1,968.00 |
| Social Security Employee | -66.14 | -1,258.01 |
| Medicare Employee | -15.47 | -294.21 |
| NY - Withholding | -48.37 | -1,010.09 |
| NY - Disability | -0.60 | -8.40 |
| | -250.69 | -5,377.80 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -9.00 | -174.00 |

| Net Pay | 807.15 | 14,738.69 |

A-211

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | SSN | Pay Period: 09/27/2021 - 10/03/2021 | | Pay Date: 10/03/2021 |

| Employee | | | | |
|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | |

SSN

\*\*\*-\*\*-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 45:29 | 10.00 | 454.83 | 4,643.83 |
| Reported Cash Tips | | | 1,070.11 | 17,171.60 |
| | 45:29 | | 1,524.94 | 21,815.43 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -55.83 | -791.24 |
| NY - Paid Family Leave | -7.79 | -111.47 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -146.00 | -2,114.00 |
| Social Security Employee | -94.55 | -1,352.56 |
| Medicare Employee | -22.11 | -316.32 |
| NY - Withholding | -75.72 | -1,085.81 |
| NY - Disability | -0.60 | -9.00 |
| | -402.60 | -5,780.40 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -189.00 |

| Net Pay | 1,107.34 | 15,846.03 |

A-212

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 10/04/2021 - 10/10/2021 | | Pay Date: 10/10/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN |
|---|---|---|---|---|---|
| NINO MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-6311 |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 44:48 | 10.00 | 448.00 | 5,091.83 |
| Reported Cash Tips | | | 1,192.23 | 18,363.83 |
| | 44:48 | | 1,640.23 | 23,455.66 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -60.96 | -852.20 |
| NY - Paid Family Leave | -8.38 | -119.66 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -172.00 | -2,286.00 |
| Social Security Employee | -101.69 | -1,454.25 |
| Medicare Employee | -23.79 | -340.11 |
| NY - Withholding | -82.60 | -1,188.41 |
| NY - Disability | -0.60 | -9.60 |
| | -450.02 | -6,230.42 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -18.00 | -207.00 |

| Net Pay | 1,172.21 | 17,018.24 |
|---|---|---|

A-213

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | | Pay Period: 10/11/2021 - 10/17/2021 | | Pay Date: 10/17/2021 |
|---|---|---|---|---|---|---|---|---|

**Employee**                                                    SSN
NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209     ***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 37:48 | 10.00 | 378.00 | 5,469.83 |
| Reported Cash Tips | | | 1,250.02 | 19,613.85 |
| | 37:48 | | 1,828.02 | 25,083.68 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| NY - City Resident | | | -60.42 | -912.62 |
| NY - Paid Family Leave | | | -8.32 | -128.17 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -169.00 | -2,455.00 |
| Social Security Employee | | | -100.94 | -1,555.19 |
| Medicare Employee | | | -23.60 | -363.71 |
| NY - Withholding | | | -81.87 | -1,250.28 |
| NY - Disability | | | -0.60 | -10.20 |
| | | | -444.75 | -6,675.17 |

| Adjustments to Net Pay | | | Current | YTD Amount |
|---|---|---|---|---|
| meals contribution | | | -15.00 | -222.00 |

| Net Pay | | | 1,168.27 | 18,186.51 |
|---|---|---|---|---|

A-214

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 10/18/2021 - 10/24/2021 | | Pay Date: 10/24/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 43:30 | 10.00 | 435.00 | 5,904.83 |
| Reported Cash Tips | | | 1,665.35 | 21,279.20 |
| | 43:30 | | 2,100.35 | 27,184.03 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -81.44 | -994.06 |
| NY - Paid Family Leave | -10.73 | -138.90 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -274.00 | -2,729.00 |
| Social Security Employee | -130.22 | -1,685.41 |
| Medicare Employee | -30.46 | -394.17 |
| NY - Withholding | -112.01 | -1,362.29 |
| NY - Disability | -0.60 | -10.80 |
| | -639.46 | -7,314.63 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -237.00 |

| Net Pay | 1,445.89 | 19,632.40 |
|---|---|---|

A-215

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | Check number: | | | Pay Period: 10/25/2021 - 10/31/2021 | | Pay Date: 10/31/2021 |
|---|---|---|---|---|---|---|

**Employee** — SSN

NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209  —  ***-**-5311

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 44:34 | 10.00 | 445.67 | 6,350.50 |
| Reported Cash Tips | | | 1,464.08 | 22,743.28 |
| | 44:34 | | 1,909.75 | 29,093.78 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -72.96 | -1,067.02 |
| NY - Paid Family Leave | -9.76 | -148.66 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -231.00 | -2,960.00 |
| Social Security Employee | -118.40 | -1,803.81 |
| Medicare Employee | -27.69 | -421.86 |
| NY - Withholding | -99.33 | -1,461.62 |
| NY - Disability | -0.60 | -11.40 |
| | -559.74 | -7,874.37 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -252.00 |

| Net Pay | 1,335.01 | 20,967.41 |

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | Check number: | | | Pay Period: 11/01/2021 - 11/07/2021 | | Pay Date: 11/07/2021 |
|---|---|---|---|---|---|---|

| Employee | | | | SSN | | |
|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 41:25 | 10.00 | 414.17 | 6,764.67 |
| Reported Cash Tips | | | 1,399.72 | 24,143.00 |
| | 41:25 | | 1,813.89 | 30,907.67 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -68.69 | -1,135.71 |
| NY - Paid Family Leave | -9.27 | -157.93 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -210.00 | -3,170.00 |
| Social Security Employee | -112.47 | -1,916.28 |
| Medicare Employee | -26.30 | -448.16 |
| NY - Withholding | -93.26 | -1,554.88 |
| NY - Disability | -0.60 | -12.00 |
| | -520.59 | -8,394.96 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -15.00 | -267.00 |

| Net Pay | 1,278.30 | 22,245.71 |
|---|---|---|

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 11/08/2021 - 11/14/2021 | | Pay Date: 11/14/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 58:20 | 10.00 | 583.33 | 7,348.00 |
| Reported Cash Tips | | | 2,556.83 | 26,699.83 |
| | 58:20 | | 3,140.16 | 34,047.83 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -127.71 | -1,263.42 |
| NY - Paid Family Leave | -16.05 | -173.98 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -524.00 | -3,694.00 |
| Social Security Employee | -194.69 | -2,110.97 |
| Medicare Employee | -45.53 | -493.69 |
| NY - Withholding | -193.19 | -1,748.07 |
| NY - Disability | -0.60 | -12.60 |
| | -1,101.77 | -9,496.73 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -18.00 | -285.00 |

| Net Pay | 2,020.39 | 24,266.10 |

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 11/15/2021 - 11/21/2021 | | Pay Date: 11/21/2021 |
|---|---|---|---|---|---|---|---|
| **Employee** | | | | | **SSN** | | |
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 52:00 | 10.00 | 520.00 | 7,868.00 |
| Reported Cash Tips | | | 2,181.63 | 28,881.46 |
| | 52:00 | | 2,701.63 | 36,749.46 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -108.19 | -1,371.61 |
| NY - Paid Family Leave | -13.81 | -187.79 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -419.00 | -4,113.00 |
| Social Security Employee | -167.50 | -2,278.47 |
| Medicare Employee | -39.18 | -532.87 |
| NY - Withholding | -158.63 | -1,906.70 |
| NY - Disability | -0.60 | -13.20 |
| | -906.91 | -10,403.64 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -18.00 | -303.00 |

| Net Pay | 1,776.72 | 26,042.82 |

212 STEAKHOUSE INC, 316 E 53RD STREET, NY 10022

A-219

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 11/22/2021 - 11/28/2021 | | Pay Date: 11/28/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 48:35 | 10.00 | 485.83 | 8,353.83 |
| Reported Cash Tips | | | 1,469.40 | 30,350.86 |
| | 48:35 | | 1,955.23 | 38,704.69 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| NY - City Resident | | | -74.98 | -1,446.59 |
| NY - Paid Family Leave | | | -9.99 | -197.78 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -241.00 | -4,354.00 |
| Social Security Employee | | | -121.22 | -2,399.69 |
| Medicare Employee | | | -28.35 | -561.22 |
| NY - Withholding | | | -102.21 | -2,008.91 |
| NY - Disability | | | -0.60 | -13.80 |
| | | | -578.35 | -10,981.99 |

| Adjustments to Net Pay | | | Current | YTD Amount |
|---|---|---|---|---|
| meals contribution | | | -18.00 | -321.00 |

| Net Pay | | | 1,358.88 | 27,401.70 |

A-220

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 11/29/2021 - 12/05/2021 | | Pay Date: 12/05/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 46:06 | 10.00 | 461.00 | 8,814.83 |
| Reported Cash Tips | | | 2,022.85 | 32,373.71 |
| | 46:06 | | 2,483.85 | 41,188.54 |
| **Taxes** | | | **Current** | **YTD Amount** |
| NY - City Resident | | | -98.50 | -1,545.09 |
| NY - Paid Family Leave | | | -12.69 | -210.47 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -366.00 | -4,720.00 |
| Social Security Employee | | | -154.00 | -2,553.69 |
| Medicare Employee | | | -36.01 | -597.23 |
| NY - Withholding | | | -141.47 | -2,150.38 |
| NY - Disability | | | -0.60 | -14.40 |
| | | | -809.27 | -11,791.26 |
| **Adjustments to Net Pay** | | | **Current** | **YTD Amount** |
| meals contribution | | | -15.00 | -338.00 |
| **Net Pay** | | | **1,659.58** | **29,061.28** |

A-221

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 12/06/2021 - 12/12/2021 | | Pay Date: 12/12/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 34:21 | 10.00 | 343.50 | 9,158.33 |
| Reported Cash Tips | | | 1,442.24 | 33,815.95 |
| | 34:21 | | 1,785.74 | 42,974.28 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| NY - City Resident | | | -67.44 | -1,612.53 |
| NY - Paid Family Leave | | | -9.13 | -219.60 |
| Medicare Employee Addl Tax | | | 0.00 | 0.00 |
| Federal Withholding | | | -204.00 | -4,924.00 |
| Social Security Employee | | | -110.72 | -2,684.41 |
| Medicare Employee | | | -25.90 | -623.13 |
| NY - Withholding | | | -91.48 | -2,241.86 |
| NY - Disability | | | -0.60 | -15.00 |
| | | | -509.27 | -12,300.53 |

| Adjustments to Net Pay | | | Current | YTD Amount |
|---|---|---|---|---|
| meals contribution | | | -15.00 | -351.00 |

| Net Pay | | | 1,261.47 | 30,322.75 |
|---|---|---|---|---|

212 STEAKHOUSE INC
316 E 53RD STREET
NY 10022

NINO  MARTINENKO SILVA
8309 3RD AVE FL2
BROOKLYN, NY 11209

| Employee Pay Stub | | Check number: | | | Pay Period: 12/13/2021 - 12/19/2021 | | Pay Date: 12/19/2021 |
|---|---|---|---|---|---|---|---|

| Employee | | | | | SSN | | |
|---|---|---|---|---|---|---|---|
| NINO  MARTINENKO SILVA, 8309 3RD AVE FL2, BROOKLYN, NY 11209 | | | | | ***-**-5311 | | |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Hourly | 31:30 | 10.00 | 315.00 | 9,473.33 |
| Reported Cash Tips | | | 1,215.06 | 35,031.01 |
| | 31:30 | | 1,530.06 | 44,504.34 |

| Taxes | Current | YTD Amount |
|---|---|---|
| NY - City Resident | -58.06 | -1,658.59 |
| NY - Paid Family Leave | -7.82 | -227.42 |
| Medicare Employee Addl Tax | 0.00 | 0.00 |
| Federal Withholding | -147.00 | -5,071.00 |
| Social Security Employee | -94.86 | -2,759.27 |
| Medicare Employee | -22.18 | -645.31 |
| NY - Withholding | -78.02 | -2,317.88 |
| NY - Disability | -0.60 | -15.60 |
| | -404.54 | -12,705.07 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| meals contribution | -12.00 | -363.00 |

| Net Pay | 1,113.52 | 31,436.27 |
|---|---|---|

212 STEAKHOUSE INC, 316 E 53RD STREET, NY 10022

A-223

# EXHIBIT 4



212 Agreements
22 Travel Instagram...
Hoobio Admin Con...
Hoobio Drive
These instagram Tr...
LAVU
212 Steakhouse
Home
End of Day
Overview
Tips & CC Batching
Manage Time Cards
Workforce
Manage Time Cards
Manage Users
Scheduling
Settings
Transactions
Orders
Payments
Gift & Loyalty Cards
Reports
Sales & Payments
Labor
Inventory
All classes
Level 1 Javier Clemente No class
Level 0 Jose Raul Roque No class
Level 1 Luis Fernandez No class
Level 3 Nikolay Volper No class
Level 3 Nino Martinenko No class
Level 1 Oscar Morales No class
Level 0 Pedro Morales No class
Level 0 Romy Lucero No class
Level 1 Samuel Garcia No class
Level 0 Ulises Castro Maldonado No class
70°F
Sunny
Search

# EXHIBIT 5

A-226

Day                               Month



| USER | COUNT | TIME |
|------|-------|------|
|  | 1 | 01-01- 2022 19:04:07 |
|  | 1 | 01-01- 2022 19:04:45 |
|  | 1 | 01-01- 2022 23:10:20 |
|  | 1 | 01-06- 2022 21:00:41 |
|  | 1 | 01-06- 2022 21:01:08 |
|  | 1 | 01-08- 2022 20:23:43 |

# EXHIBIT 6



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NINO MARTINENKO, on behalf of herself and others similarly situated, | Case No.: 22-CV-518 (JLR) (RWL) |
| Plaintiff, | **DECLARATION OF NIKOLAY VOLPER IN OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT** |
| -against- | |
| 212 STEAKHOUSE, INC., and NIKOLAY VOLPER, | |
| Defendants. | |

**NIKOLAY VOLPER,** being duly sworn, deposes and declares under penalty of perjury and states as follows:

1.    I am an individual defendant in this action.

2.    I am submitting this declaration on behalf of myself and as the corporate representative of 212 Steakhouse. I have personal and first hand knowledge and information of the facts and statements herein and I can personally attest to the authenticity of the exhibits attached to this Declaration.

3.    Plaintiffs have submitted a Damages Summary in their Motion for Summary Judgment in which they claim to the Class consists of 33 tipped employees. Plaintiff's list, however, includes six (6) individuals whose notices were returned as undeliverable. It also includes two deceased individuals who passed away prior to the commencement of this lawsuit. One of the individuals, Lychezer Lazarou, had a returned undeliverable notice. The other deceased individual on the list is Danny Birlandeau. These two deceased individuals were not on the 212 Class list.

A-228.2

4.      Adrian Pizarro is on Plaintiffs damages list, and Plaintiffs include him as a Class Member. However, we had notified Plaintiffs that he was a non-tipped employee as he worked as a back of the house employee (dishwasher). I have attached hereto as Exhibit 1 to this declaration Pizzaro's Time In/Out Report. The clock in and clock hours listed for him, clocking in at 2:00 pm show him to be a back of the house kitchen employee. Exh. 1, attached hereto.

5.      212 Steakhouse ("212" or "Restaurant") is a small restaurant in New York City. On any given shift only tipped 3-4 employees work. Tipped employees include servers, bussers and bartenders. On weekends that number could increase to 7, but that depends on the time of year. See Exhibit 2, attached hereto (sampling of tip sheets).

6.      The employees set their own schedules without any management involvement.

7.      There is no on-site manager directing the employees during their shifts. In fact, the Restaurant has no day to day manager. The kitchen staff, typically the Chef, opens the Restaurant each day a front of the house employee closes the Restaurant at night. Most of the employees have keys to the Restaurant. Servers are relieved from work when their last guest check is closed. This includes Plaintiff Martinenko. Martinenko was considered off duty after her last check closed. At that time she should have clocked out.

8.      The Restaurant employees' clock in at the start of their shift and clock out at the conclusion of the shift. Again, this should be when their last guest check is closed. The bussers are responsible for clearing the tables when the last check is closed. Employees are provided with a meal break of at least 30 minutes. They are paid for the time they are clocked in to when they clock out. Front of the house employees are provided with a minimum 30 minute meal break. The kitchen prepares a family style meal for them each shift, usually around 4:00 pm.

9.      While the employees do not clock out for the meal break, breaks of 30 minutes or more are not considered work time. Again, the employees police themselves as to these breaks and their work hours, of course they are guided by the hours of operation. The employees create their own schedules, again by the hours of operation. The servers are relieved from work when their last check (table) is closed. At that point the busser cleans the table and then sets the table for the next day. The servers stayed after their last check closed to wait for a full accounting of the days tips. That way they could take their cash tips with them that night. The time after the servers last check closing is not work time. The servers should have clocked out at this time as they were relieved from all duties and could leave the Restaurant. The did not clock out, however. My review of the time records is that they do not clock out during this time, which is not work time. For example, I reviewed Plaintiff Martinenko's December 21, 2021, time and when her last check closed. (Exh. 3, is attached hereto).[1] For that month, December 2021, there was 20 hours of non work time after the close of her shift of which she remained clocked in.

10.      Since there is no on-site manager directing the front of the house employees, those employees' manage their own work. In fact, if there are not enough customers in the restaurant, the employees among themselves can decide if someone wants to leave early. It is also up to the employees to clock out when their duties conclude. I am not there to police their clock in and clock out times and it is their responsibility to clock out when their work duties ended.

11.      I expect the front of the house employees to take a full 30 to 40 minute meal break. No one has ever complained to me that they are being interrupted during their meal break. I have never interrupted an employee during their meal break. Because the kitchen prepares the family style meal for employees, I have no reason to believe they are not taking their full meal break.

---

[1] Exhibit 3 consists of three parts:  a is the compilation, document b is Martinenko's time in and out for 2021 and document c is the Martinenko' last check and the time it was entered.

3

12.    I am not present in the Restaurant most of the time.

13.    Both Nino Martinenko and Dagmara Huk assisted with payroll, as did other employees. They, and other employees, including the Chef wrote the payroll checks. Neither Martinenko nor Huk had prepared the paychecks each week, that job was spread over several different employees. Each employee had full access to the restaurants office and the Point Of Sale System. Martinenko held the same level of security access as me, level 3, which was the highest level. With that level she could review the payroll records of all employees, download them, and even change her records (and those of other employees).

14.    Starting in 2019 the Restaurant used a payroll service to process checks and provide wage statements. When we started issuing wage statements with the checks, the statements contained the necessary information for each employee including pay rate and lawful deductions. Prior to 2019 we did provide statements to the employees containing their reported tips, time in and out and the meal credit as well as the employee's acknowledgment that they were paid.

15.    Martinenko regularly stayed in the restaurant after her shift ended. A review of her time in and time out records shows that she did not clock out when her shift ended, She was not required to remain at the restaurant after her last guest left, i.e. the last guest's check clocked out. There were no work duties for her to perform at that time. The busser was responsible for clearing the tables. Martinenko sometimes sat at the bar after her last guest left. She also waited for her cash tips to be distributed and stayed in the Restaurant for the full accounting of the tips to ensure herself that she got her full allotment of the tip pool. I think she also waited for her boyfriend's shift to be over (he was another Restaurant employee, busser who had to stay to clean the tables). This too is not considered work time for Plaintiff. I have attached hereto a listing of the period between Martinenko's last check cleared and the time she actually clocked out for a one month

4

period (12/1/21 -- 12/31/21). This non-work time counts to over 20 hours for the month of December 2021, which doesn't even include the 2.5 hrs. a week of meal break time. Exh 3, attached hereto. If this analysis is extended throughout her employment, the overtime and spread of hours would be completely wiped out, and the minimum wage/tip credit damages would be significantly adjusted downward/or completely a wash.

16.      Plaintiffs also claim that they took phone calls for the Restaurant when they weren't performing their server duties. While they may have taken sporadic phone calls from time to time, this was not a substantial or significant amount of time. The Restaurant's host was in charge of making and answering phone calls for the Restaurant. The host is a non-tipped position, and the host typically had the same hours as the other front of the house employees.

17.      The employees administered their own tip pool and came up with the percentages each would receive. The Restaurant had no role in the administration of the employees tip pool.

18.      Tips come in the form of credit card tips and cash tips. I now understand that neither Martinenko nor Huk declared their cash tips to the restaurant.

19.      I did not review the payroll or the time in and time out information. This was passed on to the accountant, who calculated the payroll for each employee and payroll taxes. The payment also included reported tips. During the course of this litigation, I have reviewed the time records.

20.      I relied on my accountant to ensure the employees were properly paid and for compliance with the wage-hour laws. 212 was my first, and only Restaurant experience. I also relied on the more experienced workers, such as Martinenko to operate the Restaurant. Martinenko started at the Restaurant in 2015. It appears from Plaintiff damages calculation that she is seeking a penalty related to the Restaurant's failure to provide her with certain information at the start of her employment in 2015. However, 2015 is beyond the limitations period of this action.

21.     I do not believe the front of the house employees worked overtime, i.e. over 40 hours in a workweek. The Restaurant's hours don't call for it. Also, the overtime and spread of hours sought in this case is attributable to non-compensable time in which an employee remained clocked in – such as his/her meal break and the time spent in the Restaurant after their shift ended without clocking out.

22.     A review of the time in/time out records for the Class shows that employees did not clock out for meal breaks. Exh 4, attached hereto.

23.     No employee complained or notified me that they were working overtime and not getting pay an overtime rate. No employee complained to me or notified me that they were not getting a full meal break. The Restaurant charged a meal credit for the family meal served to them each shift. I had no knowledge that any employee was working overtime or working through their breaks of 30 minutes or more.

24.     The Restaurant did have two prior lawsuits one in 2018 and one in 2020. The one in 2020 involved a dishworker, which is a non-tipped position. We resolved that case early in the process. I did not believe we owed the employee any money, but I made a business decision to resolve the case without expending funds on litigation. The first case was in 2018 and we also settled that case as a business decision. After that case we hired the payroll service to prepare detailed pay statements for employees. I don't recall whether the case had anything to do with that charge, but it was around the same time the case concluded. Plaintiffs also refer to a New York State Department of Labor investigation. That investigation had nothing to do with wage-hour issues but was a routine unemployment insurance audit.

25.     I have always thought we paid time employees appropriately and in accordance with the laws. I relied on my accountant to apprise me of the relevant payroll laws, and he never

A-228.7

told me the Restaurant was out of compliance. No employee notified me that they were not paid properly. We had all the relevant wage and hour notices posted in a place where employees could see them. I always posted the most recent version of the posters. The posters set forth the overtime requirements as well as the tip credit requirements. Each of our tipped employees earn sufficient tips so that their hourly wage for all hours worked equals the regular minimum wage.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  December 2 0, 2023                    _____

Nikolay Volper

A-229

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**NINO MARTINENKO, on behalf of herself**                    **CASE NO. 22 CV 518**
**and others similarly situated,**

        **Plaintiff,**

  **v.**

**212 STEAKHOUSE, INC., and NIKOLAY**
**VOLPER,**

        **Defendants.**
-------------------------------------------------------x

## DECLARATION OF MICHAEL DIGIULIO

Michael DiGiulio declares under penalty of perjury pursuant to 28 U.S.C.§ 1745 that:

1.      I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motions to Decertify the Class and to Dismiss Pursuant to Rule 12(c).

2.      I am an attorney with Joseph & Kirschenbaum LLP ("JK"), class counsel in this action.

3.      I am familiar with the facts and circumstances set forth herein.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the transcript of the October 6, 2022 deposition of Defendant Nikolay Volper, who was testifying on behalf of himself and on behalf of Defendant 212 Steakhouse, Inc., under Federal Rule of Civil Procedure 30(b)(6) in the above captioned case.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of Defendants' Responses & Objections to the Plaintiff's First Request for the Production of Documents to All Defendants served on Plaintiff on July 12, 2022.

6.      Attached hereto as **Exhibit 3** are true and correct copies of the completed opt-out forms from the eight current employees of 212 Steakhouse – Samuel Garcia Velez, Luis

Fenandez, Alexander Rynkovsky, Bonifacio J. Ramos, Everardo Perez, Javier Clemente, Jose Raul Roque Blass, and Oscar Morales.

7.  Attached hereto as **Exhibit 4** are true and correct copies of the envelopes that the seven of the eight current employees of 212 Steakhouse used to submit their opt-out forms – Bonifacio J. Ramos, Everardo Perez, Javier Clemente, Samuel Garcia Velez, Oscar Morales, Jose Raul Roque Blass, and Alexander Rynkovsky.

8.  Attached hereto as **Exhibit 5** are true and correct copies of examples of a wage statements/paystub for Plaintiff Martinenko and for Plaintiff Huk. Plaintiff Huk's wage statement, dated August 24, 2020, is the earliest wage statement that Defendants have produced in this litigation. These documents bear Bates numbers D883, D907, D948.

9.  Attached hereto as **Exhibit 6** is a true and correct copy of Plaintiff Martinenko's W-2 from 212 Steakhouse in 2021 that Defendants produced in this litigation.

10.  Defendants did not produce any wage statements for any Class Members other than for Plaintiff Martinenko and Opt-In Plaintiff Huk.

11.  Defendants did not produce a single wage notice for any Class Member in this litigation.

12.  Defendants produced Plaintiffs' time records in discovery, and in May 2023 Defendants produced time records for an additional 43 Class Members.

13.  Defendants subsequently confirmed that they did not include two deceased Class Members – Danny Birladeanu and Lytchez Lazarov – on the Class list, although they produced those two individuals' time records.

14.  Plaintiffs included Birladeanu and Lazarov in the notice distribution.

15.  Defendants provided Lazarov's last known address to Plaintiff's counsel following conditional certification of the FLSA collective. Plaintiffs' counsel identified Birladeanu's surviving spouse via public records search and a GoFundMe established after his

death and mailed the notice to her last known address as obtained from a public records search.

16.     Defendants confirmed via email that Michelle Marquez, whose time records they produced but whom they omitted from the class list because they did not have any contact information for her, is a Class Member.

17.     Plaintiffs' counsel identified Birladeanu's surviving spouse via public records search and a GoFundMe established after his death and mailed the notice to her last known address as obtained from a public records search.

18.     Defendants subsequently stated that three individuals who were included on the Class List were either not employed in covered positions (Assel Ivanskaya and Adrian Pizarro) or not employed at all (Barbara Laluz).

19.     Defendants produced time records for Pizarro and have never provided any evidence showing that Pizarro was not employed in a covered position and that he should not be included in the Class.

20.     After Plaintiffs distributed the class notice to Class Members' last known addresses as provided by Defendants or located by Class Counsel, 12 individuals opted-out of the class.

21.     At the close of the Class notice period, there are 33 Class Members, including Pizarro.

22.     Every Class Member who is a current employee (eight individuals) opted out of the Class, and they did so using a virtually identical form dated June 30, 2023, even though the opt-outs were mailed on July 1, 10, 11, 12, 17, and 18.

23.     Defendants never provided Plaintiffs with evidentiary or witness disclosures under Federal Rule of Civil Procedure 26(a).

24.     Defendants produced time records for all Class Members, which show the clock in and out dates and times of all the Class Members.

A-232

25. Defendants time records establish the number of hours that each Class Member worked, including regular hours, overtime hours, and spread of hours shifts.

26. During discovery, Defendants did not produce any copy or image of the poster depicted in Dkt. No. 112-13.

Dated: New York, New York
       December 21, 2023

                              JOSEPH & KIRSCHENBAUM LLP

                              By:    /s/ Michael DiGiulio
                                     Michael DiGiulio
                                     32 Broadway, Suite 601
                                     New York, New York 10022
                                     (212) 688-5640

                                     *Attorneys for Plaintiffs and Class*

# Exhibit 1

Page 1

```
1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - - - - - - -x
4   NINO MARTINENKO, on behalf of herself and
    others similarly situated,
5
                      Plaintiff,
6
         -against- CASE NO: 22-CV-518
7
    212 STEAKHOUSE, INC., and NIKOLAY VOLPER,
8
                      Defendants.
9
    - - - - - - - - - - - - - - - - - - -x
10
                      32 Broadway
11                    New York, New York
12                    October 6, 2022
                      10:40 a.m.
13
14
15      DEPOSITION of NIKOLAY VOLPER, the
16   Defendant in the above-entitled action,
17   held at the above time and place, taken
18   before Dikila Bhutia, a Shorthand Reporter
19   and Notary Public of the State of New
20   York, pursuant to the Federal Rules of
21   Civil Procedure, order and stipulations
22   between Counsel.
23
24          *     *     *
25
```

Page 2

1 APPEARANCES:
2
3   JOSEPH &KIRSCHENBAUM, LLP
      Attorneys for Plaintiff
4       32 Broadway
        New York, New York 10004
5
   BY: MICHAEL DiGIULIO, ESQ.
6      DENISE SCHULMAN, ESQ.
7
8
   LAW OFFICES OF MITCHELL S. SEGAL P.C.
9   Attorney for Defendant
        1129 Northern Boulevard, Ste 404
10      Manhasset, New York 11030
11 BY: MITCHELL SEGAL, ESQ.
12
13
            *   *   *
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        STIPULATIONS
2    IT IS HEREBY STIPULATED AND AGREED, by
3  and among counsel for the respective
4  parties hereto, that the filing, sealing
5  and certification of the within deposition
6  shall be and the same are hereby waived;
7    IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to form of
9  the question, shall be reserved to the
10 time of the trial;
11   IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be signed
13 before any Notary Public with the same
14 force and effect as if signed and sworn to
15 before the Court.
16        *   *   *
17
18
19
20
21
22
23
24
25

Page 4

1 N I K O L A Y   V O L P E R, the Witness
2 herein, having first been duly sworn by
3 the Notary Public, was examined and
4 testified as follows:
5 BY
6 THE COURT REPORTER:
7    Q.    Please state your name for the
8 record.
9    A.    Nikolay Volper.
10   Q.    Please state your name for the
11 record.
12   A.    2447 44 Street, Astoria, New
13 York, 11103.
14 EXAMINATION BY
15 MR. DiGIULIO:
16   Q.    Good morning, Mr. Volper.
17   A.    Good morning.
18   Q.    My name is Mike DiGiulio.  I am
19 an attorney with the law firm of Joseph &
20 Kirschenbaum.  I represent the plaintiff
21 in the lawsuit against yourself and the
22 212 Steakhouse Incorporated.  Thank you
23 for being here today.
24   A.    Thank you very much.
25   Q.    I will be referring to the 212

Page 5

1 N. VOLPER
2 Steakhouse Incorporated as 212 Steakhouse.
3 Do you understand this?
4    A.    Yes.
5    Q.    Have you ever been deposed
6 before?
7    A.    In the past?
8    Q.    Yes.
9    A.    What kind of -- can you be more
10 specific?
11   Q.    Have you ever been deposed in a
12 deposition?
13   A.    Yes.
14   Q.    How many times?
15   A.    In any business or specifically
16 for 212 Steakhouse?
17   Q.    In any business.
18      MR. SEGAL:  He is just saying if
19   you are familiar with the process.
20   A.    Yes.
21   Q.    Do you have a sense of how many
22 times you have been deposed?
23   A.    Two or three times.
24   Q.    As you know, from the two or
25 three times, I am going to ask you some

2 (Pages 2 - 5)

Page 6

N. VOLPER

1              N. VOLPER
2  questions today.
3      A.   Yes.
4      Q.   The court reporter will take
5  down everything we say to each other
6  because the court reporter is transcribing
7  in this deposition.  It is important that
8  you give verbal response to all the
9  questions.  The court reporter cannot
10  record nods or gestures.  Do you
11  understand this?
12      A.   Yes.
13      Q.   The court reporter has sworn you
14  in.  You are now answering all questions
15  under oath.  Do you understand that you
16  have the same obligation to tell you the
17  truth and are subject to the same
18  penalties of perjury as if you were
19  testifying in court?
20      A.   Yes.
21      Q.   If you don't understand my
22  questions, please let me know and I will
23  rephrase it.  If you answer a question, I
24  will assume you understood it.  Do you
25  understand this?

Page 7

N. VOLPER

1              N. VOLPER
2      A.   Yes.
3      Q.   Please let me finish asking the
4  question before you answer even if you
5  think you know what I am going to ask.
6  This way, the court reporter can get
7  everything down.
8      A.   Sure.
9      Q.   If you need to take a break at
10  any time, just let me know.  I just ask
11  that if a question is pending, you answer
12  the question before you take a break.  Do
13  you understand this?
14      A.   Yes.
15      Q.   Similarly, you may talk to your
16  lawyer before a question is asked and
17  after you have answered a question but not
18  while a question is pending.  Do you
19  understand that?
20      A.   Can you repeat?
21      Q.   Sure.
22          You may talk to your lawyer
23  before a question is asked or after you
24  have answered it, but not while a question
25  is pending.

Page 8

N. VOLPER

1              N. VOLPER
2      A.   Okay.
3      Q.   Do you understand that?
4      A.   Yes.
5      Q.   Similarly, during a deposition
6  your attorney may object to my questions.
7  However, unless he specifically instructs
8  you not to answer the question, you must
9  answer the question.  Do you understand
10  that?
11      A.   Yes.
12      Q.   Are you currently taking any
13  medications or drugs that may impair your
14  ability to testify truthfully today?
15      A.   I don't believe so.
16      Q.   Is there any other reason you
17  may not be able to testify truthfully
18  today?
19      A.   I don't believe so.
20      Q.   Are you currently taking any
21  medications that may impair your memory?
22      A.   My medical record is not going
23  to be discussed.
24      Q.   I am asking if you are on a
25  medication that will affect your --

Page 9

N. VOLPER

1              N. VOLPER
2      A.   I am not medical personnel.  I
3  am not medical trained so I cannot really
4  answer that question.  Different
5  medication for different, different
6  people.  It is very --
7      Q.   In your opinion --
8      A.   I cannot say --
9      Q.   Let me just ask a question.
10  Okay.
11          In your opinion is there any
12  reason that your memory may be impaired
13  today?
14      A.   I cannot answer that question
15  because different medication, they have
16  different effect different period of time.
17      Q.   Do you have any reason to
18  believe that your memory may be impaired
19  today?
20      A.   Do I have any reason to believe?
21      Q.   Yes.
22      A.   Well, I don't think so but we
23  will try.
24      Q.   Great.  Thank you.
25      A.   You are welcome.

3 (Pages 6 - 9)

A-237

Page 10

N. VOLPER

1           N. VOLPER
2    Q.   Without revealing any
3 attorney-client privilege you have had
4 what, if anything, did you do to prepare
5 for this deposition?
6    A.   Nothing.
7    Q.   You haven't done anything?
8    Q.   To prepare -- not really.
9    Q.   Did you meet with your attorney?
10   A.   Yes.
11   Q.   When did you meet with your
12 attorney?
13   A.   Like two or three days ago.
14   Q.   Did you meet in person?
15   A.   Yes.
16   Q.   Where did you meet?
17       MR. SEGAL:  Excuse me.  We did
18 not meet in person.
19       THE WITNESS:  Sorry.  I
20 apologize.  We were supposed to meet
21 in person but we meet via Zoom.  You
22 see, my memory may be already affected
23 -- some medications.
24       MR. SEGAL:  Let's try to answer
25 the questions.

Page 11

1           N. VOLPER
2       THE WITNESS:  Yes.
3    Q.   How long was that meeting?
4    A.   Very brief.
5    Q.   Was it half an hour?
6    A.   I think it was less than that.
7    Q.   Less than that?
8    A.   Yes.
9    Q.   Did you review any documents
10 during the meeting?
11   A.   No.
12   Q.   Have you talked with anyone else
13 besides your attorney about this
14 deposition?
15   A.   Besides attorney -- well, the
16 staff obviously, the 212 Steakhouse
17 because I have been served so they ask
18 questions what is going on.  I said we
19 cannot --
20   Q.   Besides your attorney, did you
21 tell anyone about this deposition today?
22   A.   The deposition today?
23   Q.   Yes.
24   A.   No, no.  I'm sorry.  I
25 misunderstand the question.

Page 12

N. VOLPER

1           N. VOLPER
2    Q.   It's okay.
3       You are testifying today on
4 behalf of the corporation, 212 Steakhouse
5 Incorporated, correct?
6    A.   Correct.
7    Q.   We are going to start with this
8 exhibit.
9       MR. DiGIULIO:  I am going to ask
10 this to be marked Exhibit 1.
11       (Whereupon, notice of deposition
12 was marked as Defendant's Exhibit 1
13 for identification as of this date by
14 the Reporter.)
15   Q.   Sir, have you seen this document
16 before?
17   A.   I believe that's the -- notice
18 of deposition, correct?
19   Q.   Correct.  It is the notice of
20 deposition for 212 Steakhouse
21 Incorporated.
22   A.   Yes, I believe so.
23   Q.   Please take a look at pages 2
24 through 4 under the section matters
25 designated for deposition.  Please review

Page 13

1           N. VOLPER
2 all of those matters?
3    A.   Can we stop --
4    Q.   Take your time.  Pages 2 through
5 4 for all of the matters designated for
6 deposition.
7    A.   Okay.  I am ready for question
8 No. 1.
9    Q.   Have you been designated to
10 testify about all of these topics on
11 behalf of 212 Steakhouse Incorporated?
12   A.   Yes.
13   Q.   Are there any topics on this
14 list for which you are not prepared to
15 testify today?
16   A.   From 1 to 4?
17   Q.   Pages 2 through 4 which is No.
18 1 through 22.
19   A.   That's a lot of questions but
20 let's go one by one.  22 questions.
21       MR. SEGAL:  Can you repeat the
22 question for him?
23       MR. DiGIULIO:  Sure.
24   Q.   Are there any topics on that
25 that list, 1 through 22, for which you are

4 (Pages 10 - 13)

Page 14

N. VOLPER

1
2 not prepared to testify about today?
3      A.    Just give me a second.  I have
4 to review them before answering the
5 question.
6      Q.    Please.
7      A.    Okay.  I was not really involved
8 in 212 Steakhouse for many years
9 especially the pandemic.  Some of the
10 questions I see like plaintiff's work
11 schedules and hours worked, I don't have
12 knowledge of it.
13      Q.    Which number are you referring
14 to?
15      A.    No. 2.
16      Q.    Plaintiff's work schedule and
17 hours worked?
18      A.    Yes.  Because basically, they
19 did it himself, the staff did himself.  In
20 the last three years I have been just like
21 few times there.  I have medical reasons.
22 Because of the COVID, I have four of the
23 five things medical that is not
24 recommended to get COVID.
25      Q.    Aside from No. 2, are there any

Page 15

N. VOLPER

1
2 other issues designated for deposition
3 that you are not prepared to testify about
4 today?
5      A.    I don't remember No. 5.
6      Q.    Anything else?
7      A.    No. 6.  No. 7.  I cannot give a
8 definite answer to all these questions.
9 No. 8, 9.  No. 11 is terminated by PO
10 system.  No. 12.  They did it themselves.
11 I don't understand No. 13.  No. 17, I have
12 little bit knowledge.  No. 18, I don't
13 completely understand the question.  I
14 would appreciate it if you can find a
15 different way to ask.  19, same thing.  I
16 need No. 20 to be specified in different
17 way.  I'm not sure what it is.
18      MR. SEGAL:  We will take five
19 minutes.
20      MR. DiGIULIO:  Okay.
21      (Whereupon, a short recess was
22 taken.)
23      MR. DiGIULIO:  Back on the
24 record.
25      Q.    Mr. Volper, what is 212

Page 16

N. VOLPER

1
2 Steakhouse Incorporated?
3      A.    It is a restaurant.
4      Q.    Is the 212 Steakhouse
5 Incorporated a company that owned the
6 restaurant?
7      A.    It is a restaurant.  212
8 Steakhouse is corporation.
9      Q.    Does the corporation own a
10 restaurant in Manhattan?
11      A.    Yes.  212 Steakhouse.
12      Q.    Does the entity 212 Steakhouse
13 Incorporated own anything else besides the
14 restaurant?
15      A.    No.
16      Q.    What is your relationship with
17 212 Steakhouse the corporation?
18      A.    I am the owner.  I formed the
19 corporation.
20      Q.    Does anyone else own shares in
21 the corporation?
22      A.    Well, in the past we have some
23 sales which -- legally I'm not sure how
24 the answer to this.  They transferred
25 something and they backed up from the

Page 17

N. VOLPER

1
2 deals.  So I am not really sure how that's
3 being treated but we can look at the tax
4 returns because I can't remember.
5      Q.    In your knowledge, has anyone
6 else at any point besides you owned a
7 share in 212 Steakhouse?
8      A.    That's why I have to review the
9 agreement.  I don't want to answer about
10 14, 15 pages contract.  I don't remember.
11      Q.    What contract are you talking
12 about?
13      A.    Sales contract.
14      Q.    Sales contract?
15      A.    For 212 Steakhouse.
16      *MR. DiGIULIO:  We will ask that
17 212 Steakhouse produce all sales
18 contracts that exist.
19      Q.    I believe you testified you
20 opened 212 Steakhouse?
21      A.    Correct.
22      Q.    When did you open it?
23      A.    I believe it was 2013 but we
24 start operate 2014.
25      Q.    That you stopped operating in

5 (Pages 14 - 17)

A-239

Page 18

1          N. VOLPER
2  2014?
3          MR. SEGAL:  Started.
4     Q.   Started?
5     A.   Yes, yes.  We formed the
6  corporation in 2013 but it takes time to
7  open, construction, permits and
8  everything.
9     Q.   Great, okay.
10         Prior to opening 212 Steakhouse
11  did you have experience in the restaurant
12  business?
13    A.   No.
14    Q.   No?
15    A.   No.
16    Q.   Have you owned any other
17  restaurants before?
18    A.   No.
19    Q.   What is the restaurant's
20  address?
21    A.   316 East 53 Street.  New York,
22  New York 10022.
23    Q.   Has the restaurant always been
24  located at this location?
25    A.   Yes, sir.

Page 19

1          N. VOLPER
2     Q.   What kind of restaurant is it?
3     A.   It is a 212 Steakhouse.
4     Q.   Does the restaurant specialize
5  in Kobe beef?
6     A.   Yes.
7     Q.   What is Kobe beef?
8     A.   Kobe beef is basically Wagyu
9  beef from Japan which is very exclusive.
10  And yeah, it is one of the premium steak
11  meat.
12    Q.   Does the Kobe beef come from
13  Japan?
14    A.   Yes.
15    Q.   Does the restaurant sell halal
16  meat?
17    A.   Yes.
18    Q.   What is halal meat?
19    Q.   What is halal meat?
20    A.   Yes.
21    A.   Halal meat is it needs halal
22  certification to become a halal meat.
23    Q.   Does the halal meat at the
24  restaurant come from Canada?
25    A.   I believe so.

Page 20

1          N. VOLPER
2     Q.   In the restaurant how many
3  customers does the restaurant seat inside?
4     A.   How many seatings inside -- I
5  can image about eighty.
6     Q.   Eighty?
7     A.   Yes.
8     Q.   How many tables is that?
9     A.   If you divide by two so around
10  forty tables.
11    Q.   Before March 2020 when COVID
12  came, did the restaurant have outdoor
13  seating?
14    A.   Before the 2020?
15    Q.   Yes.
16    A.   No.  It was not allowed.
17    Q.   Does the restaurant have outdoor
18  seating now?
19    A.   No.
20    Q.   No?
21    A.   No.
22    Q.   Okay.  You said the restaurant
23  opened up in 2014; is that correct?
24    A.   Correct.
25    Q.   From 2014 to March of 2020 when

Page 21

1          N. VOLPER
2  COVID came to New York, what were the
3  restaurant's hours of operation?
4     A.   All depends.  I mean, it have to
5  terminate because during the pandemic
6  limited hours so it was closed.
7          MR. SEGAL:  Before, before.
8     A.   Before the pandemic usually
9  evenings only.
10    Q.   Evenings only?
11    A.   Yes.
12    Q.   So about what time did the
13  restaurant open?
14    A.   I think as far as I remember
15  like 4:00 or 5:00.
16    Q.   What time did it close?
17    A.   We close usually when the last
18  customer leaves like maybe around 11:00.
19    Q.   Did the restaurant serve lunch?
20    A.   Lunch?
21    Q.   Yes.
22    A.   We serve -- not in the
23  beginning.  In the beginning we no serve
24  lunch.  Just barely.  We tried few times.
25  It was not very successful.  Then the

6 (Pages 18 - 21)

A-240

Page 22

```
 1            N. VOLPER
 2 pandemic come.  I don't think we don't
 3 sell lunch, only delivery.  Right now we
 4 are selling lunch.
 5    Q.   Right now?
 6    A.   Recently, yes.
 7    Q.   I want to ask you about before
 8 the pandemic.
 9    A.   Yes, sir.
10    Q.   Your testimony is -- withdrawn.
11      In 2016 which is before the
12 pandemic, did the restaurant serve lunch?
13    A.   2016?
14    Q.   Yes.
15    A.   I don't remember.
16    Q.   You don't remember?
17    A.   No.
18    Q.   Okay.  I believe you said that
19 the restaurant tried to serve lunch a few
20 times before the pandemic?
21    A.   Correct.
22    Q.   What does that mean?
23    A.   That means we try like month or
24 two and then we stopped because it was not
25 successful, we lose money.  So we try
```

Page 23

```
 1            N. VOLPER
 2 again.  We changed menu, we tried
 3 different concept.
 4    Q.   Do you remember when you tried
 5 to have serve lunch, what time the
 6 restaurant opened during that period?
 7    A.   I believe it was 12:00.
 8    Q.   Before March 2020 the restaurant
 9 tried a number of times to serve lunch
10 throughout the years?
11    A.   Yes.
12    Q.   When they did try, you opened
13 the restaurant for customers that knew; is
14 that accurate?
15    A.   It is accurate, yes.
16    Q.   How did the hours change for the
17 restaurant during the initial COVID
18 shutdown period in March of 2020?
19    A.   You are talking about when the
20 pandemic started?
21    Q.   Right when it hit.
22    A.   So as you know, there was -- we
23 was completely shut down in the beginning.
24    Q.   For how long?
25    A.   For how long -- because depends
```

Page 24

```
 1            N. VOLPER
 2 on the -- I cannot really answer
 3 completely like exact dates, what periods.
 4 We have limited capacity, completely
 5 shutdown, or delivery only, or outdoor
 6 only.  Depends on this period, but to give
 7 exactly dates and months -- because we was
 8 limited from the New York State.
 9    Q.   I understand.
10      Let's talk about the different
11 phases if you will.  Initially you were
12 shut down for a period and the restaurant
13 did not operate; is that correct?
14    A.   I think we have only delivery.
15    Q.   Okay.  During the initial
16 shutdown you still maintained a takeout or
17 delivery option for the restaurant; is
18 that correct?
19    A.   I think like -- just give me a
20 second.  I think it was like few months.
21 Then it was losing money.  Then I think we
22 shut down for like -- it is tough for me
23 to determine a period but we stopped this
24 and we continued this.  I remember because
25 limitation from the New York State.  I
```

Page 25

```
 1            N. VOLPER
 2 remember some of them -- which they don't
 3 allow indoor dining, only outside dining.
 4 We build outside dining.
 5    Q.   When did you build outdoor
 6 dining?
 7    A.   During that period of time but I
 8 don't have specific dates because I was
 9 not involved.  As I mentioned, during the
10 pandemic especially I avoid because I was
11 scared catching COVID.
12    Q.   Who was in charge at the
13 restaurant during this period?
14    A.   During this period most of the
15 like staff including plaintiff was in
16 charge.  They did their own scheduling,
17 you know, shifts.  They calculate the
18 tips.  Pretty much everything was between
19 the staff because I was absent.  I was
20 afraid during the --
21    Q.   During the initial COVID
22 shutdown you let the staff of the
23 restaurant manage the operations of the
24 restaurant?
25    A.   Correct.
```

7 (Pages 22 - 25)

Page 26

N. VOLPER
1        N. VOLPER
2    Q.   Was there anyone else?
3        MS. SCHULMAN:  Let's take a
4    short break.
5        THE WITNESS:  Thank you.
6        (Whereupon, a short recess was
7    taken.)
8        MR. DiGIULIO:  Back on the
9    record.
10   Q.   I believe you testified that the
11   restaurant currently does not have outdoor
12   dining; is that right?
13   A.   Currently, no.
14   Q.   When did the restaurant stop
15   having outdoor dining?
16   A.   Maybe like around a year ago.
17   About the fall of 2021?
18   A.   As far as I remember, yes.
19   Q.   What are the current hours of
20   operation for the restaurant?
21   A.   The current noon.
22   Q.   Is that noon?
23   A.   Noon, yes.  Noon until we have
24   customers -- usually it is like 11:00.
25   Q.   Is that five days a week --

Page 27

1        N. VOLPER
2    strike that.
3        Is that seven days a week?
4    A.   Yes.
5    Q.   How long has that been the
6    restaurant's hours of operation?
7    A.   We just recently opened lunch.
8    Let me see.  I will try to remember.
9    Maybe like few months back, like four to
10   six months back, something like that.
11   Q.   What is the lounge?
12       MR. SEGAL:  He said lunch.
13       THE WITNESS:  Sorry.  My English
14   is not very proficient.
15   Q.   It's okay.  Prior to four to six
16   months ago?
17   A.   Again, I cannot just give exact
18   date but that's my best -- best of my
19   knowledge.
20   Q.   When the restaurant closed
21   initially in March of 2020, did the
22   restaurant continue to employ
23   front-of-house staff?
24   A.   Not that I remember because it
25   was shut down.

Page 28

1        N. VOLPER
2    Q.   And then when the restaurant
3    opened back up and had outdoor dining, did
4    the restaurant hire new front-of-house
5    staff?
6    A.   Yes.
7    Q.   Were the individuals who were
8    working before rehired?
9    A.   We contact all individuals that
10   they want to come back.  Some of them,
11   they don't want to come back.
12   Q.   Who did you rehire when you
13   reopened for outdoor dining?
14   A.   Uh --
15       MR. SEGAL:  For outdoor dining?
16   A.   Okay.  Outdoor specifically.
17   Q.   There is a period I believe the
18   restaurant was open just for outdoor
19   dining?
20   A.   As far as I remember was
21   Lychezar Lazarov.  I think --
22   Q.   What position did they hold?
23   A.   Like waiter.  I think that
24   period of time if I am not mistaken,
25   Dagmara was coming.  Also Alexander -- I

Page 29

1        N. VOLPER
2    forget his last name.
3    Q.   He was a waiter?
4    A.   Yes.
5    Q.   Another Alexander.  So they both
6    Alexander, Rynkovsky I believe.
7    Q.   You said there were some
8    employees that you contacted you didn't
9    want to come back; is that right?
10   A.   We contacted all of them, but
11   some they don't even reply to us.
12   Q.   Do you remember who?
13   A.   Do I remember who -- no.  I
14   mean, I know the Chef Nelson.  No.  Pretty
15   much -- I don't remember who exactly in
16   that period of time.
17   Q.   But Chef Nelson didn't come
18   back?
19   A.   Chef Nelson didn't come back.
20   Q.   About how many individuals chose
21   not to come back?
22   A.   I cannot speculate but maybe
23   about five, six, something like that.  We
24   are not big operation.
25   Q.   This is five, six employees that

8 (Pages 26 - 29)

A-242

Page 30

```
 1          N. VOLPER
 2  counts both the back of the house and the
 3  front of the house?
 4     A.  Maybe little bit more in front
 5  of the house.
 6     Q.  So seventy ten?
 7     A.  Something like that, yes, in
 8  that range.
 9     Q.  Do you have a title for your
10  role at the restaurant?
11     A.  Official title?
12     Q.  Yes.
13     A.  Not really.
14     Q.  How often are you at the
15  restaurant?
16     A.  In the last -- during the
17  pandemic not very often.  Not very often
18  at all.
19     Q.  Before the pandemic how often
20  were you at the restaurant?
21     A.  Like monthly or weekly or --
22  maybe like five to seven times a month,
23  something like that.
24     Q.  When you were at the restaurant
25  what did you do?
```

Page 31

```
 1          N. VOLPER
 2     A.  What I do in the restaurant?
 3     Q.  Yes.
 4     A.  Well, I want to make sure the
 5  service is good like, you know, basically
 6  we have all the vendors like -- prepare,
 7  the food is good, everything is in the
 8  menu.  I want to make sure the staff is
 9  like, you know, will follow the -- follow
10  any COVID restrictions and policies
11  because that was pretty strict.  We have
12  to make sure we don't violate any policy
13  related to COVID imposed by the New York
14  State.
15     Q.  Before COVID happened that
16  wasn't something you did, right?
17     A.  Before COVID, no, no.
18     Q.  Before COVID, that was my
19  question.  What did you do at the
20  restaurant besides the things you just
21  testified about?
22     A.  Yeah, some of those things.
23     Q.  You instruct certain employees
24  about how to do their job?
25     A.  Yes.
```

Page 32

```
 1          N. VOLPER
 2     Q.  During COVID did you go to the
 3  restaurant at all?
 4     A.  Not much, not really much
 5  because again, I was afraid.
 6     Q.  When did you start going back to
 7  the restaurant regularly?
 8     A.  Well, I start going basically
 9  like more often because it was getting
10  busy in the month of December because
11  that's our busiest time.  Then many --
12  yeah, that was like the most time.
13     Q.  Is this December of 2020?
14     A.  Yeah, that was December of 2020.
15  Yes, I believe so.  I started to be there
16  more often because the restaurant is
17  getting busier.  I think we went to fifty
18  percent capacity or something.  I don't
19  remember exactly.  Then was a lot of
20  restrictions.  I want to make sure
21  mandatory vaccination for employees.
22  Complying with the laws, I want to make
23  sure everything is okay because of that.
24     Q.  After you returned to be at the
25  restaurant more regularly, how often where
```

Page 33

```
 1          N. VOLPER
 2  you at the restaurant?
 3     A.  Pretty much every other day.
 4     Q.  Before COVID you were there five
 5  to seven times a week and when you came
 6  back --
 7     A.  Five to seven times a week you
 8  said?
 9     Q.  A month you said, right?
10     A.  Not even that.  Very brief.
11  Three, four times maybe.
12     Q.  But more recently starting in
13  December of 2020 you were there every
14  other day?
15     A.  Yeah.  For the reason I already
16  described.
17     Q.  Do you still go to the
18  restaurant about every other day?
19     A.  Right now?
20     Q.  Yes.
21     A.  Yes.  Right now, yes.  I am
22  fully vaccinated.  I feel much more
23  comfortable to go there, yes.
24     Q.  Are you the ultimate decision
25  maker at the restaurant?
```

9 (Pages 30 - 33)

A-243

Page 34

N. VOLPER
1
2    A.    Yes.
3    Q.    Do you hire employees?
4    A.    I hire some employees, yes.
5    Q.    Which employees have you hired?
6    A.    Recently or during the --
7    Q.    During the entire time if you
8 can please name some employees that you
9 have hired?
10    A.    Okay.
11        MR. SEGAL:  Objection.  You can
12 answer.
13    Q.    You can answer.
14    MR. SEGAL:  You can answer.
15    A.    As far as I remember -- let's
16 see.  Dagmar for sure because that's
17 pretty much recently, Chef Nelson.  He is
18 no longer with us but -- let's see.  I
19 believe Alexander Rynkovsky.  Yeah, I am
20 pretty sure -- again.  Long time ago.
21 Yeah, probably few more people, yes.
22    Q.    Do you fire employees?
23    A.    Yes.
24    Q.    Did you fire the plaintiff, Ms.
25 Martinenko?

Page 35

N. VOLPER
1
2    A.    Yes.
3    Q.    Who replaced Nino Martinenko
4 after she was fired?
5    A.    Who replaced -- because it was
6 getting like more busy so basically we
7 have few additional employees.  No
8 specific somebody to be at her place.  It
9 is just we started to be busy.
10    Q.    Did you these additional people?
11    A.    Let me think.  I don't believe I
12 did.
13    Q.    Who did then?
14    A.    Basically, the staff.  I
15 remember one particular case.  Actually,
16 yes, yes.  For sure I have a person.  It
17 is a lady.  Her name is -- I am bad with
18 names.  Hailey.  I hired her.
19    Q.    What position was Hailey?
20    A.    Front of house.
21    Q.    Server, waiter?
22    A.    Yeah, yeah.  Front of house.
23    Q.    Do you have the authority to
24 discipline employees?
25    A.    Yes.

Page 36

N. VOLPER
1
2    Q.    You mentioned the employee
3 Alexander Rynkovsky?
4    A.    Yes.
5    Q.    Is he server at the restaurant?
6    A.    Yes.
7    Q.    Was he ever promoted to captain?
8    A.    Rynkovsky, no.  Alexander, I
9 think Alex -- or something like that was
10 promoted to captain.
11    Q.    What is a captain?
12    A.    Captain is like basically a
13 person who is little bit higher level.  As
14 long as my basic knowledge of that is with
15 high level above waiter or waitress which
16 is more professional, more taking care of
17 service, make sure service is good.
18 Basically like more professional, person
19 with lot of years of experience and
20 knowledge.
21    Q.    Did you promote this person
22 Alexander, the other Alexander to captain?
23    A.    Yes.
24    Q.    You did?
25    A.    Yes.

Page 37

N. VOLPER
1
2    Q.    Okay.  Was this person ever
3 demoted back to being a server?
4    A.    Yes.
5    Q.    Why was he demoted?
6    A.    I'm not sure demoted.
7        MR. SEGAL:  You made him a
8 captain.  Did you push him back down
9 to being just a front-of-house waiter?
10    A.    Yes.  I'm sorry, I didn't
11 understand the question.
12    Q.    It's okay.
13        Why did you do that?
14    A.    Why?
15    Q.    Yes.
16    A.    Because there was a specific
17 case that bring to my attention that he is
18 flirting with one of the girls.  In my
19 opinion that was not very professional so
20 I demoted him, yes.
21    Q.    Aside from this person, have you
22 ever disciplined any other employee at the
23 restaurant?
24    A.    Yes, of course.  Maybe I
25 suspended like a few days or anything like

10 (Pages 34 - 37)

Page 38

N. VOLPER

1         N. VOLPER
2 that.  Depends on the nature.
3    Q.   Who sets the employee salaries
4 at the restaurant?
5    A.   Who set the employee salary?
6    Q.   Yes.
7    A.   Well, the tip employees or, you
8 know, obviously the New York State set up
9 requirements.
10    Q.   You paid tip employees minimum
11 wage for tips to service workers?
12    A.   Yes.
13    Q.   And that was the entire time the
14 restaurant was open?
15    A.   The entire time, yes, as far as
16 I remember.  I mean, it is very long
17 period of time but as far as I remember.
18    Q.   Who set the employees schedules
19 at the restaurant?
20    A.   Most of the time they did
21 themselves.
22    Q.   Who set the back of house
23 salaries?
24    A.   Who set the back of the house
25 salary?

Page 39

1         N. VOLPER
2    Q.   Yes.
3    A.   Me obviously, because they vary.
4 They are not like required -- minimum wage
5 can be much more.
6    Q.   You made those decisions what
7 people will be paid?
8    A.   Yeah.  I mean, most of the time.
9 Sometimes the chef take that decision.
10 When I was absent the chef hire people,
11 you know.  Chef Nelson will hire, you
12 know, he decided based on the knowledge of
13 the skills.
14    Q.   Who sets the employee schedules
15 at the back house?
16    A.   Not me.  No, it was not me.  Not
17 me.  Basically the chef.
18    Q.   Can you approve an employee's
19 request for time off?
20    A.   Yes.
21    Q.   Did you, in fact, do that?
22    A.   Yes.  I did few times.  Yes.
23    Q.   If you are at the restaurant and
24 you tell an employee to do something, they
25 have do do it, right?

Page 40

1         N. VOLPER
2    A.   I mean, if it is -- not
3 everything they have to do.  What is
4 appropriate.
5    Q.   Fair enough.
6         But if it is within the scope of
7 their job duties you tell them to do what
8 they have to do, correct?
9    A.   Correct.
10    Q.   Who is responsible for running
11 payroll at the restaurant?
12    A.   Who is responsible -- most of
13 the staff determine to do their own
14 especially in the last few years like
15 payroll records and all this stuff, tips.
16 I was not engaged in that at all.
17    Q.   How is payroll run?
18    A.   What do you mean?
19    Q.   How are the employees paid?
20    A.   They are paid by check,
21 deduction from the --
22    Q.   You testified that the
23 front-of-house gets paid tip credit
24 minimum wage, correct?
25    A.   I assume, yes.

Page 41

1         N. VOLPER
2    Q.   That's an hourly wage, right?
3    A.   Yes.
4    Q.   All the front-of-house employees
5 gets paid --
6    A.   Hourly plus tip.
7    Q.   How does the restaurant keep
8 track of the hours that the employees
9 work?
10    A.   We have a POS system basically
11 checking the hours.
12    Q.   The restaurant requires the
13 employees to clock in and out?
14    A.   Correct.
15    Q.   What does the restaurant do with
16 those time records?
17    A.   They are in the system.  We just
18 use them.
19    Q.   Do you use them to calculate how
20 much to pay each employee?
21    A.   It is not set up like that, how
22 much to pay.  Only time records.
23         MR. SEGAL:  What he is asking is
24    those hours, do you use those to
25    calculate their weekly pay?

11 (Pages 38 - 41)

A-245

Page 42

N. VOLPER

1
2     THE WITNESS:  Correct.  I'm
3  sorry.
4     MR. SEGAL:  That's why I am
5  helping.
6     Q.   What is that process?  Who takes
7  the time records from the POS system?
8     A.   Most of the time like the staff,
9  they determine and, you know, they did it.
10  I was absent as I mentioned.  I was not
11  involved in all this stuff.  That's
12  including Nino Martinenko by the way.  She
13  writes her own checks, determined her own
14  hours.  There was trust in employees.  I
15  didn't have really doubt somebody cheat on
16  the hours, or tips, or anything like that.
17     Q.   Who would take the time records
18  out of the POS system in order to
19  calculate how much to pay the employees?
20     A.   Depends who is there, you know.
21  I don't know exactly.  Depends who is
22  there.
23     Q.   Is there anyone else besides an
24  employee of the restaurant that is
25  involved with making sure the employees

Page 43

N. VOLPER

1
2  get paid?
3     A.   Yes.  Yes, of course.
4     Q.   Who?
5     A.   A friend of mine.
6     Q.   Who is that?
7     A.   His name is Imran?
8     Q.   What is his role?
9     A.   He is helping me basically to
10  do, you know, we involved in different
11  things with him.  Basically, I was really
12  afraid to go to the restaurant during that
13  period of time and he helped me a lot in
14  terms of sometimes delivery, sometimes,
15  you know, for whatever to do,
16  communication.
17     MR. SEGAL:  Let's try to answer
18  the question.  He is asking about
19  payroll.  He is asking who calculates
20  the time sheets.
21     THE WITNESS:  It is --
22     MR. SEGAL:  Is Imran doing it,
23  is someone else doing it?
24     THE WITNESS:  It is automatic
25  calculation by the payroll system.

Page 44

N. VOLPER

1
2  Once you set up the hours, it is
3  automatic document.  So now employees,
4  they have to provide tips, like
5  everybody collect tips.  I'm not sure
6  if they provide tips credits, tip
7  employees.  Yes, that's the way.
8     MR. SEGAL:  Who is writing the
9  checks?
10     THE WITNESS:  The checks, I am
11  writing.  Most of the employees write
12  checks.  Nino Martinenko also write
13  her own check or Alexander.  I can't
14  remember.
15     Q.   Has the restaurant ever used ADP
16  or payroll service to process the payroll?
17     A.   No.  We using like accounting
18  company.
19     Q.   Sure.  What accounting company?
20     A.   It is Crow; C-R-O-W, something.
21     MS. SCHULMAN:  With N?
22     THE WITNESS:  I don't think.
23  C-R-O-W.
24     Q.   Is this accounting company
25  involved with the weekly issuance of

Page 45

N. VOLPER

1
2  checks?
3     A.   Correct.
4     Q.   What is your understanding of
5  Crow's involvement with making sure that
6  the restaurant pays --
7     A.   Basically, they determine
8  deduction New York State.  The deduction
9  required by law, they have to take from
10  the payroll checks.  Insurance, pension
11  something, New York State.  The deduction
12  basically.
13     Q.   Does someone at the restaurant
14  send the time records to Crow in order for
15  Crow to calculate how much the employee
16  earns and how much the deductions are?
17     A.   Correct.
18     Q.   Who sends the time records to
19  Crow?
20     A.   Most of the time I believe was
21  Imran.
22     Q.   Is Imran responsible for taking
23  the time records from the restaurant,
24  sending it to Crow and managing the
25  issuance of the checks of the restaurant?

12 (Pages 42 - 45)

Page 46

```
1            N. VOLPER
2     A.   Most of the time, yes.
3 Sometimes other people was involved.
4     Q.   Who signs, I believe you
5 testified to this but does 212 Steakhouse
6 pay its employees by handwritten check
7 from a checking account?
8     A.   Correct.
9     Q.   Is that Bank of America account?
10    A.   Yes.
11    Q.   Has that been the case from 2016
12 to the present?
13    A.   I believe so.  Maybe different
14 accounts but I think still was the same
15 bank.
16    Q.   Who writes the checks?
17    A.   As I mentioned in my previous
18 testimony few seconds ago, most of the
19 time the staff did including Nino
20 Martinenko.
21    Q.   How do they now how much to
22 write on the check?
23    A.   They have basically access to
24 everything so -- the POS system.  They can
25 calculate the hours, you know, the tips.
```

Page 47

```
1            N. VOLPER
2 That's pretty much it.
3     Q.   Who signs the checks?
4     A.   I already respond.  Most of the
5 time the staff did.
6     Q.   The staff would sign the check
7 on behalf of you --
8     A.   Sometimes Imran, sometimes
9 Alexander.  I was pretty much not signing.
10    Q.   Who has authority to sign checks
11 on behalf of 212 Steakhouse Incorporated?
12    A.   Like, I mean what kind of
13 authority?  Nino Martinenko have my verbal
14 authority but not anything in paper or
15 anything like that.
16    Q.   Can you sign checks on behalf of
17 212 Steakhouse Incorporated?
18    A.   Yes.
19    Q.   Did you give the authority to
20 sign checks on behalf of 212 Steakhouse
21 Incorporated to these other employees?
22    A.   Correct.
23    Q.   Does the restaurant maintain
24 personnel files for employees?
25    A.   I think we -- by personnel file
```

Page 48

```
1            N. VOLPER
2 you mean like their Social Security or
3 driver's license something like that?
4     Q.   Do you maintain a collection of
5 documents that respond to each of the
6 employees of the restaurant?
7     A.   Like what kind of -- like
8 driver's license or?
9     Q.   Any documents related to the
10 employees.
11    A.   I think we may have few.
12    Q.   Where are they kept?
13    A.   In the restaurant but I'm not
14 sure if -- I looked the last time and I
15 don't find anything.  So far not
16 successful to believe to find like
17 personnel -- like personnel documentation.
18    Q.   Are the ones that the restaurant
19 maintains kept in paper copies?
20    A.   Different documents, they are
21 pretty much in paper.  That includes
22 invoices from vendors, tips credit.
23 Pretty much everything in paper, yes.  All
24 different documents in paper, yes.
25    Q.   Does the restaurant have an
```

Page 49

```
1            N. VOLPER
2 office?
3     A.   Like we have like a small room
4 inside the restaurant.
5     Q.   What is in the office in the
6 small room?
7     A.   We have safe deposit box.  We
8 have a small desk.  We have a computer.
9 You know, normal like pens, papers, normal
10 office stuff.
11    Q.   For any personnel files that the
12 restaurant maintains, who is in charge of
13 maintaining them?
14    A.   Basically, they did it.  I was
15 not involved in that.  Like collecting any
16 -- or maybe I was involved in the
17 beginning maybe like seven, eight years
18 ago or six and a half years ago.  But I
19 don't remember being very involved.  I
20 think the staff just -- somebody usually
21 gives tasks to somebody can you please
22 collect the papers.  One of the staff
23 tasks to collect everybody -- like because
24 become a law.  Everybody have to be
25 vaccinated in order to work in the
```

13 (Pages 46 - 49)

Page 50

```
 1          N. VOLPER
 2  hospitality industry.  I give a lot of
 3  tasks to her to collect from everybody the
 4  vaccination records to make sure they are
 5  all eligible to work under the current
 6  state law.
 7      Q.   From 2016 to the present, has
 8  the restaurant had any managers?
 9      A.   I don't believe so, no.  I think
10  we may have, maybe in the beginning.
11  Maybe like 2014 but -- no, I don't believe
12  so.  No, I don't remember.  We have maybe
13  like a week or two, something like that
14  because it was like out of money so we
15  cannot really afford management salaries.
16      Q.   I believe you testified about an
17  individual named Imran Sajid, correct?
18      A.   Yes.
19      Q.   Does he work for the restaurant?
20      A.   He helped me but not really he
21  didn't join salary.
22      Q.   Is he an investor in the
23  restaurant?
24      A.   No.
25      Q.   Does he have an ownership stake
```

Page 51

```
 1          N. VOLPER
 2  in the restaurant?
 3      A.   No.
 4      Q.   As you sit here today, is it
 5  your understanding that he has an
 6  ownership stake in the restaurant?
 7      A.   Who?
 8      MR. SEGAL:  Imran.
 9      Q.   Imran?
10      A.   I have to look the records but I
11  don't think so he is in my returns, no.
12      Q.   You don't think so?
13      A.   No, because I have like few
14  other businesses.  I am overwhelmed.  I
15  can't remember everything.
16      Q.   That's fine.  I want to know
17  what your understanding is right now.
18      A.   Yes.
19      Q.   And your understanding is I
20  believe you testified he does not own any
21  part of the restaurant, correct?
22      A.   I testified I don't remember
23  because I have to look like the tax
24  returns specialist, PA.  I have to take a
25  look and let you know.
```

Page 52

```
 1          N. VOLPER
 2      THE WITNESS:  But I think we
 3  provided that, Mitch.  I think we
 4  provided that.
 5      Q.   That's fine.
 6      Who are Mr. Sajid's duties and
 7  responsibilities with respect to the
 8  restaurant?
 9      MR. SEGAL:  How do you spell his
10  last name?
11      MR. DiGIULIO:  I believe it is
12  S-A-J-I-D.
13      MR. SEGAL:  I-M-R-A-N?
14      MR. DiGIULIO:  Yes.
15      Q.   What are his duties and
16  responsibilities with respect to the
17  restaurant?
18      A.   His duties like he give me a
19  favor.  He is not on salary or anything.
20  He doesn't have specific duties like you
21  have to do this every day, you have to do
22  this.  He is just helping me.
23      Q.   How does he help you?
24      A.   How he helps me?
25      Q.   Yes.
```

Page 53

```
 1          N. VOLPER
 2      A.   Like, you know, sometimes
 3  delivery, make deliveries, pick up
 4  products, whatever we need.  You know, all
 5  these.  Sometimes helps set up.  He was
 6  running, helping me with social media,
 7  posting, running all this stuff.  I
 8  remember.  Because he was very -- like he
 9  is very knowledgeable in technology so
10  when we change menus, he put new prices in
11  wine and, you know, stuff like that.
12      MR. DiGIULIO:  Can we take a
13  five minute break?
14      THE WITNESS:  Of course.
15      (Whereupon, a short recess was
16  taken.)
17      MR. DiGIULIO:  Back on the
18  record.
19      Q.   When did Imran get involved with
20  helping you with the restaurant?
21      A.   He got involved like pretty much
22  early in the opening.  Maybe like a year
23  or two later or something like that, or
24  six months or something like that.
25      Q.   What are the back of house
```

14 (Pages 50 - 53)

Page 54

1              N. VOLPER
2 positions at the restaurant?
3      A.   Back of the house?
4      Q.   Yes.
5      A.   Do you mean the kitchen?
6      Q.   Yes.
7      A.   Oh, okay.  We have a chef
8 obviously, we have sous chef, line cooks,
9 standard stuff.
10     Q.   Chefs, sous chefs, line cooks.
11 Any other positions?
12     A.   Dishwasher.
13     Q.   How many chefs does the
14 restaurant employ at a time?
15     A.   Single one.
16     Q.   How many chefs has the
17 restaurant employed since 2016?
18     A.   Like title chef, maybe like two
19 or three, something like that.
20     Q.   Who is the first chef?
21     A.   Nelson.
22     Q.   When did he stop becoming the
23 chef?
24     A.   Pretty much immediately.
25     Q.   When did he stop?

Page 55

1              N. VOLPER
2      A.   Stop, okay.  I think he stopped
3 when the pandemic hit.
4      Q.   Since the pandemic who is the
5 next chef that the restaurant hired?
6      A.   Well, basically we don't really
7 hire like a real chef for few reasons.  We
8 cannot really find staff in the kitchen.
9 Most of them like sous chefs.  We cannot
10 really find staff to work in the kitchen.
11 We have very, very, very big issues
12 especially in the back house.  I have
13 certain point maybe one or two people for
14 maybe for weeks but not really like a chef
15 but like try to, you know, help us.  It
16 was extremely tough.  So right now I don't
17 really have chef position, position.  I
18 have person like who is, you know, taking
19 more responsibility of the kitchen.
20     Q.   Right now the restaurant doesn't
21 have a chef?
22     A.   We have person who is you can
23 technically say chef.
24     Q.   Who is that person?
25     A.   His name is Franco.

Page 56

1              N. VOLPER
2      Q.   Franco?
3      A.   Yes.
4      Q.   What are the job duties of the
5 chef?
6      A.   Job duties is like ordering
7 food, supervising stuff, training, stuff.
8      Q.   Who decides the chef's pay?
9      A.   I did.
10     Q.   What is the current chef's pay?
11     Q.   What is the current chef's pay?
12     A.   Yes.
13         MR. SEGAL:  Objection, but you
14 can answer.
15     A.   I believe it is like $1,600
16 something like that.
17     Q.   For how --
18     A.   Weekly.
19     Q.   You pay the chef weekly?
20     A.   Correct.
21     Q.   Not by the hour, correct?
22     A.   We pay weekly $1,600.
23     Q.   Was that the chef's salary since
24 2016?
25     A.   No, no.  But we have no choice.

Page 57

1              N. VOLPER
2 Now we have to pay more money.
3      Q.   I believe you said there is sous
4 chefs; is that correct?
5      A.   Correct.
6      Q.   What are the job duties of the
7 sous?
8      A.   Sous chef is basically same
9 duties like line cook, but they are more
10 specialized more fine dining.  It is for
11 the -- not like -- it is more premium
12 dining.  It is not like diner.  They are
13 more knowledge than regular line cook.
14     Q.   What do the line cooks do?
15     A.   Line cooks is basically the, in
16 our case it is basically like very simple
17 tasks like opening oysters, do salads,
18 stuff like that.
19     Q.   And the sous chefs are more
20 technical?
21     A.   Correct.
22     Q.   Are the sous chefs paid by the
23 hour?
24     A.   Correct.
25     Q.   And the line cooks are paid by

15 (Pages 54 - 57)

A-249

Page 58

```
1            N. VOLPER
2  the hour?
3     A.   Correct.
4     Q.   How many sous chefs does the
5  restaurant employ at one time?
6     A.   It is very hard to determine for
7  few reasons.  Especially in the last few
8  years opening, closing is 25 percent, 50
9  percent, not able to find staff.
10 Sometimes we are very low, maybe only two
11 three people.  Sometimes we have four,
12 five people.  But it is -- it is very
13 depends on our needs and our ability to
14 find personnel.
15    Q.   Before COVID before 2020, how
16 many sous chefs would the restaurant
17 employ at a time?
18    A.   Usually like two.
19    Q.   How many line cooks does the
20 restaurant employ?
21    A.   Line cooks?
22    Q.   Yes.
23    A.   One or two.
24    Q.   And before COVID, was that the
25 same?
```

Page 59

```
1            N. VOLPER
2     A.   Before COVID?
3     Q.   Yes.
4     A.   Pretty much the same, yes.
5     Q.   You said they are both paid by
6  the hour, correct?
7     A.   Correct.
8     Q.   What is the pay rate for say a
9  sous chef?
10    A.   I don't remember right now but
11 obviously they are much higher than the
12 minimum wage.  So maybe range from 17, 18
13 to 22, 23.
14    Q.   Does the restaurant maintain
15 some kind of records that shows how
16 much the sous chef was being paid?
17    A.   Yes, of course.  We give like
18 weekly payroll.
19    Q.   You give pay stubs?
20    A.   Correct.
21    Q.   Is that the same for the line
22 cooks?
23    A.   Correct.
24    Q.   Does the restaurant, you said
25 dishwasher is the last position?
```

Page 60

```
1            N. VOLPER
2     A.   Correct.
3     Q.   How many dishwashers does the
4  restaurant have?
5     A.   Usually just one.
6     Q.   Just one?
7     A.   Yes.
8     Q.   And they work seven days a week?
9     A.   No, no.  Sometimes the line
10 cooks step up when we are not so busy so
11 -- because, you know, we have to save
12 money.  Sometimes line cook slash
13 dishwasher.  Sometimes they step up and --
14 even the chefs doing sometimes like, you
15 know.  I just have one chef or one sous
16 chef and we have only one reservation,
17 even chef and sous chef putting some, you
18 know, clean dishes.
19    Q.   The dishwasher is paid by the
20 hour, correct?
21    A.   Yes.
22    Q.   What is the dishwasher's hourly
23 rate?
24    A.   (No verbal response.)
25    Q.   Do you know?
```

Page 61

```
1            N. VOLPER
2     A.   I imagine something like --
3         MR. SEGAL:  Don't imagine.  Do
4  you know?  Yes, I know or No, I don't
5  know.
6     A.   No, no.
7     Q.   Is the dishwasher's hourly rate
8  written down somewhere in the restaurant?
9     A.   In the POS system, yes.
10 Automatic.
11    Q.   Does the restaurant issue pay
12 stubs for the dishwashers?
13    A.   Yes.
14    Q.   The tips position at the
15 restaurant are the servers, the bussers,
16 the food runners, and the bartender; is
17 that correct?
18    A.   Correct.
19    Q.   Those are the front-of-house
20 positions?
21    A.   Yes.
22    Q.   And also the captain when there
23 was a captain; is that right?
24    A.   Yes, of course.
25    Q.   All of those are the
```

16 (Pages 58 - 61)

Page 62

N. VOLPER
1
2  front-of-house positions, right?
3      A.   Yes, sir.
4      Q.   How many servers does the
5  restaurant employ?
6      A.   Varies.  Depends.
7      Q.   Currently how many?
8      A.   Currently?
9      Q.   Yes.
10      A.   I believe four servers, two
11  bartenders.
12      Q.   How many work per shift?
13      A.   How many work per shift?
14      Q.   Yes.
15      A.   I'm sorry.  I don't understand
16  the question.
17      Q.   On any given night how many
18  servers are working in the dinner shift?
19      A.   Friday and Saturday are the most
20  busy obviously so pretty much everybody is
21  there.  Like slow days, like maybe one or
22  two.
23      Q.   Did the restaurant employ a
24  server named Cora Bethea (ph) this year?
25      A.   Cora --

Page 63

N. VOLPER
1
2      Q.   Do you know if the restaurant
3  employed a person named Cora Bethea this
4  year?
5      A.   No, I don't know.
6      Q.   Do you know whether she worked
7  -- withdrawn.
8          Did the restaurant employ a
9  server named Lucia Ross Gizburt (ph) this
10  year?
11      A.   Doesn't ring a bell.
12      Q.   What are the names of the four
13  current servers that are working at the
14  restaurant?
15      A.   Current?
16      Q.   Yes.
17      A.   It is Alexander, Rivaldo,
18  Luccio, Oscar.
19      Q.   How many runners does the
20  restaurant employee at a time?
21      A.   Usually one per night or two.
22  Depends how busy we are.
23      Q.   One or two per night.  How many
24  at a given time does the restaurant
25  employ?

Page 64

N. VOLPER
1
2      A.   At a given time, most of the
3  time like one or two.
4      Q.   What are the runners' job
5  duties?
6      A.   Runners?
7      Q.   Yes.
8      A.   Well, they help with running the
9  food, pick up the food from the station,
10  bring the food to the table.  If anything
11  like any dishes picked up, change dishes.
12  Stuff like that.
13      Q.   How many bussers does the
14  restaurant employ?
15      A.   Pretty much the same thing; one
16  or two.
17      Q.   What are the busser's
18  responsibilities?
19      A.   They stay more front of the
20  house putting water, changing glasses, you
21  know, bring new silverware if changing
22  between courses, stuff like that.
23      Q.   How many bartenders does the
24  restaurant employ at a time?
25      A.   Usually it is one.

Page 65

N. VOLPER
1
2      Q.   How many bartenders work in the
3  restaurant now?
4      A.   Now I think two part-time.
5      Q.   Who are they?
6      A.   I believe her name is Hailey and
7  Taylor or something like that.
8      Q.   Hailey is the person you
9  mentioned before who you interviewed and
10  hired?
11      A.   Yes, sir.
12      Q.   What are the job duties of the
13  bartenders?
14      A.   Job duties like -- because we
15  have like a pool house, we basically try
16  to engage everybody because of pool house.
17  So, you know, but like the major major
18  thing is the bartenders to make drinks or
19  pour cocktails, but they are not
20  absolutely to do this.  Sometimes they
21  serve food in the bar, you serve food.
22  Pretty much main main is to fill any
23  alcohol, beverage.  They can serve.  They
24  can pick up plates, glass.  Depends which
25  section maybe we need help.  Because we

17 (Pages 62 - 65)

A-251

Page 66

N. VOLPER

1
2 are pool house, we try to help each other
3 front of the house always.
4    Q.    Who are the current bussers that
5 are employed at the restaurant?
6    A.    The current?
7    Q.    Yes.
8    A.    What's his name --
9    Q.    If you don't know, that's okay.
10    A.    I don't know but I can provide
11 information if you need.
12    Q.    Who are the current runners at
13 the restaurant?
14    A.    I can provide that information.
15    Q.    You don't know right now but you
16 can provide information?
17    A.    I can, yes.
18    Q.    That's fine.
19        The plaintiff, Nino Martinenko,
20 worked at the restaurant as a server,
21 correct?
22    A.    Yes.
23    Q.    Ms. Martinenko as a server had
24 the same job duties as all the other
25 servers, correct?

Page 67

N. VOLPER

1
2    A.    Yes, sir.
3    Q.    I believe you testified Ms.
4 Martinenko helped with payroll; is that
5 correct?
6    A.    Correct.
7    Q.    What did she do to help with
8 payroll?
9    A.    Like calculation, write down
10 checks, issue to people.
11    Q.    Did any other servers help with
12 that as well?
13    A.    I believe Alexander, other
14 Alexander also did that duties.
15    Q.    They are both servers?
16    A.    Yes.
17    Q.    Ms. Martinenko worked for the
18 restaurant during two separate periods,
19 correct?
20    A.    Correct.
21    Q.    She began working for you in
22 June of 2015, correct?
23    A.    I mean, I don't remember exactly
24 when but if that's what she said.
25    Q.    She worked until 2018; is that

Page 68

N. VOLPER

1
2 correct?
3    A.    I believe so, yes.
4    Q.    She came back from work at the
5 restaurant from early 2021 to December of
6 2021, correct?
7    A.    I believe that's accurate.
8    Q.    And plaintiff, Dagmara Huk,
9 worked as a restaurant as a bartender,
10 correct?
11    A.    Yes.
12    Q.    And her job duties as a
13 bartender was the same as any other
14 bartender at the restaurant, right?
15    A.    Basically, we have the same duty
16 as everybody else.  Order, bring the food,
17 everything like -- it was like pool house.
18 It is not like specifically.
19    Q.    Before we talked about the POS
20 system where the restaurant keeps track of
21 employee's time; is that correct?
22    A.    Yes, sir.
23    Q.    And so from 2016 to now the
24 restaurant required all of its employees
25 to clock in and clock out; is that

Page 69

N. VOLPER

1
2 correct?
3    A.    Pretty much as far as I am
4 aware, yes.  I'm not sure about the shifts
5 but, you know.
6    Q.    In terms of front-of-house
7 employees, when the restaurant did operate
8 with the lunch shift, I believe you
9 testified that the restaurant opened for
10 the customers at noon, correct?
11    A.    Correct.
12    Q.    What time did the servers have
13 to arrive at the restaurant?
14    A.    They usually arrive like maybe
15 like fifteen minutes to thirty minutes
16 earlier.
17    Q.    What do they do between that
18 time and noon?
19    A.    What they did?
20    Q.    Yes.
21    A.    I mean, they make sure
22 everything is set up correctly.  Tables,
23 missing any glasses, silverware polish,
24 like preparation for lunch.
25    Q.    Is that called side work in the

18 (Pages 66 - 69)

A-252

Page 70

```
 1          N. VOLPER
 2 industry?
 3      MR. SEGAL:  Objection.
 4   A.   No, no.
 5   Q.   What is side work?
 6   A.   Side work is not related to food
 7 industry.
 8   Q.   I'm sorry.  I didn't understand
 9 you.
10   A.   Side work is not related to the
11 food industry.  As a waiter you have to
12 make sure the tables are set up, the
13 glasses are set up, the right silverware
14 is there, we have napkins folded, you
15 know, preparation before any food
16 services.
17   Q.   What time did the runners have
18 to arrive at the restaurant?
19   A.   They usually arrive like I
20 believe 4:00.
21   Q.   Does the restaurant have any
22 runners for the lunch shift?
23   A.   Most of the time we don't
24 because we have only one or two tables so
25 it is not necessary.  The wait staff
```

Page 71

```
 1          N. VOLPER
 2 prefer not to do that because you have to
 3 share the tip with somebody else.  They
 4 want to keep everything for themselves.
 5   Q.   Were bussers assigned to lunch
 6 shift when there was a lunch shift?
 7   A.   I don't remember unless there
 8 was an event where more people are
 9 involved.
10   Q.   What about bartenders?
11   A.   Bartenders as I mentioned
12 before, we are like-- pretty much
13 everybody knows serving and bartender.  So
14 some of the bartenders was also to take
15 care of the service.  We was pool house so
16 pretty much everybody how to do.  Even
17 servers, they know how to do the bartender
18 jobs.
19   Q.   If a runner or busser or
20 bartender did work a lunch shift, they
21 would have clocked in before that shift,
22 correct?
23   A.   They are supposed to, yes.
24   Q.   Most of the time when the
25 front-of-house employee worked a lunch
```

Page 72

```
 1          N. VOLPER
 2 shift they also worked a dinner shift; is
 3 that right?
 4   A.   Sometimes, yes.
 5   Q.   Is that called a double?
 6   A.   This is called -- can you be
 7 specific?  What do you mean by double?
 8      MR. SEGAL:  What the gentleman
 9 is asking is that you have a lunch
10 shift, right?
11      THE WITNESS:  Okay.
12      MR. SEGAL:  And that's from --
13      THE WITNESS:  12:00.
14      MR. SEGAL:  12:00.  But they
15 came half an hour or fifteen minutes
16 early?
17      THE WITNESS:  Okay.
18      MR. SEGAL:  Till when?  When did
19 that lunch time --
20      THE WITNESS:  Depends.  It
21 depends.  Sometimes they go early
22 because they get tired.
23      MR. SEGAL:  Roughly what is
24 lunch?  12:00 to 1:00, 12:00 to 2:00?
25      THE WITNESS:  Oh, the lunch
```

Page 73

```
 1          N. VOLPER
 2 time?
 3      MR. SEGAL:  Yes.
 4      THE WITNESS:  It can be up to
 5 3:00. 4:00.  Lunch is open until
 6 around 4:00.  After that we serve
 7 dinner.
 8   Q.   Does the restaurant close in
 9 between lunch and dinner shift?
10   A.   No.
11   Q.   So it is open from noon until
12 when it closes?
13   A.   Yes, sir.
14   Q.   If an employee works both the
15 lunch shift and dinner shift, works from
16 when the restaurant opens until later, do
17 they work straight through or do they get
18 a break?
19   A.   Well, I think -- I cannot really
20 say that because I was not there.  Usually
21 when I see like recently, they take maybe
22 half an hour break or something,
23 cigarette, walking.  That's my current
24 experience during the short period of time
25 right now.  In the past, I'm not really
```

19 (Pages 70 - 73)

A-253

Page 74

N. VOLPER

1
2 sure.
3    Q.   When is that break that you see
4 people doing that?
5    A.   Whenever they did, when there is
6 no people in the restaurant they can take
7 a break or somebody else come to the
8 restaurant like let's say about 4:00.
9    Q.   Do you instruct front-of-house
10 employee who is taking a break to clock in
11 and clock out when they come back in and
12 they are done taking the break?
13    A.   I don't remember.
14    MR. SEGAL:  Do they?
15    THE WITNESS:  I don't believe I
16 require that.  I don't know.  I don't
17 think they did that.
18    Q.   If a front-of-house employee
19 only worked the lunch shift, when did that
20 shift typically end?
21    A.   Most of the time they work more
22 than the lunch shift.
23    Q.   I understand.  Did sometimes
24 they only worked a lunch shift?
25    A.   Probably maybe 5:00, 6:00,

Page 75

N. VOLPER

1
2 something like that.  But most of the time
3 they worked after.
4    Q.   For front-of-house employees who
5 only worked the dinner shift, what time
6 were they required to get to work?
7    A.   Usually 4:00.  Sometimes they
8 come early.
9    Q.   What time does the dinner shift
10 end?
11    A.   It is not like specific time.
12 Usually 10:30, 11:00.
13    Q.   What time does the kitchen
14 close?
15    A.   We close depends on the day.  I
16 believe around 10:00.  Some days 10:30.
17    Q.   10:00 during the week and 10:30
18 on Friday and Saturday?
19    A.   Yes, yes.  It used to be 9:45.
20 Then because -- we changed when we see
21 people wants to come late at night so we
22 opened maybe fifteen minutes more, the
23 hours.
24    Q.   The servers are required to work
25 until the last customer finishes their

Page 76

N. VOLPER

1
2 meal and leave, correct?
3    A.   They are not required.  Like
4 let's say if it is only one table left and
5 you have three servers, some of them can
6 go home.
7    Q.   Is that the case throughout the
8 day?  If there is not enough customers
9 would the restaurant sometimes cut
10 someone's shift and they can go home?
11    A.   Most of the time they figure out
12 themselves.  I may cut sometimes.  Maybe,
13 maybe a few times in this period of time
14 when I figure out myself if we are not
15 busy.  We don't need all this stuff.  But
16 most of the time they did it themselves
17 like I don't want to stay here for $10
18 more and they go early.
19    Q.   For the back-of-house
20 employees, for the times when the lunch
21 was being served, what time are the
22 back-of-house employees required to
23 arrive?
24    A.   Back-of-house employees you mean
25 the kitchen staff?

Page 77

N. VOLPER

1
2    Q.   Yes.
3    A.   They usually arrive like also
4 thirty minutes before 12:00, around 11:30
5 something like that.
6    Q.   How many back-of-house employees
7 work the lunch shift?
8    A.   Just one most of the time.
9    Q.   Would that be the chef?
10    A.   No.  It varies.  It varies.  When
11 the chef is off, they usually like sous chef.
12 Most of the time it is not very busy in
13 the lunch so we don't require many people
14 at the time.
15    Q.   So most of the time the
16 back-of-house employees who works a lunch
17 shift also works the dinner shift?
18    A.   Most of the time, yes.
19    Q.   Did they work straight through
20 or did they get a break?
21    A.   Pretty much the same.  If
22 somebody comes like, they usually come
23 2:00, they taking breaks.  We are very
24 like -- we limit to when it is not busy.
25 So pretty much they make their own

20 (Pages 74 - 77)

A-254

Page 78

N. VOLPER

1  decisions when they want to go to break.
2  We are not -- we don't enforce that like
3  you have to do this from this time to this
4  time.
5  Q.   Okay.  For the back-of-house
6  employees who are assigned just to a
7  dinner shift, what time are they required
8  to arrive?
9
10   A.   Sometimes 2:00, sometimes 4:00.
11  It depends on the reservations and
12  preparation time.
13   Q.   Is it different positions are
14  required to arrive at different times or
15  why would it shift from 2:00 to 4:00?
16   A.   Because if we are like too busy,
17  like from the previous day we have certain
18  reservations where we require more
19  preparation of the food, then they come
20  maybe two hours early to prepare for
21  service.
22   Q.   Between 2:00 and 4:00 depending
23  on how busy the restaurant is, what time
24  do they work until?
25   A.   When does the shift end?

Page 79

N. VOLPER

1
2   MR. SEGAL:  Objection.  Asked
3  and answered.
4   Q.   You can answer.
5   A.   Can you repeat?  What did you
6  say?  I get confused.
7   Q.   When the back-of-house employees
8  worked at dinner shift, when does the
9  shift end?
10   A.   Depends on what time we are
11  busy.  Usually after 9:45, 9:30 the staff
12  cleaning up.  Usually 10:30, 11:00,
13  something like that.
14   MR. DiGIULIO:  The next stretch
15  is going to be a bunch of documents so
16  we can take a lunch break.
17   (Whereupon, a short recess was
18  taken.)
19   MR. DiGIULIO:  Back on the
20  record.
21   (Whereupon, Bates D1216 to D1254
22  was marked as Defendant's Exhibit 2
23  for identification as of this date by
24  the Reporter.)
25   Q.   These are documents your

Page 80

N. VOLPER

1
2  attorneys produced in this litigation.
3   A.   Okay.
4   Q.   They are produced without Bates
5  numbers.  Plaintiff's counsel put these
6  Bates numbers on the document for
7  identification.  They are at the bottom
8  right-hand corner.  For the record, they
9  are Bates stamped D1216 through D1254.
10   MR. SEGAL:  Hello.  One second.
11  Off the record.
12   (Whereupon, an off-the-record
13  discussion was held.)
14   MR. DiGIULIO:  Back on the
15  record.
16   Q.   Just to be clear, this is
17  Exhibit 2.  It is marked Bates D1216 to
18  D1254.  These are the plaintiff Nino
19  Martinenko's time records from the
20  restaurant, correct?
21   A.   Yes.
22   Q.   And the restaurant paid Nino
23  Martinenko for the hours reflected in
24  these records, right?
25   A.   Correct.  Plus tips.

Page 81

N. VOLPER

1
2   Q.   Did you give these documents to
3  your attorney?
4   A.   Yes.  I believe I gave to him,
5  yes.
6   Q.   How did you obtain them?
7   A.   How?
8   Q.   Yes.
9   A.   Through the POS system.
10   Q.   Are all the time records for all
11  of the restaurant's employees kept in the
12  POS system?
13   A.   Yes.
14   Q.   And you have access to that?
15   A.   Yes.
16   Q.   Going back to 2016, correct?
17   A.   Most likely, yes.
18   Q.   These are from 2016?
19   A.   I don't see.
20   Q.   Top left corner.
21   MR. SEGAL:  Top left corner.
22   A.   It is on top.  Okay.  Yes.
23   Q.   You are able to pull the time
24  records for all employees from 2016 to
25  present, correct?

21 (Pages 78 - 81)

A-255

Page 82

N. VOLPER

1
2   A.   Yes.
3   Q.   You can put that to the side for
4 now.
5       (Whereupon, Bates D1212 to D1215
6   was marked as Defendant's Exhibit 3
7   for identification as of this date by
8   the Reporter.)
9       MR. DiGIULIO:  For the record,
10  this is marked Exhibit 3.  These
11  documents your attorney produced in
12  this litigation.  They were produced
13  without Bates so we Bates stamped them
14  ourselves.  Bates D1212 through 1215.
15  We will send it to you.
16  Q.   These are Dagmara Huk's time
17 records from the restaurant, correct?
18  A.   Correct.
19  Q.   The restaurant paid Ms. Dagmara
20 for the hours reflected in these records,
21 correct?
22  A.   Correct.
23  Q.   These time records begin in 2020
24 and go through 2021, correct?
25  A.   It says the years.  I don't see

Page 83

N. VOLPER

1
2 it.
3   Q.   Ms. Huk, her employment ended
4 last year, correct?
5   A.   Correct.
6   Q.   If you go to the final page
7 D1215, September 24th is the last entry?
8   A.   Yes.
9   Q.   That would be September 24,
10 2021?
11  A.   Yes.
12  Q.   Working on our way backwards
13 from there, these time records cover the
14 span of 2021 into the fall and late summer
15 of 2020?
16  A.   Okay.
17  Q.   We can put that to the side for
18 now.
19  Q.   Is the pay period for the
20 restaurant Monday through Sunday?
21  A.   Monday through Sunday, correct.
22  Q.   And has it been Monday through
23 Sunday from 2016 to the current date?
24  A.   Correct.
25      (Whereupon, Bates D934 to D1012

Page 84

N. VOLPER

1
2 was marked as Defendant's Exhibit 4
3 for identification as of this date by
4 the Reporter.)
5       MR. DiGIULIO:  These documents
6 are produced by you in this litigation
7 and we have put Bates stamp numbers on
8 them.  For the record, what's been
9 marked as Exhibit 4 is Bates D934
10 through D1012.
11  Q.   Are these the pay stubs that the
12 restaurant issued to the plaintiff, Nino
13 Martinenko?
14  A.   Yeah, looks like.
15  Q.   These pay stubs were prepared by
16 the accounting company Crow; is that
17 correct?
18  A.   Yes.
19  Q.   Where is Crow located?
20  A.   I think they moved back to New
21 Jersey.  They used to be in Astoria,
22 Queens.
23  Q.   When did the restaurant begin
24 using Crow to use pay statements?
25  A.   I think it was before the

Page 85

N. VOLPER

1
2 pandemic.
3   Q.   What does the restaurant send to
4 Crow every week in order for them to
5 calculate the pay stubs?
6   A.   Well, I guess we put on the POS
7 system the hours and then the tips -- the
8 tips during that period of time usually
9 Monday through Sunday.
10  Q.   Does the POS system contain the
11 hourly rate of pay for each employee?
12  A.   I believe so, but I'm not
13 hundred percent sure.
14  Q.   Is this information sent
15 electronically to Crow every week?
16  A.   I'm not aware how it is sent.
17  Q.   Who sends it?
18  A.   Well, most of the time either
19 employee or Imran.
20  Q.   Do they e-mail it to Crow?
21  A.   I have no idea.
22  Q.   Even before 2020 you were not
23 involved in that transaction?
24  A.   No.
25  Q.   How does the restaurant receive

22 (Pages 82 - 85)

Page 86

```
 1         N. VOLPER
 2 the pay stubs from Crow?  Vie e-mail?
 3    A.  I guess he prints statements
 4 like this.
 5    Q.   Crow e-mails the statements to
 6 the restaurant?
 7    A.  To me, I never e-mail it so I
 8 don't know.  Can be to employee or to
 9 Imran.  I have no idea how transmitted but
10 to me directly, no.
11    Q.   Is there a specific person at
12 Crow that the restaurant works with?
13    A.  Yes.
14    Q.   Who is that person?
15    A.  Ebed.
16    Q.   Can you spell that?
17    A.  E-B-E-D, I believe.
18    Q.   Does Ebed have a last name?
19    A.  I don't remember.
20    Q.   Have you worked with Ebed?
21    A.  Yes.
22    Q.   When you work with him, do you
23 call him on the phone?
24    A.  Yes.
25    Q.   Do you e-mail him?
```

Page 88

```
 1         N. VOLPER
 2 reflect what the restaurant paid to Ms.
 3 Martinenko during the pay period listed
 4 here?
 5    A.  I assume.  I mean, I don't
 6 calculate the -- I don't calculate weekly.
 7 I never been involved in that.
 8    Q.   Do you have any reason to
 9 believe that these do not accurately
10 reflect what Mr. Martinenko's pay was?
11    A.  I'm sorry.  Can you repeat the
12 question?
13    Q.   Do you have any reason to
14 believe that these wage statements do not
15 accurately reflect Mr. Martinenko's pay?
16    A.  I believe they are accurate.
17       (Whereupon, Bates Plaintiff's 25
18    to 43 was marked as Defendant's
19    Exhibit 5 for identification as of
20    this date by the Reporter.)
21    Q.   These are documents that are in
22 Nino Martinenko's possession.  For the
23 record, they are marked Bates 25 through
24 43.  Please take a look at the first
25 document pages plaintiff's 25 through 28.
```

Page 87

```
 1         N. VOLPER
 2    A.  Yes.
 3    Q.   What do you e-mail him about?
 4    A.  Like different aspects of the
 5 company because I have few more companies.
 6 Some of them, you know, different e-mails
 7 and stuff like that.
 8       MR. SEGAL:  Focus on this
 9    company.
10    Q.   Do you have the physical address
11 for the company?
12    A.  Not in front of me.
13    Q.   Do you have access to it?
14    A.  Correct.
15    Q.   If we ask for it you can provide
16 it to us at some point?
17    A.  Yes.
18    Q.   What city in New Jersey is it
19 in?
20    A.  He recently moved so I think
21 Elizabeth.  I'm not sure.
22       *MR. SEGAL:  I will tell you
23 what, we will get it.
24       MR. DiGIULIO:  Thank you.
25    Q.   Do these pay stubs accurately
```

Page 89

```
 1         N. VOLPER
 2 Let me know if you know what these
 3 documents are.
 4    A.  What should I do?
 5    Q.   On this first page on
 6 plaintiff's 25, have you seen this
 7 document before?
 8    A.  This particular document, no.
 9    Q.   Are you familiar with this type
10 of document?
11    A.  I am familiar.
12    Q.   What type of document is this?
13    A.  This is basically tracking like
14 hours and tips.
15       MR. SEGAL:  Go to the first
16    page.
17    A.  Yes.
18    Q.   Is this a document that is used
19 for the restaurant?
20    A.  Correct.
21    Q.   Who created this document?
22    A.  Like every week or in general
23 who create this document?
24    Q.   In general.
25    A.  I don't remember who created
```

23 (Pages 86 - 89)

Page 90

N. VOLPER

1
2  this document.
3      Q.    Were you involved in the
4  creation of the document?
5      A.    I don't remember.  That's many
6  years ago.
7      Q.    How is the document used?
8      A.    We have like, I guess they have
9  a lot of printouts and then they put
10  information.
11     Q.    The first page right here on
12  plaintiff 25 has a list of individuals and
13  space for the signature.  Do you see that?
14     A.    Yes.
15     Q.    At the top the statement reads,
16  this document states that I have been paid
17  for this following dates, July 19th
18  through July 25, 2021.  Correct?
19     A.    Correct.
20     Q.    Did the restaurant require the
21  individuals to sign a document like this
22  when they received their pay?
23     A.    Sometimes we have issues like I
24  don't get a check for that period of time.
25  So I guess that's one of the reasons to

Page 91

N. VOLPER

1
2  keep like more closely for the record.
3      Q.    Does the restaurant maintain
4  records like this that have signatures of
5  employees who receive their checks?
6      A.    I believe we have some records,
7  yes.
8      Q.    When did the restaurant start
9  inputting this system?
10     A.    I don't remember.  I don't
11  remember.
12     Q.    Where are the signed copies of
13  these documents kept?
14     A.    The signed document of this
15  (indicating)?
16     Q.    Yes.
17     A.    Well, this is one of the copies.
18  I guess that's never been signed.  I think
19  we should ask the staff where they keep
20  them because usually they handle all this
21  stuff.
22     Q.    Are these type of documents --
23     A.    The plaintiff.
24     Q.    Are these documents kept in the
25  office of the restaurant?

Page 92

N. VOLPER

1
2      A.    Also.
3      Q.    Is there anywhere else that the
4  documents are kept?
5      A.    I don't believe so.
6      Q.    These documents were in Nino
7  Martinenko's possession.  Do you know how
8  she got them?
9      A.    No idea.
10     Q.    Do you know who sent them to
11  her?
12     A.    I don't believe who sent any
13  documents like that.  Probably she got bit
14  from the office or something.
15     Q.    Let's turn to the next page
16  plaintiff 26.  What is that document?
17     A.    The way I see it, that's
18  reflecting the dates, the hours, and the
19  tips.  Not including cash tips.  Including
20  the meal but not including the cash tips.
21     Q.    This tip is only for credit card
22  tips?
23     A.    Yes.
24     Q.    Who prepared this?
25     A.    This specific one, I have no

Page 93

N. VOLPER

1
2  idea.
3      Q.    Who is in charge of generally
4  preparing this document?
5      A.    The staff.  Sometimes Imran do
6  it.
7      Q.    Are these documents saved
8  electronically anywhere?
9      A.    I don't believe so, no.  I don't
10  believe.
11     Q.    But the document was printed
12  out, right?  There is no handwritten --
13     A.    Looks like a printout, yes.
14     Q.    On this document, are the people
15  listed above the word kitchen halfway
16  down, are these the front of house
17  employees who worked on the week of
18  July 19th to 25th in 2021?
19     A.    The kitchen staff?
20     Q.    Above the kitchen?
21     A.    Looks like the front of house
22  staff, yes.
23     Q.    Under the top line where it says
24  hours, there is a number of hours each
25  person worked?

24 (Pages 90 - 93)

A-258

Page 94

N. VOLPER

1
2    A.    Looks like, yes.
3    Q.    Where did the numbers come from?
4    A.    I guess from the POS system.
5    Q.    What is the name of the POS
6    system?
7    A.    Lavu, I think.
8    Q.    I believe you said the numbers
9    under the tip line are the credit card
10   tips?
11   A.    I believe, yes.
12   Q.    Where do those numbers come
13   from?
14   A.    From the employee.  They fill it
15   up daily how much money they make in
16   credit card tips.
17   MR. SEGAL:  Stop.  Credit card
18   tips come from when they give --
19   MS. SCHULMAN:  Let him answer.
20   MR. SEGAL:  He said cash.
21   Q.    For credit card tips, where do
22   these numbers come from?
23   A.    They are coming from the --
24   let's say that night Alexander Rynkovsky
25   worked, he fills up a form how much cash

Page 95

N. VOLPER

1
2    -- I mean no cash, tips on credit card he
3    made.
4    Q.    There is a form they fill out
5    per night if they have the tips for credit
6    cards?
7    A.    Yes.
8    Q.    The amounts are every shift that
9    they worked added up for the week?
10   A.    Correct, correct.
11   Q.    Who does that math?
12   A.    Staff.
13   Q.    What do the numbers under meal
14   prep mean?
15   A.    Meal prep is like daily you are
16   allowed to charge $3 tip I guess.  Let's
17   say from 3:00 to 4:00.  We cook for them,
18   meal preparation like -- what is the --
19   MS. SCHULMAN:  Family meal.
20   A.    Yes.
21   Q.    You charge them, is that 12
22   hours or $12?
23   A.    For the total we charge $3 per
24   day.  If they work four days, they charge
25   12.  For five days, we charge 15.

Page 96

N. VOLPER

1
2    Q.    I am going to go through the
3    names here.  Perez Everardo, what position
4    is he?
5    A.    He is front of house.
6    Q.    Alexander Rynkovsky?
7    A.    Front of house.
8    Q.    What is asterisk next to his
9    name?
10   A.    No idea.
11   Q.    Is he a captain?
12   A.    No.
13   Q.    Samuel Garcia, what position is
14   he?
15   A.    I think is food runner.
16   Q.    Javier Clemente?
17   A.    Either food runner or busser.
18   Q.    Hector Conoz?
19   A.    I don't remember this guy.  He
20   is a food runner or busser.
21   Q.    Below the word kitchen these are
22   the employees who worked in the back?
23   A.    Yes.
24   Q.    Under the hours is the hours
25   that they worked?

Page 97

N. VOLPER

1
2    A.    Correct.
3    Q.    And under total is the total
4    amount of money they were paid for the
5    week?
6    A.    Yes.
7    Q.    Why is the meal prep listed for
8    the front of house not the back of the
9    house?
10   A.    Because by law we cannot charge
11   kitchen staff.  That's why.  Somebody work
12   in the kitchen, you cannot charge.
13   Q.    What position is Pedro Morales
14   in?
15   A.    Line cook?
16   Q.    Carlos Chusan?
17   A.    Line cook also.
18   Q.    Daniel Bonilla?
19   A.    Line cook.
20   Q.    Gonzalez Amaro?
21   A.    I don't recall this guy.  Maybe
22   dishwasher.
23   Q.    Abel?
24   A.    Maybe dishwasher.
25   Q.    Rami Lucera?

25 (Pages 94 - 97)

A-259

Page 98

1          N. VOLPER
2     A.   Line cook.
3     Q.   Turn to next Page 2, plaintiff
4  27 to 28.  Do you know what these
5  documents are?
6     A.   Time cards.
7     Q.   These are the time cards who
8  worked from July 19th to July 25, 2021?
9     A.   Yes.
10    Q.   If you turn to the next page
11 plaintiff's 29, if you go to the last name
12 on this list Alessandro Arduini, what was
13 their position?
14         MR. SEGAL:  We provided that
15 information.  Objection.
16    A.   I cannot recall.  Oh, bartender.
17    Q.   He is a bartender?
18    A.   Yes.
19         MR. SEGAL:  I gave you the names
20 which I didn't have to.
21         MS. SCHULMAN:  This is off the
22 record.
23         (Whereupon, an off-the-record
24 discussion was held.)
25         MR. DiGIULIO:  Back on the

Page 99

1          N. VOLPER
2  record.
3     Q.   If you go back to Exhibit 4
4  which is plaintiff Nino Martinenko's pay
5  stubs?
6     A.   Okay.
7     Q.   Please take a look at these pay
8  stubs.  They are only from 2021.
9     A.   Let me take a look.  They are
10 2022 also.
11    Q.   Correct.
12         Did the restaurant issue pay
13 stubs to plaintiff Ms. Martinenko in 2016
14 and 2018?
15    A.   2016 to 2018?
16    Q.   Yes.
17    A.   Not sure.
18    Q.   Did you look for those pay
19 stubs?
20    A.   Yes.
21    Q.   Where did you look?
22    A.   Looked in the office and
23 restaurant, in the basement.
24    Q.   Did you ask Crow if they had
25 records of that?

Page 100

1          N. VOLPER
2     A.   Crow was -- nobody was involved
3  in 2016 with us.
4     Q.   Crow came after 2016 at some
5  point, correct?
6          MR. SEGAL:  Asked and answered.
7  I think he said after the pandemic.
8          MS. SCHULMAN:  No, he didn't.
9     A.   I can't give exactly the dates.
10 I'm sorry.  I don't know.  When I don't
11 know, I don't know.
12    Q.   Did you ask Crow if they had
13 records of Nino Martinenko's pay stubs
14 from 2018?
15    A.   We asked for all the records.
16    Q.   That Crow have?
17    A.   That they have to give us, yes.
18    Q.   How did you get the pay stubs
19 that you had?
20    A.   They sent to me.
21    Q.   Ebed?
22    A.   Ebed or his brother, I don't
23 remember who it was.
24    Q.   He sent them to you because you
25 asked?

Page 101

1          N. VOLPER
2     A.   Yes.  We asked the documents.
3     Q.   Before Crow was involved, did
4  the restaurant issue pay stubs?
5     A.   Before Crow was involved, no.
6          (Whereupon, Bates D871 to 933
7          was hereby marked as Defendant's
8          Exhibit 6 for identification, as of
9          this date.)
10    Q.   This is marked Exhibit 6.  This
11 document is produced by plaintiff in this
12 litigation.  We Bates stamped them.
13 Exhibit 6 is Bates D871 through 933.
14 Please take a look at these documents.
15 Are these the checks that you issued to
16 plaintiff, Dagmara Huk?
17    A.   Yes.
18    Q.   Did you make these images?
19    A.   Absolutely not.
20         MR. SEGAL:  Do you mean did he
21 copy the checks?
22    Q.   Did you make this document, the
23 images of the check?
24    A.   Yes.
25         MR. SEGAL:  Objection.  Can you

26 (Pages 98 - 101)

Page 102

```
1              N. VOLPER
2  rephrase the question please?  Make
3  means create.  Do you mean did he copy
4  the checks?
5      A.   Let me explain.  I am going to
6  explain.  I take copies of this checks
7  from the bank.  That's it.  I don't make
8  it.  I make the copy.
9          MS. SCHULMAN:  So you took, the
10  bank statements included a photocopy
11  of the check, correct?
12          THE WITNESS:  Correct.
13          MS. SCHULMAN:  And to put this
14  document Exhibit 6 together, you
15  pulled out from the bank statement the
16  pictures of Dagmara's check and put
17  them on one page to make copy?
18          THE WITNESS:  Correct.
19      Q.   We will mark this as Exhibit 7.
20          (Whereupon, Bates D883 to D933
21  was marked as Defendant's Exhibit 7
22  for identification as of this date by
23  the Reporter.)
24      Q.   Again, these are documents
25  defense has produced in this litigation.
```

Page 103

```
1              N. VOLPER
2  We Bates stamped them.  They are Bates
3  D883 through 933.  Are these the pay stubs
4  that the restaurant issued to the
5  plaintiff, Dagmara Huk?
6      A.   Yes.
7      Q.   Do these pay stubs accurately
8  reflect the amounts the restaurant paid to
9  Ms. Huk for that pay period?
10      A.   I was not involved, but I assume
11  that they are accurate.
12      Q.   For these pay statements, did
13  you ask Crow to give them to you so you
14  could give them to your attorney?
15      A.   Correct.
16      Q.   Have all of the pay stubs that
17  the restaurant issued to the
18  front-of-house employees contain the same
19  category of information as are in these?
20      A.   Correct.
21      Q.   And all the pay stubs that the
22  restaurant issued to the back-of-house
23  employees also contained the same
24  information?
25      A.   Only the chef, I don't think so
```

Page 104

```
1              N. VOLPER
2  because of the salary position.
3      Q.   The back of house doesn't
4  include tips, correct?
5      A.   The kitchen, no.
6      Q.   So to the extent that these wage
7  statements reflect tips, the back of house
8  doesn't have that, correct?
9      A.   No, they don't do.
10      Q.   That's the only difference?
11      A.   Yes.  They don't collect tips.
12      Q.   When the restaurant issues these
13  pay stubs they give the pay stubs to the
14  employees in paper form or electronic?
15      A.   We give them in paper form like
16  this together with a check.
17      Q.   Before the restaurant started
18  issuing these paper pay stubs before Crow
19  got involved, did the restaurant provide
20  any documents that showed the pay rates
21  and the hours worked?
22      A.   Yes.  Hours.  We put in the
23  system how many hours and stuff like that.
24  As you can see the document that you
25  showed me before with all this stuff, they
```

Page 105

```
1              N. VOLPER
2  are required to sign.
3      Q.   Just to pull up Exhibit 6 or 5.
4  These documents are from July of 2021,
5  right?
6      A.   I have to take a look again.
7      Q.   Sure.
8      A.   This particular July, yes.
9  July 19th to July 25, 2021.
10      Q.   That document does not say how
11  many hours they worked, correct, first
12  page plaintiff 25?
13      A.   This page?
14      Q.   Yes.
15      A.   Here, no.  We give the rest of
16  the employees so they can review.  That's
17  why we separate the hours, we separate
18  tips, deductions so they can review this
19  information is correct.
20          MS. SCHULMAN:  Before Crow got
21  involved, did the employees have to
22  sign a document like plaintiff 25 when
23  they received their check?
24          THE WITNESS:  Like this?
25          MS. SCHULMAN:  Like the first
```

27 (Pages 102 - 105)

A-261

Page 106

N. VOLPER

1    N. VOLPER
2  page.
3      THE WITNESS:  Yes.
4      MS. SCHULMAN:  And then the
5  second page of Exhibit 5, Plaintiff's
6  Exhibit 26, was this document, this
7  type of document provided to the
8  employees?
9      THE WITNESS:  Correct.
10     MS. SCHULMAN:  Were they given a
11 copy or were they shown a copy?
12     THE WITNESS:  I don't remember
13 that, but they obviously have all the
14 information.  By signing here, they
15 check everything in the back which is
16 correct.  They compare the tips, they
17 compare the hours.  If they see any
18 discrepancy, we was aware of that.
19     MS. SCHULMAN:  Before Crow was
20 involved, did the documents provided
21 that was like plaintiff's 26 contain
22 the same category of information that
23 are listed on plaintiff's 26?
24     THE WITNESS:  Can you be more
25 specific?

Page 107

1      N. VOLPER
2      MS. SCHULMAN:  We are looking at
3  plaintiff's 26.  For front of house it
4  was name, hours, tips, and meal prep.
5      THE WITNESS:  Okay.
6      MS. SCHULMAN:  Prior to Crow
7  being involved, is that the same
8  information that was provided to the
9  front-of-house employees with their
10 paychecks?
11     THE WITNESS:  Yes.  It is the
12 same information provided for review,
13 for them to review.
14     MS. SCHULMAN:  Let's go back to
15 plaintiff's 26.  Again, I am asking
16 about the time period before Crow was
17 involved.  Is the document that was
18 shown, the back of house when they got
19 their pay, did it contain their names,
20 their hours worked, and their total --
21     THE WITNESS:  Yes, exactly the
22 same the way it is.
23     MS. SCHULMAN:  So this type of
24 document, plaintiff's 26, which was
25 shown to employees when they got their

Page 108

1      N. VOLPER
2  pay before Crow was involved contained
3  exactly the same type of information?
4      THE WITNESS:  Correct.
5      Q.  Is there a set pay date at the
6  restaurant?
7      A.  Usually Friday.
8      Q.  And that's every week?
9      A.  Yes.
10     Q.  Has that ever changed?
11     A.  Ever changed?
12     Q.  Yes.
13     A.  I don't believe so, no.  Pretty
14 much it is the standard.
15     Q.  If you can turn to Exhibit 7 on
16 the page marked D883, the first page?
17     A.  Okay.
18     Q.  This pay period is from
19 August 24, 2020 through August 30, 2020,
20 correct?
21     A.  Yes.
22     Q.  Next to that it says the pay
23 date is August 30, 2020, correct?
24     A.  Yes.  That's the way it says
25 here.

Page 109

1      N. VOLPER
2      Q.  But the pay date could not have
3  been August 30, 2020, right?
4      A.  I don't remember.  Usually
5  supposed to be Friday.  Yes, it cannot be.
6  We pay like the following week.
7      Q.  The front-of-house employees
8  sometimes work more than forty hours a
9  week, right?
10     A.  Rarely.
11     Q.  But it does happen, right?
12     A.  Sometimes happens.
13     Q.  When front-of-house employees
14 work more than forty hours a week the
15 restaurant pays them the same rate for all
16 their hours, right?
17     A.  I'm not sure.  Let me check.
18     Q.  Let's look at Page 887 in
19 Exhibit 7.
20     A.  Which one?
21     MR. SEGAL:  887.
22     Q.  Bottom right.
23     A.  Okay.
24     Q.  This is pay period between
25 October 12, 2020 through October 18, 2020.

28 (Pages 106 - 109)

A-262

Page 110

N. VOLPER
1
2  If you look down on the hours for Ms. Huk,
3  she worked 43 hours and 15 minutes,
4  correct?
5      A.  Yes.  That's the POS shows.
6      Q.  And she was paid $10 per hour
7  for all 43 hours and 15 minutes, right?
8      A.  Yes.
9      Q.  She was not paid time and a half
10  for the hours over forty that she worked,
11  correct?
12      A.  Looks like she wasn't paid.
13      Q.  Isn't it true that the
14  restaurant did not actually pay the
15  front-of-house employees time and a half
16  for overtime?
17      MR. SEGAL:  Objection.
18      MS. SCHULMAN:  You can answer.
19      Q.  You have to answer.
20      A.  So is it true what?
21      Q.  Isn't it true that the
22  restaurant does not pay front-of-house
23  employees time and a half for hours worked
24  over forty?
25      A.  I don't know if it is true or

Page 111

N. VOLPER
1
2  not but this particular one, looks like it
3  is not done correctly.
4      Q.  Let's look at a different
5  example then.  We can look back to Nino
6  Martinenko's time records.  I believe it
7  is Exhibit 4.  If you could turn to page
8  D948.
9      A.  Thank you.
10      Q.  Ms. Martinenko's worked during
11  this pay period 45 hours 29 minutes,
12  correct?
13      A.  That is being reflected here.
14      Q.  Yes.  And that's for one week's
15  worth of time, correct?
16      A.  Yes.
17      Q.  And she was paid $10 an hour for
18  all 45 hours, right?
19      A.  Yes.
20      Q.  She was not paid any overtime,
21  correct?
22      A.  In this particular, no.
23      Q.  Do you have any time in which
24  plaintiff was paid overtime?
25      A.  Not sure about it.

Page 112

N. VOLPER
1
2      Q.  This is Exhibit 8.
3          (Whereupon, Plaintiff's 1
4      through 24 was marked as Defendant's
5      Exhibit 8 for identification as of
6      this date by the Reporter.)
7      Q.  These documents in
8  plaintiff's possession.  They are marked
9  Plaintiff's 1 through 24.
10      A.  Okay.
11      Q.  Are these pay stubs that the
12  restaurant issued to various employees?
13      A.  Yes.
14      Q.  And these are all front-of-house
15  employees, correct?
16      A.  I don't check all of them but
17  no, I don't think so.  Maybe.
18      Q.  On the first page plaintiff's 1
19  is a pay stub for Alexander Rynkovsky for
20  March 28, 2021, correct?
21      A.  Correct.
22      Q.  He worked 53 hours and
23  16 minutes, correct?
24      A.  Correct.
25      Q.  He was paid $10 an hour for all

Page 113

N. VOLPER
1
2  53 hours, correct?
3      A.  Yes.  Looks like.
4      Q.  If you go to the next page,
5  Edwardo Perez on plaintiff's 2.  This was
6  pay date March 28, 2021.  He worked
7  48 hours and 54 minutes that week,
8  correct?  It is on the back.
9      A.  Yes.
10      Q.  And he was paid $10 an hour for
11  each of those hours, correct?
12      A.  Correct.
13      Q.  And he was not paid time and a
14  half for overtime, correct?
15      A.  Correct.
16      Q.  Back-of-house employees, kitchen
17  employees at the restaurant they sometimes
18  work more than forty hours a week,
19  correct?
20      A.  Sometimes, yes.
21      Q.  Does the restaurant pay them
22  time and a half for every hour over forty?
23      A.  I hope so.
24      Q.  Do you know if the restaurant
25  pays --

29 (Pages 110 - 113)

A-263

Page 114

N. VOLPER

1          N. VOLPER
2    A.   I'm not sure.
3    Q.   Do you have any documents that
4 show that the restaurant pays time and a
5 half for employees who work in the kitchen
6 for overtime?
7    A.   Not that I know of.
8    Q.   Would it be reflected in the pay
9 statement?
10   A.   In the pay statement?
11   Q.   Yes.
12   A.   Should be.
13   Q.   And you have access to these pay
14 statements?
15   A.   Front or back?
16   Q.   Back-of-house employees?
17   A.   I do, yes.
18   Q.   Do you know what spread-of-hours
19 pay is?
20   A.   No idea.
21   Q.   Do you know the restaurant is
22 required to pay employees an extra hour
23 minimum wage for any work day that lasts
24 more than ten hours?
25   A.   Basically, I don't handle all

Page 115

N. VOLPER

1          N. VOLPER
2 this stuff.  I pass the information to the
3 accountant.  I don't produce any of this
4 statement.
5    Q.   The restaurant does not pay
6 spread-of-hours premium to any of its
7 employees, correct?
8    A.   I have no idea.  I am not aware.
9         MR. DiGIULIO:  Let's take five.
10        THE WITNESS:  Sure.
11        (Whereupon, a short recess was
12 taken.)
13        MR. DiGIULIO:  Back on the
14 record.
15        Can we have this marked?
16        (Whereupon, wage notice document
17 was marked as Defendant's Exhibit 9
18 for identification as of this date by
19 the Reporter.)
20   Q.   This is a blank form wage notice
21 document from the New York Department of
22 Labor.  It is Exhibit No. 9.  Have you
23 ever filled out and given this type of
24 document to any kind of of your employees?
25   A.   Yes.

Page 116

N. VOLPER

1          N. VOLPER
2    Q.   When did you do that?
3    A.   When did you do that?
4    Q.   When?
5    A.   Different time periods.
6    Q.   Did you keep the documents that
7 you gave them?
8    A.   Some of them I have, yes.
9    Q.   You have kept some of them?
10   A.   Yes.
11   Q.   Where are they?
12   A.   Most likely in the office.
13   Q.   Did you give this filled out
14 document to plaintiff, Nino Martinenko?
15   A.   I have no idea.
16   Q.   Did you give one of these
17 documents to Dagmara Huk?
18   A.   No idea.  Most likely not.
19   Q.   Which employee did you give this
20 document to?
21   A.   By names?
22   Q.   Yes.
23   A.   I mean, I can provide that
24 information but I don't have in front of
25 me.

Page 117

N. VOLPER

1          N. VOLPER
2    Q.   If you didn't give this document
3 to Nino Martinenko or Dagmara Huk, why do
4 you believe you gave it to other
5 employees?
6    A.   Why do I believe?
7    Q.   Yes.
8    A.   Because it was done.
9    Q.   Why did you not give it to
10 Dagmara?
11   A.   I never say I don't give it to
12 Dagmara.  I said I don't remember giving
13 to her or to Nino.
14   Q.   Which person at the restaurant
15 gave the filled out form to the
16 restaurant's employees?
17   A.   Which person?
18   Q.   Yes.
19   A.   Me.
20   Q.   You did?
21   A.   Yes.
22   Q.   Who filled out the form when you
23 gave it to the employee?
24   A.   Well, they fill up and sign this
25 portion, signature and stuff.

30 (Pages 114 - 117)

A-264

Page 118

```
1              N. VOLPER
2      Q.    Who fills out the employer
3  information in No. 1?
4      A.    This I did.
5      Q.    And you filled out No. 3, 4, 5,
6  6, 7?
7      A.    Yes.  The rest is from them.
8      Q.    Can you give us the name of a
9  single employee that you gave a filled out
10 version of this copy to?
11     A.    Not at this moment.
12     Q.    Do you recall when you gave this
13 filled out document to any employer?
14     A.    Depends on the period of time.
15     A.    Can be three months ago, can you
16 four months ago.
17     Q.    Do you recall giving this filled
18 out document four months ago to an
19 employee?
20     A.    To employee?
21     Q.    Yes.
22     A.    Let me -- I think I gave to
23 Hailey, the bartender.
24     Q.    Did you provide this document to
25 any employee before 2022?
```

Page 119

```
1              N. VOLPER
2      A.    Before 2022?
3      Q.    Yes.
4      A.    I'm not a hundred percent sure
5  if I did or not.
6      Q.    Why did you begin giving the
7  filled out documents to employees?
8      A.    Why?
9      Q.    Yes.
10     A.    Because I guess it is required.
11     Q.    When did you begin?
12     A.    Notice of acknowledgement.
13     Q.    When did you become aware of the
14 requirement?
15     A.    When I become aware -- we have,
16 I think something in the past which I
17 cannot locate, like employee this --
18 usually like employees, they know if they
19 work in the restaurant they are getting
20 tips, there is a possibility of tip to
21 employees.  They are required to fill form
22 27, I believe which are cash report form.
23 I believe the plaintiffs filled up that
24 form which is required to fill every
25 month.
```

Page 120

```
1              N. VOLPER
2      Q.    When did you become aware of the
3  requirement to give this?
4      A.    Which one?  This one?
5      Q.    Yes.
6      A.    I became aware of this
7  requirement, I cannot give you specific
8  time time period but I was aware of this
9  requirement since we have one case which I
10 cannot locate, somebody -- employee's
11 record of this form, I was penalized of
12 that.
13     THE WITNESS:  Can I add
14 something?
15     MR. SEGAL:  No.
16     THE WITNESS:  Okay.  I am not
17 allowed.
18     (Whereupon, Bates D1 to D6 was
19 marked as Defendant's Exhibit 10 for
20 identification as of this date by the
21 Reporter.)
22     MR. DiGIULIO:  This is
23 Exhibit 10.  This document is produced
24 by defendants.  This is Bates stamped
25 D1 through D6.
```

Page 121

```
1              N. VOLPER
2      Q.    Are these the tax documents
3  issued to Nino Martinenko and Dagmara Huk?
4      A.    I cannot confirm hundred percent
5  but looks like the documents.
6      MR. SEGAL:  Can you wait for him
7  to ask you a question?
8      THE WITNESS:  Yes.  He did ask.
9      MR. DiGIULIO:  I did ask him a
10 question.
11     Q.    So the first D1, D2, D3, are
12 these 1099 that the restaurant issued to
13 Nino Martinenko?
14     A.    This looks like 1099 form, yes.
15     Q.    The next page is D4 which is a
16 W-2 for 2021 for plaintiff Dagmara Huk; is
17 that correct?
18     A.    I'm sorry.  Which one?
19     Q.    D4 is a W-2 that the restaurant
20 issued to Dagmara Huk in 2021, correct?
21     A.    Yes.  Looks like, yes.
22     Q.    D5 is a W-2 from 2020 for Ms.
23 Huk, correct?
24     A.    2020?
25     Q.    Yes.
```

31 (Pages 118 - 121)

A-265

Page 122

```
 1              N. VOLPER
 2     A.   Yes.
 3     Q.   And then the last D6 is W-2
 4  issued to the plaintiff, Nino Martinenko,
 5  correct?
 6     A.   Yes.
 7     Q.   For the first three pages of the
 8  1099, who prepared these 1099s for the
 9  restaurant?
10     A.   Who prepared them -- I guess it
11  was prepared by CPA.
12     Q.   Who is the CPA for the
13  restaurant?
14     A.   At that time I don't remember
15  who is it.  It can be the same company.
16     Q.   Same company as Crow?
17     A.   Yes.  It is 2016.  It is very
18  long time ago.  I don't remember all this
19  stuff.
20     Q.   You paid the plaintiff, Ms.
21  Martinenko, on a 1099 for 2016, 2017,
22  2018, right?
23     A.   Yes.
24     Q.   Did the restaurant pay all of
25  its employees 1099 for these years?
```

Page 123

```
 1              N. VOLPER
 2     A.   I don't have records in front of
 3  me but for sure Nino Martinenko, yes.
 4     Q.   When did the restaurant begin
 5  paying its employees on W-2?
 6     A.   When?
 7     Q.   Yes.
 8     A.   Three or four years ago.
 9     Q.   Is it when the restaurant began
10  working with Crow?
11     A.   Yes.
12     Q.   Before Crow, was the restaurant
13  issuing 1099 for its employees?
14     A.   That's why I said I'm not
15  hundred percent sure.  It is long time
16  ago.  The way I look here, Nino Martinenko
17  was issued 1099 for 2016, 2017.
18     Q.   Do these documents accurately
19  reflect the wages and tips that these
20  plaintiffs received from the restaurant in
21  the respective years?
22     A.   I have to look into that records
23  but -- I have to look into that records.
24  I don't know if that's correct or not.
25  Most likely it is correct.  Maybe it is
```

Page 124

```
 1              N. VOLPER
 2  missing cash -- cash tips which Nino
 3  Martinenko failed to provide on the form
 4  27, I believe so.  That maybe is missing.
 5  Yeah.
 6     Q.   Did you gather these tax
 7  documents for this litigation?
 8     A.   Do I what?
 9     Q.   Did you gather them and give
10  them to your attorney?
11     A.   This one?
12     Q.   Yes.
13     A.   I believe so, yes.
14     Q.   Where did get it from?
15     A.   I get it from the -- my records.
16  I looked at my records and gave it to
17  them.
18     Q.   Where are the records?
19     A.   In the office.
20     Q.   On the computer?
21     A.   Some of them on the computer,
22  some of them on paper.
23     Q.   Do you have other 1099s and W-2s
24  that the restaurant issued to its
25  employees?
```

Page 125

```
 1              N. VOLPER
 2        MR. SEGAL:  Objection.
 3     Q.  You can answer.
 4        THE WITNESS:  I stay with the
 5  objection.
 6        MR. SEGAL:  You have to answer.
 7        THE WITNESS:  I have to answer?
 8        MR. SEGAL:  Yes.
 9        THE WITNESS:  Doesn't work like
10  court?
11        MR. SEGAL:  No.
12     A.  Can you repeat the question?
13     Q.  Sure.
14        MR. DiGIULIO:  Can you read back
15  the question?
16        (Whereupon, the referred to
17     question was read back by the
18     Reporter.)
19     A.  We have issued.  Some of them
20  like contractors, or cleaning services, or
21  anything like that.
22        MR. SEGAL:  It is a yes or no
23  question.
24     A.  To employees, most likely yes.
25     Q.  Do you have 1099s or W-2s that
```

32 (Pages 122 - 125)

Page 126

N. VOLPER

2 the restaurant issued to the back-of-house
3 employees?
4    A.    Kitchen staff?
5    Q.    Yes.
6    A.    Do I have them?
7    Q.    Yes.
8    A.    Not sure.  If I have them or
9 not, not sure.  Not sure.
10    Q.    Does the restaurant require new
11 hires to fill out tax documents?
12    A.    Yes.
13    Q.    Does the restaurant require new
14 employees to fill out W-4 99s?
15    A.    Yes.
16    Q.    Does the restaurant require new
17 employees to fill out W-9s?
18    A.    What is W-9?  It is a tax form
19 required by the -- I think so, yes.
20    Q.    Does the restaurant maintain the
21 filled out W-4s 99s?
22    A.    I hope so, yes.  But I never
23 looked for that.  I hope so.
24    Q.    Does your accountant have copies
25 of the W-2s and 1099s that are issued to

Page 127

N. VOLPER

2 the front and back-of-house employees?
3    A.    I believe so.
4        (Whereupon, D1093 to D1194 was
5    marked as Defendant's Exhibit 11 for
6    identification as of this date by the
7    Reporter.)
8    Q.    This is for you, Mr. Volper.
9    A.    Yes, sir.
10    Q.    These are documents that the
11 defense produced in this litigation.  They
12 were produced without Bates so the
13 Exhibit 11 is marked Bates D1093 through
14 1194.
15    A.    Correct.
16    Q.    These are the 2016 tax returns
17 for the restaurant.  Is this document the
18 2016 tax returns for 212 Steakhouse
19 Incorporated?
20    A.    Correct.
21    Q.    To the best of your knowledge,
22 are these tax returns accurate?
23    A.    To the best of my knowledge,
24 yes, it is accurate.
25    Q.    If you turn to the second page

Page 128

N. VOLPER

2 D1094?
3    A.    Okay.
4    Q.    On the bottom it says pay
5 preparer use only.  Print type preparer's
6 name.  Ebed Rada (ph).  Is that the Ebed
7 you were speaking about earlier?
8    A.    Correct.
9    Q.    2016, he was with the firm Tax
10 Zone; is that correct?
11    A.    Looks like.
12    Q.    On page 191 gross receipts or
13 sales.  It says the restaurant had over
14 $1.3 million in sales, correct?
15    A.    What was the question?
16    Q.    1094, on that page on line 1C,
17 top line on the right in the column?
18    A.    Okay.
19    Q.    It says the restaurant had over
20 $1.3 million in sales, correct?
21    A.    Yes.
22    Q.    To the best of your knowledge
23 that's accurate?
24    A.    Yes.
25    Q.    Line 8t where it says salaries

Page 129

N. VOLPER

2 and wages?
3    A.    Huh-huh.
4    Q.    Tax returns state that the
5 restaurant paid no salary or wages.  Do
6 you see that?
7    A.    Yes.
8    Q.    But you had employees in 2016,
9 correct?
10    A.    Correct.
11    Q.    If you turn to page 13, D1105 on
12 the bottom right.
13    A.    Okay.
14    Q.    This is under the schedule of
15 other deductions.  It provides restaurant
16 spent $362,657 to independent contractors;
17 is that correct?
18    A.    Yes.
19    Q.    Who are your independent
20 contractors?
21    A.    Who they are?
22    Q.    Yes.
23    A.    Like I mentioned before, can be
24 some kind of -- Nino Martinenko was --
25    Q.    Paid that way?

33 (Pages 126 - 129)

A-267

Page 130

N. VOLPER

1          N. VOLPER
2     A.    Yes.
3     Q.    Is this the way that the
4  restaurant paid its employees in 2016?
5     A.    Employees and independent
6  contractors, yes.
7     Q.    Front-of-house staff were paid
8  this way, correct?
9     A.    Yes.
10    Q.    And the back-of-house staff too?
11    A.    I can't recall that.
12    Q.    So the restaurant issued 1099s
13  for the front-of-house staff in 2016,
14  correct?
15    A.    Most likely.
16    Q.    Do you have all the 1099s that
17  the restaurant issued from the 2016 to the
18  present?
19    A.    I hope so.
20    Q.    If you flip back a few pages to
21  D1101 schedule K1, bottom right corner?
22    A.    Yes.
23    Q.    Under Section E on the left-hand
24  side of the page it says the shareholder's
25  name, Nikolay Volper.  That's you,

Page 131

1          N. VOLPER
2  correct?
3     A.    Yes.
4     Q.    Under F it says shareholder's
5  percentage of stock ownership for tax year
6  is a hundred percent, correct?
7     A.    Yes.
8     Q.    So in 2016 you owned hundred
9  percent of the restaurant, correct?
10    A.    Yes.
11    Q.    Moving forward, if the tax
12  return for the restaurant says that the
13  shareholder's percentage of the stock was
14  a hundred percent and your name is under
15  A, that reflects that you were a hundred
16  percent of the shareholder of the
17  restaurant, correct?
18    A.    Under what?  The same column?
19    Q.    Yes.
20    A.    I don't know if it says that or
21  not.
22    Q.    If it says that, that would mean
23  you were one hundred percent owner of the
24  stock of the company, right?
25    A.    Yes.

Page 132

1          N. VOLPER
2     Q.    Why did the restaurant pay the
3  front and back-of-house staff on the 1099
4  in 2016?
5     A.    Why?
6     Q.    Yes.
7     A.    I was under tremendous pressure
8  financially.
9        MS. SCHULMAN:  Why did that
10  pressure result in you paying the
11  front and back of house 1099 rather
12  than W-2?
13        THE WITNESS:  Because we were
14  losing money, a lot of money.
15        MS. SCHULMAN:  And it would be
16  more expensive if you paid them on
17  W-2?
18        THE WITNESS:  Pretty much.
19        MS. SCHULMAN:  Because you have
20  to pay more in taxes?
21        THE WITNESS:  I don't know what
22  I have to pay but -- yeah.  Some of
23  the employees, they want 1099.
24        (Whereupon, Bates D1135 to D1173
25  was marked as Defendant's Exhibit 12

Page 133

1          N. VOLPER
2  for identification as of this date by
3  the Reporter.)
4     Q.    For the record, these are tax
5  documents produced by the defense in this
6  litigation.  They are Bates stamped D1135
7  through D1173.  These are the 2017 tax
8  returns for 212 Steakhouse Incorporated.
9     A.    Okay.
10    Q.    If you look at on the second
11  page, D1136 line 1A, it says the gross
12  receipt for sales is over $1.5 million,
13  correct?
14    A.    Yes.
15    Q.    Sir, the restaurant had over
16  $1.5 million in revenue in 2017, correct?
17    A.    Correct.
18    Q.    Page 2 line 8 for under salary
19  and wages, tax returns state that the
20  restaurant paid no salary or wages,
21  correct?
22    A.    Yes.
23    Q.    In this year the restaurant paid
24  all its front and back-of-house employees
25  in 1099, correct?

34 (Pages 130 - 133)

Page 134

N. VOLPER
1
2    A.    Correct.
3    Q.    Okay.  If you look at page D1143
4  in the right-hand corner, this reflects
5  you owned hundred percent of the company
6  in 2017, correct?
7    A.    Correct.
8        (Whereupon, Bates D1174 to D1211
9  was marked as Defendant's Exhibit 13
10  for identification as of this date by
11  the Reporter.)
12    Q.    For the record, this is marked
13  Exhibit 13.  It is tax returns produced by
14  the defendants.  It is Bates D1174 through
15  D1211.  The plaintiffs have Bates stamped
16  them.  Is this the document the 2018 tax
17  returns for 212 Steakhouse Incorporated?
18    A.    Yes.
19    Q.    On the first page line one A for
20  gross receipts of sales it says the
21  restaurant had over $1.6 million in sales,
22  correct?
23    A.    Correct.
24    Q.    So the restaurant had over 1.6
25  million in revenue in 2018, correct?

Page 135

N. VOLPER
1
2    A.    Revenue or sales?
3    Q.    Gross revenue, $1.6 million,
4  correct?
5    A.    Yes.
6    Q.    On line 8 salary and wages it
7  states that the restaurant paid no salary
8  or wages in 2018, correct.
9    A.    Correct.
10    Q.    The restaurant paid all front
11  and back of house employees on 1099,
12  correct?
13    A.    Correct.
14    Q.    If you look at D1181, this
15  reflects you were the sole owner of the
16  corporation that year, correct?
17    A.    Huh-huh.
18        MS. SCHULMAN:  Instead of
19  huh-huh you should say yes.
20    A.    Yes.  Yes.
21        MR. DiGIULIO:  Can we have this
22  marked?
23        (Whereupon, Bates D1013 to D1053
24  was marked as  Defendant's Exhibit 14
25  for identification as of this date by

Page 136

N. VOLPER
1
2  the Reporter.)
3        MR. DiGIULIO:  These are
4  documents produces by defense without
5  Bates but the plaintiffs have Bates
6  stamped these documents D1013 through
7  1053.
8    Q.    Are these the 2019 tax returns
9  for 212 Steakhouse Incorporated?
10    A.    Correct.
11    Q.    If you go to the third page
12  D1015 line 1A.  For gross receipts or
13  sales it says the restaurant had over $1.6
14  six million in sales, correct?
15    A.    Yes.
16    Q.    The restaurant had over $1.6
17  million in gross revenue in 2019, correct?
18    A.    Gross sales.
19    Q.    Yes.
20    A.    Okay.
21    Q.    On line 8, here it says that the
22  salaries and wages paid by 212 Steakhouse
23  Incorporated was $248,780?
24    A.    Correct.
25    Q.    Now, if you go to D1025 bottom

Page 137

N. VOLPER
1
2  right, D1025.  It is about ten pages from
3  where we were.
4    A.    Okay.
5    Q.    Under the schedule deduction it
6  provides the restaurant spent $238,635 on
7  independent contractors, correct?
8    A.    Yes.  It says like that.
9    Q.    In 2019 did the restaurant start
10  the year paying the front the
11  back-of-house staff on 1099 and switch to
12  W-2?
13    A.    Yes.
14    Q.    Do you know when in 2019 that
15  shift happened?
16    A.    No, I don't know.
17    Q.    When that shift happened, were
18  all the front and back-of-house employees
19  moved from 1099 to W-2 at the same time?
20    A.    I hope so, yes.  I was not
21  taking care of it.
22        (Whereupon, Bates D1054 to D1092
23  was marked as Defendant's Exhibit 15
24  for identification as of this date by
25  the Reporter.)

35 (Pages 134 - 137)

Page 138

N. VOLPER

1   
2   Q.   This is Exhibit 15.  Again,
3   these are documents produced by defense to
4   plaintiff without Bates numbers.
5   Plaintiffs have Bates stamped D1054
6   through D1092.  Are these the 2020 tax
7   returns for 212 Steakhouse Incorporated?
8   A.   Correct.
9   Q.   If you turn to the third page
10  D1056 line 1A for gross receipts of sales
11  that the restaurant had over $800,000 in
12  sales in 2020, correct?
13  A.   Correct.
14  Q.   So the restaurant had over
15  $800,000 in gross revenue in 2020,
16  correct?
17  A.   Correct.
18  Q.   Line 8 for wages, on this
19  document it states that the restaurant
20  paid $183,659 in wages, correct?
21  A.   That's what it says, yes.
22  Q.   Were all the front and
23  back-of-house staff paid on W-2s in 2020?
24  A.   I believe so.
25  Q.   From all tax returns we just

Page 139

N. VOLPER

1   
2   went over from 2016 to 2020, who signs tax
3   returns for the corporation?
4   A.   I sign them.
5   Q.   Are these the tax returns that
6   you signed and submitted to the
7   government?
8   A.   Yes.
9   Q.   Defendants have not produced any
10  tax returns --
11      MS. SCHULMAN:  Off the record.
12      (Whereupon, an off-the-record
13      discussion was held.)
14      MR. DiGIULIO:  Back on the
15      record.
16  Q.   The defendants have not produced
17  tax returns for 2021.  Has the restaurant
18  filed its 2021 tax returns?
19  A.   Not yet.  We have an extension.
20  Q.   When do you plan on filing your
21  tax returns?
22  A.   I want to make sure everything
23  is correct and do it soon.
24  Q.   Were your 2021 sales higher than
25  they were in 2020?

Page 140

N. VOLPER

1   
2   A.   I don't have the calculation
3   yet.
4       (Whereupon, Bates D1255 to D1381
5       was marked as Defendant's Exhibit 16
6       for identification as of this date by
7       the Reporter.)
8   Q.   This is Exhibit 16.  These are
9   documents that the defense have produced
10  in this litigation.  They were not Bates
11  so plaintiff's counsel have provided Bates
12  numbers.  The numbers on this exhibit are
13  D1255 through 1381.  Are these tip sheets
14  from the restaurant?
15  A.   Correct.
16  Q.   Who created the template for
17  these sheets?
18  A.   I don't remember.  It is many
19  years ago.
20  Q.   When was the template created?
21  A.   I don't remember.  Since the
22  beginning I guess.
23  Q.   Since the beginning?
24  A.   Yes.  I don't know this
25  particular one, but we have this since the

Page 141

N. VOLPER

1   
2   beginning.
3   Q.   Who filled out these sheets?
4   A.   This is strictly filled out by
5   employees.
6   Q.   Does the restaurant have one of
7   these sheets per shift?
8   A.   Every single day you need to
9   have that.
10  Q.   Do they have a separate one if
11  they have a lunch shift?
12  A.   Usually, yes.  One is like
13  individual person.
14      MR. SEGAL:  He is asking if
15      there is two tip sheets per sheet.
16      MS. SCHULMAN:  Is there one tip
17      sheet per shift?  If there is a lunch
18      and dinner shift on the same day, are
19      there two tip sheets per day?
20  A.   Yes.  There are two tip sheets.
21  Q.   Do these tip sheets accurately
22  reflect the amounts of tips each employee
23  received on any given shift?
24  A.   In terms of the credit card
25  tips, yes.  I don't see here cash tips

36 (Pages 138 - 141)

A-270

Page 142

1          N. VOLPER
2  being reflected.
3      Q.   Are these the tip sheets that
4  you referred to earlier that are used to
5  calculate the total tips that each
6  employee receives per week?
7      A.   Yes, except the cash tip.  It
8  does not reflect in the calculation.
9      Q.   Okay.  The defendants produced
10  these documents in this litigation.  Who
11  from the restaurant collected these
12  documents to give to your attorney?
13      A.   This particular one?
14      Q.   Yes.
15      A.   I did.
16      Q.   You did?
17      A.   Yes.
18      Q.   Where were they?
19      A.   Those are in the restaurant.
20  Whatever I find, I passed it to my
21  attorney.
22      Q.   Have you produced all the tip
23  sheets that are in your possession?
24      A.   What I find so far, I produced
25  it.

Page 143

1          N. VOLPER
2      Q.   Where did you find these
3  specific ones?
4      A.   I mentioned.  In the office.
5      Q.   In the office?
6      A.   Yes.
7      Q.   Are there other tip sheets in
8  the office?
9      A.   I don't believe so, but can be
10  other place in the restaurant because we
11  have like documents here, documents there
12  (indicating) but very old documents.  I
13  looked -- so far was not there but
14  whatever I find, I produced.
15      Q.   These tips sheets are from --
16      A.   2021.
17      Q.   These tip sheets are from
18  various days in 2021, correct?
19      A.   Let me look through all of them
20  briefly.
21      Q.   Please.
22      A.   No.  I see 2020 here.  2021,
23  2020.
24      Q.   If you see 2020, please
25  identify.

Page 144

1          N. VOLPER
2      MR. SEGAL:  D13.  To be honest
3  with you, might be a typo.
4      Q.   Does the restaurant have tip
5  sheets from before 2021?
6      A.   Yes.  Do I have them personally?
7      Q.   Does the restaurant have them?
8      A.   Let me revise my answer.  I try
9  to locate.  Whatever I locate, I gave to
10  my attorney.  Do I keep the same system in
11  place since we opened, yes.  Just to make
12  sure it is clear.
13      Q.   Where do the employees put the
14  tip sheets after they are prepared?
15      A.   They put like a book for them.
16  We call it book, like employees book.
17  They put in one of the shelves, special
18  shelf where they put whatever documents,
19  tips.
20      Q.   What happens to these records?
21      A.   What happens to this record?
22      Q.   Yes.
23      A.   Well, I don't know what
24  happened.  Past records --
25      MR. SEGAL:  Once it goes in the

Page 145

1          N. VOLPER
2  folder, where does it go next?
3      THE WITNESS:  This?
4      MR. SEGAL:  Yes.
5      A.   It goes to another form where
6  employment -- the credit card tips plus
7  hours -- and submitted to CPA.  You have
8  to calculate hours tips, credit card
9  tips.  I don't see reflect any cash tips
10  here.  They don't declare.
11      Q.   Does the restaurant still use
12  these type of tip sheets?
13      A.   Yes, sir.
14      Q.   And so do you have these tip
15  sheets from 2022?
16      A.   2022-- yes, I do.  Current one
17  you mean for last two, three months --
18  yeah, yeah.  We have.
19      (Whereupon, Bates Plaintiff 44
20  to 59 was marked as Defendant's
21  Exhibit 17 for identification as of
22  this date by the Reporter.)
23      Q.   Exhibit 17 are documents that
24  are in plaintiff's possession.  Bates
25  range from Plaintiff 44 through Plaintiff

37 (Pages 142 - 145)

Page 146

1        N. VOLPER
2  59.  Please take a look.  Do you know what
3  they are, Mr. Volper?
4     A.   Yes.  This looks like by date by
5  employee, like how much they make on
6  credit card tips on this particular day.
7     Q.   Are these weekly tip sheets that
8  the restaurant keeps?
9     A.   Yes.
10    Q.   Who creates these documents?
11    A.   We create for long time.  I
12  don't know.  Maybe some of the employees
13  or me.
14    Q.   Does the restaurant keep these
15  records?
16    A.   We have some records, yes.
17    Q.   They are in paper form?
18    A.   Yes, yes.  They are in paper
19  form.  Same form like this but, you know,
20  original, not copies.
21    Q.   When did the restaurant begin --
22    A.   This is 2017, correct?
23    Q.   Yes.
24        When did the restaurant begin
25  using weekly tip sheets like this?

Page 147

1        N. VOLPER
2     A.   Probably most likely since the
3  beginning.
4     Q.   Is the restaurant in possession
5  of those weekly tip sheets?
6     A.   Current one, I am not too sure.
7  The past one, maybe destroyed.  Whatever I
8  have, I provide.  This is 2017, 2019.  I'm
9  not sure if I have all the years.
10    Q.   Where does the restaurant keep
11  weekly tip sheets currently?
12    A.   In our office.
13    Q.   In your office?
14    A.   Yes.
15        MR. DiGIULIO:  Let's take five
16  minutes.
17        (Whereupon, a short recess was
18  taken.)
19        MR. DiGIULIO:  Back on the
20  record.
21    Q.   Mr. Volper, you produced 212
22  Steakhouse Incorporated Bank of America's
23  bank statement, correct?
24    A.   Correct.
25    Q.   And that is 212 Steakhouse's

Page 148

1        N. VOLPER
2  only bank account, correct?
3     A.   Yes.
4     Q.   That you produced statements
5  for?
6     A.   Yes.
7     Q.   And the statements that you
8  produced were from July 2016 to the end of
9  2021, correct?
10    A.   I want to take a look.  Which
11  statement?
12    Q.   The ones that you produced in
13  this litigation.
14    A.   Yes.
15    Q.   How did you go about collecting
16  the bank statements for the production in
17  this litigation?
18    A.   Bank online.
19    Q.   What did you do online to get
20  the statements?
21    A.   It is available for certain
22  period of time.
23    Q.   You downloaded from your account
24  online?
25    A.   Yes.

Page 149

1        N. VOLPER
2     Q.   And you gave it to your
3  attorney?
4     A.   Yes.
5     Q.   When did you go about collecting
6  that information?
7     A.   When?
8     Q.   Yes.
9     A.   I think it was like two, three
10  months ago I sent information to my
11  accountant.
12    Q.   How long did it take you to pull
13  out the bank statements?
14    A.   I print and then I have to
15  download and send to him -- maybe like two
16  or three hours.
17    Q.   Do you have access to the bank
18  statements from this year, from 2022?
19    A.   Yes.
20        (Whereupon, bank statements were
21        marked as Defendant's Exhibit 18 for
22        identification as of this date by the
23        Reporter.)
24    Q.   This is marked No. 18.  Few
25  examples of some of the bank statements

38 (Pages 146 - 149)

A-272

Page 150

N. VOLPER

1    you produced in this litigation. These
2    documents were produced without Bates
3    stamps so we have Bates numbered them.
4    This is three months worth of statements
5    here. November 2020, July 2021, December
6    2021. Bates D525 through 544, D709
7    through 734, and D847 through D870. First
8    batch of pages Bates D525 through 544.
9    Are these the Bank of America bank
10   statements for the restaurant for
11   November 2020?
12       A.    This is November 1st to 30th,
13   yes, 2020.
14       Q.    If you look on page D5 through 7
15   which is the 13th page in through D54,
16   these are images of checks that restaurant
17   issued, correct?
18       A.    Correct.
19       Q.    So you have produced bank
20   statements from earlier, as early as
21   July 2016 that don't have images of the
22   checks?
23       A.    Huh-huh.
24       Q.    Are you able to access images of

Page 151

N. VOLPER

1    the checks prior to November 2020?
2        A.    No. I tried. I requested.
3        Q.    How did you request images of
4    the checks?
5        A.    By phone.
6        Q.    What did they tell you?
7        A.    They said they are going to send
8    it but there is no images. When I go
9    online, I see there is images for only
10   certain period of time. After that the
11   images don't appear.
12       Q.    The person you spoke to said
13   they would send you images?
14       A.    Which person?
15       Q.    Did you call Bank of America?
16       A.    I called Bank of America. I say
17   certain statements, there is no images.
18   They said this is different service or
19   something, but I request and they never
20   sent.
21       Q.    Did they tell you they were
22   going to send you images?
23       A.    Yes, but they never did.
24       Q.    And so --

Page 152

N. VOLPER

1        A.    Actually, they sent but there is
2    no images. I know you guys asked for that
3    but I was not able to in the past
4    statements to generate that report.
5        Q.    Before Bank of America had or
6    saved the images of the check, did 212
7    Steakhouse write down who the checks were
8    written to based on the check number?
9        A.    Yes. We have, but we keep like
10   -- because the employees did it most of
11   the time, they just put the check and then
12   another side they don't put who it is to.
13   So when you have to check -- this is the
14   most accurate information.
15       Q.    I understand at the time there
16   are images. Before there were images, is
17   there any record for which check went to
18   which person?
19       A.    No. I was not able to figure
20   out or I was not able to find that
21   information. There is two parts. When
22   the check is gone, you know, the original
23   check, the second part they don't fill it
24   up. So I don't know -- this particular

Page 153

N. VOLPER

1    check let's say Check 3053, who it belongs
2    to, if it is vendors, electrical,
3    insurance.
4        Q.    How was the restaurant able to
5    issue 1099s for employees, for staff?
6        A.    How it was issued?
7        Q.    Yes.
8        A.    Based on the past. As I
9    mentioned before, you can access certain
10   period of time but you cannot go -- I
11   think it is like one year or eighteen
12   months. At that time it was available but
13   when you put three months back, they are
14   not there anymore.
15       Q.    So at the time the restaurant
16   issued 1099s for the front and
17   back-of-house employees --
18       A.    We have that information
19   available in the system.
20       Q.    On your system or the Bank of
21   America?
22       A.    Bank of America system.
23       Q.    Does the restaurant use
24   QuickBooks?

39 (Pages 150 - 153)

A-273

Page 154

N. VOLPER

1
2    A.    No.
3    Q.    Are some of the checks issued
4 here, are they checks for employees'
5 paychecks?
6    A.    Some of the them they are for
7 different, different vendors --
8 electrical, can be many things.
9    Q.    All of these checks were checks
10 that were cashed that month; is that
11 correct?
12    A.    Yes.  If they show here, I
13 guess.  Is the back image say anything
14 about the cash?  I guess they are cashed
15 because they appear in the system.  They
16 are being cashed.
17    Q.    Earlier in this case the
18 restaurant had to provide plaintiff with
19 list for front-of-house employees that
20 were employed on or after January 20, 2019
21 so the plaintiffs can send a notice of the
22 lawsuit.  Do you recall this?
23    A.    Yes.
24    Q.    Who prepared that list?
25    A.    I prepared the list.  Generate

Page 155

N. VOLPER

1
2 from the POS system.  It was very
3 difficult to prepare that list.  I think
4 you asked for like the since the very
5 beginning.
6    Q.    I am only asking about the list
7 that we received May 5, 2022 which is
8 called the 216B list.  It is only the
9 front-of-house employees from
10 January 2019, so three years ago.  Do you
11 recall preparing that specific list?
12    A.    Yes.
13    Q.    How did you prepare it?
14    A.    I have to go to the POS system
15 to generate that records.
16    Q.    You were in the POS system to
17 figure out who worked in the restaurant
18 over the last three years?
19    A.    Yes.
20    Q.    Did you rely on any other
21 information?
22    A.    Not really because everybody is
23 supposed to be in there.
24        (Whereupon, 216B list was marked
25 as Defendant's Exhibit 19 for

Page 156

N. VOLPER

1
2 identification as of this date by the
3 Reporter.)
4    Q.    This is Exhibit 19.  This is the
5 list of front-of-house employees that your
6 attorney provided the plaintiff.  He gave
7 this to us on May 5, 2022.  Is this the
8 list you were just discussing that you
9 used the POS to determine?
10    A.    Yes.
11    Q.    How did you determine the start
12 dates on this list?
13    A.    So, how I determine the start
14 date?
15    Q.    Yes.
16    A.    I start by like the requested
17 dates to pull the list.  Requested back
18 dates to the current.
19    Q.    In the POS system does it say
20 the start dates of these employees?
21    A.    I think you have to go -- yes, I
22 think so.  When you go to the pay period
23 it is going to see when getting the first
24 -- the log in.
25    Q.    How did you determine the end

Page 157

N. VOLPER

1
2 dates?
3    A.    Same way.  When the log-in
4 stops, that means they are not there
5 anymore with the company.
6    Q.    After you generate this list
7 from the POS system, did you check any
8 other documents to make sure this is
9 accurate?
10    A.    No, I don't.
11    Q.    This was given to us on May 5,
12 2022.  You will see the first, I am going
13 to go through and ask if these people are
14 currently working at the restaurant?
15    A.    Okay.
16    Q.    Is Alexander Rynkovsky still
17 working there?
18    A.    Yes.
19    Q.    Is Everado Perez still working
20 there?
21    A.    Yes.
22    Q.    Samuel Garcia?
23    A.    Yes.
24    Q.    Javier Clemente?
25    A.    Yes.

40 (Pages 154 - 157)

A-274

Page 158

1          N. VOLPER
2    Q.   Is Dierdre Cora Bethea still
3  working there?
4    A.   I don't think so, no.
5        MR. SEGAL:  That was mentioned
6  earlier that you said you didn't
7  recognize.
8    Oh.  I know why.
9    Q.   She is a bartender looks like?
10    A.   No, no.  I was away for like
11  four, five months January until May --
12    Q.   Does she still work there?
13    A.   I don't think I ever meet her.
14  She stopped January.  Looks like she
15  stopped January 2022.  I was not there,
16  yeah.  That's why I cannot recall.  I was
17  not there, yes.
18    Q.   Bonafacio Ramos?
19    A.   I don't believe so, no.
20    Q.   You don't believe they are
21  working there?
22    A.   I cannot recall.  I can't.
23    Q.   Oscar Bravo Morales?
24    A.   I think so he is still with us,
25  yes.

Page 159

1          N. VOLPER
2    Q.   Luis Fernandez?
3    A.   I think he is still with us.
4    Q.   If we look back at the tip
5  sheets Exhibit 16, on the first page D1255
6  this is a tip sheet from May 28th of 2021.
7    A.   Correct.
8    Q.   The first name is Sasha.  Sasha
9  worked on May 2021, correct?
10    A.   They create all this short names
11  and you put all the information -- so, I
12  think he called himself Sasha.
13    Q.   Paco?
14    A.   Paco is Everado Perez.  That's
15  the way he calls himself.
16    Q.   Sammy is a runner?
17    A.   Who is Sammy -- oh, oka.  Yeah,
18  Sammy is a runner.
19        MR. SEGAL:  Is that Samuel
20  Garcia?
21        MS. SCHULMAN:  Don't lead him
22  with the answer.
23        THE WITNESS:  No, no.  He is not
24  helping.  I am just bad with the
25  names.

Page 160

1          N. VOLPER
2    Q.   Is Sammy represented on this
3  list?
4    A.   I don't know.  I stopped to go
5  after my birthday -- in fact -- yeah.
6    Q.   This list is supposed to cover
7  all the front-of-house employees in the
8  past three years?
9    A.   As you can see, they called them
10  different names.
11    Q.   I understand.  Do you know who
12  Sammy is?
13    A.   Sammy, I think is the food
14  runner.
15    Q.   To your knowledge is Sammy --
16    A.   Yes.  Samuel Garcia is the
17  runner, yes.
18    Q.   Do you know who Davey (ph) is?
19    A.   Probably Javier Clemente.  I
20  don't know.
21    Q.   You don't know who Davey is?
22    A.   This is not the correct name.
23    Q.   I understand that.  I don't want
24  you to guess who is on the list.  You
25  don't know who Davey is?

Page 161

1          N. VOLPER
2    A.   No, I don't know who Davey is.
3  I don't know their nicknames.
4    Q.   Can you turn to D1257?
5    A.   Same document?
6    Q.   Yes.  Next page.
7        MR. SEGAL:  Next page.
8    Q.   1257.  May 30, 2021.
9    A.   Yes, sir.
10    Q.   We have busser Javier.  Do you
11  know who Javier is?
12    A.   Yes.  Looks like this is the
13  same person.  They call themselves
14  differently here.  I think that's Javier.
15  This is something.  What's his name --
16  yes, Javier Clemente.  But they call
17  themselves different names here.
18    Q.   If you go to D1261, few more
19  pages down.  It is June 3, 2021.
20    A.   Yes, sir.
21    Q.   We have Ilya (ph).  Do you know
22  who that is?
23    A.   No idea.  This is like sometimes
24  we get people to help us.  This maybe from
25  outside vendors, even any member from

41 (Pages 158 - 161)

A-275

Page 162

```
 1          N. VOLPER
 2 waitress, bartender, cook, we call when we
 3 have problems with the staff we call
 4 special service and we get people.
 5    Q.   Do you sometimes get runners in
 6 that regard?
 7    A.   Also.  You see I was not there.
 8 I stopped going after pretty much end of
 9 the month.
10    Q.   Is Ilya reflected on the 216B
11 list to your knowledge?  Do you know?
12    A.   I don't know how they call
13 themselves.  That's the problem.
14    Q.   You don't know?
15    A.   No.
16    Q.   Next is JC on the same page.  Do
17 you know who JC is?
18    A.   Where is it?
19    Q.   Right here (indicating).
20    A.   I don't know that.  Maybe
21 Clemente.
22    Q.   Further down is busser, Danny or
23 what appears to be Danny.  Do you know?
24    A.   Not that I know.
25    Q.   You don't know?
```

Page 163

```
 1          N. VOLPER
 2    A.   Not that I know.  I can't read
 3 that name.
 4    Q.   JC you said was Javier.  But
 5 Javier is down here and he is a busser,
 6 right?
 7    A.   This is really difficult for me
 8 to understand because they put their
 9 nicknames.
10    Q.   I understand.
11    A.   I don't know.
12    Q.   Do you know what these names
13 refer to specifically?
14    A.   I'm not sure if I know because I
15 cannot recognize.
16    Q.   That's fine.  If you don't know
17 that's fine but you need to say you don't
18 know as opposed to guessing.
19    A.   I don't know.  I don't know.  I
20 may not -- I may not know.
21    Q.   D1268.  This is June 10, 2021.
22 Below the busser is G. Carlos.  Do you
23 know who G. Carlos is from?
24    A.   That maybe something like
25 temporary, maybe one or two days.
```

Page 164

```
 1          N. VOLPER
 2    Q.   Do you know if G. Carlos is on
 3 the 216B list?
 4    A.   Because we have like a lot of --
 5 my staff they have a lot of friends.  They
 6 just call them hey, can you help us here
 7 for one day.  So they are not like really
 8 consider like employee.
 9    Q.   My question is only if that
10 person is on the list?
11    A.   I cannot.  I don't know.
12    Q.   Okay.  You don't know.  That's
13 fine.
14    A.   I don't know.  I don't know.
15    Q.   Let's keep going.  D1311 is
16 June 16, 2021.  Bottom right.
17    A.   Okay.
18    Q.   Do you know who BGC is?
19    A.   No, I don't know.
20    Q.   Do you know if they are on that
21 list?
22    A.   No.
23    Q.   D1332 is April 3, 2021.  We have
24 Velente.  Do you know who Velente is?  Is
25 he a runner?
```

Page 165

```
 1          N. VOLPER
 2    A.   I think it was like one or two
 3 days come like overtime.
 4    Q.   Is that person listed on the
 5 216B list?
 6    A.   As employee -- no, he is not
 7 listed as employee because he was not
 8 really employee.
 9    Q.   But he worked in the restaurant
10 at least on April 3, 2021?
11    A.   Yes, looks like.  If it is in
12 there, that means he worked.
13    Q.   D1355 is from April 30, 2021.
14 Do you know Toko's full name; T-O-K-O?
15    A.   Paco, Paco
16    Q.   T-O-K-O is Paco?
17    A.   That maybe the same.  P-O-K-O.
18 I am pretty sure about that.
19    Q.   Last one May 7, 2021 which is
20 D1362.  Do you know who GF is?
21    A.   That maybe something -- GF, that
22 maybe --
23    Q.   Do you know who GF is?
24    A.   No.  Maybe some temporary
25 employee like we call to help.
```

42 (Pages 162 - 165)

Page 166

N. VOLPER

1
2     Q.    There are at least some people
3  who worked front of house who worked in
4  2021 who aren't on that list, correct?
5     A.    Let me make clear to your
6  statement.  As employee, they are not
7  because they need to be on certain amount
8  of time.  So -- we call other help.  Let's
9  say we are short of staff because we have
10  a completely disaster finding employees
11  during the certain days so we call some
12  people to help us.
13     Q.    Did the restaurant pay these
14  people directly?
15     A.    We pay them, yes.
16     Q.    Did you pay in the same way that
17  you paid the regular employees?
18     A.    To be on a payroll?
19     Q.    Yes.
20     A.    Yeah, yeah.
21     Q.    You paid the temporary workers
22  the minimum wage rate plus tips as you
23  paid the normal front-of-house workers?
24     A.    Correct.
25     Q.    Did the temporary co-workers

Page 167

N. VOLPER

1
2  clock in and out?
3     A.    I believe it.  I hope so.  I
4  don't know.  Maybe not.  They maybe not
5  clock in and clock out because they not
6  appear on the system I guess.  They just
7  give us like -- I work from 1:00 until
8  5:00.  That was it.
9     Q.    Are you aware that after you
10  produced this list, 216B list, the judge
11  ordered the restaurant to provide a list
12  of all the restaurant's front-of-house and
13  back-of-house employees from January 2016
14  to the present.  Are you aware of that?
15     A.    Yes.
16        (Whereupon, redacted list was
17     marked as Defendant's Exhibit 20 for
18     identification as of this date by the
19     Reporter.)
20     Q.    This is marked Exhibit 20.  Is
21  this the list of all front and
22  back-of-house employees from January 20,
23  2016 to the present with the names
24  redacted that you produced to your
25  attorney?

Page 168

N. VOLPER

1
2     A.    I think it is additional to this
3  list as far as I see it.  It is
4  combination of this and this I guess.
5     Q.    Your attorney produced this
6  document to plaintiff's attorney on
7  August 19, 2020.  Did you participate in
8  in creating this list?
9     A.    Yes.
10     Q.    How did you participate in
11  creating the list?
12     A.    By pulling from the POS system.
13     Q.    Did anyone else help you create
14  the list?
15     A.    I don't remember somebody
16  helping me.
17     Q.    Besides POS, did you rely on any
18  other documents to create this list?
19     A.    No.
20     Q.    When you gave this list to your
21  attorney, did it include the employees's
22  names?
23     A.    Yes.
24     Q.    Top half of the list, from the
25  top to where it says 2021 October, 2022

Page 169

N. VOLPER

1
2  February server, this is the same list as
3  the 216B list, correct?
4     A.    This list?
5     Q.    Yes.
6        MS. SCHULMAN:  We are comparing
7     Exhibit 19 to Exhibit 20.
8     A.    I assume it is the same but the
9     name has been taken here, correct?
10     Q.    Correct.
11     A.    My question is do the top 24
12  entries reflect the same individuals from
13  the 216B list as in the class list?
14     A.    I hope so.
15     Q.    All of these individuals on the
16  top on the class list were front-of-house
17  employees, correct?
18     A.    Which individuals?
19     Q.    Top 24 that are all in bold.
20  Server, runner, busser, bartender.  Do you
21  see that?
22     A.    Yes.
23     Q.    The only people that are on this
24  list Exhibit 20 who are not on Exhibit 18
25  are the back-of-house employees listed in

43 (Pages 166 - 169)

A-277

Page 170

N. VOLPER

1  
2 the bottom eight rows, correct?
3    A.  Can you repeat the question?
4 I'm sorry.
5    Q.  Sure.  The only people that are
6 on this list in Exhibit 20 which is the
7 class list who are not on Exhibit 19 which
8 is the 216B list are the last eight lines,
9 correct?
10    A.  Yes.
11    Q.  Isn't it true that the
12 restaurant had some front-of-house
13 employees who worked between January 20,
14 2016 and January 9, 2019 but were not
15 employed by the restaurant after
16 January 20, 2019?
17    A.  Is it -- can you repeat again?
18 I'm sorry.
19    Q.  Sure.  Isn't it true that the
20 restaurant had some front-of-house
21 employees who worked between January 2016
22 and January 2019 but did not work after
23 January of 2019?
24    A.  I'm sorry.  You need to repeat
25 again. I am getting tired.

Page 171

N. VOLPER

1  
2    MR. DiGIULIO:  Do you want a
3 break?
4    THE WITNESS:  I am getting
5 tired.
6    MR. SEGAL:  I can rephrase it
7 differently.
8    Q.  Did the restaurant employee
9 front-of-house employees that worked
10 before 2019 but that didn't work after
11 2019?
12    A.  I don't understand.
13    Q.  Let's look at Exhibit 17 which
14 is Plaintiff 0044.  For instance, this is
15 a tip sheet from a week in March of 2017,
16 correct?
17    A.  Correct.
18    Q.  If you look at Exhibit 19, there
19 is someone on this tip sheet named Kelsey,
20 correct?
21    A.  Yes.
22    Q.  As a server, right?
23    A.  Yes.
24    Q.  Kelsey is not on 216B list,
25 correct?

Page 172

N. VOLPER

1  
2    A.  Kelsey was there for a very
3 short period of time.  I don't know.  The
4 system doesn't generate that record looks
5 like.  Yeah, looks like the system did
6 something wrong.
7    MS. SCHULMAN:  Just try and
8 answer the question.
9    Q.  Is Kelsey on that list?
10    A.  No.
11    Q.  Miguel further down as a runner
12 that worked in March of 2017.  Is Miguel
13 on that list?
14    A.  I cannot determine but looks
15 like not.
16    Q.  Did the restaurant employ Miguel
17 in 2019?
18    A.  Probably he can be like
19 temporary something or can be employee.
20    Q.  What about Noel below Miguel?
21 Did the restaurant employee Noel in 2017?
22    A.  I know Noel.  He start like very
23 first in the beginning.  Maybe when I put
24 the -- generate the report because he was
25 like sixteen or something, maybe the

Page 173

N. VOLPER

1  
2 system doesn't reflect on sixteen and
3 seventeen.
4    Q.  Is Noel on this list which is
5 Exhibit 19?
6    A.  I don't see here.
7    Q.  Below that on Exhibit 17 you
8 have Tristan.  Do you see that?
9    A.  Tristan was not working -- 17?
10 Which one?
11    Q.  Did the restaurant employ
12 Tristan in March of 2017?
13    A.  I have no idea.
14    A.  He is on this tip sheet,
15 correct?
16    A.  Looks like Tristan is not here,
17 yes.
18    Q.  And is he not on the 216B list,
19 right?
20    A.  No.
21    Q.  Luis, busser on plaintiff's 44
22 Exhibit 17?
23    A.  I have no idea.
24    Q.  You see Luis here on Exhibit 19
25 started in February 2022, correct?  Is it

44 (Pages 170 - 173)

A-278

Page 174

1          N. VOLPER
2  the same --
3      A.   I have no idea if it is the same
4  or not.
5      Q.   Isn't it true that Stefana
6  Manzana was a server at the restaurant?
7      A.   Stefana Manzana -- something
8  ring a bell.  Yeah, maybe she was like a
9  week or two or something like that.
10     Q.   Do you recall what year she
11 worked?
12     A.   No.  I think it was -- I think
13 it was before the pandemic I believe so.
14     Q.   Isn't it true that Luis Quizphi,
15 Q-U-I-Z-P-H-I, was a busser?
16     A.   Yes.
17     Q.   And he worked at the restaurant
18 from --
19     A.   He worked like very early.
20 Yeah, it is true.
21     Q.   Is he included in Exhibit 20?
22     A.   No, because -- he was involved
23 in another lawsuit.
24        MR. SEGAL:  I don't know why it
25 was put --

Page 175

1          N. VOLPER
2        THE WITNESS:  Yes, that's why.
3      Q.   Isn't it true that Noel was a
4  runner at the restaurant?
5      A.   Noel was a runner, yes.  I
6  remember Noel very well.
7      Q.   Are they included in the
8  Exhibit 20?
9      A.   His real name is not -- I have
10 to look at Exhibit 19.  I think you asked
11 me that question already.
12     Q.   Is Noel included in Exhibit 19?
13     A.   No.
14     Q.   Isn't it true that Lucia Bonzia
15 (ph) --
16     A.   She was also very briefly there.
17     Q.   She worked as a bartender?
18     A.   She worked as a bartender and
19 moved to different city.  She was like
20 week or two or something like that.  Some
21 of the people were week or two.  Some two
22 days, some one day.  They don't like the
23 place so -- they was in the system, I
24 guess.
25     Q.   Isn't it true that Alina was a

Page 176

1          N. VOLPER
2  server at the restaurant?
3      A.   Alina?
4      Q.   Yes.
5      A.   I don't remember the name Alina
6  to be a server.
7        MR. SEGAL:  Is that on the list?
8        MR. DiGIULIO:  No, I am just
9  asking.
10     A.   No, I don't remember.
11     Q.   You don't remember if she worked
12 at the same time that Nino Martinenko
13 worked?
14     A.   I don't remember.  I don't
15 remember Alina as a server.
16        MS. SCHULMAN:  Do you remember
17 Alina in a different position?
18     A.   If I am not mistaken we have a
19 host for short period of time also.
20     Q.   Is there a host position at the
21 restaurant?
22     A.   Sometimes when we need it, when
23 we have like busy.  Sometimes I host.
24 Some friend of mine, we host.
25     Q.   Is the host paid the same hourly

Page 177

1          N. VOLPER
2  wage as front of house?
3      A.   We don't have a daily host.
4      Q.   When the restaurant does have a
5  host, are they paid the same as
6  front-of-house employee?
7      A.   They are not officially.  They
8  are like event hosts.  They are not
9  official employees.  They are like event
10 hosts.  We have like a lot of people like
11 bartenders, kitchen, different -- big
12 problem finding employees so they are
13 basically not our employees.  They are
14 through agency.
15     Q.   I believe you mentioned someone
16 name Luciano was a server at the
17 restaurant?
18     A.   Luciano?
19     Q.   Yes.
20     Q.   What is the last name?
21     Q.   I don't know.  Is it true that
22 the restaurant employed a server named
23 L-U-C-I-A-N-O?
24     A.   We have a Luciano but his name
25 is -- this one (indicating).

45 (Pages 174 - 177)

Page 178

N. VOLPER
1
2    Q.   This is Exhibit 19?
3    A.   Yes.
4    Q.   Which one?
5    A.   Lychezar Lazarov.
6    Q.   Did the restaurant hire a server
7  named Dave in 2016?
8    A.   I don't recall.
9       MR. SEGAL:  These names are
10  coming up from plaintiff?
11       THE WITNESS:  Definitely.
12       MR. SEGAL:  I need two minutes.
13       MR. DiGIULIO:  Sure.
14       (Whereupon, a short recess was
15  taken.)
16       MR. DiGIULIO:  Back on the
17  record.
18    Q.   Can you look at Exhibit 5?
19    A.   Yes, sir.
20    Q.   On the second page which is
21  Plaintiff's 26, bottom section where it
22  says kitchen there are six names, correct?
23    A.   Correct.
24    Q.   All six individuals worked in
25  the kitchen in July of 2021, correct?

Page 179

N. VOLPER
1
2    A.   For this particular days, yes.
3  They worked July 19th to 25th, but the
4  other time, they weren't.
5    Q.   But they did work at the
6  restaurant during this period?
7    A.   In this particular July 19th to
8  257, yes.
9    Q.   I believe you testified
10  previously each of their respective
11  positions.  Do all of these individuals
12  still work at the restaurant?
13    A.   Amaro, Lazero, I don't think so.
14  Gonzalez, I don't think so.
15    Q.   Gonzalez, Amaro, and Abel?
16    A.   Carlos, I don't think so.  No.
17    Q.   Pedro still works there?
18    A.   Yes.
19    Q.   Daniel still works there?
20    A.   Yes.
21    Q.   And Rami still works there?
22    A.   No.  He is not.
23    Q.   Does Gonzalez still work there?
24    A.   Gonzalez was like part-time
25  employee, not even employee.  He comes to

Page 180

N. VOLPER
1
2  help us.  We called him a few times to
3  help us because it was short of staff.
4    Q.   If you go back to Exhibit 20
5  which is the class list?
6    A.   Okay.
7    Q.   If you look at the bottom of the
8  list there are only two individuals listed
9  who worked in 2021, correct, if you look
10  at the third and fourth from the bottom?
11  A dishwasher and a cook are listed.
12    A.   There are no names.
13    Q.   They are redacted, right?
14    A.   Yeah, but there are names
15  Exhibit 19.  I cannot figure out.
16       MS. SCHULMAN:  Wait for him to
17  get through the question.
18    Q.   These bottom eight individuals
19  have no names.  I don't know the names.
20  All we have is the date when they started
21  when they ended, and their position down
22  at the bottom.  This is the back-of-house
23  people.
24    A.   Okay.
25    Q.   My question to you is on the

Page 181

N. VOLPER
1
2  class list Exhibit 20, there are only two
3  individuals listed who worked in the back
4  of house in 2021; is that correct?
5    A.   (No verbal response.)
6    Q.   These two individuals started in
7  2021 and August 2020 and who are current?
8    A.   I have to see the names
9  otherwise --
10    Q.   Are there only two current
11  back-of-house employees, correct, on this
12  list?
13    A.   Yes, looks like only two.
14    Q.   You confirmed on Plaintiff 25
15  that there were six individuals working in
16  the back of house on this week alone,
17  correct?
18    A.   As I mentioned before they
19  worked but they are not employees.  They
20  are temporary.  Woe had to call them.  In
21  the pandemic it was extremely difficult to
22  find people.
23    Q.   According to the class list
24  Exhibit 20, the restaurant had employed
25  only eight individuals in the back of

46 (Pages 178 - 181)

A-280

Page 182

1         N. VOLPER
2 house since January of 2016; is that
3 correct?
4    A.   Can you show me here?
5    Q.   Yes (indicating).  There are
6 only eight individuals.
7    A.   Yes.
8    Q.   Did the restaurant employ a chef
9 named Nelson?
10    A.   Yes.
11    Q.   When did he work at the
12 restaurant?
13    A.   Beginning.
14    Q.   Is he included on this list?
15    A.   Which list?
16    Q.   Exhibit 20.
17    A.   I have no idea.
18        MR. SEGAL:  Do you mean exhibit
19 --
20        MR. DiGIULIO:  20.  There are no
21 names on Exhibit 20.  Let's move on.
22    Q.   Going back to the bank
23 statements which is Exhibit 18, the bank
24 statement?
25    A.   Correct.

Page 184

1         N. VOLPER
2    Q.   Did he work as a chef?
3    A.   No.  He doesn't work as a chef.
4 We called him as help, to help us in
5 kitchen.
6    Q.   He worked in the kitchen?
7    A.   Correct.
8    Q.   How long did he work for the
9 restaurant?
10    A.   Maybe like -- I don't remember
11 how long but not long.
12    Q.   Is this person Abel Mendoza
13 included in Exhibit 20 on the class list
14 as the back-of-house employee?
15    A.   No, because he was not employed.
16 He was temporary worker to help us.
17 During the pandemic we called lot of
18 people just to help us.
19    Q.   Do the temporary back-of-house
20 employees do the same work as the
21 full-time employees?
22    A.   Same work?
23    Q.   Yes.
24    A.   There in the kitchen, you know,
25 whatever we need they do.  I don't know

Page 183

1         N. VOLPER
2    Q.   If you go to D709, these are the
3 bank statements for July of 2021, correct,
4 for the restaurant?
5    A.   July 2021, that's correct.
6    Q.   If we go to D730 these are
7 images of checks written from the
8 restaurant?
9    A.   Correct.
10    Q.   I am going to point out to you
11 specific checks.
12    A.   Please.
13    Q.   Abel Mendoza?
14    A.   Okay.
15    Q.   Is that his paycheck?  Check No.
16 11142.  Do you see the check on the top
17 left?
18    A.   Correct.
19    Q.   Is that his paycheck?
20    A.   This is temporary worker as
21 well.  We call them when we need him.
22 Looks like this is pay out check.
23    Q.   And you paid him directly,
24 correct?
25    A.   Correct.

Page 185

1         N. VOLPER
2 the same work or not, that's why we called
3 them.  As you know, during the pandemic
4 everyone knew you cannot find people to
5 work.
6        MS. SCHULMAN:  The temporary
7 back-of-house employees, you called
8 them when you are short of staff to
9 fill in for the missing staff.
10        THE WITNESS:  Yes.
11        MS. SCHULMAN:  And the temporary
12 front-of-house you called them to help
13 when you were missing front-of-house
14 staff?
15        THE WITNESS:  Correct.
16        MS. SCHULMAN:  So they are just
17 filling in.
18        THE WITNESS:  Correct, so they
19 can operate the business.
20    Q.   Do you pay these temporary
21 workers directly?
22    A.   Yes.  We issue checks directly.
23    Q.   I am going to show you a bank
24 statement marked D859.  It says
25 December 2021.  On the top left corner

47 (Pages 182 - 185)

Page 186

```
 1            N. VOLPER
 2  there is a check marked 9593 Vikash Patel.
 3  Do you see that?
 4      A.   Yes.
 5      Q.   Who is Vikash Patel?
 6      A.   Vikash Patel was the potential
 7  buyer for the restaurant like I mentioned
 8  before.  We have agreement to take over
 9  the restaurant.  He took certain period of
10  time.  He put deposit towards the
11  transaction, the buyout.  This is when I
12  start to refund his money back.
13      Q.   This is document D540 from
14  November of 2020 for the restaurant.  Do
15  you see that?
16      A.   Yes.
17      Q.   This is a check issued to
18  Anthony Mendiola (ph).  Number of the
19  check is 10387.  Who is Anthony Mendiola?
20      A.   He was working in the kitchen.
21      Q.   What was his position?
22      A.   Chef I think.  I believe he was
23  chef for small period of time.
24      Q.   Is he included on the class list
25  Exhibit 20?
```

Page 187

```
 1            N. VOLPER
 2      A.   I have no names here so I
 3  cannot --
 4      Q.   There is only one chef lited,
 5  correct?
 6      A.   That can be him or somebody
 7  else.  When I have no names, I cannot
 8  confirm it is on the list or not.
 9      Q.   This is Defendant's
10  Exhibit 8630, bank statement from December
11  of 2021.  Name of the check is Florentino
12  Matta (ph).  Check No. 11811.  Who is
13  Florentino Matta?
14      A.   I believe that's also a
15  temporary worker because of the amount.
16      Q.   Did he work in the back of
17  house?
18      A.   He was just called to help us,
19  yes.
20      Q.   Let me go to page Defendant's
21  Exhibit 860, also December of 2021.  Name
22  on this check is Jermaine Gambiagi (ph),
23  Check No. 11712.
24      A.   Can I take a look?
25      Q.   Please.
```

Page 188

```
 1            N. VOLPER
 2      A.   That can be some kind of vendor
 3  because of the amount.  I cannot -- maybe
 4  we paid because we need lot of repairs.
 5  That can be third-party contractor or
 6  something because of the amount.
 7      Q.   We have D733 which is from
 8  July 2021.  This is a check to Mitchell
 9  Sawyer 11229.  Do you know who Mitchell
10  Sawyer is?
11      A.   Yes, I know.  He is handling the
12  social media.
13      Q.   He handles your social media?
14      A.   Yes.
15          MR. SEGAL:  I have to take this
16  call.
17          (Whereupon, a short recess was
18  taken.)
19          MR. DiGIULIO:  Back on the
20  record.
21      Q.   This is page D723 which is from
22  July of 2021.  It is a check for Oliver
23  Morales.  Check 11060.  Would be Oliver
24  Morales?
25      A.   Independent contractor.
```

Page 189

```
 1            N. VOLPER
 2      Q.   What does he for the restaurant?
 3      A.   Photos.
 4      Q.   He takes photos?
 5      A.   Yes.
 6      Q.   D866.  This is from December.  I
 7  am going to refer the witness to D866
 8  which is a bank statements from
 9  December 2021.  This is a check to Richard
10  Francisco Garcia.  Check No. 11844.  Who
11  is Richard Francisco Garcia?
12      A.   Which one?
13      Q.   Richard Francisco Garcia.
14      A.   Looks like some kind of vendor.
15  Can be construction.
16      Q.   Do you see 4 in the bottom
17  corner, dishwasher?
18      A.   Okay.
19      Q.   Is Richard Francisco Garcia a
20  dishwasher that worked at the restaurant?
21      A.   We may call temporary, yes.  I
22  cannot see the name.  What is that --
23  okay.
24      Q.   Last one is D540 from
25  November 2020.  Check is to Ryan Kemp.
```

48 (Pages 186 - 189)

A-282

Page 190

N. VOLPER

1
2 Check No. 10386.
3    A.   He was temporary chef.
4    Q.   How long did he work for the
5 restaurant?
6    A.   For a few months.
7    Q.   Before 2016 did the restaurant
8 take any steps to ensure that the pay
9 practices of the restaurant were in
10 compliance with federal and New York law?
11   A.   Before 2016?
12   Q.   Yes.
13   A.   If we complied with federal?
14   Q.   Did the restaurant take any
15 steps to ensure that the restaurant's pay
16 practices were in compliance with New York
17 and the federal wage law?
18   A.   Which period of time?
19   Q.   Before 2016?
20   A.   I guess we pay by 1099. I don't
21 know if that counts.
22   Q.   I am asking about affirmative
23 steps that you or the people who worked
24 for the restaurant took?
25   A.   I'm not familiar with all the

Page 191

N. VOLPER

1
2 restaurant laws, labor laws. I can't
3 answer correctly on that question. I will
4 tell you what has been done.
5    Q.   Did you consult with anyone to
6 determine whether the restaurant's pay
7 practices were in compliance with the law?
8    A.   No.
9    Q.   Did you do any research on your
10 own to determine whether the pay practices
11 of the restaurant were in compliance?
12   A.   No. That's my first restaurant
13 so not much experience there.
14   Q.   Before the restaurant what did
15 you do?
16   A.   Before the restaurant?
17   Q.   Yes.
18   A.   Like I do many different things
19 which is -- how is this relevant to the
20 labor department lawsuit?
21       MS. SCHULMAN: You have to
22   answer the question.
23       MR. SEGAL: Objection, but you
24   can answer.
25   A.   I do many different things. I

Page 192

N. VOLPER

1
2 play poker. I play basketball. I go on
3 vacation --
4        MS. SCHULMAN: What did you do
5    for a living before you opened the
6    restaurant? Can I just ask, what did
7    you do for a living before you opened
8    212 Steakhouse?
9        THE WITNESS: I played poker.
10       MS. SCHULMAN: Was that your
11   main source of income?
12       THE WITNESS: Yes.
13       MS. SCHULMAN: Did you have any
14   other business before you opened 212
15   Steakhouse?
16       THE WITNESS: I have import
17   export business in the past. I have
18   e-commerce business in the past.
19   Q.   Before you opened 212 Steakhouse
20 did you ever have employees before?
21   A.   Not really, no.
22   Q.   Are you aware that most hourly
23 workers have to be paid time and a half
24 for hours worked?
25   A.   Yes, sir. Now I am aware of

Page 193

N. VOLPER

1
2 that, yes.
3    Q.   When did you become aware of
4 that?
5    A.   Being -- I cannot tell you
6 exactly the date and time. Sorry.
7    Q.   Did you know that in 2016?
8    A.   I cannot tell you the. Most
9 likely I don't, because we used 1099 form
10 so.
11   Q.   Did the restaurant ever seek
12 legal advice about the requirements for
13 paying tipped employees pursuant to a tip
14 credit?
15   A.   No.
16   Q.   Has the restaurant been
17 investigated by the state or federal
18 department of labor?
19   A.   We were audited but not
20 investigate. Investigate is like
21 basically -- I don't know how to determine
22 the word investigate.
23   Q.   You were audited by the tax
24 authority?
25   A.   By the department of labor.

49 (Pages 190 - 193)

A-283

Page 194

```
 1          N. VOLPER
 2    Q.   Federal or state?
 3    A.   New York State.
 4    Q.   New York State?
 5    A.   Correct.
 6    Q.   What was the outcome of that
 7 investigation?
 8    A.   Outcome?
 9    Q.   Yes.
10    A.   Like, they asked us to provide
11 all the documents.  They gave me
12 penalties.
13        MS. SCHULMAN:  When was that
14 audit?
15        THE WITNESS:  This was like
16 before the pandemic.
17        MS. SCHULMAN:  Do you have any
18 documents relating to that audit?
19        THE WITNESS:  Do I have
20 documents -- yes.
21        MS. SCHULMAN:  What did you have
22 to pay penalties for?
23        THE WITNESS:  I don't know.  I
24 know I have to pay penalty.  Exactly
25 for what --
```

Page 195

```
 1          N. VOLPER
 2        MS. SCHULMAN:  Do you recall
 3 what violations --
 4        THE WITNESS:  I don't know.  I
 5 don't know.  It was some kind of
 6 violation.
 7    Q.   Prior to this lawsuit has the
 8 restaurant of been sued?
 9    A.   Yes.
10    Q.   How many times?
11    A.   Like, we have been sued by
12 vendors few times.  We have a very tough
13 time in the beginning so we lost a lot of
14 money.  We have been sued by employees.
15 Obviously now is another case.
16    Q.   Are you aware of the lawsuit
17 Luis Quizphi verses 212 Steakhouse?
18    A.   Yes, sir.
19        (Whereupon, complaint was marked
20        as Defendant's Exhibit 21 for
21        identification as of this date by the
22        Reporter.)
23    Q.   Is this the lawsuit you are
24 referring to in this complaint?
25    A.   Yes.
```

Page 196

```
 1          N. VOLPER
 2    Q.   That was filed against you in
 3 December of 2018, correct?
 4    A.   Yes.
 5    Q.   Is that when you first became
 6 aware of Mr. Quizphi's allegations?
 7    A.   Little bit later because it
 8 takes time to be served.
 9    Q.   What did you do in response to
10 these allegations?
11    A.   What I did?
12    Q.   Yes.
13    A.   I mean, I hired a lawyer.
14    Q.   Did you change the pay practices
15 of the restaurant at all?
16    A.   Yes.
17    Q.   How did you change them?
18    A.   Payroll and payroll records and
19 -- et cetera.
20    Q.   Before this lawsuit?
21    A.   Before the lawsuit, yes.  No, I
22 think it was maybe after the lawsuit.  I
23 don't remember, but maybe after the
24 lawsuit.
25    Q.   I am a little confused by what
```

Page 197

```
 1          N. VOLPER
 2 changed after this lawsuit.  You said the
 3 payroll records.  How did the payroll
 4 records change?
 5    A.   How they changed?
 6    Q.   Yes.
 7    A.   Well, after I was aware what I
 8 need to be done, I start to do it
 9 correctly.
10        MS. SCHULMAN:  What specifically
11 did you change about your pay
12 practices in response to this lawsuit?
13        THE WITNESS:  I mean I stopped
14 to, you know  -- I put everybody on
15 the payroll.
16        MS. SCHULMAN:  It was in
17 response to that lawsuit that you put
18 everyone on payroll?
19        THE WITNESS:  Yeah, afterwards I
20 was aware that I made mistake here.
21        MS. SCHULMAN:  Did you make any
22 changes with respect to your payroll
23 practices in response to this lawsuit
24 other than putting the workers on
25 W-2s?
```

50 (Pages 194 - 197)

A-284

Page 198

1      N. VOLPER
2      THE WITNESS:  As far as I
3  remember, that was like pretty much --
4  pretty much it.
5    Q.    How did the case resolve?
6    A.    We settled.
7         (Whereupon, D1454 to D1462 was
8  marked as Defendant's Exhibit 22 for
9  identification as of this date by the
10  Reporter.)
11    Q.    This is not Bates stamped but
12  they are marked D1454 through 1462.  Are
13  these time records from Mr. Quizphi?
14    A.    Yes.
15    Q.    Did you produce these records in
16  the prior lawsuit with Mr. Quizphi?
17    A.    I believe they are documents
18  requested.
19    Q.    Did you also produce them during
20  the lawsuit with Mr. Quizphi back in 2018?
21    A.    During the lawsuit --
22         MR. SEGAL:  In other words, did
23  you provide this information to Mr.
24  Quizphi when they asked for demands
25  related to it?  Was this provided to

Page 199

1      N. VOLPER
2  the plaintiff in the other lawsuit?
3         THE WITNESS:  Yes.
4    Q.    Did you produce anything else to
5  the plaintiff in the prior lawsuit besides
6  these records?
7    A.    No.  Whatever documents
8  required.
9    Q.    Did you produce anything else?
10    A.    I don't remember.  Whatever they
11  required, we produced.
12    Q.    Did the plaintiff in the other
13  lawsuit produce any records to you?
14    A.    I don't believe we required any
15  documents as far as I remember.
16         (Whereupon, complaint was marked
17  as Defendant's Exhibit 23 for
18  identification as of this date by the
19  Reporter.)
20    Q.    Are you aware of the lawsuit
21  Julio De La Luz Flores verses 212
22  Steakhouse?
23    A.    Yes.
24    Q.    This is the complaint filed in
25  New York Court County Supreme, Exhibit 23.

Page 200

1      N. VOLPER
2  Is this the complaint filed against you by
3  Mr. De La Luis Flores?
4    A.    Correct.
5    Q.    And how did this case resolve?
6    A.    It was settled.
7    Q.    Did you change any of the pay
8  practices at the restaurant as a result of
9  this lawsuit?
10    A.    I don't remember in this
11  particular case.
12         (Whereupon, D1426 to D1453 was
13  marked as Defendant's Exhibit 24 for
14  identification as of this date by the
15  Reporter.)
16    Q.    These are documents marked
17  Exhibit 24.  They are produced by the
18  defendants in this litigation that were
19  not Bates.  We Bates stamped them D1426
20  through 1453.  Are these the time records
21  for Mr. De La Luz Flores?
22    A.    Yes.  Looks like time records,
23  yes.
24    Q.    And did you produce these
25  records to that plaintiff in that lawsuit?

Page 201

1      N. VOLPER
2    A.    Correct.  Yes, we did.
3    Q.    Did you produce any other
4  records in that lawsuit with Mr. De La Luz
5  Flores?
6    A.    We may, but I still don't
7  remember.  I don't remember what else was
8  produced.
9    Q.    Did you produce Mr. De La Luz
10  Flores's wage statements in that lawsuit?
11    A.    Wage statements -- I don't
12  remember.
13    Q.    Pay stubs?
14    A.    I don't remember.
15    Q.    You don't remember?
16    A.    No.
17    Q.    Did Mr. De La Luz Flores produce
18  any records to you in that lawsuit?
19    A.    No.
20    Q.    Besides these two lawsuits, are
21  you aware of any complaints that any
22  employee made about not being paid
23  lawfully at the restaurant?
24    A.    I don't believe so.
25    Q.    At the beginning of this case

51 (Pages 198 - 201)

A-285

Page 202

```
 1          N. VOLPER
 2 you asserted a counterclaim against Nino
 3 Martinenko in which you blamed her for the
 4 restaurant shutting down; is that correct?
 5     A.   Correct.
 6     Q.   And you subsequently withdrew
 7 that claim, correct?
 8     A.   I don't understand that word.
 9     Q.   Did you drop that claim?
10     A.   Yes.
11     Q.   Have you dropped that claim
12 against Nino Martinenko?
13     A.   Yes.
14     MR. DiGIULIO:  Let's take five
15 minutes.
16     (Whereupon, a short recess was
17 taken.)
18     MR. DiGIULIO:  Back on the
19 record.
20     Q.   In the two lawsuits that we
21 talked about, were you deposed in either
22 of them?
23     A.   Deposed?
24     Q.   Yes.
25     A.   I believe so, yes.
```

Page 203

```
 1          N. VOLPER
 2     MR. SEGAL:  I don't think so.  I
 3 am trying to think.  Who were the
 4 attorneys?
 5     MS. SCHULMAN:  It is on the --
 6     (Whereupon, an off-the-record
 7 discussion was held.)
 8     Q.   For the record, were you deposed
 9 in either of the previous lawsuits we
10 discussed?
11     A.   No.
12     Q.   When you were discussing the
13 temporary workers the restaurant used, was
14 that in terms of time period only after
15 the COVID that the restaurant used
16 temporary workers?
17     A.   You mean during the COVID?
18     Q.   During COVID.
19     A.   During COVID, after the COVID.
20 We are still COVID so --
21     Q.   Prior to March 2020 did the
22 restaurant use temporary workers?
23     A.   Yes.
24     Q.   Yes, you did use them?
25     A.   Yes, yes.
```

Page 204

```
 1          N. VOLPER
 2     Q.   The restaurant used them from
 3 the beginning?
 4     A.   Yes.  We used from the
 5 beginning.  Some kind of services,
 6 bartender something when we have events we
 7 use.
 8     Q.   Do you know Imran's address?
 9     A.   No.  I know he recently moved
10 but I don't know his address.
11     Q.   When you collected documents for
12 this litigation, did you ask Imran to give
13 you any documents?
14     MR. SEGAL:  Can I ask a
15 different question?
16     MR. DiGIULIO:  No.  Let him
17 finish.
18     A.   I don't know.  I was not in very
19 good stage, you know.  I can't remember.
20     Q.   Did Imran help you collect any
21 documents for this litigation?
22     A.   I don't remember.
23     Q.   You don't remember?
24     A.   I don't want to go through my
25 medical records but -- I am still under --
```

Page 205

```
 1          N. VOLPER
 2     Q.   This is Exhibit 2.  I am going
 3 to show you D1216.  This is Nino
 4 Martinenko's time records.
 5     A.   Okay.
 6     Q.   If you see on February 7th of
 7 2016, Nino Martinenko clocked in at
 8 11:18 a.m.  Is that right?
 9     A.   That's in the morning, correct?
10     Q.   Yes.  That would be a time when
11 the plaintiff Nino Martinenko worked the
12 lunch shift, correct?
13     A.   Correct.
14     Q.   When the time record shows
15 front-of-house person clocking in in the
16 morning, does that mean there was a lunch
17 shift that day?
18     A.   That's correct.  The way I see
19 it here, nobody like counted the lunch
20 breaks.
21     Q.   February 21st, same page you can
22 see she clocked in at 11:14 a.m., clocked
23 out at 3:03, clocked back in at 3:12 p.m.
24     A.   Okay.  That maybe only one day.
25 In general.
```

52 (Pages 202 - 205)

Page 206

```
 1        N. VOLPER
 2        MR. DiGIULIO:  We are done.
 3   Thank you.
 4        MR. SEGAL:  Couple of quick
 5   questions.
 6   EXAMINATION BY
 7   MR. SEGAL:
 8   Q.   You mentioned earlier today that
 9   the employees had a break of thirty
10   minutes.  Was that their meal break or the
11   meal break was in addition to that other
12   thirty minute break?
13   A.   No.  Meal, they usually -- when
14   they eat they don't -- it is not like a
15   meal break.  They usually like during the
16   shifts, they take -- in between the lunch
17   shift and dinner shift they take a break.
18   They go outside, have coffee, whatever
19   they decide to do.
20   Q.   But that's in addition to the
21   thirty minute break; is that correct?
22   A.   Correct.
23   Q.   Imran was not an employee of the
24   restaurant, was he?
25   A.   No.
```

Page 207

```
 1        N. VOLPER
 2   Q.   Was he ever paid by the
 3   restaurant?
 4   A.   No.
 5   Q.   You mentioned that he helped you
 6   with some things in the restaurant.  Was
 7   that the extent of his involvement in the
 8   restaurant?
 9   A.   Correct.
10   Q.   You mentioned that the
11   restaurant was open seven days
12   approximately from 12:00 to 11:00?
13   A.   Correct.
14   Q.   Just as Nino Martinenko checked
15   out at 3:00, do other servers, some of the
16   people at lunch leave prior to the dinner
17   shift?
18   A.   Yes.  Pretty much that's like a
19   procedure.  They want to take some break
20   between the lunch and the dinner shift,
21   yes.
22   Q.   The accountant firm listed on
23   the tax returns called Tax Zone, is that
24   the same firm as Crow?  Did they change
25   their name to Crow?
```

Page 208

```
 1        N. VOLPER
 2   A.   I believe so, yes.
 3   Q.   The tip records that you
 4   provided to the plaintiffs and that we
 5   went through today, those were only the
 6   credit card tips; is that correct?
 7   A.   Correct.
 8   Q.   And the responsibility of the
 9   employees is to tell you what cash tips
10   they make on a daily basis or at the end
11   of the week; is that correct?
12        MS. SCHULMAN:  Objection.
13   Q.   You can answer.
14   A.   That's correct.  They need to
15   fill up, I believe some kind of form.
16   Q.   You don't have the amounts that
17   they made in cash; is that correct?
18   A.   I don't remember.  They never
19   reported to me.
20   Q.   Isn't it true that if your
21   minimum wage somehow did not equal, the
22   tip minimum wage somehow did not equal the
23   correct minimum wage because the credit
24   card and the tip minimum wage did not
25   equal the regular minimum wage, it still
```

Page 209

```
 1        N. VOLPER
 2   might have if you had the cash tips; isn't
 3   that true?
 4   A.   True.
 5   Q.   When you opened up the
 6   restaurant you said it was your first
 7   endeavor in the restaurant hospitality
 8   industry?
 9   A.   Yes, sir.
10   Q.   You hired accountants, correct?
11   A.   Correct.
12   Q.   Did you rely on those
13   accountants to provide you information
14   related to the FLSA and the New York labor
15   laws?
16   A.   Yes.
17   Q.   Did you believe that they were
18   following those labor laws when they
19   reported wages and salary the way they did
20   to you?
21   A.   I believe.  I was not, you know,
22   aware of many details.
23   Q.   As you stated earlier today, you
24   did have two prior lawsuits and you had a
25   labor audit.  At any time prior to those
```

53 (Pages 206 - 209)

Page 210

1          N. VOLPER
2 actions and audit and thereafter, have you
3 ever willfully tried to violate the FLSA
4 or the New York labor laws?
5      MR. SEGAL:  Objection.
6   Q.   You can answer.
7   A.   Can you explain wilfully?
8   Q.   Wilfully means on purpose to
9 screw the employees?
10   A.   No, no.
11   Q.   In street language?
12   A.   No.
13   Q.   You mentioned throughout your
14 deposition testimony today that you
15 thought, when counsel was asking you about
16 personnel files and records, you indicated
17 that you thought you might have some in
18 the office but isn't it true that you
19 searched all your areas in the office as
20 well as the restaurant for records when I
21 requested them?
22      MR. SEGAL:  Objection.
23   A.   Yes, true.
24   Q.   Do you believe there are any
25 files or records that you did not provide

Page 211

1          N. VOLPER
2 that are in your possession?
3      MR. DiGIULIO:  Objection.
4   A.   I don't believe so.
5      MR. SEGAL:  What is the
6 objection?  Leading?
7      MR. DiGIULIO:  Form.
8   Q.   Did you ever get trained in the
9 POS system?
10   A.   No.
11   Q.   Do you think you know all its
12 features?
13   A.   I don't believe so because they
14 are constantly updated, all these
15 features.
16   Q.   You testified that you gave
17 access to the office vie checkbooks to
18 employees; is that correct?
19   A.   Correct.
20   Q.   And you stated that you can't
21 find a lot of your files; is that correct?
22   A.   Correct.
23   Q.   Is it possible your employees
24 took these files?
25      MS. SCHULMAN:  Objection.

Page 212

1          N. VOLPER
2   Q.   You can answer.
3   A.   Very possible, yes.
4   Q.   Plaintiff had some papers that
5 she produced today, correct?
6   A.   Correct.
7   Q.   Is it possible that plaintiff
8 destroyed or took away your other files?
9      MS. SCHULMAN:  Objection.
10   A.   Possible.
11      MR. SEGAL:  No further
12 questions.
13 EXAMINATION BY
14 MS. SCHULMAN:
15   Q.   You testified you relied on the
16 accountant you had when you first opened
17 the restaurant.  Who was that accountant?
18   A.   I assume it was -- because when
19 I look now the tax returns, I think it was
20 the same people but different name.
21   Q.   You have always used Ebed as the
22 restaurant's accountant?
23   A.   Yeah.  Ebed or Ali.  They
24 changed companies I guess.
25   Q.   Did you have any communications

Page 213

1          N. VOLPER
2 with those accountants about the
3 requirements of how to pay your employees?
4   A.   Like I mean they ask me, you
5 know, they ask me like -- I have to
6 provide like employees' names, Social
7 Security, address, date of birth.  They
8 request for some information that I have
9 to provide to be put into the payroll
10 system.
11   Q.   Did they ever give you any other
12 information about the legal requirements
13 with respect to your employees?
14   A.   No, no.
15      MS. SCHULMAN:  Thank you.
16      THE WITNESS:  Thank you.
17      [TIME NOTED:  5:45 p.m.]
18 _____
          NIKOLAY VOLPER
19
20
21 Subscribed and sworn to before me
22 this ___ day of _____, 2022.
23 _____
          Notary Public
24
25

54 (Pages 210 - 213)